IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HUNTLEIGH USA CORPORATION, | : | No. 03-2670C |
| Plaintiff, | : | (Judge Margolis) |
| - against - | : | |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL DEFENDANT TO PRODUCE DOCUMENTS AND TO ANSWER PLAINTIFF'S INTERROGATORIES**

Jonathan J. Lerner
Lauren E. Aguiar
William J. O'Brien
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000
Attorneys for Plaintiff

# TABLE OF CONTENTS

PAGE

QUESTIONS PRESENTED ..... 1

INTRODUCTION ..... 1
Procedural Background ..... 1
The Background of This Motion ..... 2
Huntleigh's Efforts To Resolve This Dispute Without Judicial Intervention ..... 3

ARGUMENT ..... 5

I. THE GOVERNMENT HAS REFUSED TO PRODUCE DOCUMENTS THAT ARE RELEVANT TO HUNTLEIGH'S CLAIMS ..... 6
A. Document Request Nos. 9 and 10 ..... 6
B. Document Request Nos. 15, 18 and 19 (and Interrogatory Nos. 3 and 13) ..... 7
C. Document Request No. 16 (and Interrogatory No. 8) ..... 9

II. THE GOVERNMENT HAS REFUSED TO ANSWER INTERROGATORIES THAT ARE RELEVANT TO HUNTLEIGH'S CLAIMS ..... 11
A. Interrogatory No. 4 ..... 11
B. Interrogatory No. 9 ..... 12
C. Interrogatory No. 14 ..... 13
D. Interrogatory No. 16 ..... 15

III. THE GOVERNMENT HAS FAILED TO PRODUCE DOCUMENTS WITH REASONABLE PROMPTNESS ..... 15

CONCLUSION ..... 17

# INDEX TO APPENDIX



| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Plaintiff's First Request for the Production of Documents | 1 |
| Exhibit B | Plaintiff's First Set of Interrogatories to Defendant | 11 |
| Exhibit C | Defendant's Responses to Plaintiff's First Requests for Production of Documents | 21 |
| Exhibit D | Defendant's Responses to Plaintiff's First Set of Interrogatories | 42 |
| Exhibit E | August 5, 2005 Letter From Janessa L. Grady to Lauren Aguiar | 73 |
| Exhibit F | Correspondence Regarding the Parties' Discovery Disputes | 76 |
| Exhibit G | Correspondence Regarding the Government's Delay in Producing Documents | 109 |
| Exhibit H | Excerpts From the Government's Motion to Dismiss, Dated March 25, 2004 | 119 |

# TABLE OF AUTHORITIES

## CASES

Creppel v. United States, 41 F.3d 627 (Fed. Cir. 1994) ....................9

Daval Steel Products v. M/V Fakredine, 951 F.2d 1357 (2d Cir. 1991) ....................6

Exxon Mobil Corp. v. New West Petroleum L.P., No. CIV S032222WBSPAN, 2005 WL 1366482 (E.D. Cal. June 6, 2005) ....................14

Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440 (2005).................... 10-11

Huntleigh USA Corp. v. United States, 65 Fed. Cl. 178 (2005)....................11

Jade Trading, LLC v. United States, 65 Fed. Cl. 487 (2005) ....................5

Katz v. Batavia Marine & Sporting Supplies, 984 F.2d 422 (Fed. Cir. 1993)....................5

Lingle v. Chevron U.S.A. Inc., 125 S. Ct. 2074 (2005)....................3, 8

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) ....................8, 9

Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978)....................7, 9

## STATUTES

Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (the "ATSA") .................... passim

RCFC 26 ....................5, 10

RCFC 37 ....................1, 3

Plaintiff Huntleigh USA Corporation ("Huntleigh") respectfully submits this memorandum of law in support of its motion to compel defendant, the United States (the "Government") to (i) produce documents in response to Plaintiff's First Request for the Production of Documents, dated June 10, 2005, and (ii) respond fully to Plaintiff's First Set of Interrogatories, dated June 10, 2005.

## QUESTIONS PRESENTED

1. Should the Government be compelled, pursuant to RCFC 37, to produce documents in response to document requests 9, 10, 15, 16, 18 and 19 from Plaintiff's First Request for the Production of Documents, dated June 10, 2005?

