Exhibit F

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2235
DIRECT FAX
917-777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 5, 2005

**BY FACSIMILE**

Kyle Chadwick
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corp. v. United States*, No. 03-2670C

Dear Kyle:

We have reviewed the Government's objections and responses to Huntleigh's First Request for the Production of Documents and First Set of Interrogatories. Unfortunately, we are constrained to conclude that they are of a piece with its other discovery tactics in this case thus far.

We believe it is improper and unacceptable for the Government to have refused to respond, in whole or in part, to nine of the twenty-two document requests, and to have failed to answer (or answered inadequately) twelve of the seventeen interrogatories. As detailed below with respect to each issue, the Government has deliberately adopted an unduly restricted view of Huntleigh's claims and, by extension, an overly constrained interpretation of the information relevant to those claims. It has mischaracterized the purpose of other requests in an inappropriate attempt to shoehorn them into the holding of the Supreme Court's decision in Lingle v. Chevron U.S.A. Inc.; and it has refused to acknowledge relevant issues of fact already recognized by the Court in this action. In short, the objections are indefensible under the liberal principles governing the scope of discovery under the Federal Rules, and reflect a fundamental misperception of what this case is about. So as not to burden the Court with another discovery

motion, we request that you immediately reconsider your objections to the document requests and provide answers to each of Huntleigh's interrogatories.

**PRELIMINARY MATTERS**

The Government states in several objections to Huntleigh's document requests that it will produce "all" responsive material "subject to" the specific objections listed therein. Certain interrogatory objections contain similar wording. (See, e.g., Interrogatory Objection No. 10 (providing information "subject to" objections based on relevance and privilege, among other grounds).) This qualifying language, of course, implies that all responsive information is not necessarily being produced, and that certain information is, in fact, being withheld on the basis of one or more objections. To resolve this ambiguity, please advise us, for each document request and interrogatory where it is relevant, (1) whether information is in fact being withheld and, if so, (2) the objection or objections upon which you are basing the Government's right of nondisclosure.

You state that the Government's privilege log will be furnished "within a reasonable time." Please let us know when we can expect it. Also, to the extent that you are withholding information from interrogatory responses on the basis of privilege, federal statute or any other ground enumerated in General Objection No. 5, please confirm in writing that you will be identifying this information in your privilege log.

**RESPONSES TO THE GOVERNMENT'S OBJECTIONS**

**Document Requests**

Document Request No. 3 (and Interrogatory No. 6). These requests seek information pertaining to the TSA's Report to Congress on Transportation Security, dated March 31, 2003, including all documents relating thereto and the names of individuals who were involved in its preparation. With regard to Document Request No. 3, the Government represents that it will produce "all" responsive materials, except for documents that are "completely unrelated to Huntleigh's claims." Similarly, in response to Interrogatory No. 6, the Government has confined its identification of individuals to those who helped prepare "parts of the Report that arguably could be relevant to the case."

We cannot evaluate the legitimacy of these vague and ambiguous objections until you clarify your definition of relevance – that is, until you identify with greater particularity the "issues and concerns affecting TSA and transportation security" that, from your perspective, are "not at issue in this case." (See Document Objection No. 3; Interrogatory Objection No. 6.) Also, we assume that you intend to produce, among other things, all documents pertaining to the TSA's admission, on page 10 of the Report, that it "assumed the airlines' passenger screening company contracts" on February 17, 2002. We similarly assume that you have not withheld the

names of individuals who were involved in preparing this section of the Report. Please confirm in writing that each of our assumptions is correct.

Document Request Nos. 9 and 10. You argue, in substance, that Huntleigh is not entitled to review interim contracts between the Government and other private screening companies, settlement agreements resolving payment disputes under those contracts, and other, related communications because such documents are, in your view, irrelevant. Because it may lead to admissible evidence, we are entitled to review these agreements and communications to determine, among other things, if (1) the Government acknowledged – either explicitly or implicitly – the right of any private screening company to receive compensation for the confiscation of its business, (2) any terms in such agreements may be argued to constitute payment for just compensation, or (3) the Government acknowledged in these documents, either in words or substance, that it had assumed or was assuming contracts between private screening companies and the airlines. So construed, this request is reasonably calculated to obtain evidence that certainly is relevant, or could lead to relevant evidence, in applying the Penn Central test and the ATSA.

Document Request No. 11. The Government claims that it "could not determine Huntleigh's affiliates (however defined) without undue burden and expense" – a highly dubious assertion given the reference in your motion to dismiss to Huntleigh's "foreign ownership." (As I am sure you know, the Government may determine Huntleigh's corporate affiliation with little effort by searching the Internet.) In any event, it is our understanding that Huntleigh's parent, International Consultants on Targeted Security (ICTS), performed consulting services for the Government on issues pertaining to passenger and baggage screening. With that clarification, please respond to our request.

Document Request Nos. 15, 18 and 19 (and Interrogatory Nos. 3 and 13). You have categorically refused to produce documents or answer interrogatories regarding the TSA's performance as a passenger and baggage screener, relying primarily (if not exclusively) on relevance grounds. These objections totally misconstrue the purpose of our requests. We are not attempting to challenge the "effectiveness" of the ATSA "in improving airline security," and thus your reliance upon the Supreme Court's recent decision in Lingle v. Chevron U.S.A. Inc. is misplaced. Rather, we are requesting this information in order to refute an argument that the Government itself raised in its briefing to this Court.

