Exhibit H

No. 03-2670C
(Senior Judge Margolis)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HUNTLEIGH USA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7561

Attorneys for Defendant

OF COUNSEL:

AMY ALLEN RUGGERI
Attorney-Advisor
Office of Chief Counsel
Transportation Security
Administration

MARCH 25, 2004

## III. September 11 & Its Aftermath

### A. The September 11 Hijackings

On September 11, 2001, American Airlines Flight 77, originating from Dulles International Airport, was hijacked by terrorists and flown into the Pentagon, killing 125 people in the building and 64 other passengers and crew. Argenbright Security, Inc., a subsidiary of Securicor PLC, provided contract screening services at Dulles that day. App. 17; Plaintiff's First Amended Flight 77 Master Liability Complaint and Argenbright Security's Master Answer at ¶¶ 24-26, 28, 35-37, In re September 11 Litigation, App. 19-28.[2]

On September 11, 2001, United Airlines Flight 93, originating from Terminal A, Newark International Airport, was hijacked by terrorists and crashed into a field near Shanksville, Pennsylvania, killing all 40 people on board, and the four hijackers. Argenbright provided screening services that day for United at Terminal A of Newark International Airport. App. 17; Plaintiff's Flight 93 Master Liability Complaint and Argenbright Security's Master Answer at ¶¶ 16, 34-37, In re September 11 Litigation, App. 29-37.

---

[2] Again, relevant excerpts from the cited pleadings are provided in the appendix to this brief. The entire text of the pleadings is at http://www.sept11tortlitigation.com/court_papers.html.

On September 11, 2001, American Airlines Flight 11, and United Airlines Flight 175, both originating from Boston's Logan International Airport, were hijacked by terrorists and flown into One and Two Word Trade Center, respectively, killing 2792 other people. Plaintiff, Huntleigh, provided contract screening services at Logan for United on that day. App. 17; Plaintiff's Flight 175 Master Liability Complaint and Huntleigh's Master Answer at ¶¶ 28, 47-48, In re September 11 Litigation, App. 38-49. The September 11 hijackings left 3,021 people dead. App. 17.

B. Congressional Reaction

Not surprisingly, one of the immediate responses to the September 11 hijackings was a renewed interest in the adequacy of airline and airport security practices, especially the policy of leaving passenger screening to the airlines and their contractors, such as Huntleigh and Argenbright. Accordingly, between September 20 and 25, 2001, both the Senate Committee on Commerce, Science, and Transportation, as well as the Subcommittee on Aviation for the House Committee on Transportation and Infrastructure, conducted hearings on aviation security.

Both committees received reports from the General Accounting Office (GAO) discussing well-known problems.

App. 50; 64. GAO's special agents had successfully used fictitious credentials to gain access to secure areas, and tests of screeners had revealed rates of failure to detect dangerous objects in excess of 20 percent. App. 51-52, 55-58; 65-66, 68-71. GAO noted that the primary causes of the screeners' performance failures were poor training, and turnover exceeding 100 percent a year at major airports stemming from low wages, limited benefits, and repetitive work. App. 56-57; 69-70. Generally, screeners received near minimum wage, which was typically lower than the starting wages at airport fast food restaurants. App. 57; 70.

GAO also surveyed the practices of five countries that FAA and industry had agreed possessed effective screening programs. App. 52, 58; 75. It found that some of the countries' operations were more stringent than the United States, only allowing ticketed passengers through checkpoints and keeping greater numbers of law enforcement personnel nearby. In contrast to the United States, several of the countries required screeners to be citizens, and to receive far more training. Additionally, they received relatively better pay and benefits, "middle income" as opposed to virtually minimum wage in the United States. App. 58-59; 75-76.

Finally, GAO stressed that, in the rest of the world, passenger screening is almost always the responsibility of either the airport authority or the government. Indeed, it observed that "worldwide, of 102 other countries with international airports, 100 have placed screening responsibility with the airports or the government; only 2 other countries-Canada and Bermuda-place screening responsibility with air carriers." App. 59-60.

Among the additional testimony received was that of Paul Hudson, Executive Director of the Aviation Consumer Action Project, who stated:

> [A]s those involved with this issue have known for years, the system is broken and has been incapable for over a decade to bring its performance up to the level required by existing security regulations based on past terrorist attacks, much less anticipate and effectively deal with future ones.

App. 96.

Mr. Larry C. Johnson of the Business Exposure Reduction Group also testified:

> The GAO as well as several news organizations has [sic] documented repeated instances over the last several years of inadequate and unprofessional screening at airport security checkpoints. The problems include checkpoints staffed with people who are generally underpaid and ill-trained, a high turnover in personnel, employment of non-US citizens in security positions and

> no requirement to hold any kind of security clearance.
>
> * * * *
>
> By putting the Federal Government in charge of all security operations at an airport we will at least create a structure that can be held accountable.

App. 81.

Among those echoing these views were Ms. Patricia A. Friend, International President, Association of Flight Attendants ("AFA"). App. 87 ("AFA agrees with most Americans that we must immediately federalize the airport screening process"). Also, agreeing was Mr. Jerry Epstein, Former President of the Board of Airport Commissioners for the City of Los Angeles. App. 89 ("The thrust of my remarks here this morning is to impress upon you my heartfelt belief that our security needs will only be resolved through the implementation of a national solution-the establishment of a trained special force whose members are identified, trained, and managed by one accountable agency).

On November 19, 2001, Congress responded to these concerns by enacting the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (codified primarily in scattered sections of 49 U.S.C.). That Act established the Transportation Security Administration ("TSA") within the

a. The Nature Of The Government's Act Dictates That It Is Not A Taking

As previously noted, to aid in considering whether a regulatory taking has occurred, the Supreme Court has identified three factors for consideration. The first factor is the character of the Government's act, which the Supreme Court has long recognized is critical in takings analysis. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 488 (1987). Thus, it is well settled that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent. Transp. Co., 438 U.S. at 124.

