IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HUNTLEIGH USA CORPORATION, Plaintiff, | : | No. 03-2670C |
| - against - | : | (Senior Judge Margolis) ECF Case |
| THE UNITED STATES, Defendant. | : | |

**PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO DESIGNATE AND PRODUCE A WITNESS PURSUANT TO RCFC 30(b)(6), TO COMPLETE ITS DOCUMENT PRODUCTION AND FOR EXPEDITED CONSIDERATION**

Pursuant to Rule 37(a)(2)(B) of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff Huntleigh USA Corporation ("Huntleigh") respectfully moves to compel defendant, the United States (the "Government"), to (1) designate a witness or witnesses to testify as to Topics 5-7 of Huntleigh's Rule 30(b)(6) deposition notice, dated November 18, 2005; and (2) to provide in advance of this deposition a complete production of documents in response to Huntleigh's Interrogatory No. 10 and Document Request No. 8. As explained below, the Government has represented that it will not produce a witness to testify regarding Topics 5-7, which is currently scheduled to take place on January 4, 2006. Pursuant to Rule 37(a)(2)(B) and Rule 10 of this Court's Case Management Procedures, undersigned counsel for Huntleigh certifies that it has attempted to confer in good faith with counsel for the Government in order to resolve the matters in dispute.

Huntleigh understands that the Government will be moving on an expedited basis to compel certain Rule 30(b)(6) testimony from Huntleigh. In light of the foregoing, Huntleigh respectfully requests expedited consideration of this motion so that both may be heard and decided by the Court as soon as practicable.

## INTRODUCTION

On November 18, 2005, Huntleigh served the Government with a Rule 30(b)(6) deposition notice seeking a designated representative to testify concerning nine topics. (See Notice of Deposition of 11/18/05, Ex. A.) These topics include the following:

> 5. The changes and/or enhancements to passenger and baggage screening implemented by the Government after federalization, including decisions with respect to personnel, hiring criteria, wages, training, and equipment/technology.
>
> 6. TSA's budgets for fiscal years 2002-2005, and the proposed budget for 2006, pertaining to airport passenger and baggage screening.
>
> 7. The costs incurred and the monies received by the Government, in connection with airport passenger and baggage screening, from 2002 to the present.

Topics 5-7 are derived in part from Huntleigh's Interrogatory No. 10,[1] Document Request No. 7[2] and Document Request No. 8.[3] During discovery, in apparent recognition that documents on these subject matters are relevant, the Government produced some (though not all) of the documents called for by Interrogatory No. 10 and Document Request No. 8 -- including personnel, wage, hiring and equipment information; and general funding information regarding the provision of screening services, and also produced or directed Huntleigh to each of the TSA budgets. Accordingly, Huntleigh submits that the Government should be directed to produce all responsive documents in

---

[1] Interrogatory No. 10 relates to data concerning the Government's operation of passenger and baggage screening (e.g., number of screeners, hours worked, wage and benefit rates) at each of Huntleigh's former locations.

[2] Document Request No. 7 seeks the TSA budgets for the years 2002 through the present. The Government subsequently produced or directed Huntleigh to these materials. Accordingly, Huntleigh's request for the production of additional documents is not directed at this Request.

[3] Document Request No. 8 seeks documents sufficient to reflect the costs incurred and monies received by the TSA in connection with passenger and baggage screening.

response to Interrogatory No. 10 and Document Request No. 8, before the Rule 30(b)(6) deposition on January 4, 2006.

On December 1, 2005, counsel for the Government informed Huntleigh that the Government would produce a witness to testify concerning Topics 1-4 and 8-9 of the deposition notice, but would not do so for Topics 5-7 unless Huntleigh persuaded him that the matters "could be relevant to the case." (12/01/05 Letter, Ex. B.) Counsel for Huntleigh responded on December 8, 2005, explaining that Topics 5-7 were designed to elicit testimony concerning the actual operation of passenger and baggage screening in the wake of September 11. (See 12/08/05 Letter, Ex. C.) Counsel further noted that these facts were relevant to the issue of damages, as they will, among other things, allow Huntleigh to confirm the reasonableness of its assumptions regarding the Company's fair market value at the time of the taking. On December 15, 2005, the Government replied that it would not "provide or produce a witness to testify as to those topics absent a court order." (12/15/05 Letter, Ex. D.) This motion followed.

