# EXHIBIT B

# In the United States Court of Federal Claims

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

HUNTLEIGH USA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

No. 03-2670C

(Filed: January 17, 2006)

## ORDER

After a hearing in court on January 17, 2006 regarding the parties' motions to compel Rules of the Court of Federal Claims ("RCFC") Rule 30(b)(6) testimony, it is hereby **ORDERED** that:

1. Plaintiff's Motion to Compel Defendant to Designate and Produce a Witness Pursuant to RCFC 30(b)(6) and to Complete Its Document Production, filed December 23, 2005, is **GRANTED**.

2. Defendant's Motion to Compel RCFC 30(b)(6) Testimony, filed January 6, 2006, is **GRANTED**.

3. Defendant will certify that the agency head of the Transportation Security Administration personally considered the contents of, and authorized the assertion of the deliberative process/pre-decisional executive privilege with regard to, each document for which the defendant asserts that privilege.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

# EXHIBIT C

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HUNTLEIGH USA CORP., | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No. 03-2670C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 31

Place: Washington, D.C.

Date: January 17, 2006

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HUNTLEIGH USA CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 03-2670C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Room 512, Courtroom 8
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Tuesday,
January 17, 2006

The parties met, pursuant to notice of the Court, at 2:00 p.m.

BEFORE: HONORABLE LAWRENCE S. MARGOLIS
Judge

APPEARANCES:

For the Plaintiff:

LAUREN E. AGUIAR, Esquire
SARAH HECKMAN YARDENI, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-2235/735-3000

For the Defendant:

KYLE CHADWICK, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., Room 7062
Washington, D.C. 20530
(202) 305-7562

APPEARANCES: (cont'd.)

Also for the Defendant:

JANESSA GRADY, Esquire
Transportation Security Administration
601 12th Street South, 12th Floor
Arlington, Virginia 22203
(571) 227-2682

P R O C E E D I N G S

(2:00 p.m.)

THE CLERK: All rise. United States Court of Federal Claims is now in session, the Honorable Lawrence S. Margolis presiding.

THE COURT: Good afternoon. Have a seat.

THE CLERK: This is Case No. 03-2670C, Huntleigh USA Corporation v. The United States. Appearing on behalf of the Plaintiff, Lauren Aguiar. On behalf of Defendant, Kyle Chadwick. This is a hearing on the parties' motions to compel Rule 30(b)(6) testimony.

THE COURT: All right. I've read the papers. I believe Plaintiff filed their motion first, so you're entitled to be heard first.

MS. AGUIAR: Thank you, Your Honor. Thank you. As you mentioned that you read the papers, I will not go back over a lot of what was outlined in the papers. Let me just summarize where I think we are. As I see it, the Government concedes the legal position that forms the basis of our motion, which is that evidence regarding events and circumstances post-taking certainly could be admissible. I think it's pretty clear in their opposition papers that they do not take issue with that.

What they suggest instead is that it's a question of whether that principle of law applies on the facts of this case. And let me tell you why I think it doesn't. I think that their reading of the case law is unduly narrow. And what they do in their papers is they pick apart each one of the cases and they say, here's why this particular factual circumstance is not analogous to this case.

But if you read the cases that we cited in our brief and you look at the two Supreme Court cases that precede it, which I'll grant you are not takings cases -- one is a patent case -- the theme that emerges from those cases is that the Courts basically say, look, we'd rather not speculate, and we'd rather not have uncertainty. So we are always going to err on the side of admitting evidence where it may go to value and where it may go to a more proper explanation of just compensation.

If you look at the Georgia-Pacific case, there's a good quote on page 337 of that case, where they say, "such a determination..." and that is of value, "...embraces all the facts and circumstances that a reasonable, fully informed, and knowledgeable willing seller and willing buyer would consider at the time of a hypothetical transaction at the date of the

taking." And then they go on to say in a footnote that that is meant to encompass what they call the anticipations of a buyer and what may happen after the taking.

