IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HUNTLEIGH USA CORPORATION, Plaintiff, | : | No. 03-2670C |
| - against - | : | (Judge Margolis) |
| THE UNITED STATES, Defendant. | : | ECF Case |

**PLAINTIFF'S PRETRIAL MEMORANDUM OF**
**<u>CONTENTIONS OF FACT AND LAW</u>**

Jonathan J. Lerner
Lauren E. Aguiar
SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Plaintiff
Huntleigh USA Corporation

October 20, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

ISSUES OF FACT AND LAW ..... iv

INTRODUCTION ..... 1

CONTENTIONS OF FACT ..... 3

CONTENTIONS OF LAW ..... 19

I. THE EVIDENCE AT TRIAL WILL SHOW THAT HUNTLEIGH SUFFERED A COMPENSABLE TAKING ..... 19

A. The Constitutional Framework ..... 19

B. Huntleigh Had a Protected Property Right In Its Business Assets, Including Its Contracts, Going-Concern Value and Goodwill ..... 19

C. The Degree of Economic Impact on the Plaintiff Determines the Appropriate Legal Test To Apply ..... 20

1. The *Lucas* Test Applies To Regulatory Takings of Personal Property ..... 21

2. The Evidence Will Show that The Relevant Property For Purposes of the Takings Inquiry is Huntleigh's Screening Business ..... 21

3. The Evidence Will Demonstrate That The Act Constituted A Categorical Taking Under *Lucas* ..... 24

4. The Evidence Also Will Establish that The Act Constituted A Taking Under The Three-Part *Penn Central* Test ..... 29

II. THE EVIDENCE AT TRIAL WILL ESTABLISH THAT HUNTLEIGH IS ENTITLED TO COMPENSATION UNDER THE ACT ..... 32

CONCLUSION ..... 33

# TABLE OF AUTHORITIES

## CASES

Armstrong v. United States, 364 U.S. 40 (1960) .......... 19

Bassett, N.M. LLC v. United States, 55 Fed. Cl. 63 (2002) .......... 27, 28

Bauman v. Ross, 167 U.S. 548 (1897) .......... 32

Cane Tenn. v. United States, 57 Fed. Cl. 115 (2003) .......... 23

Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602 (1993) .......... 22

Cienega Gardens v. United States, 67 Fed. Cl. 434 (2005) .......... 23

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) .......... 19, 20, 29, 30

College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666 (1999) .......... 20

Conti v. United States, 48 Fed. Cl. 532 (2001) .......... 30

Doe v. United States, 100 F.3d 1576 (Fed. Cir. 1996) .......... 32

Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568 (Fed. Cir. 1988) .......... 26

Georgia Pacific Corp. v. United States, 640 F.2d 328 (Cl. Ct. 1980) .......... 25, 27

Hendler v. U.S., 175 F.3d 1374 (Fed. Cir. 1999) .......... 28, 31 32

Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440 (2005) .......... 19, 20, 30, 32

Keystone Bituminous Coal Association v. De Benedictis, 480 U.S. 470 (1987) .......... 21, 22

Kimball Laundry Co. v. United States, 338 U.S. 1 (1949) .......... 19, 28

Lee County v. T&H Associates, Ltd., 395 So. 2d 557 (Fla. Dist. Ct. App. 1981) .......... 26

Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005) .......... 20, 21, 29, 30

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) .......... 32

Loveladies Harbor, Inc. v. U.S., 28 F.3d 1171 (Fed. Cir. 1994) ........................ 20, 22, 24

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992)......................... 1, 21, 24

Maritrans, Inc. v. United States, 40 Fed. Cl. 790 (1998)............................................... 31

Miller v. United States, 223 Cl. Ct. 352 (1980).......................................................... 29

Naegele Outdoor Adver., Inc. v. City of Durham, 803 F. Supp. 1068
(M.D.N.C. 1992) ............................................................................................. 24

Olsen v. United States, 292 U.S. 246, 257 (1934) ........................................................ 27

Palm Beach Isles Associates v. United States, 208 F.3d 1374 (Fed. Cir. 2000) ........ 20, 22

Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978)............. 2, 29

Rose Acre Farms, Inc. v. United States, 373 F.3d 1177 (Fed. Cir. 2004)....................... 21

Sartori v. United States, 67 Fed. Cl. 263 (2005)..................................................... 21, 22

Schneider v. County of San Diego, 285 F.3d 784 (9th Cir. 2002)................................. 32

United States v. 0.88 Acres of Land, 670 F. Supp. 210 (W.D. Mich. 1987)............. 19, 28

United States v. 38,994 Net Usable Square Feet, No. C 8569, 1989 WL. 152806
(N.D. Ill. Nov. 21, 1989).................................................................................... 26

United States v. Brooklyn Union Gas Co., 168 F.2d 391 (2d Cir. 1948).................. 26, 27

United States v. Thayer-West Point Hotel Co., 329 U.S. 585 (1947)............................. 24

Vulcan Materials Co. v. City of Tehuacana, 369 F.3d 882 (5th Cir. 2004) ..................... 25

Whitney Benefits v. United States, 18 Cl. Ct. 394 (1989) ...................................... passim

Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1991)....................................... 27, 32

## STATUTES

14 C.F.R. part 108 ............................................................................................. 3, 13

Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597, 49
U.S.C. 44901 ................................................................................................ passim

Pursuant to Appendix A ¶ 14(a) of the Rules of the United States Court of Federal Claims, and the Court's June 23, 2006 Order, plaintiff Huntleigh USA Corporation ("Huntleigh") respectfully submits this Pretrial Memorandum of Contentions of Fact and Law.

## ISSUES OF FACT AND LAW

1. Whether the Aviation and Transportation Security Act (the "Act"), and the Government's actions pursuant thereto, eliminated all economically beneficial use of Huntleigh's passenger and baggage screening business, such that it effected a categorical taking under Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992).

2. Whether, in the alternative, the Act and the Government's actions pursuant thereto, constituted a taking under Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978), where (i) the burdens of the Act fell disproportionately on Huntleigh and a small number of other private security screening companies; (ii) Huntleigh had reasonable, investment-backed expectations that it would not be eliminated from the screening industry by a government takeover; and (iii) the Act prohibited Huntleigh from continuing to perform under its private contracts to provide passenger and baggage screening services, causing serious harm to Huntleigh and leaving it with only non-screening operations.

3. What amount of compensation is owed to Huntleigh based on an analysis of Huntleigh's fair market value as of November 19, 2001, where Huntleigh would have provided heightened screening services, in a manner consistent with the way in which the screening industry had been growing and evolving prior to 9/11 and the way in which the industry developed after 9/11 in response to the heightened threat environment.

4. Whether Huntleigh is entitled to adequate compensation under the Act where (i) the Act expressly provides for the payment of "adequate compensation" if the government assumes "the

rights and responsibilities of . . . contract[s] for the provision of passenger screening services," (ii) the Government assumed the rights and responsibilities of every one of Huntleigh's screening contracts, and (iii) the Government has admitted in official statements, deposition testimony and contemporaneous internal documents that it assumed existing private screening contracts.

**INTRODUCTION**

The evidence at trial will establish that Huntleigh's business assets were the subject of a categorical taking under the Fifth Amendment to the United States Constitution, entitling Huntleigh to just compensation. The taking of Huntleigh's property was effectuated by the federal government's enactment and implementation of the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (the "Act"), which nationalized the screening industry at airports throughout the United States and legally prohibited Huntleigh from performing under its long-standing contracts to provide pre-departure passenger and baggage screening services. Pursuant to the Act, the federal government replaced private companies, including Huntleigh, in performing all passenger and baggage screening functions, and hired many of Huntleigh's employees to do it.