2. Should the Government be compelled, pursuant to RCFC 37, to provide answers (or more responsive and complete answers) to interrogatories 3, 4, 8, 9, 13, 14 and 16 from Plaintiff's First Set of Interrogatories, dated June 10, 2005?

3. Should the Government be compelled, pursuant to RCFC 37, to complete its production of documents by a date certain, as determined by the Court?

## INTRODUCTION

### Procedural Background

This case arises from the Government's enactment and implementation of the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (the "ATSA"). The ATSA mandated that the Government create a new federal agency, the Transportation Security Administration or "TSA." The TSA, in turn, was directed to begin screening all passengers and baggage at domestic airports by November 19, 2002. By virtue of this law, Huntleigh and all other private screening companies were legally prohibited from continuing to conduct their airport passenger and baggage screening businesses. Within roughly one year of the ATSA's passage, Huntleigh's screeners were

completely replaced with federal workers employed by the TSA, resulting in the total destruction of Huntleigh's screening business.

On November 14, 2003, Huntleigh commenced this proceeding, asserting two causes of action. In Count I, Huntleigh alleges that the Government's federalization of passenger and baggage screening constitutes a taking of its property without just compensation, in violation of the Fifth Amendment to the United States Constitution. In Count II, Huntleigh contends that the Government violated Section 101(g) of the ATSA by assuming Huntleigh's screening contracts with airlines but failing to provide "adequate compensation" therefor, as required by the statute. By orders dated January 5, 2005 and April 21, 2005, this Court denied the Government's motion to dismiss Huntleigh's claims, thereby paving the way for the parties to embark on discovery. Pursuant to the Court's Joint Discovery Schedule, all fact discovery must be completed by December 15, 2005.

**The Background of This Motion**

On June 10, 2005, Huntleigh served the Government with (i) Plaintiff's First Request for the Production of Documents (see Exhibit A) [1]; and (ii) Plaintiff's First Set of Interrogatories to Defendant (see Exhibit B). Approximately one month later, on July 14, 2005, the Government served its objections and responses to Huntleigh's document requests (see Exhibit C); and on July 15, 2005, it served answers and objections to Huntleigh's interrogatories (see Exhibit D) (collectively, the "Discovery Responses"). As of the date hereof, the Government has refused to produce documents in response to six of Huntleigh's document requests, and has failed to answer (or answered inadequately) seven of Huntleigh's interrogatories, thereby necessitating this motion.

[1] All exhibits are set forth in the accompanying Appendix.

To justify its nondisclosure of information, the Government has raised objections that are indefensible under the liberal principles governing the scope of discovery, and reflect a fundamental misperception of what this case is about. As set forth below with respect to each outstanding item, the Government has adopted an unduly narrow view of Huntleigh's claims and, by extension, an overly constrained interpretation of the information relevant to those claims. It has mischaracterized the purpose of other requests in an inappropriate attempt to shoehorn them into the Supreme Court's holding in Lingle v. Chevron U.S.A. Inc., and it has refused to acknowledge relevant issues of fact already recognized by the Court in this action.

The Government has also dragged its feet in providing Huntleigh with copies of documents that it has agreed to produce. On August 4, 2005, the Government sent by overnight courier the first installment of its document production (see Exhibit E), which it promised to complete on a "rolling basis" by the end of the month. This initial production was extremely small, appeared to consist largely of documents that had been printed from various Government web sites, contained no electronic data (such as e-mails) and responded to only five of Huntleigh's document requests. Since this first production, Huntleigh has received no additional documents and the Government has failed to answer numerous inquiries by Huntleigh concerning the Government's timetable for resuming and completing its "rolling production."