In defending its actions, the Government specifically argued in its motion to dismiss that private screeners (including Huntleigh) failed to adequately protect the flying public prior to September 11 and posed a danger to the public – and therefore such private businesses could be eliminated without paying adequate compensation. (See Gov't Opening Br. at 45-48). While we do not concede that these issues would be properly before the Court, if the Government intends to argue that Huntleigh's performance was inadequate or that Huntleigh did not adequately protect the flying public, then Huntleigh's performance will – according to the Government – be at issue in this action.

If that is the case, the requested information is indisputably relevant to whether Huntleigh failed to adequately protect the public or was a quality screener. In making an informed judgment about Huntleigh's performance, context is obviously critical. Not only must Huntleigh be allowed to develop evidence about its own abilities, it must be able to measure its performance against other screeners, including those employed more recently by the TSA. Benchmarking a company against other organizations with similar operations is a standard method of evaluating performance. Under the circumstances, there is simply no credible basis for removing the TSA's own workers from this equation. If the Government wants to argue that Huntleigh's performance was inadequate (and that compensation for the taking of its property may be withheld as a result), then it cannot preclude Huntleigh from developing contrary evidence.

Document Request No. 16 (and Interrogatory No. 8). Through these narrowly tailored demands, we are requesting information about the TSA's hiring of individuals who formerly worked at Huntleigh and other private screening companies. You have suggested that this information does not exist and would be too burdensome to locate even if it did. Both objections are without merit. First, we find it hard to believe that the TSA, the federal agency responsible for protecting air passengers from terrorists, does not track basic information about its employees' backgrounds. Indeed, your assertion is contradicted by the concession (in the very next sentence of both objections) that "background investigation files" do exist and are housed at the National Archives and Records Center. The Government's objections, then, would appear to rest not on the existence of responsive information, but rather on the so-called "burden and expense" associated with obtaining it.

However, RCFC 26(b)(2), the rule upon which you rely, makes clear that the "burden or expense" of proposed discovery must "outweigh[] its likely benefit" before it can serve as a valid ground for limiting disclosure. In this case, information regarding the TSA's hiring of workers from private screening companies is of paramount importance. As noted above, the Government has argued that it was entitled to legislate private screening companies out of existence without compensation because they had failed to adequately protect the flying public. A necessary corollary to this argument is that private screeners were unqualified, unprofessional and unprepared to perform their jobs competently. Huntleigh, of course, vigorously denies that such pejoratives apply to its operations, and the Court has expressly held that Huntleigh may present evidence in this regard. See Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 449 (2005) ("Huntleigh I"); Huntleigh USA Corp. v. United States, 65 Fed. Cl. 178, 180 (2005) ("Huntleigh II") (holding that Huntleigh may present evidence that "it did not present a danger to the public").)

The Government's willingness to hire Huntleigh employees as TSA screeners is highly probative of whether Huntleigh posed a safety threat such that the Government could confiscate its property without paying for it. A decision by the TSA to hire a substantial number of Huntleigh screeners, if proven, would certainly negate any inference that the company's

workforce was a "safety threat." Also, comparing the number of former Huntleigh workers hired with comparable figures for other private screening companies would be relevant in determining the relative quality of Huntleigh's workforce, which in turn would bear on any valuation of the company's goodwill and going concern value. This information, moreover, is solely within the Government's possession, making it impossible for Huntleigh to obtain through alternative means. These three factors tip the scales heavily in favor of disclosure.

Document Request No. 17. In refusing to produce documents concerning the BearingPoint report, you state that the "performance of the screening companies involved in the Pilot Project is not relevant to any of the claims or issues in this litigation." This argument overlooks the report's examination of the costs associated with performing passenger and baggage screening in a post-September 11 world. (See BearingPoint Report at 16-18.) This analysis, and the information upon which it is based, is probative of what Huntleigh's own cost structure might have been but for the confiscation of its business. This data is obviously relevant in valuing Huntleigh's losses – an issue, of course, that is front and center in this litigation. Accordingly, your objection is baseless.

**Interrogatories**

Interrogatory No. 4. Again you have invoked Lingle, this time in an effort to conceal the identity of Federal Security Directors, or "FSDs," who worked at the Huntleigh Locations. Our request has absolutely nothing to do with Lingle or the "ATSA's effectiveness in improving airline security." The TSA has described FSDs as the employees "who lead federal security operations at each airport." (See Press Release, "DOT Begins Recruiting Federal Security Directors for Airports" (Jan. 8, 2002).) As such, we would expect them to have firsthand knowledge of how passenger and baggage screening was conducted following the Government's takeover. Such information (concerning staffing levels, hours worked, wages and benefits paid, etc.) is essential in measuring the exponential increase in demand for security services following the September 11 attacks – an issue that is directly relevant to any valuation of Huntleigh's goodwill and going concern value. Parenthetically, you have already agreed in Interrogatory No. 10 to produce information regarding the staffing levels, hours worked and wage rates at the Huntleigh Locations. Thus, you can have no legitimate objection to identifying the relevant individuals – in this case, the FSDs – who can testify about and place in context this raw data.

Interrogatory No. 7. You did not respond at all to Interrogatory No. 7, which seeks the name and last known address of each person who was involved in preparing an April 16, 2004 BearingPoint publication entitled "Private Screening Operations Performance Evaluation Report." Instead, it appears that you responded twice to Interrogatory No. 8. Please provide your answer to Interrogatory No. 7.