Of special significance among those adjustments of benefits and burdens are exercises of the police power "directed at protecting the safety, health, and welfare of the communit[y]." Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002). "The exercise of the police power to address that kind of general public welfare concern is the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations." Id.; M & J Coal

Co. v. United States, 47 F.3d at 1155 (Government may regulate to ensure the public is free from "imminent danger").

Indeed, since "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,'" and property interests that pose such a danger may be destroyed without need for compensation. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. at 491-92; see also Penn Cent. Transp., 438 U.S. at 125 (stating that when health, safety, morals, or general welfare are at stake, governments may enact regulations that destroy property interests without paying compensation); M & J Coal Co. v. United States, 47 F.3d at 1154-55 (Government may abate danger to the public health or safety without requiring the community to bear the burden).

In this case, the Government's interest in protecting the safety of the public did not prompt it to only now impose its regulatory presence upon the screening industry in the form of the Aviation and Transportation Security Act. Government regulation was the genesis for airline passenger screening from the beginning, and has always dictated how it would be accomplished. Statement of the Case, Part II. Thus, as Huntleigh has admitted, "[c]ommercial aviation has long been

the subject of unique and pervasive federal regulation and control," App. 12, and "[a]viation security requirements, including the screening of passengers and baggage, originated as part of a federal 'nationwide anti-hijacking program . . .' which began in late 1968." App. 7. That effort ultimately led to the statutory obligation upon the airlines that either they or their agents screen all passengers. 49 U.S.C.S. § 44901 (Law. Ed. 1998). Thus, as previously noted, Huntleigh's status as a screening contractor did not flow from its own development of that market, but was "a creature of government regulation of public health and welfare." <u>See Page v. United States</u>, 51 Fed. Cl. at 336-39.

As also previously described, after September 11, Congress understandably reviewed the system of having the airlines provide screening services through their contractors, such as Huntleigh, and concluded that it was not adequate to protect the public. Accordingly, through the Aviation and Transportation Security Act, Congress relieved the airlines of their screening responsibilities and undertook that burden for the Government. Statement of the Case, Part III.

The nature of the Government's action in this case released regulated firms (the airlines) from one of their regulatory burdens (screening), and undertook that burden

itself. To the extent this regulatory relief then released the airlines of their need for the services of other contractors (the screeners) to assist them in complying with the former regulatory requirement, we are completely unaware of any precedent even suggesting that these incidental effects of such an act can constitute a taking. Indeed, the entire premise of modern regulatory takings law comes from the Supreme Court's conclusion that "if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)(emphasis added). There is no analogous principle applying to deregulation.

Moreover, the regulatory relief here did not physically invade Huntleigh's property, or preclude Huntleigh from providing screening services to any other customers in need of it. The Government simply decided it did not wish to require such services any longer in the airline industry and would rather provide them itself.[6] Instead of taking anything, here

[6] Significantly, the Government did not completely displace the use of private screeners in the airline industry. The Aviation and Transportation Security Act established a pilot program that initially permits five airports to seek the services of qualified private screeners for all passenger and property screening, and the Act eventually permits any airport to seek such services, through contracts entered into by the Government. Pub. L. No. 107-71, sec. 108(a), §§ 44919-20, 115 Stat. 611-13. If Huntleigh qualifies, it could compete for any such contracts. To the extent Huntleigh does not qualify because of its foreign ownership, it would seem then that if

the Government chose to give more of its own resources. If doing so rendered the services being provided by Huntleigh and the other screeners unnecessary, it "simply adjust[ed] the benefits and burdens of economic life to promote the common good." Connolly, 475 U.S. at 225.

Even if the regulatory relief provided by the Act could theoretically constitute a taking of some direct property interest in doing business, or in some other interests, such as contracts, goodwill, or going concern value, it certainly would not be a taking in this case. Here, the Government's action was incontrovertibly intended to advance a regulatory scheme protecting the public's safety, and flowed directly from a Congressional conclusion that the airlines' screeners were failing to adequately protect the public. This determination is evident in the floor comments preceding passage of the Act. They essentially demonstrate dissatisfaction with a security system driven by the airlines' reliance upon lowest bids, and the problems that flowed from

---

it truly possesses the valuable goodwill in the airline screening industry it claims, its owner would be inclined to sell the company to domestic owners, preserving the alleged goodwill and collecting upon its capitalized value. If, in fact, airports are not interested in seeking Huntleigh's services, but would rather use Federal screeners, then presumably Huntleigh does not really enjoy the goodwill it claims to possess with the public.

that, such as poorly trained and paid screening personnel, high turnover, and high error rates. Congress decided that public safety required, at least initially, a single force of screeners directly employed and controlled by the Government. Statement of the Case Part III(B). These acts to preserve public safety must prevail over any property interest Huntleigh might have possessed to collect profits from the existing system, and therefore do not constitute a taking.

b. Huntleigh Did Not Possess Any Investment-Backed Expectations To Be Free Of The Regulatory Relief Provided By The Act

The nature of the Government's actions here alone dictate that Huntleigh's claim should fail, but even if the Court proceeds to consider the other two factors that aid a takings analysis, they too lead to dismissal. The second factor is the degree of interference with reasonable investment-backed expectations. "In this case, which involves a business engaged in a highly regulated industry, the plaintiff's reasonable investment-backed expectations are an especially important consideration in the takings calculus." Rith Energy, 270 F.3d at 1351. Much of what we demonstrated previously, that Huntleigh did not possess a property right to continue to engage in screening forever, applies equally here.