For the reasons set forth below, the Government should be compelled to designate and produce a witness (or witnesses) to testify concerning Topics 5-7, and to answer questions regarding the documents already produced on these topics, which relate directly to the issue of damages. As even the Government acknowledges, in proving just compensation under the Fifth Amendment, Huntleigh is entitled to establish its fair market value at the time of the taking. In this case, a hypothetical buyer would have taken into consideration the increased need for, and costs of, screening post September 11. Under settled precedent, in measuring fair market value, courts and litigants are permitted to consider events that occurred after the taking.

## ARGUMENT

Under the Fifth Amendment, "[t]he proper measure of just compensation is that which will put the owner 'in as good a position pecuniarily as he would have occupied if his property had not been taken.'" Bass Enters. Prod. Co. v. United States, 133 F.3d 893, 895 (Fed. Cir. 1998) (citing United States v. Miller, 317 U.S. 369, 372 (1943)). In other words, a claimant is entitled to be indemnified fully and completely for the extent of his loss. See Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304 (1923) ("The compensation to which the owner is entitled is the full and perfect equivalent of the property taken."); accord Cienega Gardens v. United States, 67 Fed. Cl. 434, 470 (2005).

In quantifying this "full and perfect equivalent," a court may properly determine and consider the "fair market value of the property lost as a result of the taking." Bassett, New Mexico LLC v. United States, 55 Fed. Cl. 63, 69 (2002) (citing Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473 (1973)). For purposes of this inquiry, "fair market value" is measured by "what a hypothetical buyer in a hypothetical free market for the property that was taken would have paid for the property." Independence Park Apartments v. United States, 61 Fed. Cl. 692, 707 (2004) (citing Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984)).

"Focusing on the goal of full indemnity, a number of courts have allowed the use of 'hindsight evidence' in determining just compensation." United States v. 38,994 Net Usable Square Feet, No. 87 C 8569, 1989 WL 152806, at *3 (N.D. Ill. Nov. 21, 1989). For instance, in Georgia Pacific Corp. v. United States, 640 F.2d 328 (Ct. Cl. 1980), the United States Court of Claims allowed plaintiff to introduce post-taking data regarding logging practices "for purposes of corroborating the reasonableness of the views of a [date-of-taking] prospective purchaser and seller as to their anticipations relative to future logging efforts." Id. at 337 n.5. Underlying the court's

holding was a belief that when actual data is available, "the law should express 'a judgment from experience as against a judgment from speculation.'" Id. (citing Tanner v. Little, 240 U.S. 369, 386 (1916)). As Justice Cardozo observed for the Supreme Court in the patent law case Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933), this experience, or "book of wisdom," may be used by courts "to correct uncertain prophecy" and make informed judgments about how an issue -- such as the determination of fair market value -- would have been decided.

This reasoning has been applied by courts in takings cases to confirm the reasonableness of a party's assumptions regarding fair market value at the time of the taking. See, e.g., 38,994 Net Usable Square Feet, 1989 WL 152806, at *3 (admitting evidence regarding actual costs incurred by property owner during period of taking for purposes of reaching a hypothetical valuation as of the date of the taking); Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394, 412 (1989) (considering coal transaction that took place subsequent to the taking for purposes of valuing claimant's coal at the time of the taking); Lee County v. T&H Assocs., Ltd., 395 So.2d 557, 561 (Fla. Dist. Ct. App. 1981) (conditions that prevailed subsequent to the taking were relevant in determining whether crops, which had not matured at the time of the taking, ultimately would have enhanced value of land).

In this case, Huntleigh is entitled to elicit the same evidence that was deemed relevant in the foregoing cases. Huntleigh seeks testimony and documents that will assist it in properly confirming what a potential buyer would have paid for the Company at the time of the taking. This analysis necessarily entails making informed judgments about how a potential buyer at that time would have evaluated Huntleigh's prospects for growth, future business and cash flow. It is Huntleigh's position that a prospective buyer would have given substantial weight to the fact that the events of September 11 resulted in heightened passenger and baggage screening requirements and an increased demand for these services. Topics 5-7 seek concrete facts/evidence concerning the actual operation of

passenger and baggage screening in the wake of September 11. Under the authorities cited above, these facts -- even if they pertain to events that occurred after the taking -- properly may be used by Huntleigh to confirm and corroborate the reasonableness of its assumptions regarding fair market value at the time of the taking. For this reason, the Government should be compelled to designate and produce a knowledgeable witness to testify regarding these relevant matters.

The Government argued in its December 1 letter to Huntleigh that (1) post-taking information/data is not relevant to Huntleigh's damages because those facts could not have been known to a potential purchaser at the time of the alleged taking and (2) an assessment of what Huntleigh's business "might have become" would amount to a calculation of consequential damages.