Now let me talk specifically about our case. The government suggests in its papers that this is all a made-up world that we're talking about here. They suggest this dichotomy between a real world and a but for world. I see why they're trying to do that, but let me explain why I think that doesn't make any sense. I'm not talking about two worlds. I'm talking about the world. I'm talking about the world of when the TSA took over screening.

I want to look at actual facts, actual data, and actual figures that will inform the expert's opinion, rather than speculating about what's in their files. They make it sound like what they're doing is so different from what the private companies were doing because it's a federal agency doing it.

But the reality of it is that it's basically the same screeners. Many of them are the exact same screeners that worked for the private companies. Now they wear a TSA jersey. They work at the same checkpoints. They work at the same airports. They work for the same airlines. They screen the same public.

THE COURT: What percentage of Huntleigh employees were employed by TSA? Do you have any idea?

MS. AGUIAR: We do have some idea because we specifically asked for that, and it's actually a very large percentage.

THE COURT: Could you give me an estimate?

MS. AGUIAR: I'm going to ask for your leeway here, and I'll ask Sarah if that's something she can think about over the next few minutes because it is in the documents. Just to speculate, I'd say on the order of 70 to 80 percent, but don't hold me to that. But it's a very large number.

THE COURT: All right.

MS. AGUIAR: So the same basic tasks they're performing. They're screening people and their bags. The ultimate goal is the same, making people safe to fly. And they're ultimately accountable to the same federal regulations, FAA regulations. Yes, it's now a federal agency doing it and they do it a little bit differently and Mr. Chadwick may say they do it with some different equipment, but by and large, they're doing the same thing. So when they say there's no conceivable relevance to what we would have done, that doesn't work for me.

So information regarding the current pay

structure, the hours, the number of screeners at checkpoints, the training that they go through, all of that, I think, is relevant. So just to sort of conclude, I think that, as I said, the theme that I see in the cases is that the Courts are, in a way, they're stretching to say whatever information may fall within this book of wisdom, which is the phrase that one of the Courts uses and they use in a lot of the patent cases.

You take this book of wisdom because we value certainty over speculation, and the goal here is to get at the true loss. So if you want to get at the true loss, this is information that should be available to you. And I think at best, the government's argument that they do it differently, and therefore, their data doesn't really transfer to a private market, I think at best that goes to the weight that you would afford that evidence.

And when you listen to our expert or you compare the data that they've produced to us to what he's speculating about, you can weigh that. But I certainly don't think it goes to relevance. If you have any questions, I'm happy to answer them.

THE COURT: The government has produced most of the documents you're seeking, is that true?

MS. AGUIAR: I wouldn't say most. We made a point in our papers that they've actually produced some, and I don't know whether I should go so far as to say it may frankly have been inadvertent because they're taking the position that the information is not relevant and that we shouldn't have it.

So we have some of it, and it's very spotty. Like, we'll have a month here and a month there, so, yes, the answer is yes. They've produced a bit of it, but I wouldn't say most. And so what our position is that they should produce all of the relevant information in documents and that we should have a witness on this topic.

THE COURT: All right. Thank you.

MS. AGUIAR: Thank you.

THE COURT: Yes, sir.

MR. CHADWICK: Good afternoon, Your Honor. Should this be limited just to Plaintiff's motion at this point?

THE COURT: At this point, yes, let's dispose of that motion, and we'll get to your motion.

MR. CHADWICK: All right. You ask yourself, what would a buyer have paid for these assets, whatever they are, on the date of the taking or immediately prior to the taking? We know part of that

answer, which is that had a buyer known that the government would be doing these activities and the private companies would not, a buyer would be willing to pay approximately zero or maybe the salvage value.

This is not a case of a property, such as real property, that existed in its current state, then there was a taking, and it continued to exist largely in its prior state but subject to different legal conditions and then we could trace through some costs, some expectations from that property to the same property after the legal event.