The evidence at trial will demonstrate that as a result of the Act, Huntleigh was deprived of all economically beneficial use of its property, which is appropriately considered for the takings analysis as its screening business, which differs markedly from the other services Huntleigh happened to offer. In all events, the screening business was Huntleigh's only profitable business and once it was confiscated, the other services (essentially loss leaders), had minimal value. As a result, the entire value of Huntleigh's business was taken. This complete confiscation of Huntleigh's business assets constitutes a categorical taking pursuant to the Supreme Court's decision in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). Although the federal government effectuated a taking of Huntleigh's business property, including its contracts, going-concern value and goodwill, it failed to pay just compensation in violation of the Takings Clause of the Fifth Amendment to the Constitution.

Even if the Court were to find that the Act did not effect a "categorical" taking, the Act plainly constituted a taking under the three-part test in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978). First, the Act has the character of a taking: it was aimed squarely at private screening companies and shifted the entire burden onto a small class of private screening companies, including Huntleigh. Second, Huntleigh had reasonable, investment backed expectations that it could enter into and perform pursuant to private screening contracts. Given Huntleigh's history and reputation in the airport screening industry, as well as the regulatory trend toward enhanced airport security by private screening companies, Huntleigh made substantial investments in its business with the reasonable expectation that the Government would not impose an industry-wide monopoly for itself, void Huntleigh's private contracts, and destroy the goodwill and going-concern value Huntleigh had worked so hard to create. Third, Huntleigh has suffered significant and severe damages. According to commonly accepted valuation techniques and methodologies, Huntleigh's fair market value as of the takings date was between $151 and $201 million (bearing interest, these amounts are $169-$225 million). Once the screening business was taken, Huntleigh's fair market value was, and still is, de minimis. Accordingly, "just compensation" to Huntleigh, which is what a willing buyer would pay for Huntleigh unaffected by the taking less the residual value, is up to $201 million, plus interest.

Apart from establishing the taking, the evidence at trial also will demonstrate that the Government violated the Act, which provides that the Government "may assume the rights and responsibilities of [a] . . . contract for provision of passenger screening services . . ., subject to payment of adequate compensation." § 101(g)(2), 49 U.S.C. § 44901. The undisputed evidence will establish that the "rights and responsibilities" of Huntleigh's contracts were assumed by the Government when screening responsibility was placed solely in the hands of the Transportation

Security Administration ("TSA"). Therefore, the Government is required by the Act to pay Huntleigh "adequate compensation" for its private contracts.

## CONTENTIONS OF FACT

**Huntleigh's History As a Successful**
**Passenger and Baggage Screening Company**

1. Since the 1970s, private screening companies had provided pre-board passenger and baggage screening services on behalf of air carriers pursuant to applicable Federal Aviation Administration ("FAA") regulations. These regulations required each air carrier to establish a specific air transportation security program with certain minimum security requirements and provided for the screening of all passengers and property to be carried aboard an aircraft. 14 C.F.R. §§ 108.1-33. Air carriers contracted with private companies, like Huntleigh, to provide pre-board screening services pursuant to the airlines' approved security program.

2. The FAA regulations also required, in some circumstances, that checked baggage be screened by explosive detection systems equipment prior to being loaded onto the aircraft. 14 C.F.R. §§ 108.13, 108.20. Accordingly, private screeners, including Huntleigh, performed this function as well.

3. Huntleigh began performing passenger and baggage screening services in 1988. By 2001, Huntleigh had grown to be an established industry leader. As of September 2001, Huntleigh had screening contracts with more than seventy-five airlines, both domestic and international, at over forty airports across the United States. By this time, passenger and baggage screening had become the core of Huntleigh's business, comprising the vast majority of its revenue and profitability.

4. Huntleigh entered into agreements with airlines that outlined the services that Huntleigh would provide and included other terms of the parties' relationship. These contractual

relationships between Huntleigh and the airlines were in some instances governed by "core" agreements. The core agreements were supplemented by individually negotiated location exhibits, which set forth the rates and services that were specific to each airport location. In some instances, the contractual relationship would be governed only on a location by location basis pursuant to individual agreements. Some of Huntleigh's screening contracts had initial terms that were for a specific number of years (e.g. 2 to 5 years), while others did not specify a definite period.

5. Airlines customarily renewed their screening contracts -- both those with "initial term" conditions and those that were of an indefinite term. By 2001, Huntleigh had continuously provided airport screening services for more than a decade for various airlines, including American, Continental and United. Since 1991, no major airline had terminated a core agreement. The airlines renewed and often expanded the initial terms of the contracts based on, among other things, Huntleigh's consistent ability to perform under the contracts. Throughout its history, Huntleigh operated on the basis of continuously renewed contracts. As such, Huntleigh had a reasonable expectation that the screening contracts in existence at the time of the taking would continue into the foreseeable future.[1]

**Huntleigh's Growth and Prospects Before 9/11**

6. In 1998, Huntleigh agreed to sell its business to ICTS International N.V. ("ICTS"), a company incorporated in the Netherlands, which specialized in aviation security throughout Europe. ICTS was a leading provider of enhanced aviation security services and had been

---

[1] This case does not involve any contention by the Government that Huntleigh's performance as a screener warranted its removal or that it was a danger to the public. (See 10/18/05 Tr. at 8:14-17) Indeed, the Government represented that it will not offer evidence at trial to attempt to prove any such contentions. (Id. at 15:17-22.)

working for a number of years to improve aviation security in Europe. In response to expected growth in the U.S. aviation security market, Huntleigh and ICTS saw opportunities for expansion. Huntleigh was well positioned to increase its already substantial customer base and to realize the benefits of the enhanced aviation security services that could be introduced in the U.S. market. After Huntleigh's sale to ICTS in 1998, Huntleigh focused its business primarily on the lucrative and expanding screening industry.

7. From 1998 to 2001, Huntleigh's financial performance was on an upward trend, showing consistent, year-over-year revenue and profit growth. By 2001, Huntleigh's screening business was generating revenues of $68,892,000.

8. As anticipated, Huntleigh's opportunities in the screening business were expanding. In the years prior to September 11, 2001 ("9/11"), there were discussions in the political arena and among airport security industry leaders concerning, among other things, potential enhancements to aviation security in general, and passenger and baggage screening in particular. As a result, the FAA was explicitly directed by federal legislation, and instructed by the White House Commission on Aviation Security (the "Gore Commission"), to strengthen screening operations, including increased performance standards and training.

9. As directed by the Gore Commission and Congress, the strengthening of aviation screening included an FAA goal to work toward "100% checked baggage screening by [explosive detection systems]" prior to boarding. The FAA had issued a Notice of Proposed Rule Making in this regard and its budget for fiscal year 2002 (which was approved prior to 9/11) appropriated $97.5 million exclusively for the purchase of additional explosive detection system machines to screen checked baggage. The requirement of increased baggage screening -- the same services already being performed in a more limited manner by private screening companies

-- would necessarily entail a greater number of screeners to perform this job, regardless of who employed the screeners. Huntleigh was already providing baggage screening services, and was well positioned to meet that increased demand. Huntleigh would have hired more screeners to perform these services, which would have yielded higher revenues.