**Huntleigh's Efforts To Resolve This Dispute Without Judicial Intervention**

Huntleigh files this motion with great reluctance, after trying unsuccessfully to resolve these discovery disputes with the Government. In accordance with RCFC 37(a)(2)(B) and Rule 10 of this Court's Case Management Procedures, after the Government served its Discovery Responses, undersigned counsel for Huntleigh

conferred with the Government on multiple occasions. On August 5, 2005, Huntleigh's counsel, Lauren Aguiar, wrote a letter to the Government addressing in detail the deficiencies in the Discovery Responses. (See Exhibit F, which includes the numerous letters exchanged between counsel leading up to the filing of this motion.) Ms. Aguiar further requested that the Government contact her so that the parties could schedule a mutually convenient time to confer about the topics raised in Huntleigh's letter.

On August 8, 2005, Kyle Chadwick with the Department of Justice responded that the Government was in the process of reviewing Huntleigh's objections, and would respond "as soon as we reasonably can." Hearing nothing further from the Government, on August 12, 2005, Huntleigh's counsel inquired in writing about the timing of the Government's response. Noting the discovery schedule under which the parties are operating (with a fact discovery deadline of December 15, 2005) and the corresponding need to address discovery disputes with reasonable promptness, counsel asked that the Government specify when it would respond to Huntleigh's August 5 letter.

After asking for further time to respond, the Government finally answered Huntleigh's August 5 letter on August 22, 2005. While the Government abandoned several of its objections and clarified others, it stood by its refusal to answer several document requests and interrogatories. Four days later, on Friday, August 26, 2005, Huntleigh responded to the Government's letter in a final attempt to narrow – if not eliminate – the disputes that would have to be presented to the Court. That same day, Ms. Aguiar left a voicemail message for Mr. Chadwick in which she conveyed her willingness to discuss the remaining disputes by telephone on either August 29 or 30.

Finally, on August 29, 2005, Mr. Chadwick faxed a letter to Ms. Aguiar in which he purported to clarify the Government's response to Interrogatory No. 14. The letter did not attempt to resolve or even address any of the other outstanding disputes. Ms. Aguiar advised the Government on Tuesday, August 30, that her concerns regarding the Government's response to Interrogatory No. 14 had not been alleviated. In her letter, Ms. Aguiar once again invited Mr. Chadwick to speak with her by telephone regarding the parties' disagreements. By the time of the filing of this motion on August 30, Mr. Chadwick had not contacted Ms. Aguiar by phone to discuss these issues.[2]

## ARGUMENT

"It is a premise of modern litigation that the Federal Rules contemplate liberal discovery, in the interest of just and complete resolution of disputes." Katz v. Batavia Marine & Sporting Supplies, 984 F.2d 422, 424 (Fed. Cir. 1993). Under RCFC 26(b)(1), parties may obtain discovery of any matter, not privileged that is relevant to the claim or defense of any party. For purposes of this rule, relevance is "broadly construed." Jade Trading, LLC v. United States, 65 Fed. Cl. 487, 491 (2005) (citing Katz, 984 F.2d at 424). The party receiving a request must not only produce information which is admissible as evidence, but also information that "appears reasonably calculated to lead to the discovery of admissible evidence." RCFC 26(b)(1). "Reasonably calculated" is a very broad concept and means, in effect, "any possibility that the information sought may be

[2] Huntleigh also attempted on numerous occasions – without success – to confer with the Government about its failure to produce documents with reasonable promptness. (See Ex. G.) By letter dated August 11, 2005, counsel for Huntleigh expressed concern regarding the small size of the Government's initial production, and requested that a substantial volume of documents be produced by the end of the month. (Id.) By letters dated August 16, August 23 and August 30, Huntleigh inquired about when the Government intended to continue and complete its document production. (Id.) The Government did not respond to any of these three letters.

relevant to the subject matter of the action." Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991) (emphasis added).

In short, the federal system expressly permits litigants such as Huntleigh to conduct a fair and reasonable investigation of their claims through discovery rules that are designed to be expansive in scope and interpreted liberally. As set forth below, the Government has lost sight of these governing principles in responding to Huntleigh's discovery requests.