Interrogatory No. 9. Relying primarily on relevance grounds, you have refused to disclose any information about the involuntary removal of TSA screeners from their positions

and the attrition rate for TSA screeners. This is not an attempt to discredit the ATSA's effectiveness, but rather is to address an argument that the Government already has advanced, and has not withdrawn. Specifically, in its motion to dismiss, the Government claimed that the allegedly substandard performance of private screening companies was due, in part, to inappropriately high turnover rates. (See Gov't Opening Br. at 12, 50.) As a matter of fundamental fairness, Huntleigh is entitled to present evidence of its own turnover rates in context, juxtaposed against the results of other companies and the Federal Government. Again, if the Government intends to argue that it doesn't have to "pay" because Huntleigh didn't "perform," the Government cannot properly restrict access to relevant evidence on that very issue.

Interrogatory Nos. 10 and 11. Interrogatory No. 10 seeks certain information (e.g., number of screeners, wage and benefit rates, hours worked) regarding those passenger and baggage screeners who worked at the Huntleigh Locations from 2002 to the present. Although you have supplied a general description of how the TSA deployed its workforce, you have not provided any of the specific information requested, representing that you will supplement this response "as [you] receive additional information." Please tell us when we can expect a supplemental response. Also, please give us a timetable for answering Interrogatory No. 11, which incorporates by reference your incomplete response to Interrogatory No. 10.

Interrogatory No. 12. In response to this interrogatory, which asks the Government to detail its evaluation of private screening companies from 1998-2002, you have provided a general description of the testing program employed by the FAA, and represented that you will supplement the Government's answer with information about the DOT Inspector General's testing. On its face, the interrogatory primarily seeks quantitative data about the results of this testing – data that you have not disclosed. Rather than have us speculate as to the basis for your objection, please provide the grounds so that we may determine whether such objection is reasonable.

Interrogatory No. 14. The Government has not provided a response to either subpart (a) or subpart (b) of this interrogatory. The interrogatory does not ask whether the Government contends that private screeners in general failed to adequately or appropriately protect airline passengers, nor did we request that you provide your own interpretation of Congressional intent. Rather, the interrogatory asks whether you intend to argue that Huntleigh's performance as a passenger and baggage screener was inadequate in any way. If so, we expect the Government to identify the basis for its contention and the documents upon which it intends to rely.

We are equally puzzled by your response to subpart (b). This interrogatory does not ask the Government to justify its enactment of the ATSA. As we have previously made clear, Huntleigh is not challenging the Government's right to legislate in this area, nor is it challenging the avowed purpose of the ATSA. We are contesting the Government's right to confiscate Huntleigh's property through legislation without compensating them for it.

We will not allow the Government to sidestep this interrogatory. The modern discovery rules are intended to eliminate "trial by surprise." See, e.g., Exxon Mobil Corp. v. New West Petroleum L.P., No. CIV S032222WBSPAN, 2005 WL 1366482, at *6 (E.D. Cal. June 6, 2005) (denying defendants' request to assert previously undisclosed fraud defense where nondisclosure was deliberate and reflected defendants' "desire to conduct a 'trial by surprise.'"). That is why the rules of this Court expressly permit contention interrogatories. See RCFC 33(c). We reserve the right to compel a proper response or to move in limine at a later time to preclude the Government from introducing at trial any evidence that Huntleigh failed to adequately or appropriately protect airline passengers. See Tritek Technologies, Inc. v. United States, 63 Fed. Cl. 740, 751 (2005) (observing generally that failure to supplement response to contention interrogatories can result in preclusion sanction even without filing of motion to compel).

Interrogatory No. 16. Since the Government's response to Interrogatory No. 14 is inadequate, it follows a fortiori that incorporating by reference this response, as you have done, is equally insufficient. It also is the case that Interrogatory No. 16 is asking a different and more focused question: does the Government contend that Huntleigh failed to adequately or appropriately perform its duties at Logan Airport's United Airlines terminal on September 11, 2001? Your generalized response to Interrogatory No. 14 does not answer this very specific query regarding Huntleigh.

* * * *

We hope that these issues can be resolved with resort to motion practice, especially as it is the Government that has represented that broad discovery in this case is needed. Please contact me so that we may schedule a mutually convenient time to talk next week and confer about the foregoing. If you are not willing to confer to resolve these issues by August 12, 2005, we will be forced to file a motion to compel. We look forward to hearing from you promptly.

Very truly yours,

Lauren Aguiar

Lauren E. Aguiar

cc: Mark A. Melnick

**U.S. Department of Justice**

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7561
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

August 8, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Lauren E. Aguiar
Skadden, Arps, Slate Meagher& Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States,
Fed. Cl. No. 03-2670 C

Dear Mr. Lerner and Ms. Aguiar:

We are reviewing your seven-page facsimile letter of August 5, 2005 and will respond as soon as we reasonably can. As a preliminary matter, we stand by our commitment to provide a privilege log within a reasonable time, but we are not prepared to commit to a date, as we do not know yet how many documents we may locate and need to withhold.