The Government's arguments miss the point. Huntleigh does not suggest that a hypothetical buyer would have had access to this post-taking data from the TSA, or that Huntleigh is entitled to consequential damages. However, a prospective purchaser, at the time of the taking, would certainly have considered Huntleigh's potential future cash flow and profits in assessing the fair market value of the Company. Put another way, the value that Huntleigh would have commanded on the open market as of the time of the taking obviously would have been informed by the nature of, and changes in, the screening industry post-September 11. Accordingly, Huntleigh's expert will prepare a valuation of the Company at the time of the taking, and the actual data (e.g., costs, wage data and hours information) will be used to determine whether his assumptions about Huntleigh's prospects and cash flow are reasonable.

Compelling the appearance of a witness on these issues is particularly appropriate since the Government has already produced documents that are responsive to Topics 5-7. For instance, it has produced personnel, wage, hiring and equipment information; TSA budgets; and general funding information surrounding the provision of screening services. Having produced these materials, the

Government could attempt to use them at trial -- either to impeach Huntleigh's witnesses or to aid the testimony of its own witnesses. Under such circumstances, it would be fundamentally unfair to deny Huntleigh the opportunity to obtain a fuller understanding of these Government documents through the deposition process.

## CONCLUSION

For the foregoing reasons, Huntleigh respectfully requests expedited consideration of this motion, and an order (1) granting the motion in its entirety; (2) compelling the Government to designate and produce a witness to testify as to Topics 5-7 of Huntleigh's Rule 30(b)(6) deposition notice; (3) compelling the Government to provide in advance of this deposition a complete production of documents in response to Huntleigh's Interrogatory No. 10 and Document Request No. 8; and (4) granting such other and further relief as it may deem just and proper.

Dated: December 23, 2005
New York, New York

Respectfully submitted,

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ Jonathan J. Lerner
Jonathan J. Lerner (attorney of record)
Lauren E. Aguiar
William J. O'Brien
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000
Attorneys for Plaintiff

# ATTACHMENTS

Exhibit A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HUNTLEIGH USA CORPORATION, Plaintiff, - against - THE UNITED STATES, Defendant. | No. 03-2670C Senior Judge Margolis |

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) the Rules of the United States Court of Federal Claims, plaintiff Huntleigh USA Corporation, by and through its counsel, will take the deposition of defendant the United States of America, by and through a person or persons with knowledge of the topics set forth in Exhibit A hereto, beginning at 9:30 a.m. on December 13, 2005, and will continue from day to day until completed, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, N.W., Washington, D.C. 20005-2111. The deposition will be recorded using stenographic means and videotape before a person authorized to administer oaths.

Dated: November 18, 2005
New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Jonathan Lerner by Lauren Aguiar

Jonathan J. Lerner (attorney of record)
Lauren E. Aguiar
William J. O'Brien
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000
Attorneys for Plaintiff

**EXHIBIT A**

Pursuant to Rule 30(b)(6) of the Rules of the United States Court of Federal Claims, you shall designate one or more of your employees, agents, officers, or other persons most knowledgeable on the following subject matters:

1. The basis upon which the Government[1] decided to employ Huntleigh as a provider of passenger and baggage screening services in the period between the passage of the Aviation and Transportation Security Act ("ATSA") and complete federalization, and the reasons for continuing to utilize Huntleigh's services in place of Argenbright in certain locations.

2. The Government's decisions with respect to compliance with the ATSA's requirement that the Government take over responsibility for every existing private passenger and baggage screening contract.

3. The Government's determination of whether and in what manner to assume or take assignment of Huntleigh's passenger and baggage screening contracts.

4. The testimony to Congress on January 23, 2002 by John McGaw, former Under Secretary of Transportation for Security, and the portion of the TSA's March 31, 2003 Report to Congress on Transportation Security pertaining to the assumption of passenger screening contracts.

---

[1] As used herein, the term "Government" refers to its relevant departments, agencies, and offices, such as the Department of Homeland Security, the Department of Transportation, the Transportation Security Administration ("TSA"), the Federal Aviation Administration, the Defense Contract Management Agency, and the United States General Accountability Office.

5. The changes and/or enhancements to passenger and baggage screening implemented by the Government after federalization, including decisions with respect to personnel, hiring criteria, wages, training, and equipment/technology.

6. TSA's budgets for fiscal years 2002-2005, and the proposed budget for 2006, pertaining to airport passenger and baggage screening.

7. The costs incurred and the monies received by the Government, in connection with airport passenger and baggage screening, from 2002 to the present.