In this case, the business of Huntleigh's, of conducting airline passenger and baggage screening, didn't exist. And it's not that it didn't exist just for Huntleigh. It didn't exist as a private business at some point.

THE COURT: Because you allegedly took their property, isn't that why?

MR. CHADWICK: That is, but, Your Honor, there has been some suggestion in Huntleigh's papers that we shouldn't be able to "use" that fact. Well, the fundamental fact is that this isn't a tort case. It's not even a breach of contract case. It is a taking.

Even assuming a taking occurred, a taking is

not a wrongful action. There's nothing wrong with a taking. A taking is right in the Fifth Amendment of the Constitution. Just compensation is required, but it's not as if we'd be relying on some sort of wrong and getting some inequitable result from it.

The facts are the facts. The fact is you can't imagine Huntleigh's property that's at issue continuing after this event, legal event, which we contend, as you know, is not a taking. But whatever it is, the market doesn't exist. Whatever market expectations would have been formed, clearly nothing came of them because there was no further market.

Now, you can look at the experience of the government, but that we submit by definition, that is only speculative. You know, to suggest that it simply goes to the weight, I think, is not correct. There just isn't a connection between the private market that existed and the government function now. And it doesn't have anything to do with Huntleigh's property or Huntleigh's price prior to that, for that simple reason that the price certainly would have dropped to zero had anybody --

THE COURT: How can you prove the fair market value at the time of the alleged taking?

MR. CHADWICK: Well, you'd certainly have to

come up with some sort of valuation method. There is certainly multiples times revenues, things like that. At whatever point you can cut it off before one became aware, of course, that this market was going to disappear. You'd have to at some point make sure you were at a point before the market had taken that into account, but you could do multiples times revenue, something like that.

I would also flip it around and say as part of what we've put forward here, this gets really to our next motion. Maybe I should save that. I was going to say, we put forward that there's been significant remuneration to Huntleigh during the same period, and that really goes to our other motion.

THE COURT: Well, we may just spill into the other motion a little bit. Go ahead, continue.

MR. CHADWICK: That's essentially all I had. I mean, have we cited a case that talks about this but for world concept? No. Has Huntleigh cited a case that's analogous to this, where they allege that market for the property no longer existed after the taking? No. So, you know, in our view, the salient points about those cases, given the background principle that what you're supposed to be doing is looking at the fair market value as of the date of the

taking, that's the background principle.

There has to be some reason, principled reason, to look past the date of the taking. The reasons in all of those cases seem to be that there was a guess or an expectation that would have existed on the taking date which simply came to fruition.

In other words, in the Florida case, the plants grew and the crops were sold. There's no point in, you know, giving a speculative value as of the taking date because we actually know that number. Same thing with the price of the coal. Same thing with whether a park in the Georgia-Pacific case would have affected the timber value. You know, we know what happened.

Here, you just don't have the same property. You can't look at the same property and say, well, we were expecting this to happen. Let's see if it happened because that market didn't exist. There's no more going concern of that screening business, by definition.

THE COURT: How can you, on the one hand, deny the Plaintiff the information and then on the other hand, in your other motion, ask for royalty information and severance costs? They seem to me inconsistent.

MR. CHADWICK: Well, I was going to start my presentation on the other motion by saying it seems clear to us and it seems clear from Ms. Aguiar's presentation this afternoon that Huntleigh's positions can't both be right. Whether ours are both right, of course, that's my next burden to bear.

THE COURT: Or you're both wrong.

MR. CHADWICK: Maybe we're both wrong. But it cannot be true that the actions and experiences of the government during, but mostly after, the alleged taking, are integral and relevant to a damages calculation. But also at the same time, that major expenses noted on Huntleigh's balance sheet in the year apparently, as far as we can tell, of the alleged taking, are irrelevant. The Plaintiff's balance sheet is what evaluation is all about. And to the extent that that is going to form a large part of this case, there doesn't seem to be any logical way that both of those positions could be held correct.