10. Prior to 9/11, Government studies recommended that screening continue to be performed by private screening companies like Huntleigh, and that it not be federalized. In 1996, Congress directed the FAA to conduct a study regarding the allocation of civil aviation security responsibilities. As a result, in 1998 the FAA issued a report entitled "Study and Report to Congress on Civil Aviation Security Responsibilities and Funding," which analyzed whether civil aviation security responsibilities should remain a partnership between the government, the airlines and screening companies with enhanced guidelines and increased responsibility for screening companies; whether the responsibilities should be transferred entirely to the government; or whether there was another scenario that would improve aviation security. The 1998 FAA report concluded that "a consensus exists to retain the current system of shared responsibilities. The Report does not recommend a transfer of air carrier responsibilities to either airport operators or the Federal Government." (emphasis added). Indeed, as the Associate Administrator for Civil Aviation Security of the FAA testified before Congress in April 2000, "there is little support for the Government's assumption of air carrier responsibilities."

11. Instead, the role of private screening companies like Huntleigh would have been enhanced. In January 2000, the FAA issued a Notice of Proposed Rule Making that contemplated private screening companies taking an even greater role in airport security and being directly certified to provide FAA-approved screening (rather than the certification being held by the airline). Huntleigh was aware of this contemplated change, and positioned itself to

benefit from the increased role in aviation security. Indeed, Huntleigh supported the FAA's proposed rule to certify private screening companies and wrote to the FAA in May 2000 commending the FAA's efforts and "strongly advocat[ing] joint industry government partnerships to further our mutual goal of providing a safe and secure environment for the traveling public."

12. By 2001, the screening industry was consolidating, and becoming dominated by larger companies, like Huntleigh, who controlled an ever-growing market. Huntleigh stood to benefit from this consolidating market and from the movement toward increased screening services.

**Huntleigh's Reasonable Investment Expectations**

13. Prior to the taking, Huntleigh had every reasonable expectation that its private contracts would continue to perform screening services pursuant to its contractual relationships with airline industry customers, and that these relationships would continue into the future, given the custom and industry practice as well as its own track record. Huntleigh also reasonably expected to provide expanded and enhanced services in line with aviation security industry trends.

14. In reliance on these reasonable expectations, Huntleigh invested capital and devoted substantial resources to enhance its infrastructure, to hire and train a larger workforce to service its long-term screening contracts as well as the increased demand for screening services, and to continue to expand its business in line with industry trends.

**The Heightened Threat Environment After 9/11**
**And Its Impact on Huntleigh's Screening Business**

15. The attacks of 9/11 resulted in a heightened threat environment that instantly focused attention on the need to accelerate implementation of enhanced security measures at airports, especially pre-board screening standards. Though many screening initiatives previously had

been under consideration, or were working their way through the federal approval process, the events of 9/11 precipitated an immediate and rapid change and expansion to pre-board screening.

16. After 9/11, the heightened threat environment mandated a greater number of screeners at each security checkpoint. The individuals performing screening "needed to be better paid . . . better trained . . . better educat[ed]," and to have the use of increasingly sophisticated equipment at their disposal.

**Immediately After 9/11, Huntleigh Hired**
**Additional Employees and Raised Rates**

17. Huntleigh recognized that the heightened threat environment would demand more screening personnel and resources. Immediately after 9/11, reflecting these perceived needs, Huntleigh hired additional employees to meet the added demand for security services and instituted rate increases for all its screening services. These higher rates, which applied across-the-board to all Huntleigh screening customers at each of its locations, led to a corresponding increase in revenues and profit for Huntleigh.

18. The airlines agreed to, and did, pay the higher rate increases in response to the increased demands of the new security environment and in order to comply with their statutory obligations. The airlines would have continued to pay higher rates into the future if that is what had been statutorily mandated, as it would have been a required cost of operation.

19. Huntleigh reasonably expected that private screening companies would remain an essential ingredient in aviation security, even if its customers or the regulations it operated under, changed. The prevailing view on airline security was that it would be operated through a joint partnership between government and private screeners was the prevailing thinking on the future of aviation security. As late as October 25, 2001, while Congress was in the midst of determining how to react to the events of 9/11, the President issued an official letter approving

of a "public/private partnership," and expressing his opposition to "mandat[ing] that all passenger and baggage screeners must be Federal workers in all circumstances" because it was an "inflexible, one-size-fits-all requirement [that would] fail[] to permit security tailored to the very different circumstances that exist at airports across the country." On November 1, the House of Representatives voted down a proposal that included federalization of screening responsibilities. As late as October 2001, Huntleigh still "felt confident that federalization would not occur," even if the Government elected to modify the statutory scheme in some way.

20. Huntleigh was ready, willing and able to continue providing passenger and baggage screening services into the indefinite future and was poised to maintain its increased workforce and rates and to expand its operations further. This naturally would have resulted in increased future revenues for Huntleigh.

21. In November 2001, Huntleigh management created a presentation for the purposes of meeting with ICTS, its corporate parent, to review preliminary views on Huntleigh's budget for the following year. At the time the document was prepared, Huntleigh knew that the screening industry was undergoing a radical transformation and that the demand for Huntleigh's services would increase as a result. However, because of the uncertainty of the exact nature and scope of the changes, Huntleigh's management did not attempt to predict or quantify the full potential magnitude of the changes, nor were they factored into the tentative budget projections. The presentation was based on only the limited information available at the time until the Company could better understand and determine what would happen in the industry. It was effectively a "placeholder" and did not attempt to predict the full potential magnitude of all the changes to aviation security that were expected to occur.

22. The budget did reflect the modified rates charged to existing customers, resulting in anticipated earnings before taxes attributable to screening of $10.18 million for 2002. Although this projection represented an increase over 2001, that increase only took into account the increased rates charged to existing customers immediately after 9/11. While the budget did not reflect Huntleigh's full financial potential in a sale or market value, absent elimination of its screening business by the Act, the budget presentation does establish a minimum threshold for assessing Huntleigh's fair market value, given the future growth that would result from the events of 9/11. The evidence will show that considering the other relevant facts that impacted Huntleigh's revenues and profits, such as a vastly expanded workforce to accommodate checked baggage screening and an increase in the amount hours worked by all screeners, Huntleigh could have expected earnings to double or triple from the projection made in the November 2001 budget. Applying the Government's multiple to this projection reveals a fair market value in the range of at least $138.45 million to $207.67 million. This is in line with Huntleigh's expert's opinion of the company's fair market value at the time of the taking.

**The Act Required Federalization of the**
**Private Passenger and Baggage Screening Industry**

23. On November 19, 2001, the President signed the Act into law. Pub L. No. 107-71, 155 Stat. 597. A new agency within the Department of Transportation, the TSA, was created with exclusive responsibility over pre-board passenger and baggage screening. 49 U.S.C § 114. The Act squarely prohibits Huntleigh, as well as other private screening companies, from performing pre-board screening services pursuant to private screening contracts. See § 110(b)(2), 115 Stat at 614.

24. The decision to federalize civil aviation security represented a major departure from the direction in which both the industry and the Government had been moving prior to 9/11.