## I.

## THE GOVERNMENT HAS REFUSED TO PRODUCE DOCUMENTS THAT ARE RELEVANT TO HUNTLEIGH'S CLAIMS

### A. Document Request Nos. 9 and 10

In February 2002, the Government entered into "interim contracts" with various private screening companies (including Huntleigh) to provide passenger and baggage screening while the TSA implemented its rolling takeover of screening operations on an airport-by-airport basis. Requests 9 and 10 ask for the production of interim contracts between the Government and other private screening companies, settlement agreements resolving payment disputes under those contracts, and other, related communications. (Ex. A, at Appendix Page ("App.") 4.) The Government has categorically objected to the production of such documents on relevance grounds. (Ex. C, at App. 29-30.)

Because they may lead to admissible evidence, Huntleigh is entitled to review these agreements and communications to determine, among other things, (i) if the Government acknowledged – either explicitly or implicitly – the right of any private screening company to receive compensation for the confiscation of its business, (ii) if any terms in such agreements may be argued to constitute payment for just compensation, or

(iii) if the Government acknowledged in these documents, either in words or substance, that it had assumed or was assuming contracts between private screening companies and the airlines. So construed, this request is reasonably calculated to obtain evidence that certainly is relevant, or could lead to relevant evidence, in applying the ATSA and the test established by the Supreme Court in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).

This conclusion is unaffected by the Government's claim that there are (i) "no 'documents in which the government has agreed to pay money to a private screening company as compensation for the Government's takeover of passenger and baggage screening'"; and (ii) no "settlement agreements with security screening companies resolving disputes that are related to this litigation." (Ex. F (August 22 Letter).) Reasonable people can – and often do – differ when it comes to interpreting documents, and we are entitled to review these interim contracts, settlement agreements and related materials for potentially relevant information. In the end, if the agreements and other documents are as innocuous as the Government claims they are, it should have no problem producing them. Notably, at no point has the Government argued that producing responsive documents would be unduly burdensome.

**B. Document Request Nos. 15, 18 and 19 (and Interrogatory Nos. 3 and 13)**

These requests and interrogatories seek information concerning the TSA's performance as a passenger and baggage screener. (See Ex. A, at App. 5-6; Ex. B, at App. 13, 16.) The Government has categorically refused to respond to these demands, relying primarily (if not exclusively) on relevance grounds. (See Ex. C, at App. 33-37; Ex. D, at App. 50, 64.) In substance, the Government has advanced two distinct, yet related, arguments. First, it claims that Huntleigh's demands are improperly designed to

elicit information that would be used to challenge the "ATSA's effectiveness in improving airline security." (Id.) Such a so-called challenge, the Government maintains, has been foreclosed by the Supreme Court's recent decision in Lingle v. Chevron U.S.A. Inc., 125 S. Ct. 2074 (2005). And second, the Government argues that these requests are part of an improper attempt to "reweigh" whether Congress acted wisely in enacting the ATSA. (See Ex. F (August 22 Letter).) The Government has totally misconstrued the purpose of Huntleigh's requests.

Huntleigh is not attempting to challenge whether the ATSA has been "effective[] in improving airline security," nor is it trying to revisit whether, viewed ex ante, Congress' decision to federalize passenger and baggage screening was an appropriate and proper way to improve aviation security. Instead, Huntleigh seeks this information in order to refute an argument that the Government itself raised in its briefing to this Court. In defending its actions, the Government specifically argued in its motion to dismiss that private screeners (including Huntleigh) failed to adequately protect airline passengers prior to September 11 and therefore posed an ongoing danger to the public. This so-called public safety threat, the Government argued, gave it the right to eliminate these private businesses without paying just compensation. (See Exhibit H, at App. 126-29 (Gov't Opening Br.).)

While Huntleigh does not believe that these issues are properly before the Court,[3] if the Government intends to argue that Huntleigh's performance was poor or that it did

---

[3] Huntleigh intends to argue in the first instance that it suffered a categorical taking, as defined by the Supreme Court in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). Under Lucas, where the State deprives an owner of "all economically beneficial use" of its property, it may resist compensation only if the owner's property use could have been enjoined in the courts under the State's common law power to abate nuisances.

not adequately protect the flying public, then Huntleigh's performance will – according to the Government – be at issue in this action. If that is the case, the requested information is indisputably relevant to whether Huntleigh failed to adequately protect the public or was a quality screener. In making an informed judgment about Huntleigh's performance, context is obviously critical. Not only must Huntleigh be allowed to develop evidence about its own abilities, it must be able to measure its performance against other screeners, including those employed more recently by the TSA. Benchmarking a company against other organizations with similar operations is a standard method of evaluating performance. Under the circumstances, there is simply no credible basis for removing the TSA's own workers from this equation. If the Government wants to argue that Huntleigh's performance was inadequate (and that compensation for the taking of its property may be withheld as a result), then it cannot preclude Huntleigh from developing contrary evidence.