Sincerely,

Kyle Chadwick

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch

cc: J. Grady, TSA

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
(212) 735-2235
DIRECT FAX
(917) 777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 12, 2005

By Fax

Kyle Chadwick, Esq.
United States Department of Justice
Commercial Litigation Branch, Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corporation v. United States,*
Index No. 03-2670C (Judge Margolis)

Dear Kyle:

I write to follow up on my letter of August 5, 2005 concerning the Government's responses and objections to Huntleigh's document requests and interrogatories. Your letter dated August 8 vaguely states that you will respond to my letter "as soon as you reasonably can," but does not give us any sense of when we should expect a substantive response.

We are willing to be flexible, but in order to meet the discovery schedule in this case, the parties must be reasonably prompt in meeting their respective discovery obligations and in resolving issues that arise. Because the Government already has had weeks to consider our requests, we see no reason why these issues cannot be discussed -- so that we can reach a resolution or, if necessary, resort to motion practice. Accordingly, please let me know when you will be responding to my letter. In any event, if the Government is not prepared to "meet and confer" about these discovery disputes by August 17, Huntleigh will seek appropriate relief to compel production of the documents and answers to the interrogatories.

Very truly yours,

Lauren Aguiar

Lauren E. Aguiar

U.S. Department of Justice

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7561
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

August 16, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Lauren E. Aguiar
Skadden, Arps, Slate Meagher& Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States, Fed. Cl. No. 03-2670 C

Dear Mr. Lerner and Ms. Aguiar:

This responds to Ms. Aguiar's letter of August 12. My letter of August 8 was as clear as we could make it in these circumstances. While we fully understand the need to respond to your seven-page letter of August 5 as soon as we reasonably can, we will not be prepared to respond substantively to that letter tomorrow, August 17. We believe – and we would expect the Court to agree – that it is not unreasonable for you to wait a bit longer than eight business days for such a response. If you will reconsider your threat to file a motion to compel, we will continue to work diligently with the goal of responding to your August 5 letter not later than early next week.

Sincerely,

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch

cc: J. Grady, TSA

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
(212) 735-2235
DIRECT FAX
(917) 777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 16, 2005

By Fax

Kyle Chadwick, Esq.
United States Department of Justice
Commercial Litigation Branch, Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corporation v. United States,*
Index No. 03-2670C (Judge Margolis)

Dear Kyle:

I received your letter of earlier today, indicating that you will not be able to respond to my August 5 letter regarding discovery disputes this week. Given the significant amount of time that will be needed to respond to the letter, I assume (although your letter does not make it clear) that you will be responding substantively to each of the points raised in my letter by "early next week." If my assumption is incorrect, please let me know immediately. Otherwise, we will wait until next Tuesday for your substantive response -- after which time we will raise these issues with the Judge so as to eliminate any further delay.

On a related note, we have received no additional documents from the Government since the small initial installment of your "rolling production" on August 5. Please let us know when we can expect the next batch of responsive documents.

Very truly yours,

Lauren Aguiar

Lauren E. Aguiar

**U.S. Department of Justice**

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7561
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

August 22, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Lauren E. Aguiar
Skadden, Arps, Slate Meagher& Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States,
Fed. Cl. No. 03-2670 C

Dear Mr. Lerner and Ms. Aguiar:

This responds to Ms. Aguiar's letter of August 5, 2005 concerning our responses to Huntleigh's first interrogatories and requests for documents. In keeping with the Government's practice, we address here the substantive issues raised in the letter and disregard the invective, argument of plaintiff's case, and loaded rhetoric. It is far more productive and efficient, in my experience, for both parties to focus upon communicating their positions and attempting to resolve issues, rather than questioning one another's motives. We invite Huntleigh to join us in this approach. At the same time, our decision not to respond to any aspect of your correspondence should not be construed as a concession on our part.

To begin with what you identify as "preliminary matters," when the Government states, in response to a document request or interrogatory, that it will provide all "responsive" material, subject to our objections, this means we intend to locate and provide all responsive material, unless there is reason to withhold it on the basis of some privilege. If we withhold information on the basis of privilege, we will so note in a privilege log, which we will assemble and provide once we have completed our document production. If we are withholding (or are not searching for) documents on relevance grounds, we have stated that specifically in our responses. For example, in our response to plaintiff's document request number 3, discussed below, we have agreed to produce documents related to certain portions of the cited report to Congress.

If, by contrast, a request calls for documents or information not within the control of the Executive Branch of the United States, for which we therefore have no obligation to search, we have noted that objection, but we have also produced some responsive items, such as Government Accountability Office reports, that are readily available to us. The objection indicates that we do not intend to seek out all documents or information potentially responsive to

the request. Finally, some requests were so vague or broad that it would not be possible for the Government to provide "all" responsive documents, even to the extent we understood what is being requested. We have noted this in our responses, where applicable. We invite Huntleigh either to narrow those requests or to identify specific documents that it seeks, as it is quite possible that doing so could abate or eliminate our objections on those grounds.

We address the other issues raised in your letter in the order you raised them.

Document Request No. 3 and Interrogatory No. 6: As you note, the Government plans to produce, among other things, all nonprivileged documents pertaining to the "assumption" language on page 10 of TSA's March 31, 2003 report Congress, and we have already identified the people who were involved in preparing that part of the report. Huntleigh also possesses a copy of the report. We will assume, unless you notify us otherwise, that Huntleigh has appropriately agreed to limit the scope of interrogatory number 6 and document request number 3 to the information above. At the same time, while reserving the right to object, we are certainly willing to consider working with Huntleigh to obtain further, specific information related to the March 2003 report, which we invite you identify.