8. Attempts made by the Government to inform private security companies and/or the public, prior to September 11, 2001, that the Government might assume responsibility for airport passenger and baggage screening or otherwise prevent private screening companies from continuing to operate their business.

9. The economic impact that the ATSA may impose, and after passage did impose, on passenger and baggage screening companies.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 18th day of November 2005, I served by United States mail (first class mail, postage prepaid) a true and correct copy of plaintiff's Notice of Deposition, addressed as follows:

Kyle Chadwick, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L. Street, N.W., 8th Floor
Washington, D.C. 20530

November 18, 2005

Sarah Yardeni

Sarah H. Yardeni

Exhibit B

**U.S. Department of Justice**

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7562
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

December 1, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Skadden, Arps, Slate Meagher& Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States,
Fed. Cl. No. 03-2670 C

Dear Mr. Lerner:

This letter concerns the notice of RCFC 30(b)(6) deposition served upon the Government by Huntleigh on November 18, 2005. As I indicated to Lauren Aguiar yesterday, we intend to produce Anthony (Tony) Washington in accordance with the notice to testify as to six of the nine topics identified (1-4, 8, and 9). The remaining three topics (5-7) appear to be irrelevant. Had Mr. Washington been able to discuss those topics, we might nonetheless have proffered him to do so, in order to avoid a discovery dispute. (For that matter, we do not necessarily agree that the topics about which he will testify are relevant.) However, because we would need to prepare at least one, and quite possibly as many as three, additional deponents to address topics 5-7, we will not make these witnesses available voluntarily unless we are persuaded that the testimony could be relevant to the case.

The topics at issue are --

> 5. The changes and/or enhancements to passenger and baggage screening implemented by the Government after federalization, including decisions with respect to personnel, hiring criteria, wages, training, and equipment/technology.
>
> 6. TSA's budgets for fiscal years 2002-2005, and the proposed budget for 2006, pertaining to airport passenger and baggage screening.
>
> 7. The costs incurred and the monies received by the Government, in connection with airport passenger and baggage screening, from 2002 to the present.

We presume that Huntleigh considers these issues relevant to damages, as they appear to bear no plausible relation to the threshold question of whether a compensable taking has occurred. Even so, we see no connection between these issues and any legally viable theory of damages.

Compensation for a permanent taking of private property is measured by "the fair market value of the property at the time of the taking." Almota Farmers Elev. & Warehouse Co. v. United States, 409 U.S. 470, 474 (1943), quoted in Yuba Nat. Resources, Inc. v. United States, 904 F.2d 1577, 1580 (Fed. Cir. 1990); Board of County Supers. of Pr. Wm. v. United States, 276 F.3d 1359, 1364 (Fed. Cir. 2002) (measure is what the taken property "would have commanded in the open market"). Unlike breach of contract damages, this measure does not allow an owner to recover "consequential damages [it] suffers as a result of the taking." Yuba, 904 F.2d at 1581; see United States v. General Motors Corp., 323 U.S. 373, 378-80 (1945).

It follows that the facts potentially relevant to Huntleigh's damages do not extend beyond the facts that were known or could reasonably have been learned by a potential purchaser at the time(s) of the alleged taking(s) – i.e., certainly no later than November 2002, when the screening function was completely Federalized. The valuation analysis does not involve a retrospective assessment of what Huntleigh's business "might have become," had ATSA never been enacted, which would amount to a calculation of consequential damages.

These established damages principles plainly exclude your topic number 5, which relates solely to the period after Federalization. Topics 6 and 7 might relate to the period prior to the alleged taking(s), to a limited extent. We fail to see, however, how the costs and budgets of TSA, and of the Government more generally, even in 2002, could be relevant to Huntleigh's market value in the same period. If, upon reflection, you continue to seek testimony regarding topics 5-7, please explain to me the grounds for Huntleigh's position.

Very truly yours,

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch

Exhibit C

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2235
DIRECT FAX
917-777-2235
EMAIL ADDRESS
LAGUIAR@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 8, 2005

**BY FACSIMILE**

Mark A. Melnick, Esq.
Assistant Director
United States Department of Justice
Commercial Litigation Branch, Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Huntleigh USA Corporation v. United States,*
Index No. 03-2670C (Senior Judge Margolis)

Dear Mr. Melnick:

This will respond to Kyle Chadwick's letter of December 1, 2005, in which he informed us that the Government does not intend to produce a witness to testify concerning Topics 5-7 of Huntleigh's Rule 30(b)(6) deposition notice because the issues raised therein "appear to be irrelevant." Mr. Chadwick also asserted, in a November 30, 2005 email, that Topics 5-7 are "objectionable for the reasons described in the judge's ruling on [Huntleigh's] motion to compel."