Now, is ours correct? Well, again, I think with respect to Huntleigh, I frankly don't understand the counter argument. I'm not sure there is one in law. You know, Huntleigh can certainly assert that we already know some of this. Huntleigh questions our motives with respect to an unrelated case. I think

that's somewhat beneath comment, but the point is, you know, there's really no substitute for discovery. If DCAA audits were a substitute for discovery, there would be a lot less discovery in this Court as you know, Your Honor.

We're talking about here total, probably, of a half an hour to 45 minutes of questions. If Your Honor allows this to go through, I would propose that we do it by telephone. I mean, clearly it's not an enormous area, but here you have two large expenses. Here you have something that's going to be integral to at least a portion of a number of the government's responses to the allegation of taking. One is, of course, that the same legislation that Huntleigh alleges affected the taking actually conferred benefits on them.

At a minimum, we would suggest you need to net out whatever the damages of the taking would be, net the benefits out of that. We would suggest as a matter of law, and this is also an argument, that it's not a taking to begin with, that there are benefits conferred in the process.

There's also something that may not be as clear, but the fact that, in addition to dividends, Huntleigh paid a royalty to its corporate parent,

which, as the Court can see, is explained a bit further in some of the attachments to Huntleigh's opposition, goes in our mind to, if you will, an analogy to the parcel as a whole doctrine. In other words, what is the unit we're talking about here?

If Huntleigh is in such close relation and has such close ties and management interaction with ICTS, a much larger company, maybe what we've really got here is some injury to a small part of ICTS, rather than to a large part of Huntleigh. I mean, we're certainly allowed to argue that, and it's just something we want to look into.

And I will say, and I'll represent to the Court for what it's worth, these topics that we want to hear about came up as a result of our expert. I'm assuming that's true for Huntleigh as well, but it's certainly true in our case. We didn't look around for some excuse to ask about these things. Our expert wants to know about those line items. So, unless the Court has further questions, I'd leave it there.

THE COURT: How about the issue of privilege? Does that enter into some of the documents that we're considering here?

MR. CHADWICK: It didn't enter directly into our objection. There may be some overlap in the

documents, is what I'm saying, but not significant overlap. It's really two issues in terms of our objections. There are deliberative process documents which we've said, conceded, in effect, would be responsive, and, you know, we would be producing them if they were not subject to the deliberative process privilege. So we haven't raised a relevance objection to the deliberative process arguments. We see that as two different types of objections.

THE COURT: Are you asserting the deliberative process decision on privilege here with regard to any of these documents?

MR. CHADWICK: No, not with respect to these two cross-motions, no.

THE COURT: Okay. Thank you.

MR. CHADWICK: Thank you.

THE COURT: Yes?

MS. AGUIAR: May I?

THE COURT: Yes.

MS. AGUIAR: Just a few points to respond regarding our motion, and if you'd like me to address the other, the government's motion, I'll do that.

Mr. Chadwick says this is a case where we don't have a tangible piece of property, but our property was our business and the functions that we

performed. And they're now performing those same functions and that same business. So we didn't continue. He makes much of the fact that we weren't able to continue. No one was able to continue. There was no private market. But it did continue, just in a slightly -- not in a different form, but with a different emblem on their shirt.

And he also made a comment about market expectations and that the market expectation would be that the value of the company was zero. Our point is you have to value it at the date of taking, so if it had not been taken, what did we lose? So a buyer would have looked at our company before the statute was passed and said, okay, 9/11 happened. No legislation has been passed. We don't know what's going to happen yet.

So our expert is going to address, okay, well, in that period, what would a buyer say? A buyer would say, given what just happened, there may be a significantly increased need and desire for security. More screeners, higher pay, better equipment. You know, if you look at the market in that time period post-9/11, the market cap of the security-related companies went up.

So this is something that our expert will

do, and the evidence that we're looking for will help to assess the reasonableness of those assumptions that he has and to corroborate -- or not corroborate. I don't know what that information is going to do for me. Whether it will actually show that our valuation should be higher or should be lower, but that's exactly why we need the evidence.

Would you like me to basically address the government's motion or --

THE COURT: Let me hear from the government on their motion.

MS. AGUIAR: Okay.

THE COURT: I sort of cut him off. I'll let him expound, and then I'll let you respond.

MS. AGUIAR: All right. Thanks.

THE COURT: Did you want to say anything more with regard to your motion or address that?

MR. CHADWICK: Not so much. I just want to emphasize, in combination with our --

THE COURT: We're talking about Plaintiff's motion here?

MR. CHADWICK: Yes, Plaintiff's motion. In combination with our relevance objection, I would emphasize -- and I would submit that this distinguishes Huntleigh's motion from ours, that

you're talking about a significant burden on the government to prepare witnesses to speak about these very broad, general topics which are financial and operational.

We need at least two, if not three, witnesses to speak to these three topics, and you're talking about from 2002 essentially through the present. So it's not a question to the extent any balancing needs to be done. It's not a question, as far as we can tell, of simply answering a few questions. It would require us, at least not knowing what the questions were, to engage in substantial preparation of two, if not three, witnesses. I just wanted to emphasize that.

THE COURT: Okay. Thanks, counsel. You just said a half hour or 45 minutes. Isn't that what you said?

MR. CHADWICK: I said that. I said that for our question.

MS. AGUIAR: But he was talking about those other topics.

MR. CHADWICK: Yes, I'm talking about ours. If we're able to ask ours.

THE COURT: All right. You want to respond to your motion anymore?

MS. AGUIAR: You know what? I'll do it when I get up later, if that's okay.

THE COURT: Okay. We're back to your motion.

MR. CHADWICK: To be fair, Your Honor, I think I've spoken to our motion.

THE COURT: Yes?

MS. AGUIAR: Okay. Just to close the loop on the comment about the burden on the government to produce witnesses, Your Honor is probably not aware of this, but we've essentially taken all the other depositions in this case, and it's strikingly different than most of the complex, commercial cases that I litigate.

We have taken a whopping total of two depositions in this case, one on each side. So we're really not, in my view, going hog wild with discovery. So if there have to be another, you know, one or two witnesses, that to me doesn't seem like a tremendous burden. We are certainly not objecting on the basis of burden to the government's motion. So let me address it.

The government is seeking information regarding these two nonrecurring items. Huntleigh is not taking the position that its post-taking financial

information is not relevant because I do think that, in a way, that would be somewhat hypocritical of me to stand up and say that information from the government regarding post-taking is relevant, but mine is not. We produced all of our post-taking financial data basically up through until the time of our production, and I did not object on the grounds that it wasn't relevant. So they have it.

My issue is that they want to inquire into two nonrecurring items on our financials that I don't think go to value. And what disturbs me about it is that there is another case, which you've probably read in our papers, that's going on before ODRA, O-D-R-A, and that is absolutely the focus of that ODRA proceeding is this royalty and severance issue. So it does raise a question for me about motivation.

Now, Mr. Chadwick may say, well, that's all well and good. Just because these two issues are relevant to ODRA doesn't make them irrelevant to this case. But I see marginal relevance, if any at all, in this case, and it's really the crux of the ODRA proceeding. So it seems to me that these discovery requests are being interposed in the wrong case.

THE COURT: If you've produced the documents relating to severance and the other issue --

MS. AGUIAR: Royalties.

THE COURT: -- royalties, yes, how can you object to depositions with regard to those particular documents? I mean, it's just inconsistent.

MS. AGUIAR: Well, I'll tell you why I think it's not because we've produced our financial statements in general. And so when they asked for a witness specifically on these two topics, and, you know, in their motion, by the way, they don't say that we need to produce more documents. They don't have sort of an accompanying request for sort of additional documents and a deposition. They just want a witness on these questions. To me, it just doesn't seem like -- they seem like granular issues on our financial statements, two nonrecurring line items that don't go to value.

THE COURT: But that's your opinion.

MS. AGUIAR: Yes, thus, I oppose the motion.

THE COURT: Because the government is going to make a big deal out of it.

MS. AGUIAR: Maybe so. So I would agree with the government or with you, if it's your position, certainly, that the revenue that we earned from screening in 2002 I think may very well bear on, okay, if our business hadn't been taken, how much

would we be worth? How much revenue would we have made because we were at the government's request, operating on their behalf for almost a year? And so I think the revenue that we made during that period is relevant. I just don't see the particular relevance of these two specific -- and they didn't continue. These line items don't appear in subsequent years. It's just 2002 when we were operating under the government contract because obviously we weren't screening after 2002. So, thank you.

THE COURT: Mr. Chadwick, was there anything further?

MR. CHADWICK: 2002, Your Honor, is the year of the taking. That distinguishes it from future years in a very funny little way.

THE COURT: What's the date of the taking?

MR. CHADWICK: Well, we don't know for sure what the alleged date of the taking is. We suggested a few dates that would have to be chosen from.

THE COURT: Do you have a view?

MR. CHADWICK: Yes. We believe the taking occurred actually in November of '01, with the passage of the statute. It would seem to be, though, that a culpable argument can be made for February of '02, when essentially all of Huntleigh's private passenger

baggage screening was gone, and Huntleigh became a government contractor.

THE COURT: So I've got to figure that one out, is that what you're telling me?

MR. CHADWICK: Unless we can stipulate down the line, probably that will be one of the issues. You know, so you have nonrecurring items, you know, fine. But they occur in the year of the taking. One of these so-called granular items amounts to more than a third of Huntleigh's gross profits for that year, and that's the royalty.

Each of these items, I believe, at least I see I wrote in our motion that the royalty is greater than Huntleigh's GNA expenses and its goodwill amortization in '02 combined. I think that's also true of the severance costs or else it's very close to those two combined. These are large expenses. We don't know to what extent they will play any role in the valuation.

We just want to know to be prepared to the extent that they do, but certainly with respect to, I think, the clearest argument we might make would be with respect to the offset issue that I raised earlier, that if there are going to be damages calculated for a taking, we will be arguing that there

are significant benefits conferred in that process.

And one major question there, I think, would have to be does this $22 million royalty, does that count as part of the benefits, or is that not something Huntleigh earned because it's something it had to pay off to its corporate parent?

The same, I think, could be raised in a slightly more complicated fashion with the severance costs. So, you know, they are dollar figures. We don't know exactly how they are going to play into the case, but clearly they are about the balance sheet of the Plaintiff in the year of the taking. So, thank you.

THE COURT: Why don't you give me about ten minutes, and I'll give you a decision.

MS. AGUIAR: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

THE COURT: Have a seat. I'm going to grant both motions to compel, and I believe the information requested by both parties is relevant to the fair market value valuation method developed by the Courts. I'll leave it to the parties to work out the days, the times of the depositions. Are there any other issues you wanted me to consider? Ms. Aguiar?

MS. AGUIAR: Yes.

THE COURT: Yes?

MS. AGUIAR: There are two, Your Honor. One relates to the fact that as I understand it, we're not having our previously scheduled status conference tomorrow.

THE COURT: That's right.

MS. AGUIAR: So Mr. Chadwick and I wanted to raise the issue of the current schedule. I think we're in agreement that we can leave the dispositive motion date as current, May 1, but that in light particularly of your ruling now, that we will need to push the expert deadlines a bit. And I think that he and I -- not I think, I know he and I are good at working out dates amongst ourselves. So if it's okay with you, we'll just suggest to you the dates that we've agreed to, and then you can perhaps order those dates.

THE COURT: That would be fine.

MS. AGUIAR: Okay.

THE COURT: That would be fine.

MS. AGUIAR: And the other issue concerns a submission that we made to Your Honor. I believe you probably received it this morning. Mr. Chadwick and I had discussed this issue of the predecisional privilege, executive privilege, a week or so ago on

the deposition. A significant number of documents have been withheld on the basis of this privilege, and while I'm not a frequent practitioner of this Court, the way I read the --

THE COURT: You've become one recently.

(Laughter.)

MS. AGUIAR: The way I read the recent case law, including the Jade Trading case, is that more is required to formally and properly assert that privilege. We raised it with the government, and I understand Mr. Chadwick's position. They've done what they need to do, and we believe that it needs to be asserted by affidavit or declaration, explaining the nature of the documents. And explaining why the information in those documents is subject to the privilege. That's the way I read the Marriott case from 2004 and Judge Williams' opinion in the Jade Trading case.

THE COURT: Mr. Chadwick?

MR. CHADWICK: In a nutshell, Your Honor, our understanding and our procedure to date is that the time to formally support this, what we call deliberative process privilege, is in response to a motion to compel. And at that point, we do produce the necessary affidavits, et cetera.

Before that point, we're not aware of any case law that says it isn't properly asserted, for instance, in a privilege log, simply because a privilege log doesn't have affidavits accompanying it. We believe in response to a motion to compel is when those requirements are triggered, specifically the affidavit of the agency head.

THE COURT: So you don't want me to really rule on the issue until it's fully briefed?

MR. CHADWICK: Well, I mean, Ms. Aguiar raises the threshold issue, and we're happy to take Your Honor's ruling on it, which is, does the government need to provide Ms. Aguiar with affidavits and the like prior to a motion to compel? Or do we do it in response to a motion to compel?

THE COURT: And what do you rely on as the authority?

MR. CHADWICK: Essentially the same authorities that Ms. Aguiar cites. They appear to us to be discussing how the privilege is asserted in response to a motion.

THE COURT: You apparently disagree with Jade then?

MR. CHADWICK: Yes.

THE COURT: All right. Is there anything

further from the Plaintiff?

MS. AGUIAR: It seems somewhat counterintuitive that an affidavit would not have to be provided until a motion to compel because as I read Jade and Marriott, the policy behind requiring this affidavit is so that judges, such as yourself, do not get caught up in these kinds of things. So that the affidavit is provided beforehand so a thoughtful process is undertaken, and that may reduce the likelihood that the parties fight about it. But that's all I have, thank you.

THE COURT: I'm going to require the defense counsel to certify that the head of TSA personally considered the contents of and authorized the assertion of the deliberative process/predecisional privilege over each document for which the Defendant asserts privilege, following Jade. Is there anything further?

MS. AGUIAR: Not from our end, Your Honor. Thank you.

THE COURT: As far as scheduling is concerned, I'm not sure that that May 11 date is going to -- I think that was the date of the pretrial, if I'm not mistaken?

MS. AGUIAR: Actually, May 1 is just the

date for the parties to submit their dispositive motions.

THE COURT: Yes, but there was a pretrial date in there, too, as I remember it. May 11, wasn't it? I don't have the papers before me.

MS. AGUIAR: All I have is a dispositive motion on May 1 and a trial on October 3.

THE COURT: Okay.

MS. AGUIAR: Okay.

THE COURT: All right. Got it.

MS. AGUIAR: But the last thing I was just going to say is that you have been doing conferences all along.

THE COURT: All right. Fine. All right. Is there anything further? Thank you very much.

MR. CHADWICK: Thank you, Your Honor.

MS. AGUIAR: Thank you.

(Whereupon, at 2:45 p.m., the hearing in the above-captioned matter was concluded.)

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 03-2670C

CASE TITLE: Huntleigh USA Corp v. U.S.

HEARING DATE: 1/17/06

LOCATION: Washington DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before US Court of Federal Claims

Date: 1/17/06

[signature]

Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018