25. The Act provides that screening must be performed exclusively by federal workers, and states that the TSA "shall provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft," and further mandates that all passenger screening at all airports "shall be carried out by a Federal Government employee." § 110(b)(2), 49 U.S.C. § 44901(a) (emphasis added). Similarly, section 110(c)(1) of the Act states that no later than one year after the Act's passage, "the Under Secretary of Transportation for Security shall deploy at all airports in the United States where screening is required . . . a sufficient number of Federal screeners [and other Federal personnel] . . . to conduct the screening of all passengers and property . . . at such airports." 49 U.S.C. § 44901.

26. Consistent with the trend prior to 9/11, section 110(a) of the Act also required that all checked baggage be screened by explosive detection systems equipment. 49 U.S.C. § 44901(d). The Act accelerated the previous proposals by requiring that this be accomplished by December 31, 2002. Also consistent with the trend that had begun to emerge before 9/11, section 111 of the Act required certain enhanced criteria for screener hiring and performance standards. 49 U.S.C. § 44935(e)-(f).

**The Government Implemented a Federal Monopoly Over Passenger and Baggage Screening, Eliminating Huntleigh's Business**

27. As required by the Act, the Government implemented a sweeping monopoly over the private screening industry. The Government could not accomplish the task of "assum[ing] civil aviation security functions and responsibilities" by the statutory deadline, and it enlisted assistance from private screening companies, including Huntleigh.

28. On February 17, 2002, Huntleigh and the Government entered into a letter contract, pursuant to which Huntleigh temporarily would provide, in return for payment, screening

services on behalf of the Government at certain locations, including all of Huntleigh's existing checkpoints. Huntleigh was later awarded several locations formerly staffed by Argenbright, another private screening company.

29. Huntleigh temporarily provided screening at these locations while the newly-formed TSA hired and trained its federalized workforce -- many of whom previously had been employed by Huntleigh and other private screening companies.

30. Although Huntleigh was paid for the services it rendered during the interim period pursuant to its contract with the Government, the provision of these services was necessarily limited and finite under the express terms of the Act. In effect, this transition period simply delayed the date on which the TSA took possession of the various stations and screening operations that comprised Huntleigh's screening business. Absent the Act, Huntleigh would have provided similar services to its customers and would have received compensation in line with the nature and extent of those services.

31. During the summer and fall of 2002, the Government, with little or no advance warning, federalized Huntleigh's airport locations one by one, removed it's screeners from the checkpoints, and eliminated Huntleigh from providing screening services. As soon as a location was federalized, Huntleigh was no longer permitted to provide screening at that location and was no longer able to earn any revenue, from the Government or otherwise, for screening at that location.

32. By November 2002, the Government had fully effectuated its country-wide screening monopoly. Today, every checkpoint for which Huntleigh had a contract to provide screening services is staffed by TSA employees. Huntleigh realizes no revenue and no profit from any checkpoint passenger and baggage screening operations.

**Huntleigh's Non-Screening Services**

33. Historically, Huntleigh offered certain non-screening services, such as skycap and wheelchair services, to its airline customers in order to provide ancillary airport support needs.

34. Huntleigh's non-screening services were fundamentally different in a number of important respects from its screening business. Screening was a distinct service that involved, among other things, screening travelers and their carry-on baggage and detecting explosive devices in checked baggage through the use of explosive detection systems, known as "EDS" or "CTX" machines. Huntleigh's screening services were performed pursuant to regulations promulgated by the FAA and were continuously monitored for compliance with the regulatory scheme. The employees performing screening tasks were required to meet certain regulatory requirements, including hiring criteria, experience, background checks and training. 14 C.F.R. §§ 108.23, 108.31. Reflecting the unique character of screening, Huntleigh trained and employed a separate workforce to handle these sensitive, security-related tasks.

35. By contrast, non-screening services (e.g., operating wheelchairs and ticket checking) were performed by different employees who were not subject to the regulations in 14 C.F.R part 108. The only overlap in personnel was at the management level; to reduce operational costs, managers typically supervised both screening and non-screening employees.

36. Huntleigh's screening and non-screening services also were different from a strategic and financial perspective. As of the time of the taking, Huntleigh maintained separate statements of earnings for these two businesses, given the unique earning implications for each. The non-screening services were "loss leaders" -- unprofitable services that were bundled together with Huntleigh's profitable screening operations in order to make the Company's overall bid packages more attractive. Because developments in the industry indicated that the demand for screening

services would increase into the future, Huntleigh naturally focused its growth strategy predominantly, if not exclusively, on expanding its screening operations.

37. In November 2001, Huntleigh's non-screening services did not represent a viable or valuable stand-alone business. Huntleigh has operated at an ever-increasing financial loss since 2002. In 2003, excluding a one-time write down in that year, Huntleigh operated with extensive losses. For the years 2004 and 2005, Huntleigh suffered pretax losses of $1,541,000 and $1,792,394.56, respectively. Even after adjusting for certain tax credits, the losses for 2004 ($1,125,000) and 2005 ($1,152,189.62) were significant. In the first five months of 2006, Huntleigh has sustained pre-tax losses of $648,152.58 and a net loss of $478,350.76. As of today, Huntleigh's business is simply not a viable enterprise.

38. Huntleigh is also suffering severe operational problems. For example, since the loss of its screening business, Huntleigh has been unable to meet its payroll from internally-generated cash flow, forcing it to seek alternative sources of funding through third party lenders.

39. Huntleigh has been forced to negotiate a new credit facility with LaSalle Business Credit ("LBC"), a lender that deals exclusively with companies in financial distress. Given Huntleigh's heightened risk of default, LBC demanded and obtained stricter covenants and a higher interest rate for the credit facility.

40. Because Huntleigh cannot generate sufficient cash flow to fund its day-to-day operations, it is reliant on LBC's credit facility for working capital. This, in turn, has caused the Company's interest expense to increase dramatically. In the span of one year (2004-2005), Huntleigh's interest expense has risen from $126,434 to $572,429.

41. Huntleigh's management has taken extreme measures to salvage what little remains of the company. Beginning in 2002, Huntleigh implemented a comprehensive plan to lower operational expenses, which had little impact on Huntleigh's financial situation.

42. Following the termination of its screening operations, Huntleigh attempted to diversify and offer new services, including cargo and catering security. However, efforts at diversification met with no success.

43. Understanding it had no future as a stand alone airport services company, since 2002, Huntleigh tried on numerous occasions to attract potential purchasers -- participating in at least twenty separate meetings and engaging in negotiations with at least thirteen potential buyers -- with no success.

44. In 2005, the failed efforts at a sale of Huntleigh culminated in an offer by Joseph Tuero, Huntleigh's former President and CEO who had since left Huntleigh to pursue more promising opportunities, to acquire the company for nothing other than the outstanding accounts receivable Huntleigh was able to collect and remitting them to Huntleigh's ultimate parent company, ICTS.

45. Huntleigh has been unable to market and sell itself to a willing buyer at any price.

**Federalized Pre-Board Passenger**
**And Baggage Screening Today**

46. With the Government's assumption of screening responsibilities complete, and the federal monopoly over the industry in place, the scope of pre-board passenger and baggage screening has greatly expanded.

47. In recent years, the number of travelers (and therefore the volume of baggage) has risen, and absent the statutory cap on screeners of 45,000 full time equivalent employees, the number of screeners would likely be much higher, to handle this increase. The mandate that all checked baggage be screened required the purchase of large quantities of equipment and the creation of a

massively expanded baggage screener workforce. As screening technology has evolved, and will continue to evolve, additional training is required. Screener compensation and benefits represent the largest portion of the TSA's operating costs, and in 2005 the TSA spent approximately $2.18 billion on this line item.

48. Had Huntleigh not been statutorily precluded by the Act from performing its passenger and baggage screening contracts, it would have continued to provide all the additional screening required at its locations in the post-9/11 heightened threat environment and would have benefited from the increased demand for its services. In response to the increased demands made of the screening industry triggered by 9/11, Huntleigh would have been operating with an expanded workforce and performing enhanced security services. It would have been carrying out passenger and baggage screening functions in a manner substantially similar to the manner in which the TSA operates today.

**The TSA Assumed the Responsibilities**
**of Huntleigh's Screening Contracts**
**<u>As Contemplated By the Act</u>**

49. Because screening services previously had been provided by private companies pursuant to private contracts, the Act expressly recognizes that federalization of screening might require the Government to assume the rights and responsibilities of private screening contracts, and that if the Government did so, it would be required to pay adequate compensation to the parties. <u>See</u> § 101(g)(2), 115 Stat. at 603-04.

50. The TSA has admitted that it assumed the rights and responsibilities of the screening contracts. Anthony Washington, a former FAA employee who was recruited to work for the newly-formed TSA and served directly under TSA Chief Counsel, testified as the Government's 30(b)(6) witness on the topic of contract assumption under the Act. Mr. Washington squarely

admitted that the TSA "assume[d] the passenger and baggage screening responsibilities of those [screening] contracts."

51. In January 2002, John Magaw, then Under Secretary of Transportation for Security at the TSA, testified to Congress that: "On February 17 less than a month from today the TSA will take over the aviation screening responsibility that has been the airlines' up until now by assuming the airline screening contracts and equipment that provide passenger screening at the Nation's airports." Mr. Washington confirmed that he had "no reason to doubt Mr. Magaw's statement" to Congress regarding aviation security and the deadlines set forth in the Act.

52. Subsequent reports by the TSA to Congress confirm the TSA's assumption of screening contracts. In a March 31, 2003 report to Congress, the TSA once again acknowledged that private screening contracts were assumed, pursuant to the Act, as an essential part of the process of federalizing airport security functions nationwide:

> As required by [the Air Transportation and Security Act], on February 17, 2002, TSA took over the responsibility for civil aviation security functions from [the] FAA and approximately 1400 FAA aviation security personnel became the core workforce of the TSA. That same day TSA assumed the airlines' passenger screening company contracts and all equipment used to perform passenger screening at the Nation's airports. This was the first step toward the required hiring, training and positioning of Federal security screeners at all U.S. airport screening checkpoints, achieved on November 18, 2002, as required by law.

(emphasis added.)

53. This report to Congress was vetted within the agency, underwent "extensive revisions," and was circulated to "TSA executives" and within the "Department". The Report was presented to Congress in final form on March 31, and included the language regarding assumption quoted above.

54. Even though the Act specifically requires the payment of "adequate compensation" to the parties to screening contracts, the Government violated its statutory obligations by failing to pay such compensation to Huntleigh.

**Huntleigh's Fair Market Value Was**
**At Least Between $151 and $201 Million**

55. The evidence at trial will demonstrate that Huntleigh's business would have expanded after 9/11, given the increased threat environment. A potential purchaser evaluating Huntleigh prior to the takings date would have considered, for example, Huntleigh's operating history, including its long-term screening contracts and rates, its ongoing relationships with airlines, the expanding nature of the screening industry in the U.S., market expectations, the events of 9/11 and the resulting impact on the pre-board screening industry. Further, as noted above, Huntleigh's management envisioned growth of at least two or three-fold over and above the rate increases implemented immediately after 9/11, as they anticipated measures such as 100% screening of checked baggage (requiring a much larger work force), increased hours for all screeners, and enhanced performance standards requiring even higher wages and higher rates.

56. Huntleigh's expert, Mr. Tregillis, considered a variety of pre-taking factors, including Huntleigh's financial and operational, heightened security post-9/11, history; the stock market and industry reaction to 9/11 and market expectations, and applied commonly accepted valuation techniques, including the income approach and the market approach, concluding that the fair market value of Huntleigh's screening business was between $151 and $200 million at the takings date, exclusive of interest. Now that this business has been eliminated, it is valueless. Mr. Tregillis also specifically noted that Huntleigh's non-screening services lacked profitability both before and after the taking. As a consequence, Huntleigh's remaining business is now, at best, of minimal value.

## CONTENTIONS OF LAW

### I. THE EVIDENCE AT TRIAL WILL SHOW THAT HUNTLEIGH SUFFERED A COMPENSABLE TAKING

#### A. The Constitutional Framework

57. The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As explained by the Supreme Court, this guarantee "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

58. In effecting a federal monopoly over the pre-board passenger and baggage screening industry, and confiscating Huntleigh's entire screening business without compensating Huntleigh, the Government has violated this fundamental principle, forcing Huntleigh to bear a public burden that should properly be borne by the public as a whole.

#### B. Huntleigh Had a Protected Property Right In Its Business Assets, Including Its Contracts, Going-Concern Value and Goodwill

59. As the evidence will show, Huntleigh had substantial business assets, including contracts (which were routinely renewed), goodwill and going-concern value, all of which were "taken" by the Government -- lock, stock, and barrel. As a matter of law, each of these business assets is a compensable property interests under the Takings Clause. See Kimball Laundry Co. v. United States, 338 U.S. 1, 9-13 (1949) (recognizing intangible property rights, including going concern value, as compensable property); Cienega Gardens v. United States, 331 F.3d 1319, 1329-30 (Fed. Cir. 2003) (recognizing contracts as compensable property); United States v. 0.88 Acres of Land, 670 F.Supp. 210 (W.D. Mich. 1987) (recognizing goodwill and going concern value as compensable property); see also Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 445-46 (2005) ("Huntleigh I").

60. The regulated nature of the industry in which Huntleigh's business operated does not preclude it from establishing a viable takings claim. See Cienega Gardens, 331 F.3d at 1330-31; Huntleigh I, 63 Fed. Cl. at 447. This is especially true where, as here, a business does not depend on the exercise of the Government's regulatory power, but simply is subject to certain regulations. Id.[2]

**C. The Degree of Economic Impact on the Plaintiff Determines the Appropriate Legal Test To Apply**

61. Under Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), a categorical taking occurs if the Government eliminates "all economically beneficial use" of the property. In such circumstances, "economic impact" becomes the sole and determinative issue. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005); see also Loveladies Harbor, Inc. v. U.S., 28 F.3d 1171, 1181-82 (Fed. Cir. 1994) (categorical taking found when remaining value is de minimis); Palm Beach Isles Assocs. v. United States, 208 F.3d 1374 (Fed. Cir. 2000) (categorical taking where the remaining property had "no or minimal value" (emphasis added)). The evidence in this case will establish that by taking Huntleigh's passenger and baggage screening business, all

---

[2] The Government also erroneously argued that Huntleigh is claiming only that its right to engage in business was taken. (See 10/12/06 Hearing Tr. at 18:7-12). In reality, the evidence will demonstrate that Huntleigh's business assets were taken. In any event, College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 675 (1999), relied on by the Government in earlier briefing in this case, plainly recognized that "business assets" like goodwill are protected property rights. The Court explained that there is no "generalized right to be secure in one's business interests" free from a competitor's false advertising under the Due Process Clause. 527 U.S. at 672. But the Takings Clause was not before the Court in College Savings Bank and the Court did not address the situation where, as here, the Government arrogated Huntleigh's screening business for itself by totally shutting down Huntleigh's business, hiring Huntleigh's employees, and taking its business assets. Clearly, there is a difference between having the right to continue in business and the right not to have your business taken. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005) (distinguishing Due Process claims from Takings claims). Huntleigh's claim is, and always has been, for the latter.

of the economic value of Huntleigh's business was destroyed. Therefore, the Government has effected a categorical taking under Lucas for which compensation must be paid.

### 1. The *Lucas* Test Applies To Regulatory Takings of Personal Property

62. Any attempt by the Government to continue to argue that Lucas applies only to takings of real property, and is, therefore, inapplicable to this case, is foreclosed by controlling legal authority to the contrary -- including a unanimous decision of the United States Supreme Court. Lingle, 544 U.S. at 548 (noting, in a regulatory business taking, that "a plaintiff seeking to challenge a government regulation as an uncompensated taking of private property may proceed . . . by alleging a Lucas-type 'total regulatory taking,' [or] a Penn Central taking"); see also Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004) ("The trial court correctly rejected the government's contention that a 'per se' takings analysis is never applicable when personal property is at issue"), cert. denied, 125 S.Ct. 2541, (2005).

### 2. The Evidence Will Show that The Relevant Property For Purposes of the Takings Inquiry is Huntleigh's Screening Business

63. The relevant property for purposes of the takings analysis in this case (the so-called "denominator") is Huntleigh's heavily regulated passenger and baggage screening business. Here, a whole business was taken, not a portion of otherwise fungible real or other property. Huntleigh's entire screening business was confiscated, not simply a fungible portion of that screening business. This is not a case where the Act took a portion of Huntleigh's screening business by federalizing screening only at certain airports (such as higher-risk, urban airports) and allowed Huntleigh to continue to perform under its contracts at other locations. Here, the Government confiscated an entire business from Huntleigh -- not just a portion of it. See Sartori v. United States, 67 Fed. Cl. 263, 274 (2005); cf Keystone Bituminous Coal Ass'n v. De

Benedictis, 480 U.S. 470, 497 (1987). Accordingly, Huntleigh is not attempting artificially to divide fungible units of its business by focusing solely on what was taken. Cf Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 644 (1993); Keystone Bituminous Coal Ass'n, 480 U.S. at 497 (rejecting claimant's attempt to define parcel as the coal regulated by the Government, while ignoring coal left unaffected by the regulation). The fortuity that Huntleigh also pursued other lines of business -- whether skycap services or coffee shops -- should not and does not affect the definition of the relevant property.

64. Even where only a portion of property is regulated, to define the relevant property, courts consider whether a "'unique attribute inherent in the restricted portion [of the property] provides a basis for distinguishing it from the unrestricted portion.'" Sartori, 67 Fed. Cl. at 274 (quoting Rose Acre Farms, 373 F.3d at 1190).

65. The evidence at trial will establish that Huntleigh's passenger and baggage screening business was fundamentally distinct from its non-screening services, and, therefore, should not be included in the denominator for the Lucas analysis. These businesses were different from the regulatory, personnel, strategic, and financial perspective.

66. Even if the Court were to determine that the relevant property to examine for takings purposes should extend beyond Huntleigh's passenger and baggage screening business to include its different non-screening services, the evidence will establish that after its screening business was taken, Huntleigh's remaining non-screening operations were, at best, of minimal value. The Government's contention that if Huntleigh's non-screening service were shown to have "salvage value" (10/12/06 Hearing Tr. at 20:18) it would preclude application of the Lucas test is wrong as a matter of law. See, e.g., Loveladies Harbor, 28 F.3d at 1181-82 (categorical taking found when remaining value [1% of total value] was found to be de minimis); Palm Beach Isles, 208

F.3d at 1381 (categorical taking where the remaining property had "no or minimal value" (emphasis added).) Even assuming Huntleigh's remaining post-taking value is worth up to $1 million, that represents a de minimis amount of less than 1% of the fair market value of Huntleigh's pre-taking business.[3]

67. As a matter of law, the relevant property can not include Huntleigh's foreign-incorporated parent, ICTS International N.V for numerous separate and independent reasons. First, as a nonparty, ICTS's interests cannot be factored into this Court's assessment of the relevant parcel and corresponding economic impact. See Cienega Gardens v. United States, 67 Fed. Cl. 434, 474-79 (2005) (evaluating economic impact of regulation on plaintiff partnerships, without taking into account the holdings of individual partners of such partnerships). Second, as a separate corporate entity with distinct legal rights, Huntleigh is entitled to have its corporate form respected for purposes of the takings analysis. See Cane Tenn. v. United States, 57 Fed. Cl. 115, 118, 122-31 (2003) (analyzing takings claims of plaintiffs Cane Tennessee, Inc. and Colten, Inc. separately, even though both corporations were owned by the same individual). Third, the other operations of Huntleigh's foreign parent corporation could never be part of the relevant parcel because, at the time of the taking, they were entirely international in character and

---

[3] Recently, the Government suggested that Huntleigh will only introduce evidence of the nominal value of its non-screening services now, rather than after the taking. (See 10/12/06 Hearing Tr. at 22:3-14.) The evidence will show that the company's non-screening operations were not profitable as a standalone business both before and after the taking. Although it was apparent that Huntleigh's "economic development [was] effectually prevented" (see Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394, 406 (1989), aff'd, 926 F.2d 1169 (Fed. Cir. 1991)) the date the Act was passed, Huntleigh's loss became concrete the moment Huntleigh was physically precluded from performing screening at the end of 2002. Huntleigh recorded a loss in 2003 (which began approximately 1 month after Huntleigh was forced to cease screening operations). Huntleigh has suffered escalating losses in fiscal years 2004 and 2005. Since 2002, Huntleigh has attempted to sell its non-screening services to at least thirteen potential buyers -- with no success.

therefore, by definition, do not fall within the regulatory authority of the U.S. Government. See Vulcan Materials Co. v. City of Tehuacana, 369 F.3d 882, 890 (5th Cir. 2004). Finally, ICTS was operated separately and independently from Huntleigh's operations, making it inappropriate to combine the two for takings purposes. See, e.g., Naegele Outdoor Adver., Inc. v. City of Durham, 803 F. Supp. 1068, 1074 & n.4 (M.D.N.C. 1992) (refusing to include as part of relevant parcel plaintiff's "unrelated" revenues from advertising sold outside Durham through its Raleigh/Durham operating division, where Durham city regulation restricted advertising on billboards owned by plaintiff), aff'd mem., 19 F.3d 11 (4th Cir. 1994); see also Lucas, 505 U.S. at 1016 n.7 (state court's aggregation of total value of all real property in vicinity owned by plaintiff in Penn Central was "extreme" and "unsupportable" approach to takings calculus).

### 3. The Evidence Will Demonstrate That The Act Constituted A Categorical Taking Under *Lucas*

68. The economic impact of the Act in this case was dramatic and devastating: Huntleigh's formerly profitable and growing business assets were rendered worthless. At trial, the evidence will demonstrate that the fair market value of Huntleigh as of the takings date, excluding interest, was between $151 and $201 million. Based on commonly-accepted valuation techniques, including the income (return on equity) approach and the market (or comparable sales) approach. Immediately after the Act prohibited Huntleigh from performing its passenger and baggage screening contracts, the value of Huntleigh's then non-existent screening business was effectively zero. This is a quintessential case of the value of a claimant's property going from something to nothing essentially overnight.

69. In forming his expert opinion concerning Huntleigh's fair market value, Huntleigh's expert, Mr. Tregillis, takes into account all relevant pre-taking information available to a hypothetical buyer in November 2001, including: interviews and information from Huntleigh's

officers, including Joseph Tuero and Richard Sporn; Huntleigh's history, such as its screening contracts, rates, and financial performance; the expanding nature of the screening industry in the U.S.; the events of 9/11; the investment community and market expectations; the heightened threat environment and the impact on the pre-board screening industry; who Huntleigh's customers would be; and various risks -- including the possibility that the Government would increase its involvement in screening. Additionally, Mr. Tregillis specifically analyzed the pre-taking stock price reaction to 9/11 and Huntleigh's pre-taking plans to "significantly enhance the services it provided." After considering this information -- including the view of Mr. Sporn that Huntleigh's business would grow two- or three-fold due to the heightened threat environment after 9/11 -- Mr. Tregillis utilized post-taking information as a "data point" to corroborate the other facts. For example, Mr. Tregillis consulted certain individual items of post-taking information, such as number of screeners, rates and hours, which is the type of data that would have been anticipated and considered by potential purchasers at the time of the taking to confirm the reasonableness of his analysis.

70. Mr. Tregillis's methodology for assessing Huntleigh's fair market value as of the takings date is entirely consistent with the relevant case law. After analyzing a hypothetical buyer's expectations as of the takings date, Mr. Tregillis looked to specific items of post-taking information to corroborate the reasonableness of those expectations. Mr. Tregillis utilizes post-taking information in the limited manner envisioned by the courts. See Georgia Pacific Corp. v. United States, 640 F.2d 328, 337 n.5 (Cl. Ct. 1980) (allowing plaintiff to introduce post-taking data regarding logging practices "for purposes of corroborating the reasonableness of the views of a [date-of-taking] prospective purchaser and seller as to their anticipations relative to future logging efforts" and noting that "in circumstances where the prediction of damages rests on

uncertain future events, which is the case here, reasonable use of hindsight would not, in any event, be fatal as plaintiff so strenuously maintains") (internal citation omitted); see also Whitney Benefits, 18 Cl. Ct. at 412 (considering coal transaction that took place subsequent to the taking for purposes of valuing claimant's coal at the time of the taking); see also United States v. 38,994 Net Usable Square Feet, No. 87 C 8569, 1989 WL 152806, at *3 (N.D. Ill. Nov. 21, 1989) (admitting evidence regarding actual costs incurred by property owner during period of taking for purposes of reaching a hypothetical valuation as of the date of the taking); Lee County v. T&H Assocs., Ltd., 395 So. 2d 557, 561 (Fla. Dist. Ct. App. 1981) (conditions that prevailed subsequent to the taking were relevant in determining whether crops, which had not matured at the time of the taking, ultimately would have enhanced value of land); see, e.g, Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988) ("the methodology [for determining a reasonable royalty as evidenced by a hypothetical negotiation between willing licensor and willing licensee] encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look at events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.") (emphasis added), overruled on other grounds, 383 F.3d 1337 (Fed. Cir. 2004).

71. As the Second Circuit Court of Appeals held in United States v. Brooklyn Union Gas Co., 168 F.2d 391 (2d Cir. 1948):

> . . . deductions or conclusions as to future productivity not only must be made, but are an important element in a case of this kind. The question then becomes one whether deductions as to the future may be checked up by the actualities as they have happened. It would seem an eerie conclusion that a court must resort to guess, closing its eyes to reality, when its decision must actually be formulated after the true facts become

> available. We think the evidence admissible not as a standard of value in itself, but for its bearing on the prospective values at the time of taking."

Id. at 397 (emphasis added). Underlying these opinions is the sound judgment that when actual data is available, "the law should express 'a judgment from experience as against a judgment from speculation.'" Georgia Pacific Corp., 640 F.2d at 337 n.5 (quoting Tanner v. Little, 240 U.S. 369, 386 (1916)). Indeed, given the unprecedented nature of 9/11 on the screening industry, this case present a scenario in which using actual data to confirm predictions of value is most useful and appropriate.

72. Huntleigh would have sold its business to the highest bidder, i.e. the buyer with the most optimism about Huntleigh's business. See Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 156 (1990) (fair market value is determined by the "highest and best use" of the property). In determining the fair market value of Huntleigh's screening business, the Court should take into account "all considerations that fairly might be brought forward and reasonably be given substantial weight in . . . bargaining between a buyer and seller." Olsen v. United States, 292 U.S. 246, 257 (1934), see also Bassett, N.M. LLC v. United States, 55 Fed. Cl. 63, 69 (2002). These considerations necessarily include projections that a willing buyer would make about Huntleigh's likely future revenues. See Yancey v. United States, 915 F.2d 1534, 1542 (Fed. Cir. 1991) ("[T]he fair market value of property . . . can include an assessment of the property's capacity to produce future income if a reasonable buyer would consider that capacity in negotiating a fair price for the property."); see also Whitney Benefits, 18 Cl. Ct. at 410 (finding is permissible to look to a claimant's prospects to determine fair market value despite the uncertainty or speculative nature of those prospects). This assessment also includes provision for the "transferable intangible values of [its] former business," such as the goodwill that Huntleigh had

generated in the screening industry. United States v. 0.88 Acres of Land, 670 F. Supp. 210, 213 (W.D. Mich. 1987); see also Kimball Laundry Co., 338 U.S. at 9-13.[4]

73. Huntleigh is seeking to recover the value of the business taken by the Government. To be sure, potential future revenues are critical to determining the value a buyer would pay for the business. See Whitney Benefits, 18 Cl. Ct. at 409 (compensation for real property taken included valuation of coal reserves on that property, "which can only be measured by their ability to produce income," and are not consequential damages); see also Kimball Laundry, 338 U.S. at 9 (determination of just compensation for real property taken included value of lost trade routes, as these were "the reasonably probable earnings of [the] business").

74. It is beyond dispute that "[j]ust compensation requires that the government remunerate a deprived property owner so as to place the property owner in as good a position pecuniarily as if the government had not taken his property." Bassett, 55 Fed. Cl. at 69 (emphasis added); Hendler v. U.S., 175 F.3d 1374, 1382 (Fed. Cir. 1999) ("the Government's obligation is, to the extent possible following the Government's intrusion, to restore the landowner to the position he was in absent any government action"). This assessment of just compensation under the Fifth Amendment includes an award for interest accruing from the time of taking. Whitney Benefits, 18. Cl. Ct. at 416 (Citing United States v. Thayer-West Point Hotel Co., 329 U.S. 585 (1947), Miller v. United States, 223 Cl. Ct. 352 (1980)).

---

4 From these unequivocal holdings, the Government's erroneous assertion that consideration of Huntleigh's projected future income potential to determine fair market value at the time of the taking boils down to a request for "consequential damages" because it purportedly seeks speculative future earnings (see, e.g., 10/12/06 Hearing Tr. at 55:17-23; Gov't S.J. Br. at 21) and because its claim for goodwill is really a taking of "its ability to be in business" (see, e.g., 10/12/06 Hearing Tr. at 17:5-18:14; 58:3-17), fails as a matter of law.

### 4. The Evidence Also Will Establish that The Act Constituted A Taking Under The Three-Part *Penn Central* Test

75. Even if this Court were to conclude that the Act did not effect a "categorical" taking under the Lucas test, then the three-factor analysis in Penn Central would apply to determine whether the Act constituted a compensable regulatory taking. See Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978). The three factors identified by the Supreme Court are: (1) the character of the governmental action; (2) the extent to which the regulation had interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. Id. The evidentiary record will establish that the Government's actions pursuant to the Act constituted a regulatory taking of Huntleigh's business.

#### a. The Character of the Government Action Demonstrates That There Has Been A Taking Under *Penn Central*

76. The Government's takeover of Huntleigh's passenger and baggage screening business caused substantial harm to Huntleigh by destroying the value of its business assets. As such, the Government improperly shifted a "disproportionate" share of the regulation's burden onto a "small class of private parties," which included Huntleigh. Cienega Gardens v. United States, 331 F.3d 1319, 1328, 1340 (Fed. Cir. 2003).

77. Contrary to the Government's position that the Act does not posses the "character of a taking" because it was enacted for a "public purpose," whether the Act was enacted for a legitimate public purpose has no bearing on the Government's entitlement to take Huntleigh's property without compensation. See Lingle, 544 U.S. at 543 ("[T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.") (emphasis added)); Cienega Gardens, 331 F.3d at 1340 ("Congress' purpose in enacting the statutes may have been entirely legitimate but the government has not shown that the actions Congress

took . . . were within its powers to exercise without also granting compensation." (emphasis in original)); see also Huntleigh I, 63 Fed. Cl. at 449.

78. Likewise, whether a law is effective in substantially advancing a public purpose "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." Lingle, 544 U.S. at 542. The purported success (or failure) of legislation has no relevance, one way or another, to whether a taking has occurred because it "reveals nothing about the magnitude or character of the burden a particular regulation imposes upon private property rights," and provides no "information about how any regulatory burden is distributed among property owners." Id. (emphasis in original). Huntleigh is not arguing -- and has never argued -- that its takings claim turns on whether the Act was successful or unsuccessful, and Huntleigh informed the Government as such almost a year ago.

b. The Evidence Will Show that The Government Interfered With Huntleigh's Reasonable Investment-Backed Expectations

79. The evidence at trial, including the history of the airport security industry and Huntleigh's near 15-year tenure in the industry, will demonstrate that Huntleigh had a reasonable expectation that the Government would not impose an industry-wide monopoly and expropriate its business, and invested significant resources to meet its long-term contractual obligations in reliance on these reasonable expectations.

80. Courts have repeatedly and unequivocally rejected the argument that Huntleigh's investment-backed expectations are not reasonable because the plaintiff, like Huntleigh, it operated in a highly regulated industry. See Conti v. United States, 48 Fed. Cl. 532, 537 (2001), aff'd, 291 F.3d 1334 (Fed. Cir. 2002); Maritrans, Inc. v. United States, 40 Fed. Cl. 790, 797 (1998).

c. The Evidence Will Establish That the Economic Impact of the Act Upon Huntleigh Has Been Serious and Severe

81. Huntleigh will prove at trial that the Act resulted in the elimination of Huntleigh's passenger and baggage screening contracts, its going concern value and goodwill. According to the evidence that will be presented, Huntleigh's fair market value was in the range of $151 to $201 million (plus interest). Stripped of its "crown jewel" screening business, Huntleigh's remaining non-screening operations have resulted in losses for each of the last three years.

82. The Government's contention that the just compensation to which Huntleigh is entitled should be reduced to the extent that Huntleigh received "special benefits" or earned "additional profits" as a result of the Act, by providing interim screening services to the Government, is wrong. The evidence will establish that Huntleigh received no "benefits" from the Act -- special or otherwise -- nor did it earn any "additional" profits. To establish "special benefits" the Government would have to show that the claimed "special benefit" flowed from the Act. Cf Hendler, 175 F.3d at 1382-83 (the benefit must "happen as a result" of the taking). In other words, the Government must show that Huntleigh received some additional income that it would not have obtained "absent any government action." Id. at 1382.

83. If the Government had not passed the Act and taken Huntleigh's business, Huntleigh would have continued to realize substantial revenue and profits from its screening contracts in 2002 and well beyond. Any additional profits earned by Huntleigh in 2002 were due to the demand for more screening as a result of the heightened threat environment following 9/11, they were not the result of "government action," and were not caused by the Act. Cf Bauman v. Ross, 167 U.S. 548 (1897); Hendler, 175 F.3d at 1382-83.

## II. THE EVIDENCE AT TRIAL WILL ESTABLISH THAT HUNTLEIGH IS ENTITLED TO COMPENSATION UNDER THE ACT

84. This Court has jurisdiction over Huntleigh's claim under the Act. Huntleigh I, 63 Fed Cl. at 451; see also Doe v. United States, 100 F.3d 1576, 1580-84 (Fed. Cir. 1996).

85. The Act provides that the TSA "may assume the rights and responsibilities of [a] . . . contract for provision of passenger screening services . . . subject to payment of adequate compensation to parties to the contract, if any." § 101(g)(2), 49 U.S.C. § 44901 (emphasis added). It cannot be sincerely disputed that the TSA "assumed" screening responsibilities from the private companies. See Huntleigh I, 63 Fed. Cl. at 451. On its face, the Act does not require that the actual contracts be assumed to require the payment of "adequate compensation."

86. The compensation due to Huntleigh must be "adequate," and must account for the reasonably expected future revenue stream from its existing screening contracts. See Yancey, 915 F.2d at 1542; Whitney Benefits, 18 Cl. Ct. at 409. This entitlement cannot be reduced by any "benefits" received by Huntleigh from the Government in 2002, as such "benefits" did not flow from the Act and constituted a quid pro quo for interim screening services rendered. Cf Hendler, 175 F.3d at 1381-83.

87. The term "adequate compensation" is frequently used interchangeably with "just compensation" in government confiscation cases. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 425 (1982); Schneider v. County of San Diego, 285 F.3d 784, 794 (9th Cir. 2002). Therefore, the Court should conclude from Congress' use of the phrase "adequate compensation" that it intended to create a statutory right to Fifth Amendment compensation for the taking of private screening contracts under the Act, without requiring plaintiffs to surmount the requirements of a traditional common law takings analysis. Simply because the damages resulting from an interpretation of "adequate" and "just" compensation may

be the same, and the Government may be liable under both theories, does not lead to the conclusion that the Act is somehow "redundant," as the Government has suggested, to the Fifth Amendment of the Constitution. To the contrary, the statutory framework creates an automatic right to compensation where the Government "assume[s] the rights and responsibilities" of the screening contracts, while the Fifth Amendment requires a more thorough analysis of entitlement to compensation under applicable takings jurisprudence.

88. The evidence will establish Huntleigh's losses based on the Government's assumption of the rights and responsibilities of its screening contracts.

## CONCLUSION

When the evidence is presented at trial, Huntleigh will meet its burden of proof on Counts I and II in its Complaint and demonstrate its entitlement to compensation.

Dated: October 20, 2006
New York, New York

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ Jonathan J. Lerner
Jonathan J. Lerner (attorney of record)
Lauren E. Aguiar
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Plaintiff
Huntleigh USA Corporation

Of counsel:
Sarah Heckman Yardeni
Elliot Friedman