**C. Document Request No. 16 (and Interrogatory No. 8)**

Through Request No. 16 and Interrogatory No. 8, Huntleigh requested information about the TSA's hiring of individuals who formerly worked at Huntleigh and other private screening companies.[4] (Ex. A, at App. 6; Ex. B, at App. 14.) In its initial

---

See id. at 1027-29. Similarly, under Penn Central's "character of the government action" prong, courts examine "the degree of harm created by the claimant's prohibited activity" through "the lens of state nuisance law." Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). In this case, there are no circumstances under which Huntleigh's lawful operation of a business, pursuant to regulations and standards prescribed by the Government itself, could be considered a nuisance under state law. Accordingly, Huntleigh believes that its performance is not properly before the Court –under either Lucas or Penn Central.

[4] In the spirit of compromise, Huntleigh agreed to limit these requests to hiring data concerning its own former employees, so as to alleviate the Government's so-called burden of responding. Huntleigh continues to believe, however, that comparable hiring

objections, the Government suggested that this information did not exist or, even if it did exist in certain background investigation files, would be too burdensome to locate. (See, e.g., Ex. D, at App. 55 ("The TSA does not track this information for its employees and has no reasonable or practical means to provide this information.").) In its August 22 letter, the Government backtracked somewhat, stating that responsive data might be found in both the background investigation files (which reside at the National Archives) and in the TSA's personnel files. (Ex. F (August 22 Letter).) Still, it refused to gather the relevant data, arguing that such a process would "require literally hundreds of hours" to complete and would produce, at best, evidence of "dubious probative value." (Id.) The Government's objections are without merit.

RCFC 26(b)(2), the rule upon which the Government relies, makes clear that the "burden or expense" of proposed discovery must "outweigh[] its likely benefit" before it can serve as a valid ground for limiting disclosure. (Emphasis added.) In this case, information regarding the TSA's hiring of Huntleigh's former screeners is of paramount importance. As noted above, the Government has argued that it was entitled to legislate private screening companies out of existence without compensation because they had failed to adequately protect the flying public. A necessary corollary to this argument is that private screeners were unqualified, unprofessional and unprepared to perform their jobs competently. Huntleigh, of course, vigorously denies that such pejoratives apply to its operations, and the Court has expressly held that Huntleigh may, if necessary, present evidence in this regard. See Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 449

---

data from other private screening companies is highly relevant, as it would allow Huntleigh to juxtapose the TSA hiring rates for its own workers against data for other screeners.

(2005) ("Huntleigh I") ("The Court holds that the nature of the government's action is the type that may require compensation, such that plaintiff should have an opportunity to present evidence."); Huntleigh USA Corp. v. United States, 65 Fed. Cl. 178, 180 (2005) ("Huntleigh II") (reconfirming that Huntleigh may present evidence that "it did not present a danger to the public").)

The Government's willingness to hire Huntleigh employees as TSA screeners is highly probative of whether Huntleigh posed a safety threat such that the Government could confiscate its property without paying for it. A decision by the TSA to hire a substantial number of Huntleigh screeners, if proven, would certainly negate any inference that the company's workforce was a "safety threat." Indeed, if Huntleigh's screeners posed a threat to the flying public prior to September 11 (as the Government has implied), it is inconceivable that TSA officials would have hired these same workers to screen passengers and baggage after September 11. This information, moreover, is solely within the Government's possession, making it impossible for Huntleigh to obtain through alternative means. These two factors tip the scales heavily in favor of disclosure.

## II.

## THE GOVERNMENT HAS REFUSED TO ANSWER INTERROGATORIES THAT ARE RELEVANT TO HUNTLEIGH'S CLAIMS

### A. Interrogatory No. 4

Interrogatory No. 4 asks the Government to identify the name and last known address for each Federal Security Director, or FSD, who was (or is) responsible for supervising passenger and baggage screeners at checkpoints formerly staffed by Huntleigh. (Ex. B, at App. 13.) The TSA has described FSDs as the employees "who lead federal security operations at each airport." Given the nature of their responsibilities,

Huntleigh expects that the FSDs will have firsthand knowledge of how passenger and baggage screening was conducted following the Government's takeover. Such information (concerning staffing levels, hours worked, wages and benefits paid, etc.) is essential in measuring the exponential increase in demand for security services following the September 11 attacks – an issue that is directly relevant to any valuation of Huntleigh's goodwill and going concern value.[5]

After initially refusing to name any of the FSDs (see Ex. D, at App. 51), the Government relented, agreeing in its August 22 letter to provide "the names and airport assignments of the current Federal Security Directors, as of July 2005." (Ex. F (August 22 Letter) (emphasis added).) Interrogatory No. 4, however, is meant to capture the names of both present and former FSDs, so long as they were responsible for one or more former Huntleigh Locations from 2002 to the present. Given its high probative value, Huntleigh believes it is entitled to this additional information as well. Moreover, Huntleigh is only asking for a limited number of additional names and addresses, which is hardly a burdensome request.

**B. Interrogatory No. 9**

Relying primarily on relevance grounds, the Government has refused to disclose any information about the involuntary removal of TSA screeners from their positions and the attrition rate for TSA screeners – the two categories of information sought by Interrogatory No. 9. (See Ex. D, at App. 57.) The Government claims once again that

[5] The Government has agreed in Interrogatory No. 10 to produce information regarding the TSA staffing levels, hours worked and wage rates at Huntleigh's former locations. (See Ex. D, at App. 58-59.) Thus, the Government can have no legitimate objection to identifying the relevant individuals – in this case, the FSDs – who can testify about and place in context this raw data.

Huntleigh is searching for evidence to help discredit the ATSA's effectiveness (see id.), but this is simply not the case. Rather, Interrogatory No. 9 is intended to address an argument that the Government itself has advanced, and has not withdrawn. Specifically, in its motion to dismiss, the Government claimed that the allegedly substandard performance of private screening companies was due, in part, to inappropriately high turnover rates. (See Ex. H, at App. 123.) As a matter of fundamental fairness, Huntleigh is entitled to present evidence of its own turnover rates in context, juxtaposed against the results of other companies and the Federal Government. Again, if the Government intends to argue that it doesn't have to "pay" because Huntleigh didn't "perform," the Government cannot properly restrict access to relevant evidence on that very issue.

**C. Interrogatory No. 14**

Interrogatory No. 14 asks a straightforward question: does the Government plan to contend "(a) that prior to the [ATSA's] passage, Huntleigh's passenger and baggage screeners failed to adequately or appropriately protect airline passengers and, if so, (b) that this alleged failure served as a justification for replacing Huntleigh's screeners with personnel from the TSA without providing just compensation therefor?" (Ex. B, at App. 16.) As noted above, in its motion to dismiss, the Government suggested that it might place the quality of Huntleigh's performance in issue when it argued, in substance, that Huntleigh and other private screening companies had presented a threat to flying public such that their businesses could be confiscated without compensation. (See Ex. H, at App. 126-29.)

Despite raising this argument in its motion, the Government has refused to elaborate on its position in response to Interrogatory No. 14 – beyond providing generalized answers that are both evasive and incomplete. In its original objections, the

Government gave a response that was confined to what Congress supposedly concluded about all private screening companies when it was considering enactment of the ATSA. (See Ex. D, at App. 65 ("As stated in our motion to dismiss, and as reflected in ATSA's legislative history, Congress . . . found that the existing system of having airlines provide screening services through contracts with private screening companies provided inadequate protection to the public from terrorist attacks.").)[6] Then, in its August 22 letter, the Government purported to amplify its prior answer by declaring that it did "not contend that Huntleigh's performance as a passenger and baggage screener, prior to the ATSA's passage, differed meaningfully from the performance of other private screening companies during the same time period." (Ex. F (August 22 Letter).) The Government went on to vaguely represent that it would not "single out Huntleigh for criticism at trial." (Id.) Huntleigh has tried, unsuccessfully, to seek further clarification from the Government regarding what these latest statements mean. (See Ex. F (August 26 Letter).) Neither the Government's original objection nor its August 22 letter provides a responsive answer to the specific question that was posed.

The Government should not be allowed to sidestep this interrogatory – particularly since it has raised the issue of Huntleigh's performance in its briefing before this Court. The modern discovery rules are intended to eliminate "trial by surprise." See, e.g., Exxon Mobil Corp. v. New West Petroleum L.P., No. CIV S032222WBSPAN, 2005 WL 1366482, at *6 (E.D. Cal. June 6, 2005) (denying defendants' request to assert

[6] The Government also claims (wrongly) that the interrogatory is somehow asking it to "justify" the enactment of the ATSA. (Ex. D, at App. 65-66.) But as Huntleigh has previously made clear, its is not challenging the Government's right to legislate in this area, nor is it disputing the avowed purpose of the ATSA. Huntleigh is contesting, however, the Government's right to confiscate Huntleigh's property through legislation without compensating them for it.

previously undisclosed fraud defense where nondisclosure was deliberate and reflected defendants' "desire to conduct a 'trial by surprise.'"). Yet that is apparently what the Government is hoping to achieving by artfully dodging this critically important interrogatory. Properly construed, this interrogatory is simply trying to clarify – and perhaps narrow – the legal and factual issues that must be litigated by the parties. Accordingly, Huntleigh respectfully submits that the Government should be compelled to provide a more candid and direct response to this interrogatory.

**D. Interrogatory No. 16**

In Interrogatory No. 16, Huntleigh has asked the Government whether it contends that Huntleigh failed to adequately or appropriately perform its duties at Logan Airport's United Airlines terminal on September 11, 2001. (Ex. B, at App. 17.) In asking about September 11, Huntleigh has posed a question that is different and more targeted than Interrogatory No. 14, the request that addresses Huntleigh's screening performance more generally. Yet despite the unique focus of Interrogatory No. 16, the Government's response has merely incorporated by reference its already-inadequate response to Interrogatory No. 14. (Ex. D, at App. 68.) For this reason, the Government should be compelled to answer Interrogatory No. 16 as well.

## III.

## THE GOVERNMENT HAS FAILED TO PRODUCE DOCUMENTS WITH REASONABLE PROMPTNESS

The Government has taken an unreasonably long amount of time to provide Huntleigh with copies of documents that it has agreed to produce. Huntleigh's document requests were served on June 10, 2005. It was not until almost eight weeks later, on August 5, 2005, that Huntleigh received the first installment of the Government's

document production, which it promised to complete on a "rolling basis." This initial production was extremely small, appeared to consist largely of documents that had been printed from various Government web sites, contained no electronic data (such as e-mails) and responded to only five of Huntleigh's document requests. Since this first production on August 5, Huntleigh has received no additional materials and no explanation from the Government for the delay – despite repeated inquiries by Huntleigh's counsel. (See Ex. G, at App. 109 (Letters of August 11, 16, 23 and 30).) Given the discovery deadlines established by the Court (including a fact discovery cut-off of December 15, 2005), and given the amount of time that the Government has had to gather responsive documents (since at least mid-June), the Court should compel the Government to complete its document production by a date certain, but in no event later than September 16, 2005.

## CONCLUSION

For the foregoing reasons, Huntleigh respectfully requests that the Court issue an order (i) granting this motion in its entirety; (ii) compelling the Government to produce documents in response to each of the document requests identified above; (iii) compelling the Government to completely answer all of the interrogatories referenced above; (iv) compelling the Government to complete its document production; and (v) granting such other and further relief as it may deem just and proper.

Dated: August 30, 2005
New York, New York

Respectfully submitted,

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ Jonathan J. Lerner

Jonathan J. Lerner (attorney of record)
Lauren E. Aguiar
William J. O'Brien
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000
Attorneys for Plaintiff