We remain of the view, however, that, as written, this interrogatory and this document request are overly broad and unduly burdensome. Simply put, neither the identity of every person involved in preparing the March 2003 report, nor every document relating to it, is relevant to this case. The report addresses every aspect of TSA's operations in calendar year 2002. This clearly encompasses information that is not at all relevant to this litigation, including, but not limited to, discussions of maritime, land, and rail statistics; maritime and land security; multimodal security; intelligence domain awareness; the history of aviation security (e.g., the deployment of Explosive Detection System ("EDS") from inception to the present); the TSA explosives unit; international aviation security; research, engineering, and development (e.g., recommendations for research, development, testing, and evaluation of several items ranging from EDS to screening checked baggage to enhancing detection of chemical, biological, radiological and nuclear weapons of mass destruction); and cooperative efforts with other departments, agencies, and instrumentalities of the United States, as well as with foreign transportation and security authorities. The report also contains an appendix entitled, "Summary of Activities and Accomplishments for 2002" that lists more than 78 milestones and events in 2002. None of those appears to be relevant to this case, although we are prepared to reconsider that assessment, if Huntleigh will point to specific matters that it considers relevant.

Document Request Nos. 9 and 10: We remain of the view that the interim contracts between the Government and private screening companies other than Huntleigh, all of which were entered into after the passage of ATSA, are not relevant to Huntleigh's claims or our defense; and we note that your letter advances no argument to the contrary. We have stated, in response to document requests 9(ii) and 10(iii), that there are no "documents in which the government has agreed to pay money to a private screening company as compensation for the Government's takeover of passenger and baggage screening." Nor are there any settlement

agreements with security screening companies resolving disputes that are related to this litigation. The disputes with other private screening companies involving the interim contracts pertain solely to the definitization of those contracts and have no probative value with respect to Huntleigh's claims here. Even assuming, without admitting, that those documents might be relevant to Huntleigh's pending definitization claim before the Office of Dispute Resolution for Acquisition, to which you refer in your definitions, that is a different case.

Document Request No. 11: Thank you for clarifying that, by Huntleigh's "affiliates," you mean ICTS. We will produce documents in response to this request with that understanding.

Document Request Nos. 15, 18, and 19 and Interrogatory Nos. 3, 9, and 13: We stand by our objections, as our position remains that information regarding TSA's performance as a passenger and baggage screener is not reasonably calculated to lead to the discovery of relevant evidence. You indicate that Huntleigh seeks this information to counter the Government's argument that, in passing ATSA, Congress took action to protect public safety, health, and welfare. TSA's record in this regard, however, was established after Congress' passage of ATSA and is not germane, therefore, to determining the purpose or character of ATSA.

In assessing the "character of the governmental action" under the Penn Central test, courts examine the nature of the public interest served by the regulation, by "'inquir[ing] into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.'" Maritrans v. United States, 342 F.3d 1344, 1356 (Fed Cir. 2003) (quoting Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994)). Courts "will not reweigh the evidence Congress considered in making its determination." Id. at 1357. To the extent that legislative fact finding is considered at all, cf. Connolly v. PBGC, 475 U.S. 211, 225 (1986) (no discussion of factual record for "character" factor), the only information that is even arguably relevant here is the information that was available to Congress when it passed ATSA. See Rose Acre Farms v. United States, 373 F.3d 1177, 1194-95 (Fed. Cir. 2004) (reversing trial court finding on "character" prong as improperly based on information developed after regulation was promulgated).

Document Request No. 16 and Interrogatory No. 8: We remain convinced that the overwhelming burden and expense of compiling information concerning the former employers of TSA employees greatly outweighs any reasonably likely benefit to Huntleigh. SeeRCFC 26(b)(2). It is true, as noted in your letter, that the names of former employers should be included on each employee's background investigation form. However, there exists no searchable database of those tens of thousands of investigation files, which, as we have noted, are archived alphabetically (not by employee position or function) by the National Archives and Records Administration. Nor is there any assurance that the security forms are even in those files, since, prior to October 2002, TSA retained only the adjudications on the background checks and certain transmittal information. The official personnel files for current and former TSA employees may include resumes that would list former employers – but TSA's human resources contractor possesses more than 50,000 such files, maintained alphabetically, for all current

employees, both screeners and nonscreeners; and tens of thousands of personnel files of former employees are archived. Manually searching the available files would require literally hundreds of hours.

Equally important, whether TSA has employed screeners who formerly worked for Huntleigh is, at best, of dubious probative value and, we believe, irrelevant to the point Huntleigh apparently wishes to make. The screener position has been entirely transformed since the Federalization of the screening function. Among other things, screeners now undergo significantly more hours of training, receive greater supervision, and use more advanced and sophisticated equipment than was the case before September 11, 2001. Because the job is fundamentally different, knowing whether, and to what extent, TSA hired screeners that had worked for Huntleigh would tell us little, if anything.

<u>Document Request No. 17 and Interrogatory No. 7</u>: Although we do not retract our relevance objection, we will produce any and all nonprivileged documents possessed by the TSA that are responsive to plaintiff's document request number 17. We note, however, that the vast majority of documents pertaining to the BearingPoint report are in the exclusive custody and control of BearingPoint, not the Government. We apologize for inadvertently omitting a response to interrogatory number 7. We are preparing a first supplemental response to the interrogatories, which will include that response. We will serve our supplemental responses as soon as possible, although I will be traveling Wednesday through Friday of this week.

<u>Interrogatory No. 4:</u> Notwithstanding our objections, we will provide in our first supplemental interrogatory responses the names and airport assignments of the current Federal Security Directors, as of July 2005. To be clear, we continue to believe this information is irrelevant. (The suggestion that we have "conceal[ed]" the names of the FSDs is unwarranted, as they can readily be found on the Internet and elsewhere.) Please note, further, that any request for information or testimony from a former TSA employee involving information obtained in his or her official capacity must be made pursuant to 6 C.F.R. § 5.41, <u>et seq.</u>

<u>Interrogatory Nos. 10 and 11:</u> Our first supplemental interrogatory responses will include substantive responses to these interrogatories.

<u>Interrogatory No. 12:</u> To clarify our response, the quantitative data concerning the testing program is, indeed, what we are prohibited by statute and executive order from releasing.

<u>Interrogatory No. 14:</u> We did, in fact, respond to both subparts of this interrogatory. (Indeed, your own letter refers to our response to subpart (b).) We add the following clarification: The Government does not contend that Huntleigh's performance as a passenger and baggage screener, prior to ATSA's passage, differed meaningfully from the performance of other private screening companies during the same time period. We hope this will assuage any concern on Huntleigh's part that we might single out Huntleigh for criticism at trial.

We firmly agree that a primary goal of discovery is to avoid "trial by surprise." A corollary, however, is that one should accept that an opposing party's contentions are what that party states they are. Specifically, you state that interrogatory number 14 "does not ask the government to justify its enactment of the ATSA," but, instead, asks us to justify "confiscat[ing] Huntleigh's property through legislation without compensating [Huntleigh] for it" (original emphasis). That may be how you wish to frame the issue, but that is neither what ATSA says, nor what Congress intended to do. Accordingly, we are not mounting a defense of the action you describe. The decision to Federalize the screening workforce, which Huntleigh alleges was a taking, was made by Congress, in ATSA. There is no other action or decision to examine. It is entirely appropriate and responsive, therefore, for us to answer interrogatory number 14 by referring to ATSA and its legislative history. It was also appropriate – in the interest of avoiding trial by surprise – for us to place Huntleigh on notice of our position that we need not present evidence at trial to "justify" ATSA.

Interrogatory No. 16: We would only add to our response to this interrogatory the same clarification that we offered above regarding number 14.

Finally, you conclude your August 5 letter with the hope that Huntleigh's concerns can be resolved, "especially as it is the Government that has represented that broad discovery is necessary in this case." Since, as you know, we have never argued that "broad discovery" of the Government is warranted, we are unsure how to interpret the "especially" clause. I presume you are not suggesting that Huntleigh's obligation to respond to our discovery requests is affected by Huntleigh's professed level of satisfaction with the Government's discovery responses. I am likewise reluctant to interpret the above as a threat on your part to file a motion to compel with the partial aim of distracting time and resources from our discovery efforts. Please advise me if we have misunderstood this or any other part of your August 5 letter. I trust this letter resolves some of Huntleigh's concerns, and I look forward to resolving others, to the extent possible.

Very truly yours,

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch

cc: J. Grady, TSA

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2235
DIRECT FAX
917-777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 26, 2005

**BY FACSIMILE**

Kyle Chadwick
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corp. v. United States*, No. 03-2670C

Dear Kyle:

This will respond to your letter dated August 22, 2005 regarding discovery disputes. We appreciate your representation that the Government intends to answer several of Huntleigh's outstanding document requests and interrogatories, but there remain significant differences of opinion regarding the sufficiency of the Government's compliance with our requests. Even taking into account the concessions made in your August 22 letter, the Government still has refused to respond, in whole or in part, to a number of document requests and interrogatories. As I also specifically explained in my voicemail message to you today, I am willing to discuss them with you and am available at any time on August 29 and August 30. It is our intention to file a motion to compel on any open issues at the end of business on Tuesday, August 30.

You state that the Government will serve "as soon as possible" supplemental interrogatory responses containing, among other things, answers to Interrogatory Nos. 4, 7, 10 and 11. Since the answers to these interrogatories are long overdue, we would expect the supplemental responses to be served by next week. We further understand from your letter that

the Government will be furnishing documents in response to Request Nos. 11 and 17. Please let me know when we will be receiving that production.

**Document Requests**

Document Request No. 3 (and Interrogatory No. 6). As to these requests, you have confirmed (i) that the Government will be producing, "among other things, all nonprivileged documents pertaining to the 'assumption' language on page 10 of TSA's March 31, 2003 report [to] Congress," and (ii) that you have already identified all people who were involved in preparing that part of the report. At the same time, you state, incorrectly, that Huntleigh has "agreed to limit the scope" of Request No. 3 and Interrogatory No. 6 to the information referenced above. Your statements to the contrary notwithstanding, information pertaining to the deployment of Explosive Detection Systems (described on pages 11-12 of the report and throughout the attached appendix of "Activities and Accomplishments"), is relevant to Huntleigh's claims insofar as it describes the increase in baggage screening requirements after September 11. This information, in turn, speaks directly to what Huntleigh's value would have been but for the confiscation of its screening business by the Government. With that clarification, please confirm that you will be supplementing your response to both Request No. 3 and Interrogatory No. 6.

Document Request Nos. 9 and 10. You claim that there are (i) "no 'documents in which the government has agreed to pay money to a private screening company as compensation for the Government's takeover of passenger and baggage screening'"; and (ii) no "settlement agreements with security screening companies resolving disputes that are related to this litigation." You further claim that the interim contracts "have no probative value with respect to Huntleigh's claims here." However, reasonable people can – and often do – differ when it comes to interpreting agreements, and we are entitled to review these interim contracts and settlement agreements for potentially relevant information. In the end, if the agreements are as innocuous as you claim they are, then you should have no problem producing them. I note that you do not claim that producing responsive documents would be unduly burdensome. We will include this issue in our motion to compel.

Document Request Nos. 15, 18 and 19 (and Interrogatory Nos. 3, 9 and 13). It is our position that these document requests and interrogatories are proper and your August 22 letter only reinforces this belief. As your cited authorities make clear, in evaluating the "character of the governmental action" under Penn Central, courts examine, among other things, "the degree of harm created by the claimant's prohibited activity" through "the lens of state nuisance law." Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). There are no circumstances under which Huntleigh's lawful operation of a business, pursuant to regulations and standards prescribed by the Government itself, could be considered a nuisance under state law. Nevertheless, if you are planning to make such an argument, we are entitled to rebut the same by presenting Huntleigh's performance in context, juxtaposed against comparable work

done by TSA screeners.[1] Again, this information is being sought based on our present understanding of what the Government intends to argue at trial. In light of your response, we will include this issue in our motion to compel.

Document Request No. 16 (and Interrogatory No. 8). We are not persuaded by your objections to these requests. In your letter, you state that information regarding the TSA's hiring of former Huntleigh workers[2] is of "dubious probative value," purportedly because the "screener position has been transformed since . . . Federalization" through more rigorous training, the use of "more advanced and sophisticated equipment" and "greater supervision." Whether the screening function has been "transformed" has nothing to do with the TSA's willingness to hire (or not to hire) former Huntleigh workers in the first instance. If Huntleigh's screeners posed a threat to the flying public prior to September 11 (as the Government has implied in its briefing to the Court), it is inconceivable that TSA officials would have hired them to screen passengers and baggage after September 11 – new equipment and training programs notwithstanding.

As to the issue of burden, your letter discloses for the first time that the TSA has personnel files which may contain the requested data. This is in addition to the potentially responsive background investigation files that reside at the National Archives. While admitting that the data exists, you claim that retrieving it would require "literally hundreds of hours," making the task unduly burdensome. Huntleigh should not be deprived of relevant evidence due to the manner in which the Government has chosen to store its employee files. The Government, moreover, has brought any burden on itself by suggesting that Huntleigh's performance may be an issue at trial. If the Government intends to attack Huntleigh's reputation as a screening company (and, as discussed below, we require clarification of your intentions in this regard), then it must deal with the consequences of that strategic decision. One such consequence is that Huntleigh must be allowed to discover evidence to the contrary, even if it would be burdensome for the Government to locate and produce. We will include this issue in our motion to compel.

---

1 The cases cited in your letter do not help your position. In Rose Acre Farms and Maritrans, the plaintiffs were disputing whether Congress had acted wisely in passing the subject legislation. See Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1192-95 (Fed. Cir. 2004) (addressing district court's holding that regulations were "misguided"); Maritrans v. United States, 342 F.3d 1344, 1357 (Fed. Cir. 2003) (asserting that passage of double hull requirement for shipping vessels was "politically motivated"). In both cases, the Federal Circuit chose not to "reweigh" whether the regulations themselves were proper. Huntleigh, on the other hand, is not attempting to revisit whether federalizing passenger screening was an appropriate way to improve aviation security. Rather, our intent is to examine in context any suggestion by the Government that Huntleigh's performance was inadequate.

2 While you have framed your response in terms of Huntleigh's employees, the demands are not so limited, and in fact ask for comparable information relating to other private screening companies as well. While we continue to believe that hiring data for other private screeners is relevant (as it would allow us to compare the hiring rates for Huntleigh workers with data for other screeners), we are willing to limit these demands to Huntleigh in the spirit of compromise, so as to alleviate the Government's so-called burden of responding.

**Interrogatories**

Interrogatory No. 4. While we appreciate your agreement to provide "the names and airport assignments of the current Federal Security Directors, as of July 2005," our interrogatory is meant to capture the names of both present and former FSDs, so long as they were responsible for one or more former Huntleigh Locations from 2002 to the present. Unless you are representing that there has been no turnover of FSDs at the Huntleigh Locations since the creation of the position in 2002, we believe we are entitled to this additional information. Moreover, we are only asking for a limited number of additional names and addresses, which is hardly a burdensome request. We will include this issue in our motion to compel.

Interrogatory No. 12. Please provide us with citations to the statute and executive order that you believe preclude the Government from releasing quantitative testing data for Huntleigh and other private screening companies. If you indeed are prohibited by law from divulging this information (even subject to a protective order), then we will not pursue this discovery further. Of course, your refusal to provide this information – whether compelled by statute, executive order or otherwise – will have a profound impact on the Government's defense of this matter. Without access to the testing data, Huntleigh would be seriously prejudiced in its effort to refute the Government's assertion that Huntleigh and other private screening companies failed to adequately protect the flying public prior to September 11. If that is the case, we will move at the appropriate time to preclude the Government from introducing any evidence at trial concerning the alleged inadequacy of private screening companies, whether that evidence pertains to Huntleigh or to private screening companies more generally. This would include not only the detailed testing data requested in Interrogatory No. 12, but also any evidence of alleged private screening failures considered by Congress when enacting the ATSA, such as reports and testimony (if any) from the General Accounting Office, Federal Aviation Administration and the Department of Transportation, among others. We await your response before raising this with the Court.

Interrogatory Nos. 14 and 16. We require clarification of your response to Interrogatory Nos. 14 and 16. You state that "[t]he Government does not contend that Huntleigh's performance as a passenger and baggage screener, prior to ATSA's passage, differed meaningfully from the performance of other private screening companies during the same time period." You further represent that the Government will not "single out Huntleigh for criticism at trial." Our interpretation of this response is that the Government does not intend to make any specific arguments or introduce any specific evidence concerning the quality of Huntleigh's performance as a passenger and baggage screener. Rather, the Government will focus exclusively (if at all) on the evidence that was considered by Congress concerning the alleged failures of private screening companies as a whole. (As noted above, we believe that the Government will have waived its right to introduce even this evidence given its inability to produce testing data.) Please confirm in writing that our interpretation of your response is correct.

While our clear preference would be to resolve our disputes amicably, we believe that our exchange of letters has sufficiently clarified the parties' respective positions for purposes of the meet and confer requirement. Nevertheless, in an additional attempt to take issues off the table if possible, I am available at any time on August 29 or 30 and am willing to discuss these issues with you. However, it is our intention to file a motion to compel at the end of business on Tuesday, August 30.

Very truly yours,

Lauren Aguiar

Lauren E. Aguiar

**U.S. Department of Justice**

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7561
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

August 29, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Lauren E. Aguiar
Skadden, Arps, Slate Meagher& Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States,
Fed. Cl. No. 03-2670 C

Dear Mr. Lerner and Ms. Aguiar:

Despite our continuing disagreements, I appreciate the generally constructive tone of Ms. Aguiar's facsimile letter of 4:59 p.m., August 26, 2005 and her voice mail message of the same day. We may be able to resolve at least one more issue before Huntleigh files its promised motion to compel. Specifically, perhaps you could identify where in our briefs you believe the Government has, as your letter states, argued that "Huntleigh's lawful operation of a business . . . could be considered a nuisance under state law" (p. 2); "suggest[ed]" that we may "attack Huntleigh's reputation as a screening company" at trial (p. 3); or indicated that we intend to "introduc[e] . . .evidence at trial concerning the alleged inadequacy of private screening companies . . ." (p. 4). As we expressed essentially the exact opposite positions at pages 40-41 of our August 31, 2004 reply, among other places, I am optimistic that we can readily clear up any remaining miscommunication between the parties concerning these points.

Very truly yours,

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch

cc: J. Grady, TSA

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK 10036-6522
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2235
DIRECT FAX
917-777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 30, 2005

**BY FACSIMILE**

Kyle Chadwick
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corp. v. United States*, No. 03-2670C

Dear Kyle:

This will respond to your letter that was faxed to me at 5:35 p.m. on August 29, 2005. While we do not believe that we should have to point out arguments that in our view are evident from the Government's motion, we will do so in the spirit of compromise and a good faith interest in taking issues off the table.

We believe that the Government will attack Huntleigh's reputation as a screener or introduce evidence concerning the alleged inadequacy of private screeners generally from several passages of the Government's motion to dismiss. By way of example, in Section I(D)(2)(a) of your opening brief, you state that in enacting the Aviation and Transportation Security Act, Congress concluded that "having the airlines provide screening services through their contractors, such as Huntleigh . . . was not adequate to protect the public." (Gov't Br. at 47.) You make a similar assertion on page 49 and then argue that the private screening system was plagued by "poorly trained and paid screening personnel, high turnover, and high error rates." (Id. at 49-50.) At pages 10-14 of the Government's opening brief, you make reference to numerous "well-known problems" with private screening and specifically cite -- gratuitously, in our view -- Huntleigh's provision of screening services at Logan's United Airlines terminal on

September 11, 2001. (Id. at 10-14.) The Government also made similar statements at oral argument. (See Tr. of 11/4/04, at 75 ("The government gave them the opportunity as private entities to . . . engage in this highly important process that couldn't be more important of protecting human life. The government ultimately concluded after giving them that opportunity that they were not adequately protecting human life.").) These arguments, viewed collectively, suggest to us that the Government will place at issue Huntleigh's performance or the performance of private screeners generally.

We have examined pages 40-41 of the Government's reply brief (as you invite us to do in your letter) and this part of the brief -- which asserts that Huntleigh has not demonstrated that it possessed a reasonable investment-backed expectation -- does not represent the "exact opposite" of our position as stated above. Indeed, as far as we can tell, it does not even address, let alone alleviate, our concerns about the Government's strategy. If we are to resolve this matter amicably, then the Government needs to clarify its position. Rather than engage in extended letter writing, I again suggest that we discuss this issue; I am available all day today. Otherwise, we will include this issue in our motion to compel.

Very truly yours,

Lauren E. Aguiar