We believe Mr. Chadwick has misconstrued the purpose of these 30(b)(6) subjects, which are (at the very least) reasonably calculated to lead to the discovery of admissible evidence concerning damages. Despite Mr. Chadwick's suggestion, we are not attempting to elicit evidence regarding so-called consequential damages. Rather, we seek evidence that will assist Huntleigh in determining "what a hypothetical buyer in a hypothetical free market . . . would have paid" for Huntleigh at the time of the taking. See Independence Park Apartments v. United States, 61 Fed. Cl. 692, 707 (2004) (citations omitted). This exercise necessarily entails making determinations about how a potential buyer at that time

would have viewed the Company's prospects for growth, future business and cash flow.

In this case, in properly establishing damages, Huntleigh must be entitled to demonstrate, among other things, that a prospective buyer obviously would have given substantial weight to the fact that the September 11 terrorist attacks resulted in heightened passenger and baggage screening requirements and an increased demand for the services provided by private companies. Topics 5, 6 and 7 in the 30(b)(6) deposition notice seek concrete facts/evidence regarding passenger and baggage screening in the wake of September 11. These facts -- even if they pertain to events that occurred after the taking -- are highly relevant and may be used by Huntleigh to, among other things, confirm or corroborate the reasonableness of its assumptions regarding fair market value at the time of the taking. A damages expert clearly will need to know these facts in order to adequately prepare a valuation.

Mr. Chadwick is incorrect about the relationship between Topics 5-7 and the prior motion to compel. The Government agreed to produce information concerning the subjects raised in Topics 5-7, which are derived from Huntleigh's Interrogatory No. 10, Document Request No. 7 and Document Request No. 8, respectively. For this reason, Topics 5-7 were not included in Huntleigh's motion to compel or addressed by the Court in its decision.

In light of the foregoing, we encourage you to reconsider the Government's position on Topics 5-7. If a witness will not be produced, we will file a motion to compel no later than December 20, 2005, so that the motion may be fully briefed by the January 18, 2006 teleconference with Judge Margolis. In the meantime, I invite you or Mr. Chadwick to call me to discuss this directly.

Very truly yours,

Lauren E. Aguiar

cc: Kyle Chadwick, Esq.

Exhibit D

**U.S. Department of Justice**

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7562
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

December 15, 2005

BY FACSIMILE AND MAIL

Jonathan J. Lerner
Skadden, Arps, Slate Meagher & Flom
Four Times Square
New York, NY 10036-6522

Re: Huntleigh USA Corp. v. United States,
Fed. Cl. No. 03-2670 C

Dear Mr. Lerner:

I write concerning the parties' recent correspondence regarding our RCFC 30(b)(6) depositions. As we read Lauren Aguiar's letter dated December 8, 2005, Huntleigh, in its RCFC 30(b)(6) topics 5, 6, and 7, seeks internal Government information, relating almost entirely to the period after the Federalization of passenger and baggage screening, in order to support its arguments concerning what a prospective purchaser of Huntleigh's assets would have known or "given substantial weight to" at the time of Federalization. This is unconvincing, given that such a potential buyer would not have had access to information that was either (i) non-public or (ii) not in existence at the time of the alleged taking. Accordingly, having considered your letter, we do not intend to prepare or produce a witness to testify as to those topics absent a court order.

Ms. Aguiar argues in her December 9, 2005 letter that topics 2 and 3 of the Government's RCFC 30(b)(6) notice – concerning a "royalty" and "severance costs" reflected in Huntleigh's books for fiscal and calendar year 2002 – do not appear relevant. It is certainly difficult to square that argument with the position taken in Ms. Aguiar's December 8 letter, that information relating to Huntleigh's business which would have been learned by a prospective buyer is pertinent to damages. Huntleigh has not yet taken a firm position concerning the date(s) of the alleged taking(s). However, unless Huntleigh will stipulate that its claim(s) fully accrued in 2001, the Government is certainly entitled to inquire regarding the royalty and the severance costs, which were among Huntleigh's largest expenses in 2002 and thus bear directly upon its financial condition at that time. We urge you to reconsider and to provide testimony concerning our topics 2 and 3.

Although we hope it will be unnecessary to file a motion to compel testimony, we are prepared to do so within a matter of days and to request expedited consideration, so that the court can address your objections in or before early January, when we have agreed the RCFC 30(b)(6) depositions will take place.

Please contact me with your reactions to the above or if questions arise.

Very truly yours,

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch