# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CIENEGA GARDENS, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 94-1C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| CHANCELLOR MANOR, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 98-39C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON <u>LIABILITY AND JUST COMPENSATION FOR CIENEGA GARDENS PLAINTIFFS</u>**

Pursuant to the Court's September 30, 2004 Order, and ¶ 14(b) of Appendix A of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the takings claims of plaintiffs (1) the Del Amo Gardens partnership (owner of the Del Amo Gardens Apartments), (2) the Cienega Gardens partnership (owner of the Cienega Gardens Apartments), (3) the Las Lomas Gardens partnership (owner of the Las Lomas Gardens Apartments), (4) the Skyline View Gardens partnership (owner of the Skyline View Gardens Apartments), and (5) the Blossom Hill partnership (owner of the Blossom Hill Apartments) ("plaintiffs").

## QUESTIONS PRESENTED

1. Whether the claims of plaintiffs Blossom Hill and Skyline View violate the Assignment of Claims Act and may not serve as the basis for a recovery against the Government.
2. Whether the claims of plaintiffs Blossom Hill and Skyline View are ripe for adjudication.
3. Whether plaintiffs Del Amo Garden, Las Lomas, and Cienega Gardens resolved all claims against the Government when they signed Use Agreements.
4. Whether Title II and Title VI effected a regulatory taking upon plaintiffs.
5. If a regulatory taking is found to have occurred, what just compensation is owed to plaintiffs for the taking?
6. Whether plaintiffs are entitled to interest on any award of just compensation and, if so, whether the interest should be compounded.

## STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL

### A. The Initial Transactions

#### 1. The Programs

1. In the 1960s and 1970s, the Department of Housing and Urban Development ("HUD") offered several programs for insuring mortgages under the National Housing Act ("NHA"), the purpose of which was to provide a stock of low-income housing. 12 U.S.C.A. § 1715*l*(d)(3) & § 1715z-1.

2. Sections 221(d)(3) and 236 of the NHA each authorized programs that provided participants with subsidized, below market-rate mortgages.

3. Under these programs, owners agreed to maintain rents at Government-approved levels to ensure that the apartments would be available for low- and moderate-income tenants.

4. Program participants obtained a HUD-insured mortgage from private lenders. Each participant's Deed of Trust note had a "rider" which provided that a note could be prepaid after the loan's 20th anniversary without HUD's prior approval. Each participant's Deed of Trust note also contained a penalty for prepayment within 24 years of the original mortgage date. If a participant prepaid more than 15 percent of the note's original principal amount during one calender year, the note required the payment of 3 percent of the amount in excess of 15 percent of the original note, less 1/8 of 1 percent for each 12-month period that had elapsed since the note was entered.

### 2. <u>Investment-Backed Expectations In The Low-Income Housing Industry</u>

5. Congress designed the Section 231(d)(3) and 236 programs with special incentives to make what would have been an otherwise unattractive investment in low-income housing into an appealing investment vehicle with almost immediate profitability for investors.

#### a. <u>Developers' Expectations</u>

6. Pursuant to these programs, developers could borrow 90 percent of the overall cost of the project in a HUD-insured loan. This offered developers greater leverage than any comparable conventional loan, and the loans were non-recourse. The developers were also entitled to a builder's fee. When credited against the cost of the project, the developer's initial cash investment dropped below 5 percent of the purchase price. Finally, developers typically syndicated the equity interest in the investment, which left the developers with no money at risk in the property. After syndication, developers typically received a cash profit, as well as possessed whatever portion of equity interest that was retained after the syndication. In light of these incentives, investment in these programs was risk free for the developers.

7. Thus, developers generally expected to recoup their initial investment with a profit through syndication of the property. The developers further expected to obtain continuing profits from regular dividends on their equity portion and by selling services, such as property management, to the building. Given the uncertainties and vagaries of the real estate market and the economy, developers willingly participated in low-income housing without any expectation as to whether they would be able to prepay their HUD-insured mortgages after 20 years.

**b. Investors' Expectations**

8. Congress also designed the low-income housing programs to be attractive to potential equity investors. Properties in the 236 and 221(d)(3) programs were entitled to accelerated depreciation of costs. This depreciation schedule ensured that program properties would record large paper losses throughout the properties' initial years. When combined with the high leverage of the 236 and 221(d)(3) deals, the properties became extremely attractive tax shelters for high-income individuals.

9. A tax shelter is an investment vehicle in which a material component of an investor's return is derived from the ability to shelter unrelated income – such as the salary of a doctor or lawyer – with net tax deductions or credits thrown off by the tax shelter. When developers syndicated low-income housing shares to limited partners it was understood by all involved that the investors were purchasing tax shelters.

10. Developers typically structured the section 221(d)(3) and 236 investments as limited partnerships to effectuate "pass through" tax treatment of the entities' losses. The Federal Government does not tax partnerships as entities; rather, each individual partner claims their equity portion of the partnership's income and losses on Schedule E of their Form 1040. Kenneth

Malek, an expert on investing in low-income housing, will testify that under the Federal tax laws in existence in the 1970s, a high-income individual could recoup their investment in low-income housing in two or three years given the investment's ability to shelter income from other sources. Thus, investors in low-income housing were almost exclusively interested in the investment's tax losses.

11. Because tax benefits generated sufficient return to attract investors, limited partners invested in section 221(d)(3) and 236 projects without regard to the opportunity to prepay the HUD-insured mortgage. A limited partner would have invested in low-income housing projects even if the property was expected to have no after-tax value upon the prepayment date. The limited partners' investment backed expectation for investing in low-income housing projects was the ability to receive tax deductions and, secondarily, receipt of regular dividend payments from the property.

**3. <u>Plaintiffs' Investment Expectations</u>**

12. Plaintiffs had no significant expectations regarding the opportunity to prepay the HUD-insured mortgage at the time of the partners' original investments.

13. Jona Goldrich, Sol Kest, Robert Stern, Robert Hirsch and Warren Breslow[1] (collectively, the "G&K partners") developed plaintiffs' properties. The G&K partners became general partners in the properties they developed. These individuals invested in low-income housing because, based upon the funding structure, there was no risk in the investments. The investments permitted the G&K partners to immediately profit and then collect dividends and

[1] Warren Breslow was not one of the original partners on any of the four plaintiffs, but he later became one of the G&K partners as the group developed properties in the late 1970s and beyond, and he eventually bought shares of plaintiffs' properties.

fees in perpetuity.

14. Plaintiffs are five unrelated limited partnerships developed to invest in low-income housing. Through the 236 and 221(d)(3) programs, each plaintiff developed one multifamily apartment building or complex in the mid-1970s. The shares in each partnership were sold or syndicated in part to limited partners to take advantage of the tax benefits that arose from the investment.

15. The G&K partners also own the following companies which provided management and maintenance services for the plaintiffs: G&K Management Co., Inc.; Mechanical Services; Overland Computer Services; Pacific Coast Micro Utility Co. Ltd; Greater California Micro Utility, Ld; G&K Builders Supply; Active Mortgage Corp.; Overland Media Co., LLC. Thus, the G&K partners profited from the services rendered to plaintiffs.

16. The G&K partners syndicated many of their buildings, including two of plaintiffs in this case. Under syndication agreements, the G&K partners sold 95 to 99 percent of the properties to limited investors. When properties were syndicated, the syndicators created, and the G&K partners approved, prospectuses describing the investments.

17. The Skyline View prospectus, dated November 22, 1972, sets forth the partnership's investment backed expectations. DX 93. The Skyline View prospectus confirms that the G&K partners' expectations mirrored that of the typical, reasonable investor in low-income housing. It states that "[t]he estimated return to the Limited Partners consists largely of tax write-offs over the first 19 years after initial payment." DX 93 at CGII-003412.

18. The limited partners who invested in Skyline View in 1972 had no investment backed expectations regarding the property's market value twenty years later. The Skyline View

prospectus states that the investment projections "are based upon the assumption that the Partnership will sell the Project at the end of the 21st calendar year after Final Endorsement for $1 . . . ." DX 93 at CGII-003473. In sum, the Skyline View partners, both general and limited, invested with the assumption that the property would be worth no more than $1 twenty years after their initial investment. The only expectation actually backed with an investment was the lucrative tax benefit.

19. The G&K partners considered Skyline View one of their premier properties, in one of the best geographic locations. Their decision to syndicate it and their assumption that the property would have no residual value is the only contemporaneous evidence regarding the G&K partner's investment-backed expectations regarding the other four plaintiffs.

## B. The Preservation Statutes

20. In the late 1980s, Congress became concerned that a large number of owners might utilize the prepayment opportunity, thus reducing the supply of low-income housing throughout the country. See S.Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. As a result, Congress enacted two pieces of legislation to meet an anticipated crisis in the availability of low-income housing.

### 1. Title II

21. In 1987, Congress passed the Emergency Low Income Housing Preservation Act ("ELIHPA" or "Title II"), which took effect on February 5, 1988. Pub.L. 100-242, 101 Stat. 1877 (reprinted as amended at 12 U.S.C.A. § 17151 (note) (West 1989)). Title II placed certain limits on plaintiffs' ability to prepay their HUD-insured mortgages and provided a series of incentives for owners with HUD-insured mortgages that had reached their initial prepayment date. Id.

These included:

- Increasing allowable distribution.
- Revising the method of calculating equity.
- Increasing access to residual receipts accounts or excess replacement reserves.
- Insurance for a second mortgage under Section 241(f) of the NHA.
- Increasing rents on existing Section 8 contracts.
- Financing for capital improvements.

22. To obtain the Title II incentives, owners submitted notices of intent and, subsequently, plans of action. If HUD accepted the plans, the agency invited the owners to sign a "Use Agreement." Participation in the Title II Use Agreement program was strictly voluntary.

23. The Title II incentives were based upon appraisals intended to ascertain the property's market value in the absence of HUD restriction. Under Title II Use Agreements, owners agreed not to prepay their HUD-insured mortgage. Entering into a Use Agreement fully compensated owners for any economic effect the limits on prepayment may have caused as well as for the value of the opportunity to prepay going forward.

**2. Title VI**

24. In 1990, Congress replaced Title II with the Low Income Housing Preservation and Resident Ownership Act of 1990 ("LIHPRHA" or "Title VI"), 12 U.S.C. § 4101 et seq., which provided a series of options to owners who would have been otherwise eligible to prepay their mortgage note. Title VI provided a comprehensive framework by which owners could obtain compensation, exit the HUD programs entirely, or prepay their HUD-insured mortgage.

25. To obtain any of these options, Title VI required owners to file notices of intent, conduct appraisals, and then submit plans of action within various statutory time frames. This was known as the preservation process, because HUD's objective was to preserve low-income

housing. Owners were able to submit their first notice of intent as early as two years prior to their original prepayment date and, thus, possessed the ability to reduce any administrative delays after their prepayment eligibility date. DX 279 at DOJ 0292 & DOJ 0299. Owners comfortable with the status quo could skip the preservation process and continue receiving the same benefits they had been receiving the previous 20 years. Further, HUD permitted owners who had plans of action pending under Title II to choose whether to continue under that statute or to switch to the opportunities in Title VI, if they wished. 12 U.S.C. § 4101(note (b)); Pub.L. 101-625, Title VI, § 604 (transitional provisions); DX279 at DOJ 0296-0297.

26. Title VI provided HUD with the discretion to approve outright prepayment at the outset of the process if certain economic conditions were met. 12 U.S.C. § 4108. Section 4108 provided that HUD could approve a plan of action requesting termination of the low-income affordability restrictions through prepayment. Id. For an owner to qualify for prepayment, HUD would have to make certain findings regarding the effect that prepayment would have upon the tenants and the overall supply of low-income housing in the area. Id.

27. Congress also permitted HUD to provide financial incentives to owners in exchange for the owner's agreement to forego prepayment and extend affordability restrictions. 12 U.S.C. § 4109. In exchange for extending the restrictions, HUD could provide owners with a variety of incentives, including access to residual receipts accounts, rent increases, financing for capital improvements, greater Section 8 coverage, and access to a portion of the property's equity. 12 U.S.C. § 4109.

28. Title VI also permitted HUD to approve and facilitate the sale of the property based upon the fair market appraisals of the property's value without the HUD restrictions. 12 U.S.C.

§ 4110(b). Such a sale would release the owner from the program entirely. HUD also provided grants and loans to non-profit entities in order to fund purchase of projects from private owners.

29. Congress also provided owners with insurance that they would not be interminably trapped in the program without benefits. Section 4114 served as an "escape hatch" by requiring HUD to approve prepayment if the promised incentives or benefits were not available. 12 U.S.C. § 4114. For example, if HUD approved a plan of action to grant incentives to an owner but funding was not available for 15 months, the owner could prepay its mortgage. Id. Also, if an owner obtained approval of a plan of action for sale, but the property was not purchased at fair market value within a specified period, the owner could prepay. Id.

30. Finally, to ensure that owners were not subject to economic losses while their completed plans of action were pending, Congress ordered HUD to complete the review within 180 days and, if the review extended beyond that, HUD was to provide retroactive incentives to owners as compensation. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce the distribution of retroactive incentives and the 180 day time frame. Id.

**C. Congress Passed The HOPE Act In 1996**

31. Concern regarding waste and abuse of the programs by owners lead Congress to reconsider Title II and Title VI (collectively "preservation statutes"). In January 1995, Congress began considering a bill that would remove any limitations on the opportunity to prepay. DX447. In March 1995, HUD notified owners that such legislation was pending, but continued to process plans of action until the pending statute was passed. DX318.

32. In March 28, 1996, Congress passed the Housing Opportunity Program Extension Act ("HOPE Act"), Pub.L.No. 104-120, § 2, 110 Stat. 834. Among other features, the HOPE Act

permitted mortgage prepayment (and thus termination of the low-income affordability restrictions) without HUD's prior approval, provided that the owner not raise rents for 60 days following prepayment. As such, any previous limitations upon prepayment were completely lifted as of March 28, 1996, and eligible owners could thereafter prepay at any time.

## D. Plaintiffs Had Several Options

33. Each plaintiff was free to choose among the options available under the preservation statutes. Specifically, each plaintiff could have chosen to exchange their opportunity to prepay for a set of incentives under a Use Agreement or to seek a buyer at a fair market value.

### 1. Each Plaintiff Chose To Pursue Use Agreements

34. Cienega Gardens, Las Lomas, and Del Amo each filed notices of intent to seek Use Agreements under Title II. Later, when given the option of switching their applications to Title VI, each plaintiff refused. Through a process of appraisal and appraisal review, each plaintiff negotiated with HUD regarding what the property's value would be if there had been no HUD restrictions. Ultimately, plaintiffs and HUD reached the following valuations:

- Cienega Gardens: $8,360,000.
- Del Amo: $11,710,000.
- Las Lomas: $6,848,726.

35. These valuations served as the basis for plaintiffs' incentives in the preservation process. If plaintiffs had chosen to sell their properties, these values would have also served as the selling price. Later, HUD's inspector general would conclude that HUD's field offices were substantially overvaluing owners' properties in the preservation process. Ronald Hendricks, an expert appraiser, has reviewed the appraisals and the agreed upon valuations. At trial, Mr. Hendricks will explain that the property valuations agreed to by HUD and the plaintiffs (1)

overstate the rents that would have been available to the plaintiffs as conventional properties, and (2) overstate the properties' values as well.

36. In May, 1995, Cienega Gardens, Del Amo, and Las Lomas each signed Use Agreements with HUD. In exchange for valuable financial benefits, each plaintiff traded in their opportunity to prepay and resolved any claim they had against the Government. The Use Agreements each acted as an accord and satisfaction. Plaintiffs knowingly agreed not to reserve any rights to bring suit against the Government pursuant to the Fifth Amendment.

37. Plaintiffs were not under any financial duress when the agreed to sign Use Agreements. The plaintiffs would have signed Use Agreements for Las Lomas, Del Amo, and Cienega Gardens even if they had possessed the unlimited opportunity to prepay. Although plaintiffs were aware that Congress was considering restoring the unlimited opportunity to prepay, the Del Amo, Las Lomas, and Cienega Gardens plaintiffs willingly signed Use Agreements.

38. The Use Agreements placed the Las Lomas, Del Amo, and Cienega Gardens plaintiffs in the same or better financial position than they would have been occupied had they prepaid their respective mortgages. If not, plaintiffs would have chosen to sell the properties at a market rate and pursue other investment opportunities.

39. In 1993, Skyline View and Blossom Hill each filed notices of intent to seek Use Agreements under Title VI. Under Title VI, each plaintiff obtained an appraisal for their property. HUD obtained appraisals, as well. After negotiations to resolve differences in the appraised values, the plaintiffs and HUD reached the following valuations:

- Skyline View: $11,771,135.

• Blossom Hill: $10,945,000.

Again, Mr. Hendricks has reviewed these appraisals and the agreed valuations and concluded that the valuations (1) overstate the rents that would have been available to the plaintiffs as conventional properties, and (2) overstate the properties' values.

40. On May 8, 1995, HUD approved Skyline View's plan of action and triggered the 15-month performance period. See 12 U.S.C. § 4114. Similarly, HUD issued its preliminary approval of the Blossom Hill plan of action 11 days later on May 19, 1995. DX77. Skyline View and Blossom Hill understood that if HUD did not timely fund the Use Agreements within 15 months, each could each prepay its mortgage pursuant to Title VI. Id.; DX368.

41. On June 15, 1995, HUD informed plaintiffs that it was likely that funding would be unavailable for approved plans of action. Under Title VI, Skyline View would have become eligible to prepay its mortgage on August 8, 1996, and Blossom Hill would have become eligible to prepay on August 19, 1996. DX77.

42. The HOPE Act restored Skyline View's and Blossom Hill's unlimited opportunity to prepay on March 28, 1996. Those plaintiffs informed HUD that they wished to prepay their mortgages effective June 1, 1996. DX266; DX328.

43. Skyline View and Blossom Hill never exhausted their administrative remedies pursuant to the preservation statutes because, after Congress passed the HOPE Act, plaintiffs chose to leave the preservation process and prepay their mortgages. Thus, HUD never issued a final decision regarding the preservation incentives the plaintiffs were seeking and whether prepayment would be permitted pursuant to Title VI.

2. **Plaintiffs Ignored the Option to Sell**

44. The San Francisco and Los Angeles areas had numerous non-profit organizations interested and willing to purchase section 221(d)(3) and 236 properties from private owners pursuant to the preservation statutes. To facilitate and expedite the process, HUD compensated consultants who assisted the parties. The agency also funded non-profit organizations to permit them to acquire these buildings.

45. Although several non-profit organizations expressed interest in purchasing their properties for the appraised fair market value, plaintiffs refused to pursue this option.

46. Each plaintiff chose not to sell its property through the preservation statutes despite the fact that it could have extracted the entire fair market value of their equity. Had plaintiffs wished to sell their property to a non-profit organization for its appraised fair market value, there would have been a willing buyer available. If, for some reason, the plaintiffs had not received a bona fide offer, the plaintiffs could have prepaid their mortgages pursuant to 12 U.S.C. § 4114.

E. **The Properties Prior To Title II**

47. Although the HUD-insurance programs made low-income housing available, those programs did not provide any direct assistance for tenants to pay rents.

48. Over time, HUD provided a number of programs to assist tenants in paying rent. One form of rental assistance was Housing Assistance Payment ("HAP" or "Section 8") contracts. These were contracts, signed by an apartments' owners and HUD, covering some set number of units in a given building. DX8, DX58; DX75. HAP contracts were project-based assistance, meaning that the assistance ran with the building. Del Amo, Blossom Hill, and Skyline View each participated in the HAP program. Id.

49. HAP contracts provided that "[p]repayment of the mortgage shall not, by itself, affect any of the rights of the Owner or HUD under this contract." DX8 at CGII-000049; DX58 at CGII-001032. When an apartment building signed a Section 8 contract it agreed to adhere to the HUD restrictions even if the owner prepaid the mortgage. Id.

50. HAP contracts provided benefits to apartment owners with HUD-insured mortgages. Without a HAP contract, the owners had to find tenants able to pay their entire rent, regardless of what percentage it was of their income. With HAP, tenants only had to pay 30 percent of their adjusted gross income (whatever that happened to be) as rent, with HUD paying the rest.

51. A HAP contract reduced the apartment owner's credit risk (the risk that the rent would not be paid). Also, under HAP contracts, HUD paid its portion of the rent in a lump sum at the first of the month.

52. HAP contracts reduced the likelihood that a unit would be empty ("vacancy risk"). For HUD properties, there are generally waiting lists with from 10 to 1,000 names. This is not true for conventional properties. Indeed, G&K Management does not maintain waiting lists for its conventional properties. Not only did HAP contracts reduce vacancy risk by enlarging the pool of eligible tenants, it also provided subsidies for vacant units. Under the terms of plaintiffs' Section 8 contracts, HUD paid the owners 80 percent of the contract rents on vacant units, for up to 60 days.

53. On July 6, 1988, HUD issued a rule that owners had to give tenants 12 months notice before choosing not to renew a HAP contract. DX324. This provided tenants and HUD with time to find new accommodations or new subsidies.

54. Skyline View, Del Amo, and Blossom Hill each signed five-year HAP contracts that

overlapped with their initial prepayment dates. Thus, the properties would have been subject to affordability restrictions even if they had prepaid their HUD-insured mortgages on the original prepayment dates

55. Before 1996, HAP contracts were renewed in five- year increments. During that time, HUD did not permit tailor-made contracts of shorter duration.

56. In the absence of the preservation statutes the Skyline View, Del Amo Garden, and Blossom Hill plaintiffs each would have faced a choice: forego HAP assistance until the prepayment date or renew their HAP contract for five years although it would limit the rents the buildings could charge upon prepayment.

57. If plaintiffs had chosen to forgo the HAP contracts that overlapped their initial prepayment, the properties would have suffered substantial financial loss and faced potential foreclosure.

### F. <u>Prepayment Of The HUD-Insured Mortgages</u>

58. Prepayment of a HUD-insured mortgage has certain costs and risks for an owner. To prepay a HUD-insured mortgage, an owner must obtain a new, non-subsidized loan for the property.

59. Lenders were unwilling to make long-term, unsubsidized loans for the properties without evidence that the properties could obtain the conventional rents that they projected. Generally, lenders wanted an owner to demonstrate what conventional rates the property could get for two or three years before providing a long-term unsubsidized loan.

60. If the owners wished to prepay, they had two options: finance the prepayment with cash obtained from the partners, or obtain a bridge loan with the partners' personal property at

risk if the loan defaulted. Either option increased the partners' investment – and risk – in the property. For example, when the owners prepaid both Skyline View and Blossom Hill, they were forced to obtain bridge loans because conventional financing was unavailable at that time.

61. If an owner prepaid, it would have to pay mortgage transaction costs twice. The first set of transaction costs would result from the bridge loan necessary to finance prepayment. The second set would result from securing a long-term mortgage after two or three years of a proven track record as a conventional property.

62. In converting to a conventional property, an owner faced various "conversion costs" such as increased vacancies and increased costs for advertising and obtaining tenants.

### G. <u>Discounting</u>

63. Because a dollar earned sooner is worth more than a dollar earned later, cash flows are properly subject to discounting. Specifically, cash flows should be discounted based upon their riskiness. Lower discount rates should be used for more reliable, or less risky, cash flows.

64. Discounting is the economic process of calculating the value of cash flows back to a given point in time, taking into account inflation, risk, and the real rate of return. Net present value is the present value of future cash flows, minus original investment. Discounting is used to obtain net present value. DX1277.

### H. <u>Risks Associated With Real Estate Investments</u>

65. Investors in apartment buildings face a range of risks, including risks associated with the rent levels, apartment occupancy, operations of the apartment, credit risk, interest rate risks, inflation risks, including risks of natural disasters such as earthquake, fire, and flooding.

66. In preparing a projection of expected annual rent increases, G&K Management assumes a 3 percent annual increase.

67. An appropriate discount rate for risky cash-flow streams from conventional properties is 15 percent. An appropriate discount rate for cash-flow streams from subsidized, HUD-insured housing is 10 percent.

**I. <u>Composition of Partnerships Changed</u>**

68. In 1994, at the time of the alleged taking, Skyline View and Blossom Hill were owned primarily by limited partners who had purchased their interests in the properties in 1973 and 1974 when the properties were syndicated.

69. Throughout the entire alleged taking period, these limited partners owned more than 75 percent of each of these properties. These limited investors had no relationship and little contact with the G&K partners.

70. When the Skyline View and Blossom Hill plaintiffs filed this suit, the limited partners continued to own nearly all the equity in plaintiffs. At that time, the limited partners would have been entitled to the majority of any recovery from this law suit.

71. In December 1996, after plaintiffs had given notice that they would prepay their HUD-insured mortgages, trusts and entities controlled by the various G&K partners purchased the limited partners' shares in Skyline View and Blossom Hill. At this time, the various G&K partners and entities controlled by them will receive any recovery obtained in this law suit.

# DEFENDANT'S CONTENTIONS OF LAW

## I. THE PLAINTIFFS CLAIMS LACK RIPENESS, STANDING, OR HAVE BEEN WAIVED

The Court should reject the plaintiffs' claims Based upon ripeness, standing, and waiver. The Skyline View and Blossom Hill plaintiffs's claims are unripe and, even if they were ripe, the claims would violate the Anti-Assignment of Claims Act ("ACA"), 31 U.S.C. § 3727. Moreover, by signing Use Agreements pursuant to the preservation statutes, the remaining plaintiffs, Del Amo, Las Lomas, and Cienega Gardens, have resolved their claims against the Government.

### A. The Skyline View And Blossom Hill Plaintiffs Claims Are Not Ripe

Because the Blossom Hill and Skyline View plaintiffs did not pursue their claims under Title VI to finality, the Court should conclude that the Skyline View and Blossom Hill claims are not ripe for adjudication.

#### 1. Plaintiffs Must Pursue Claims To Finality

Finality is required before a court can determine whether an owner could receive just compensation from the responsible agency for the alleged taking.

The United States Supreme Court has established that a claim charging that a regulation effects a taking "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985). No court can properly ascertain whether the statute or regulation goes "too far" until it is actually applied to the property in question. "It is only at this

point that one's property is meaningfully burdened by the law, bringing an actual controversy between the owner and the government into being." Id; see also Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991) (an as-applied regulatory takings claim can only arise when a property owner has actually sought, and been denied, the opportunity to exercise the alleged rights).

The Government's action is not "'complete' in the sense of causing a constitutional injury 'unless or until [it] fails to provide an adequate postdeprivation remedy for the property loss.'" Williamson, 473 U.S. at 195 (quoting Hudson v. Palmer, 468 U.S. 517, 532 n.12 (8th Cir. 1984)). Therefore, as long as the Government has provided options by which the owner could receive adequate remuneration, and a claimant has not yet exhausted the agency's discretion in providing compensation, the claim is not ripe for judicial review. Id. at 190; see also Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 295 (1981).

The Supreme Court's reluctance to decide takings claims until a final decision has been issued is well founded in the "very nature of the inquiry required by the Just Compensation Clause." Williamson, 473 U.S. at 190. Two important factors necessary to establish a taking are: (1) the economic impact of the challenged action upon the owner; and (2) the extent to which the regulation interferes with the owner's reasonable investment-backed expectations. Id. Both inquiries are highly fact specific and "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." Id. at 191. Thus, ripeness is necessary in light of the fact that courts must engage in "'ad hoc, factual inquiries' [that] must be conducted with respect to specific

property and ultimate valuation relevant in the unique circumstances." Hodel, 452 U.S. at 295 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175 (1979)).

Contrary to plaintiffs' suggestions, the preservation statutes established a statutory framework that did much more than simply limit plaintiffs'opportunity to prepay their HUD-insured mortgages. The statutes provided alternative means by which owners could seek to avoid these limitations, obtain compensation for these limitations, or leave the HUD program altogether. Specifically, the preservation statutes provided HUD great discretion to provide incentives through Use Agreements to owners willing to maintain the property's low-income nature. 12 U.S.C. § 4109. The statutes also provided compensation through the property's market-rate sale. 12 U.S.C. § 4110.

Finally, the statute provided for a unilateral opportunity to prepay should the owners fail to obtain a Use Agreement or complete a market sale. 12 U.S.C. § 4114. Thus, the preservation statutes provided a range of opportunities whereby HUD could compensate the owners or allow the opportunity to prepay. Until HUD issues a final decision and expends its remaining discretion regarding incentives, sale, or prepayment pursuant to section 4114, a takings claim cannot be ripe because the nature of the Government action and its economic impact remains unknown. The Court is left to speculate as to the nature of the Government action and its economic impact because HUD could have applied Title VI either to provide incentives or allow prepayment. This sort of speculation is precisely what the ripeness doctrine is designed to prevent.

An agency's final decision may also directly affect the Court's analysis as to whether "the government has provided an adequate process for obtaining compensation." Williamson, 473

U.S. at 194-95 (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984)). "[I]f resort to that process 'yield[s] just compensation,' then the property owner has 'no claim against the Government' for a taking." Id. The prospect of compensation is essential because "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Id. (citing Hodel, 452 U.S. at 297) (emphasis added). Nor does compensation have to be paid in advance or contemporaneously with the taking. Id. Rather, there merely must be a "reasonable, certain and adequate provision for obtaining compensation" at the time that the taking occurs. Id. (quoting Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-125 (1974)).

These issues were addressed by the United States Court of Appeals for the Eighth Circuit in Parkridge Investors Ltd. P'ship v. Farmers Home Admin., 13 F.3d 1192 (8th Cir. 1994), where the court determined that a claim alleging that Title II had resulted in a taking of prepayment rights pursuant to a loan agreement was not yet ripe. The Eighth Circuit concluded that because the Farmers Home Administration ("FmHA") retained extensive discretion to approve the sale of the property or even prepayment, the claim was too speculative. 13 F.3d at 1199. In other words, because the owner had yet to apply to sell the property for fair market value, the claim was not ripe.

Receipt of the fair market value for the property is all that an owner would be entitled to pursuant to the Fifth Amendment and the owner could possibly receive precisely this amount from sale of the property. Id. Further, if the FmHA failed to approve a proposed sale, then the agency was permitted to allow the owner to prepay, which would be "precisely the outcome the partnership seeks" as a result of the litigation. Id. Thus, the Eighth Circuit concluded that the

owner's damages were "entirely speculative," and that "[e]ven if the Act represents a taking, it may turn out to be justly compensated, and therefore constitutional." Id. (citing Thetford Props. IV Ltd. P'ship. v. United States Dep't. of Housing and Urban Dev., 907 F.2d 445, 448 (4th Cir. 1990)). Because the owners had filed their claim prior to applying for sale or prepayment, the Eighth Circuit was left only to speculate as to the extent of Title II's effect upon the property in question.

Thus, owners needed to pursue their claims for incentives or sale to completion before having standing to bring suit here seeking just compensation under the Fifth Amendment.

**2. Blossom Hill and Skyline View Did Not Pursue Their Claims To Finality**

Because Blossom Hill and Skyline View did not pursue relief to finality, the Court should conclude that those plaintiffs' claims are not ripe.

Both Blossom Hill and Skyline View had initial prepayment dates in 1994. At that time, both properties pursued incentives through plans of action filed with HUD. On January 27, 1995, the owners of Blossom Hill and Skyline View each submitted plans of action to HUD to extend the affordability restrictions on the properties in exchange for incentives, as permitted under section 4114. DX77; DX211. On May 8, 1995, HUD preliminarily approved Skyline View's plan of action. DX63. HUD approved Blossom Hill's plan of action a few days later. DX 77.

HUD's approval of the plans of action did not amount to a final decision, however. Under Title VI, after approving the plans of action, HUD had 15 months to offer Skyline View and Blossom Hill funded Use Agreements to memorialize the terms agreed to in the plans of action. Pursuant to Title VI, if HUD failed to provide funded Use Agreements, Skyline View and

Blossom Hill would have been permitted to prepay their HUD-insured mortgages in August 1996. The owners of Skyline View and Blossom Hill were well aware of the possible opportunity to unilaterally prepay and carefully tracked the progress of their applications. DX323.

Indeed, before the 15 months had passed, HUD informed the plaintiffs that funding was currently unavailable and confirmed that the properties would be eligible to prepay in August, 1996, if funding was not found. On March 28, 1996, Congress passed the HOPE Act, lifting Title VI's restrictions upon the opportunity to prepay. Pub.L.No. 104-120, § 2, 110 Stat. 834. On May 30, 1996, Skyline View and Blossom Hill informed HUD of their intention to prepay pursuant to the HOPE Act. DX199, DX246. Those plaintiffs prepaid their mortgages pursuant to the HOPE Act on December 19, 1996. DX87, Interrog. 2, Interrog. 5.

During the 15 months after the Skyline View and Blossom Hill plans of action were awaiting funding, HUD retained the discretion to either (1) fund the Use Agreements and provide lucrative incentives in exchange for extending the affordability restrictions; or (2) allow prepayment by August, 1996. 12 U.S.C. §§ 4109, 4114. Congress' passage of the HOPE Act and the decisions of Skyline View and Blossom Hill to leave the preservation program prevented HUD from issuing a final decision regarding either properties' plan of action. Thus, the window to obtain a final decision – and therefore ripen a claim – closed.

The fact that HOPE restored plaintiffs' opportunity to prepay does not ripen their claims. In Boise Cascade Corp. v. United States, 296 F.3d 1339, 1351 (Fed. Cir. 2002), a Government agency notified a property owner that the owner could not log timber on its property because of the presence of endangered owls. In response, the owner applied for a logging permit. Before a

final decision on the application, the owls disappeared from the owner's property and the agency lifted the logging restriction. Id. The United States Court of Appeals for the Federal Circuit held that the owner's takings claim was not ripe. Id. at 1351-52. Similarly, Blossom Hill's and Skyline View's takings claims are not ripe, even if they decided to terminate their plans of action because HOPE was enacted. This Court cannot ascertain with any certainty how HUD would have ultimately expended its discretion on applying Title VI to Skyline View and Blossom Hill. Because Blossom Hill and Skyline View did not follow the statutorily designed compensation process to completion, their takings claims are not ripe for adjudication.

### 3. Cienega VI Specifically Requires Each Plaintiff In This Case To Establish That Its Claim Is Ripe

The Skyline View and Blossom Hill plaintiffs mistakenly cite Cienega Gardens VI for the proposition that their takings claims are ripe merely because it would have been futile to apply outright to prepay pursuant to section 4108. Set II Plaintiffs' Pretrial Memorandum Of Contentions Of Fact And Law," filed October 12, 2004, at pages 36-37. This vastly overstates the Federal Circuit's narrow holding for several reasons

First, in Cienega Gardens v. United States, 265 F.3d 1237 (Fed. Cir. 2001) ("Cienega VI"), the Court confirmed that an owner must obtain "a final decision from the governmental agency charged with administering challenged regulations before the claim is properly justiciable." 265 F.3d at 1244. The Federal Circuit also reaffirmed that "where agencies have discretion, requiring a final administrative decision ensures that there has been an injury-in-fact." Id. at 1245 (citing Williamson, 473 U.S. at 193). Thus, the Court in no way undermined the ripeness requirement of a final agency resolution.

Second, although Cienega VI concluded that the claims before it were ripe, it specifically constricted its holding "only to the circumstances of the Model Plaintiffs and those other owners that demonstrate on a case-by-case basis in future proceedings that it would have been futile to submit prepayment requests to HUD." 265 F.3d at 1248. Thus, the Federal Circuit specifically issued a mandate to this Court to determine, under the applicable facts, whether each plaintiff has demonstrated that its claim is ripe. Here, if plaintiffs had remained in the Title VI program until August, 1996, they either would have received incentives or authorization to prepay their HUD-insured mortgage. Thus, plaintiffs cannot meet the factual showing required in Cienega VI.

Third, the Federal Circuit only addressed one ripeness issue in the context of the preservation statutes.[2] The Cienega VI Court did not consider the full range of HUD's remaining discretion to offer compensation to plaintiffs by distributing incentives pursuant to section 4109, approving transfer of the property pursuant to sections 4110 and 4111, or permitting prepayment pursuant to section 4114. Stated differently, although the Court concluded that the plaintiffs did not have to file requests to prepay, this merely absolved the plaintiffs from pursuing one possible option under Title VI. The Court neither considered nor resolved the result of the plaintiffs' failure to complete any of the options under that title. It is the availability of these other options, which the Skyline View and Blossom Hill plaintiffs did not pursue to finality, that leaves the plaintiffs' claims unripe.

---

[2]In Cienega Gardens VI, the Federal Circuit concluded that it would have been futile for the four model plaintiffs to have applied for prepayment pursuant to section 4108. Cienega VI, 265 F.3d at 1248. In doing so, however, the Cienega Gardens VI Court ignored its prior, binding precedent by prematurely considering the futility exception. See Howard W. Heck & Assocs. v. United States, 134 F.3d 1468 (Fed. Cir. 1998); Southern Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990); see also Greenbrier v. United States, 40 Fed. Cl. 689, 693, 702 (1998); aff'd, 193 F.3d 1348 (Fed. Cir. 1999).

Finally, Cienega VI did not consider the effect the intervening passage of the HOPE Act had upon the ripeness of a claim where an application for just compensation or the restoration of the opportunity to prepay was pending. Skyline View and Blossom Hill did not pursue relief for the alleged taking to finality and, as such, those plaintiffs' claims are not ripe.

**B. Skyline View's and Blossom Hill's Claims Violate The Anti-Assignment Of Claims Act**

The Court should reject all claims for the Skyline View and Blossom Hill plaintiffs because they violate the Anti-Assignment of Claims Act ("ACA"), which prohibits the assignment of disputed claims against the Government. 31 U.S.C. § 3727(b).

Under the ACA, a plaintiff may not "transfer or assign[] any part of a claim against the United States Government or of an interest in the claim." 31 U.S.C. § 3727(a)(1). Thus, the only party entitled to compensation for a taking is the owner at the time of the taking, not the owner at an earlier or later date. See United States v. Dow, 357 U.S. 17, 20 (1958) (Supreme Court determined that plaintiff could only prevail "if the 'taking' occurred while he was the owner."). See also United States v. Shannon, 342 U.S. 288, 291-92 (1952); Stearns Co. v. United States, 34 Fed. Cl. 264, 270 (1995).

In the early 1970s, when Blossom Hill and Skyline View were developed, the general partners sold nearly all of the equity in the properties to limited partners through a syndication service. After the syndication, the general partners retained only 5 percent of the equity in each property. With only minor changes, this ownership structure continued through the properties' original prepayment dates and through 1994, when plaintiffs filed this suit.

In December, 1996, when the properties prepaid their HUD-insured mortgages, the G & K partners reacquired the limited partners' interest in the properties. The G & K Partners, and

trusts controlled by those partners, now exclusively own these properties and, more importantly, will be the sole recipients of any compensation awarded by this Court.

Because the G & K partners did not own the limited partners' interests at the time of the taking, they cannot assert the takings claims of those interests in this lawsuit. As the Court stated in Dow, "it is undisputed that '[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" 357 U.S. at 20-21 (brackets in original, quoting Danforth v. United States, 308 U.S. 271, 284 (1939)).

In Applegate v. United States, 35 Fed. Cl. 406 (1996), this Court concluded that, pursuant to the ACA, the property owners could only recover for property taken after the date of their purchase; not for property taken before the date of purchase. See id. at 421. The Court explained that "'[t]he person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking.'" Id. at 419 (quoting Lacey v. United States, 219 Ct. Cl. 551, 560, 595 F.2d 614, 619 (1979)) (emphasis added). The Court concluded that "[s]ince plaintiffs are barred by law from claiming damages prior to ownership, and no valid assignment has occurred, plaintiffs are precluded from recovering damages for any property taken before the date of purchase for each affected property." Id. at 421.

Thus, the Court should conclude that the ACA bars Blossom Hill and Skyline View Plaintiffs from asserting any taking clams against the Government.

### C. The Doctrine Of Accord And Satisfaction Bars The Takings Claims Of Las Lomas, Cienega Gardens, and Del Amo

The Court should conclude that the doctrine of accord and satisfaction blocks the claims of the three plaintiffs that signed Use Agreements.

Three plaintiffs entered into "Use Agreements" with HUD. Those agreements recited (emphasis added) that:

> pursuant to ELIHPA, the Owner has requested, and HUD has agreed to provide certain incentives, as set forth herein, in exchange for the Owner's agreement to continue low-income affordability restrictions on the Project for the remaining term of the original mortgage . . . ."

DX6; DX 144 (emphasis added).

The express language of the Use Agreements – setting forth the acceptance of incentives "in exchange for" continuation of restrictions upon projects – bars any takings challenge to the preservation statutes' restrictions upon Las Lomas, Cienega Gardens, and Del Amo. See Chancellor Manor v. United States, 331 F.3d 891, 896 n.3 (Fed. Cir. 2003). Indeed, the Use Agreements further provided that "in consideration of the mutual promises set forth herein," Use Agreement owners' projects would be used, except where HUD approved commercial use, "solely as rental housing for Very Low, Lower, and Moderate Income Families." DX6; DX144.

Because of those mutual promises, plaintiffs who signed Use Agreements have no takings claims against the United States. Even assuming for the sake of argument that the preservation statutes did effect a taking, the Use Agreements supplanted the obligation to pay just compensation with the obligations set forth in the agreements, requiring any future "recovery" only in accordance with the terms of the agreements themselves, in actions for breach of contract. See Aktieselskabet Dampskibsselskabet Svendborg v. United States, 131 Ct. Cl. 399, 407, 30 F.Supp. 363, 367-68 (1955), cert. dismissed, 350 U.S. 978-79 (1956). In Independence Park Apartments v. United States, 61 Fed. Cl. 692, 701 (2004), this Court stated:

> To the extent that plaintiffs believe that the government has breached contractual rights under the Use Agreements and HAP

contracts, they should move for leave to amend or supplement the complaint in this action to encompass their breach of contract allegations based upon such agreements.

Because Las Lomas, Cienega Gardens, and Del Amo have, in effect, exchanged any Fifth Amendment rights to just compensation that they might have had for contract rights defined by the Use Agreements, the Court should dismiss those plaintiffs' takings claims.

## II. CONGRESS DID NOT EFFECT A TAKING OF THE PLAINTIFFS' OPPORTUNITY TO PREPAY THEIR HUD-INSURED MORTGAGES

The Court should conclude that Congress's passage of the preservation statutes did not effect a taking of plaintiffs' contractual opportunities to prepay their HUD-insured mortgages. Instead, the Court should conclude that, at most, plaintiffs suffered a minor and uncompensable delay in exercising or bargaining away this contractual opportunity.

The question of when a regulatory taking occurs cannot be disposed of by general propositions; it is a question of degree. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416 (1922). Moreover, "the denial of one traditional property right does not always amount to a taking." Andrus v. Allard, 444 U.S. 51, 65 (1979). Where a property owner "possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." Id. at 65-66. Although certain regulations may prevent the most profitable use of certain property, such an impact is not dispositive. Id. at 66. "[A] reduction in the value of property is not necessarily equated with a taking." Id. Claimants such as plaintiffs must bear the costs of regulations which restrict some of the uses of their property, "within limits, that is a burden borne to secure 'the advantage of living and doing business in a civilized community.'" See id. at 67 (quoting Pennsylvania Coal, 260 U.S. at 422 (Brandeis, J., dissenting)).

The relevant factors to determine whether a regulatory taking has occurred include: (1) the character of the Governmental action; (2) the regulations' economic impact upon the claimant; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978); 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1580 (Fed. Cir. 1995).

### A. The Government's Actions In Enacting The Preservation Statutes Do Not Have The Character Of A Taking

The Court should conclude that the Government's actions do not have the character of a taking because the preservation statutes satisfied an important Governmental interest and did not impose upon the owners a disproportionate burden in meeting this interest. In considering the character of the Government's action, a court should "inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." Maritrans Inc. v. United States, 342 F.3d 1344, 1356 (Fed. Cir. 2003); Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994).

#### 1. The Preservation Statutes Satisfied Important Governmental Interests

The Court should conclude that Title II and Title VI satisfied the important Governmental interest of ensuring that the nation had a sufficient supply of low-income housing.

In the late 1980s, Congress had become concerned that a large number of owners of 221(d)(3) and 236 properties might utilize the prepayment opportunity, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. As a result, Congress enacted two pieces of legislation. First, Title II was enacted on an emergency basis to provide a temporary means of addressing the possible prepayments while Congress developed Title VI, a more complex,

targeted statute. Both Title II, which was enacted in 1987, and Title VI, which was enacted in 1990, were specifically designed to meet an anticipated crisis in the availability of low-income housing. The primary purposes of these acts were to preserve the national low-income housing stock and to compensate owners for the impact of doing so.

The investigation into the character of the Government's action requires "that a reviewing court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994).

Because of the national responsibility in securing housing for low-income individuals, the implementation of the preservation statutes clearly served the public interest.

**2. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing Disproportionately Upon The Plaintiffs**

The Court should conclude that the preservation statutes did not disproportionately shift the burden of providing low-income housing onto plaintiffs.

The Supreme Court has held that statutory and regulatory restrictions on property rights are not compensable takings if "the burdens they impose are not so wholly disproportionate to the burdens other individuals face in a highly regulated society that some people are being forced 'alone to bear public burdens which, in all fairness and justice, must be borne by the public as a whole . . . .' " United States v. Locke, 471 U.S. 84, 106 n.15 (1985) (quoting Armstrong, 364 U.S. at 49); see also Maritrans, 342 F.3d at 1357.

Here, the preservation statutes limited the owners' opportunity to prepay their HUD-insured mortgages to ensure a sufficient supply of low-income housing. The options Congress provided to the owners, however, ensured that the public would bear the cost of this housing.

First, the statutes provided HUD with the discretion to approve outright prepayment if certain economic conditions were met. 12 U.S.C. § 4108.

Second, Congress vested HUD with the discretion to provide financial incentives to owners in exchange for the execution of a new regulatory agreement which would extend the affordability restrictions. 12 U.S.C. § 4109(a). In effect, HUD had the discretion and resources to purchase from the owners their opportunity to prepay. 12 U.S.C. § 4109(b)(1)-(2). Many owners, including three plaintiffs, signed Use Agreements and exchanged their opportunity to prepay for these incentives.

Third, HUD possessed the discretion to approve and facilitate the sale of the property. 12 U.S.C. § 4110. Such a sale would release the owner from the program entirely, as well as result in the owner receiving the fair market value for its investment. Thus, if an owner determined that it no longer wished to participate in the HUD program, it could sell its property at the value the property would have been worth absent any HUD restrictions. Many investors throughout the country sold their properties and left the HUD program entirely. In order to obtain any of these benefits, an owner had to file a notice of intent, obtain an appraisal, and then submit a plan of action for HUD's approval within the various time frames provided for by the statute.

Fourth, unilateral prepayment was potentially available pursuant to Title VI. 12 U.S.C. § 4114. This "escape hatch" provision ensured that owners would not be trapped without benefits

should HUD not have sufficient funding to deal with all owners, Congress created this escape hatch by which an owner could prepay and leave the program, if the promised incentives were ultimately unavailable. Id.

Thus, from the time Congress passed the preservation statutes, owners understood that – at their selection – they would either obtain (1) incentives in exchange for the opportunity to prepay, or (2) the market value of their entire property. If the Government failed to make good on these benefits, HUD would allow prepayment. Thus, the preservation statutes did not shift burdens onto the HUD owners.

Plaintiffs may argue that delays in the incentives program constituted a taking. First, the plaintiffs could have filed their notices of intent as early as two years prior to their prepayment eligibility date. Thus, most – if not all– of the preservation process could have been completed as of the plaintiffs' original prepayment dates, thus obviating any delays. DX279 at DOJ 0292. In addition, the preservation statutes provided compensation for any alleged delays longer than 180 days, provided that the owners did not cause the delays. 12 U.S.C. 4115(c).

Specifically, if HUD failed to approve a completed plan of action within 180 days, the statute required HUD to provide retroactive incentives and assistance to owners in the amount that the owners would have received if HUD had complied with the time limitations. Id. Further, the statute provided owners with the right to go into district court to enforce these retroactive benefits. The plaintiffs failed to avail themselves of these options to enforce the 180 day time line and retroactive incentives and therefore have waived any claim to delays associated with the preservation process.

Given these incentives and this clear regulatory scheme, Congress did not – either in intent or in effect – shift the burden of low-income housing onto the owners. Instead, Congress merely adjusted the benefits and burdens of economic life to promote the common good. Penn Central, 38 U.S. at 124.

Thus, the Court should reject plaintiffs' claim that the Government forced plaintiffs to suffer a physical occupation of their properties by Government-approved low-income tenants at below-market rents and "drastically curtailed [p]laintiffs' right to transfer their properties." Plaintiffs Mem. at ¶¶ 122-124. This argument ignores the regulatory scheme that surrounded the limits on the opportunity to prepay and clearly overstates any inconvenience to the owners caused by the programs' changes, some of which was within the plaintiffs' control.

Based upon the Federal Circuit's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) ("Cienega VIII"), plaintiffs also assert "[t]he character of the government's actions in enacting Title II and Title VI and appropriating owners' prepayment rights is thus decided in this Circuit." Plaintiffs' Mem. at ¶ 120. This argument, however, is flawed because this is a different case involving different plaintiffs. Indeed, the Federal Circuit in Cienega VIII specifically determined that the opinion did not have precedential value with respect to the remaining plaintiffs in this case. 331 F.3d at 1353-54. The Court wrote:

> Thus for the thirty-eight non-model plaintiffs, because the record before us is not developed at all as to, for example, economic impact, we remand for the trial court to allow the parties to develop an appropriate record and to rule on liability, and if liability is found, also on damages.

Id.

Thus, the nature of the Government's action strongly weighs against any determination that the preservation statutes effected a taking.

### B. Plaintiffs Are Unable To Demonstrate That The Government Denied It Economically Viable Use Of Its Property

The Court should reject plaintiffs' claim that the preservation statutes denied the owners any economically viable use of the properties because (1) the incentives and opportunities provided by Congress outweighed any burden the plaintiffs faced, and (2) the damages alleged by plaintiffs do not constitute sufficient harm to be deemed a taking.

#### 1. The Preservation Statutes Could Not Have Caused Plaintiffs Significant Economic Impact Because They Offered Plaintiffs Alternatives

Under Penn Central, the Court must consider the regulation's economic impact upon the claimant "to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." Loveladies Harbor, 28 F.3d at 1176-77 (citing Pennsylvania Coal, 260 U.S. at 413) (stating that the "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law"). In order to prevail, the plaintiff must show a serious financial loss from the regulatory imposition. This is known as a denial of "economically viable use of [an owner's property]." Agins v. City of Tiburon, 447 U.S. 255, 260 (1980); Nollan v. California Coastal Comm'n, 483 U.S. 825, 834 (1987). Of primary importance, however, is that the owner "show a serious financial loss from the regulatory imposition." Loveladies Harbor, 28 F.3d at 1177. The "economic impact of the regulation upon the claimant" is "measured by the change, if any, in the fair market value caused by the regulatory imposition." Florida Rock Indus., Inc. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994).

Here, no plaintiff suffered any measurable economic impact. The challenged legislation created new opportunities for the owners that offset – and in some cases exceeded – any financial burden associated with delaying the owner's ability to exercise their opportunity to prepay their HUD-insured mortgages.

**a. <u>The Opportunity To Sell</u>**

As noted above, an owner could elect to sell their property at a price established by appraisals of the property's unrestricted market value. 12 U.S.C. § 4110. Upon the sale of the property, owners were free to use the proceeds in any way that they wished, including investing in market-rate conventional housing. By doing so, owners could free themselves entirely from HUD restrictions. If plaintiffs did not receive a bona-fide offer to purchase their property at the appraised value or if the sale fell through for other reasons, then the preservation statutes permitted the owners to prepay their mortgages and free themselves of HUD's restrictions.

The option to sell the property at a market rate clearly satisfies any obligation the Government had to plaintiffs. Thus, the preservation statutes could not have caused plaintiffs any measurable economic harm.

**b. <u>The Opportunity To Sign A Use Agreement</u>**

As an additional alternative, HUD had the authority to provide financial incentives to owners in exchange for the execution of a Use Agreement that would commit the owner to an additional period of affordability restrictions. 12 U.S.C. § 4109(a).

Three plaintiffs – Cienega Gardens, Las Lomas, and Del Amo – obtained funded Use Agreements, and, in signing, agreed to permanently forgo the opportunity to prepay their HUD-insured mortgages. These plaintiffs concluded that the incentives available under the Use

Agreements were even more attractive than a sale of the property at a market rate. Rather than reducing the economically viable use of the property, as plaintiffs have claimed, acceptance of the benefits of a Use Agreement preserved the economically viable use of the property and resulted in returns on plaintiffs' investments that were essentially comparable to the returns they have allegedly would have received in the but for world.

As noted above, Skyline View and Blossom Hill also partly pursued the plan of action process. Under Title VI, both properties were given dates by which they could prepay if they were not offered funded Use Agreements. If the Court concludes these properties claims are ripe – a position with which we disagree – the Court should further conclude that these properties had restored to them under the preservation statutes that which they claim was taken: the opportunity to prepay. As such, the preservation statutes could not have harmed Skyline View or Blossom Hill.

Clearly, the options available under the preservation statutes ensured that plaintiffs did not suffer any measurable harm under the preservation statutes.

### 2. The Proper Measure Of Economic Harm Is Change In The Fair Market Value Caused By The Regulatory Imposition

Even if the Court concludes that the preservation benefits did not compensate for the limitations on the opportunity to prepay, plaintiffs did not face sufficient economic impact to support a finding of a regulatory taking.

To determine the economic impact of a regulatory taking, courts typically apply a diminution in value approach to determine what effect the alleged taking had upon the overall property value. See Yancey v. United States, 915 F.2d 1534, 1541 (Fed. Cir. 1990); Florida Rock Industries, Inc. v. United States, 791 F.2d 893, 901 (Fed. Cir. 1986), cert. denied, 479 U.S.

1053 (1987). Under this approach, a court calculates the difference between the value of the property before and after the regulation divided by the value of the property before the regulation. Id. This approach yields losses of between zero and 100 percent. The Court can then determine whether a serious financial loss resulted from the regulatory imposition.[3]

Here, the evidence demonstrates that plaintiffs have not suffered anything near the economic impact that constitutes a taking. Defendant's appraisal expert, Ronald Hendricks, performed two corresponding analyses on each plaintiff's property. First, he considered the property's value on the property's original prepayment date, had the property been immediately free of any HUD restriction. Next, Mr. Hendricks considered the property's value on that same date, adjusted for how the property's value would have been affected if the owner known that they would not be able to prepay the mortgage and convert to a conventional property until the end of the plaintiffs' alleged taking period (either upon the signing of a Use Agreement or passage of the HOPE Act).[4]

Based upon these valuations, Dr. William Hamm, an economic expert, computed the alleged change in the valuation of the plaintiffs' property. He reached the following conclusions:

Blossom Hill 13.3%

---

[3] See, e.g., Florida Rock Indus., Inc. v. United States, 45 Fed. Cl. 20, 43-44 (1999) (73.1% diminution in value); Loveladies Harbor v. United States, 21 Cl. Ct. 153, 160 (1990), aff'd, 28 F.3d 1171 (Fed. Cir. 1994) (99% diminution); Bowles v. United States, 31 Fed. Cl. 37, 48-49 (1994) (between 91.8% and 100%); Formanek v. United States, 26 Cl. Ct. 332, 340 (1992) (taking – 88%); Yancey v. United States, No. 413-85C (Dec. 30, 1988), Slip op. 16-18, Joint Appendix (JA) 390-92, aff'd, 915 F.2d 1534, 1539 (Fed. Cir. 1990) (77% diminution).

[4] To be conservative in performing this analysis, Mr. Hendricks intentionally ignored any benefits plaintiffs would have obtained over the taking period from the continuing HUD benefits that predated the prepayment period. Mr. Hendricks also ignored the benefits the properties had available under the preservation statutes. Taking either of these benefits into account would have reduced or eliminated the economic impact.

| | |
|---|---|
| Cienega Gardens | 25.1% |
| Del Amo | 18.6% |
| Las Lomas Gardens | 28.8% |
| Skyline View | 12.9% |

We are aware of no cases in which a court has found a taking where the diminution in value was less than 50 percent. Courts have, however, concluded that plaintiffs suffered no serious financial loss even with significantly higher percentages of economic impact: Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 645 (1993) (46% diminution); Jentgen v. United States, 228 Ct. Cl. 527, 532-33, 657 F.2d 1210, 1213 (1981) (50% diminution) cert. denied, 455 U.S. 1017 (1982); see also Walcek v. United States, 49 Fed. Cl. 248, 271-72 (2001), aff'd, 303 F.3d 1349 (Fed. Cir. 2002) (59.7% diminution).

The Court should conclude that the damages alleged by the plaintiffs do not constitute serious financial harm.

### 3. Plaintiffs' Diminution-In-Profits Approach Provides No Insight

The Court should conclude that the diminution in profits approach advocated by plaintiffs provides no insight into the economic impact of the preservation statutes.

In their pre-trial briefs and in their expert reports, plaintiffs advocate a return-on-investment approach to measure the economic impact of the alleged taking. Under this approach, the plaintiffs claim to measure the economic impact of the Government action based upon alleged changes in the plaintiffs' profits. Because the diminution in profits approach provides no useful insight into the alleged economic harm plaintiffs faced under the preservation statutes, the Court should reject this analysis.

First, plaintiffs' economic harm analysis completely ignores the benefits the Government made available to plaintiffs from the very first day of the alleged taking and throughout the alleged taking period. Clearly, any measure of economic impact must consider the benefits offered under the challenged regulation. See Penn Central, 438 U.S. at 137. Instead, plaintiffs' approach assumes that the only option available to the owners was remaining in the program at the original distribution. This, of course, was not the case. Because plaintiffs' model ignores the other options, the Court should reject plaintiffs' measure of economic harm.

Second, the diminution in profits approach provides no insight into the economic realities facing plaintiffs. Under plaintiffs' approach, Dr. Peiser only considers the alleged effect on quarterly cash flow. This approach ignores benefits the owners received from other sources, including accretion of equity on plaintiffs' mortgage and increases in the properties' value over time. Moreover, plaintiffs' approach ignores the change in risk that accompanies prepayment and becoming a conventional property, rather than remaining in the HUD program

The Federal Circuit has previously held that profit-based calculations are an inadequate substitute for the required evidence demonstrating the degree of diminution in the property's value. See Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) ("The profit that Forest allegedly lost does not necessarily reflect the reduction in market value the denial of the permit caused."); RCK Props., Inc. v. United States, 528 U.S. 951 (1999). These examples demonstrate that, if loss in profit is considered, the loss cannot be measured by putting profit in the denominator of the diminution calculation.

Plaintiffs' sole bases for proposing the diminution in profits approach are references to the method in Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1187 (Fed. Cir. 2004) and in

Cienega Gardens, 331 F.3d at 1342-43. These cases do not compel the use of the proffered approach. In Cienega Garden – the first case to ever reference to the "rate of return" analysis – the court expressly stated that it was adopting such an analysis solely "in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data." Id. at 1345. Indeed, the Court explained that it was only adopting a diminution in return, rather than the traditional diminution in value, "because the government neither argues error in the trial court's adoption of the plaintiffs' expert's calculation of rate of return value, nor error in the trial court's repeated rejection of the government's data." Cienega Gardens, 331 F.3d at 1343 n.40. Certainly, the Federal Circuit did not express a preference for the rate of return analysis over the traditional approach long endorsed by the Supreme Court. Similarly, in Rose Acre, the court refused to endorse the rate-of-return analysis over the value analysis, but merely permitted the trial court to determine which approach provided the better insight into the economic harm. 373 F.3d at 1197.

Here, the Court should reject the rate-of-return analysis because the approach is economically unsound as the plaintiffs seek to apply it in this case. First, it seeks to measure the consequences of the alleged taking, rather than value of what was allegedly taken. As such, the approach is fundamentally at odds with the settled law of Constitutional takings: that just compensation for a taking is measured at the time of the alleged taking, First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 320 (1987), and does not include compensation for the consequences of the alleged taking. Yuba Natural Res., Inc. v. United

States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) (stating that "lost profits . . . are consequential damages that are not recoverable as part of just compensation for a temporary taking.").[5]

Second, it violates established Supreme Court jurisprudence holding that the economic impact of an alleged taking must be measured with reference to the parcel as a whole. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 497 (1987); Penn Central, 438 U.S. at 130-31; Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993). Plaintiffs cannot simply divide the property into what was allegedly taken and what was not taken to demonstrate that the alleged taking was complete and compensable. Ultimately, any formula for measuring economic impact that puts profit in the denominator is tautological: you cannot properly measure the economic impact of an alleged taking by looking only at the effect of the alleged taking upon the portion of the property that allegedly was taken.

Third, plaintiffs' approach is flawed because it attempts to divide the property interest into temporal segments to argue that property was deprived of all economic use during a particular period of time. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l. Planning Agency, 535 U.S. 302, 331 (2002); Maritrans, Inc., 342 F.3d at 1355 (stating that a claimant "may not confine the takings analysis . . . to [specific] periods . . . in order to argue that there were categorical takings during those periods"). Plaintiffs' approach considers only a single component or segment of plaintiff's property rights – the cash distributions to the owners – at a single point in time. This "snapshot" ignores all other expected cash flows that were reflected in the value of plaintiffs' property as a whole prior to the limitations on prepayment. Plaintiffs' methodology would yield

---

[5] The Supreme Court has long held that consequential damages, such as those sought here, are not available for Fifth Amendment takings. See, e.g., Kimball Laundry Co. v. United States, 338 U.S. 1, 7 (1949); see also United States v. Petty Motor Co., 327 U.S. 372 (1946).

the same measure of severity, regardless of whether the taking was permanent, or merely limited to a period of one month. The actual economic impact of a governmental action, however, is highly sensitive to the action's duration. An action limited to a single month could cause a negligible diminution in the economic value of the property, while a permanent taking of the same character could cause a major diminution in the property's value. Plaintiffs' approach, however, would find the impact to be the same in both cases.

Finally, the use of plaintiffs' return-on-investment approach ignores the widely accepted theory of dividend irrelevance. Application of his methodology would tend to reward investors who wish to take their returns in the form of cash, and penalize investors who seek capital gains by minimizing cash payouts, even though both sets of investors realize the same total return on their investment. Moreover, as a matter of economics, if the "but for" return on investment is zero or negative (which can occur at many properties), then the percent diminution is either not computable or meaningless.

Based upon the options available under preservation statutes, and upon the alleged change in value in the plaintiffs' property, the Court should conclude plaintiffs were not significantly harmed by the preservation legislation.

### C. **The Preservation Statutes Did Not Adversely Affect The Reasonable Investment Backed Expectations In The Properties**

The third criterion in a regulatory takings analysis is consideration of whether the regulation interfered with plaintiffs' distinct investment backed expectations. Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) (citing Penn Central, 438 U.S. at 124). This is "a way of limiting takings recoveries to owners who [can] demonstrate that they bought their property in reliance on a [particular] state of affairs that did not include the challenged regulatory regime."

Loveladies Harbor, 28 F.3d at 1177. Courts apply a two-part test in assessing investment backed expectations, considering both the reasonable expectations of an objective investor and then the subjective expectations of the plaintiff. See Chancellor Manor, 331 F.3d at 904; Cienega Gardens, 331 F.3d at 1346.

**1. Plaintiffs Possessed No Reasonable Investment Backed Expectation Regarding The Opportunity To Prepay**

The Court should conclude that the plaintiffs' reasonable investment backed expectations placed little or no import upon the opportunity to prepay given the general structure of low-income housing transactions in the 1970s. Thus, the preservation legislation had no adverse effect upon investment backed expectations viewed objectively, that is, from the perspective of a reasonable investor in the marketplace.

A claimant's investment backed expectation "must be more than a 'unilateral expectation or an abstract need;'" it must be reasonable. Ruckelshaus, 467 U.S. at 1005-06 (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 161 (1980)). Thus, the Court examines the expectations of a reasonable investor in the claimant's property. Chancellor Manor, 331 F.3d at 904 ("The critical question is what a reasonable owner in the [claimant's] position should have anticipated."); see also Forest Props., 39 Fed. Cl. at 77 (citing Ciampitti v. United States, 22 Cl. Ct. 310, 321 (1991) (the court should "analyze the plaintiff's expectations in light of the regulation, the agencies' actions, and the reasonableness of the plaintiff's economic expectations")).

Kenneth Malek, an expert in limited partnership investments, will explain at trial that, in the early and mid-1970s, developers typically built low-income housing using limited partnerships. Typically, the developers retained syndicators to market and sell equity in the

properties to limited partners. The structure of these transactions had special appeal to both the developers and to limited partners who purchased the majority interest in the properties.

Mr. Malek will explain that low-income housing projects were marketed to investors as tax shelters. Accordingly, reasonable limited partner investors in such projects were high-income individuals who invested principally to obtain income tax benefits. Low-income housing projects were particularly well suited for use as tax shelters, having high leverage (often over 90 percent) and accelerated depreciation. As a result, the tax benefits generated were substantial, were realized almost immediately, and dwarfed all other aspects of the investment. For instance, limited partner investors in Skyline View reasonably anticipated (i) a complete return on their investment through tax benefits in less than two years, and (ii) nearly 80 percent of investment returns to be tax-related.[6] DX93. On the other hand, no investment returns were attributable to prepayment of the project's HUD-insured mortgage after 20 years and conversion to a market-rate project. Such returns were not significant to the limited partners because the returns were highly speculative and were unnecessary given the enormous and immediate tax benefits available in the transaction. It was generally understood throughout both HUD and the housing industry that tax shelters were the main economic force driving low-income housing projects built pursuant to sections 221(d)(3) and 236.

The expectations of a reasonable developer were similar. A typical developer would anticipate dividends and tax benefits from the retained stake in the property. In addition, a developer would reasonably expect builder profits from construction of the project, continuing management fees, and immediate profits from monetization of the tax benefits by syndication to

---

[6] The other 20 percent was attributable to the limited dividend payable in accordance with the regulatory agreement.

limited partners. Thus a developer more than recouped its original investment upon the syndication of the property.

Prepayment after 20 years was not a significant consideration for developers of low-income housing both because of the speculative nature of the prepayment opportunity and because a reasonable developer would use high-quality properties – those genuinely expected to increase in value over time – to construct conventional projects for market-rate tenants.

Finally, developers of low-income housing projects were well-aware that, in dealing with HUD, they could expect bureaucratic red tape and delays. Indeed, delays were anticipated by reasonable developers and were factored into their expectations. The possibility that prepayment might have been delayed beyond 20 years would not, therefore, have affected participation in HUD's low-income housing programs.

In sum, because the investment-backed expectations of reasonable investors were based upon tax benefits, dividends, builder profits, management fees and/or profits from syndication – not the hypothetical possibility of prepayment 20 years down the road – the preservation statutes could not have interfered with reasonable investment backed expectations of the developers or the investors.

### 2. Plaintiffs' Partners Placed Little Import Upon The Opportunity To Prepay

The plaintiffs offer no evidence that they subjectively placed any value upon the opportunity to prepay their HUD-insured mortgages at the time of the original investment.

A claimant must demonstrate that it had an actual (i.e., subjective) investment-backed expectation premised upon the regulation at issue. See Cienega Gardens, 331 F.3d at 1346 ("we start with an analysis of the [claimants'] actual expectation because we require [an] actual

expectation . . . as a threshold matter"). Compensation where there was no actual reliance would be an unjustified windfall. See id. at n.42.

Based upon their witness list, plaintiffs do not intend upon offering testimony from the majority of their partnerships regarding the importance or relevance of the opportunity to prepay at the time of their original investment. Moreover, the only contemporary evidence regarding plaintiffs' understanding of the value of the opportunity to prepay, indicates the partners assumed that the opportunity was nearly valueless.

#### a. The Plaintiffs Are The Partnerships

As explained above, the claimant entitled to compensation for a taking is the owner at the time of the taking – not the owner at an earlier or later date. E.g., Dow, 357 U.S. at 20-21 (citing Danforth, 308 U.S. 271; and United States v. Dickinson, 331 U.S. 745 (1947)); American Pelagic Fishing Co., LLP v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (quoting Wyatt v. United States, 271 F.3d 1090,1096 (Fed. Cir. 2001) (stating that "'[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation'"); Chancellor Manor, 331 F.3d at 901 (same). The claimants here are five limited partnerships, each of which owned a single multi-family apartment complex.

In assessing each plaintiff's subjective investment backed expectation, the Court must inquire into what each plaintiffs' investment backed expectations were at the time it entered the HUD program. See Cienega Gardens VIII, 331 F.3d at 1346 n.2.

#### b. The Plaintiffs Possessed No Subjective Investment Backed Expectations Regarding The Opportunity To Prepay

Only one contemporaneous document shows the actual expectations for the investments in any of the properties at issue. This document – a November 1972 prospectus – was developed

by syndicators working on behalf of the G & K partners. DX93. Ultimately, the Skyline View plaintiff used the prospectus to sell limited partnership interests to investors in the Skyline View project. A similar prospectus was prepared – though it was not retained and produced in this action by the plaintiffs – in order to syndicate the Blossom Hill project.

The Skyline View prospectus describes the ability to shelter income as the principal benefit of investing. Id. It further details a limited dividend that investors in the property could expect to receive. Id. Notably absent, however, is any mention of large returns upon prepayment of the project's HUD-insured mortgage after 20 years. Id. Indeed, to the contrary, the prospectus projects only a $1.00 residual net value for the property after 20 years. Id.

The Skyline View prospectus was held out by the general partners as a materially accurate description of an investment in Skyline View at its inception. Thus, according to their own records, the general partners had no subjective expectation of any return based upon the opportunity to prepay the HUD-insured mortgage after 20 years. Further, because limited partner investors necessarily relied upon the prospectus in making their investment decision, the limited partners would likewise have attributed no value to the opportunity to prepay. The preservation statutes, therefore, had no effect upon actual (i.e., subjective) investment-backed expectations.

The G&K partners, moreover, characterize Skyline View as one of their very best located properties. Nonetheless, at the time of the investment, no value was attributed to the opportunity to prepay and convert the property to market rate after 20 years. Consequently, the Court can infer that investors in poorer-quality properties such as Cienega Gardens, Del Amo, and Las Lomas Gardens also anticipated no return on their investment based upon the opportunity to prepay.

The Court should conclude that, at the time plaintiffs entered into the deals, they placed little value on the opportunity to prepay and that if they had such expectations, those expectations were not reasonable. Further, the Court should conclude that plaintiffs have failed to establish the elements of a regulatory taking and, as such, are not eligible for any compensation.

## III. PLAINTIFFS' LOST-PROFITS MODEL DOES NOT PROVIDE A PROPER MEASURE OF JUST COMPENSATION

The Court should reject plaintiffs' lost-profits model as it overcompensates the plaintiffs for any regulatory taking.

### A. Plaintiffs Are Only Entitled To Nominal Damages

The Court should conclude that plaintiffs are only entitled to nominal damages for the Government's taking of an opportunity plaintiffs would not have pursued.

Given the benefits available under the preservation statutes, there is no evidence that, had they been given a choice, plaintiffs would have chosen to forgo the preservation benefits and prepay their HUD-insured mortgage. In January 1995, Congress was considering a bill that would have restored plaintiffs' unlimited opportunity to prepay their mortgage. DX447. The Las Lomas, Del Amo, and Cienega Gardens plaintiffs, nevertheless, chose to sign Use Agreements and receive the incentives under the preservation statutes. This decision demonstrates that, even if plaintiffs had possessed the unfettered opportunity to prepay their mortgages in the but-for world, plaintiffs would have chosen to sign the funded Use Agreements anyway. As such, plaintiffs are only entitled to nominal compensation for the taking of an option plaintiffs would never have exercised.

### B. The Government's Damage Model Is The Better Measure Of Just Compensation

If the Court concludes that plaintiffs are entitled to compensation, the Court should conclude that the Government's rental value model calculates compensation more reliably than plaintiffs' lost-profits model.

#### 1. The Government's Model Calculates Fair Rental Value

The Government's proposed model follows the circuit law regarding damages for temporary takings.

"'The law is well-settled that the measure of just compensation for a temporary taking is the fair rental value of the property taken for the period involved.'" Yuba, 904 F.2d at 1580 (quoting Yuba Natural Res., Inc. v. United States, No. 460-80L, slip op. at 7 (Cl. Ct. Mar. 9, 1989)). The proper measure of damages involves a three step process: (1) identify the property that was taken, (2) determine the period involved, and (3) calculate the "rental value" of the property taken.

##### a. The Property Allegedly Taken Was The Opportunity To Convert

To the extent the Court determines the Government took business opportunities from the plaintiffs, it was merely a delay in the opportunity to prepay the mortgages and convert the buildings to conventional properties. Like any business opportunity, the opportunities allegedly taken by the Government had potential benefits and risks.

##### b. The Property Was Temporarily Taken

If the Court finds that plaintiffs' delay in prepaying their HUD-insured mortgages constituted a taking pursuant to the Fifth Amendment, the Constitution would require the

Government to pay just compensation for the period commencing on the date HUD's application of the preservation statutes first effected a taking and ending on the date Congress rescinded limits on the prepayment opportunity. See San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 653-654 (1981) (Brennan, J. dissenting) (stating that "once a court establishes that there was a regulatory 'taking,' the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation).[7] At most, the takings period here runs from the date each of the properties could have first prepaid their mortgages[8] until the properties signed "Use Agreements" or, should this Court conclude that Skyline View and Blossom Hill are ripe, when Congress passed the HOPE Act.

Plaintiffs' ability to prepay their mortgages vested on the 20th anniversary from HUD's endorsement of the Deed of Trust note. Thus, the damage period for each property varies depending upon the date of the initial transaction. The damages period ends for Del Amo, Las Lomas, and Cienega Gardens when they signed "Use Agreements" with the Government. For Skyline View and Blossom Hill, the taking period terminated shortly after Congress passed the HOPE Act, which restored plaintiffs' unlimited opportunity to prepay.[9]

---

[7] Although the dissenting opinion, this and other circuits give great weight to Justice Brennan's decision in San Diego. See footnote 10 below.

[8] As noted above, the actual point of taking does not arise until the final decision by the Governmental agency.

[9] As noted above, we do not believe the Federal Circuit's conclusions regarding the nature of the legislation is law of the case from Cienega VIII. Should this Court hold differently, then the Court should also conclude that the Federal Circuit has definitively ruled that HOPE Act resolved all takings under Title II and Title VI. See Cienega VIII, 331 F.3d 1341 n.34.

### c. **The Government's Model Values The Rents On The Taken Opportunity**

When dealing with intangibles, such as plaintiffs' opportunity to prepay, the proper way to calculate "fair rental value" is to value the property on the day of the taking and then determine a reasonable return on the value taken. In the case of a temporary regulatory taking:

> the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the regulatory restriction. See Nemmers v. City of Dubuque, 764 F.2d 502, 505 (8th Cir. 1985). Under this approach, the landowner recovers what he lost. To award any affected party additional compensation for lost profits or increased costs of development would be to award a double recovery: the relevant fair market values by definition reflect a market estimation of future profits and development costs with respect to the particular property at issue.

Wheeler v. City of Pleasant Grove, 833 F.2d 267, 271 (11th Cir. 1987).

The first step in this analysis is determining the market value of what was taken as of the date of the taking. See Nemmers, 764 F.2d at 504-505 (citing San Diego Gas, 450 U.S. at 659);[10] see also Hamilton Bank of Johnson City v. Williamson County Reg'l. Planning Comm'n., 729 F.2d 402. 403 & 408-409 (6th Cir. 1984) (affirming a verdict based upon a fair rate of return on the value of the property during the time of the taking); rev'd on other grounds, sub nom. Williamson, 473 U.S. 172.[11] Dr. Hamm has calculated plaintiffs' cost of delaying their ability to

[10] In San Diego, Justice Brennan wrote "As a starting point, the value of the property taken may be ascertained as of the date of the 'taking.'" 450 U.S. at 659. Although this was in the dissenting opinion (dissenting on other grounds), many courts have adopted Justice Brennan's analysis. See, e.g., Yuba, 904 F.2d at 1580; Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1579-1580 (Fed. Cir. 1994).

[11] Although the appellate court decision does not describe the methodology applied in awarding damages, the Supreme Court does. Williamson, 473 U.S. at 184 n.6.

switch to market renters for the duration of the alleged damage period. Specifically, he has calculated net present discounted expected cash flows in the but-for and actual worlds over the entire, 20-year life of the "right to prepay" that was allegedly taken by the Government.

These values, however, represent the entire value of the opportunity to prepay, as if a permanent taking had occurred. The Government, of course, at most merely delayed the opportunity to prepay. Thus, the second step in the valuation of a temporary taking is to calculate the proper rental value, or interest rate of return, on the value of this property. See Yuba, 904 F.2d at 1581; Wheeler, 833 F.2d at 271. Dr. Hamm applies the London Interbank Offer Rates ("LIBOR"). The results are:

- Las Lomas: $428,992.
- Del Amo: $249,819.
- Cienega Garden: $318,112.
- Skyline View: $ 370,564.
- Blossom Hill: $381,529.

If the Court concludes that plaintiffs are entitled to damages for the delay in their opportunity to convert, Dr. Hamm's analysis should form the basis of any damage award.

### C. Plaintiffs' Lost-Profits Model Is Not The Proper Measure Of Just Compensation

The Court should conclude that plaintiffs' initial model does not meet the legal requirements of just compensation under the Fifth Amendment.

**1. The Plaintiffs' Model Does Not Measure The Fair Rental Value Of The Property Taken**

As noted above, the Federal Circuit has held fair rental value for the period of the taking is the proper measure of just compensation for a temporary taking. Yuba, 904 F.2d at 1580-81. Plaintiffs' model, however, makes no effort to measure this rental value.

Instead, the model measures the actual profits Dr. Peiser believes plaintiffs would have obtained had they in fact converted to conventional properties on the first possible date – that is, he attempts to measure what would have been the actual outcome from the business, rather than the rental value of the opportunity on the date of the alleged taking.

This measure of damages is improper because it gives plaintiffs the profits from the opportunity without subjecting them to the risks. The "fair rental value" of the taken opportunity must embody the risks that go with the opportunity, as well as the possibility that plaintiffs might have selected not to pursue the opportunity. Plaintiffs' model ignores these factors.

Because plaintiffs' model makes no effort to measure the rental value of the business opportunity, the Court should reject the model as the proper measure of just compensation.

**2. Lost Profits Are Not Proper Compensation For A Taking**

The Court should also reject plaintiffs' lost-profits model because expectancy damages are not recoverable as just compensation for a taking.

Lost profits are one form of expectancy damages. See Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). "A party's expectation interest is the 'interest in having the benefit of his bargain by being put into as good a position as he would have been had the contract been performed.'" See Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 344(a) (1981)).

In 1996, when the Model Plaintiffs in Independence Park offered a nearly identical model as the damages calculation for a breach of contract, both the plaintiffs and their expert properly described the model as a lost-profits model. More importantly, the trial court, in adopting the plaintiffs' model repeatedly referred to it as a "lost-profits model." Cienega Gardens v. United States, 38 Fed. Cl. 64, 73-76 (1997). The fact that plaintiffs now seek to re-label the model does not change the nature of the damages it seeks to measure. Here, Dr. Peiser's model provides plaintiffs with the profits they allegedly would have obtained had they prepaid their HUD-insured mortgages on the loan's 20th anniversary, and immediately converted the buildings to conventional units charging competitive rents.

The Federal Circuit has consistently refused to award lost profits for a taking. In Yuba, the Federal Circuit affirmed the Claims Court's refusal to award such damages on the temporary taking of a gold mine. Yuba, 904 F.2d at 1583. The Court concluded that:

> [A]ny attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject as a basis for determining just compensation under the Fifth Amendment.

Id. The Court went on to say that "lost profits . . . are consequential damages that are not recoverable as part of just compensation for a temporary taking." Id.[12]

Here, Dr. Peiser's speculation about how profitable plaintiffs' properties would have been in the conventional market is every bit as speculative as those measures rejected in Yuba. The Court should reject plaintiffs' lost-profits model.

---

[12] The Supreme Court has long held that consequential damages, such as those sought here, are not available for Fifth Amendment takings. See, e.g., Kimball Laundry, 338 U.S. at 11-12; see also Petty Motor Co., 327 U.S. at 377-378.

### 3. Plaintiffs' Lost-Profits Model Applies The Wrong Valuation Date

The Court should reject the plaintiffs' lost-profits model because it measures damages as of the date of trial.

Damages for takings are properly measured at the time the property was taken. See First English Evangelical Lutheran Church, 482 U.S. at 320. Such a policy is both economically and legally sound. As a matter of law, the property's owner has no control over the property after the date of taking, and should not be held accountable for the property's loss in value, nor rewarded with the property's increase in value. Indeed, courts have repeatedly refused to award damages based upon changes in the property's value over the course of the temporary taking. See Yuba, 904 F.2d at 1581-1582; Wheeler, 833 F.2d at 271.

Plaintiffs' damage model measures damages based upon an ex post examination of how the California rental markets performed in the years following the temporary taking. This methodology is completely at odds with the bedrock of takings theory. Indeed, it rewards plaintiffs with the potential benefits they may have obtained without accounting for any of the risks that would have accompanied those profits.

The Yuba Court measured damages from a temporary taking of property by applying what a prospective lessee would have paid for the temporary use of the property before the taking occurred. This ex ante valuation, based upon the information available at the time of the taking, ensured that the property holder was compensated for what was taken, when it was taken. Because plaintiffs' model does not compensate the plaintiffs based upon the value of their property at the time of the taking, it does not properly measure damages.

In Independence Park, the Court concluded that the proper date upon which to measure a temporary taking is on the date when the taking ended. 62 Fed. Cl. at 709. The Court also concluded that the proper measure of damages was plaintiffs' lost-profits model because something was taken from the plaintiffs – the opportunity to prepay over a specified period – that was not effectively returned. Id. at 707-708. Defendant respectfully contends that these conclusions are inconsistent and should not form the basis of the Court's award in this case. If the Court concludes that something was taken from the plaintiffs and never returned – a position with which we disagree – long standing precedence directs that damages be measured as of the date of the taking. Conversely, if the Court determines that any taking was merely temporary, the rental value approach in Dr. Hamm's model is the proper measure of compensation should any be allowed.

**D. Plaintiffs' Lost-Profit Model Contains Numerous Errors**

The Court should reject plaintiffs' lost-profits model because it is based upon numerous errors that render any result speculative.

**1. Dr. Peiser's Model Makes No Allowance For Benefits Available Under The Preservation Statutes**

Dr. Peiser's model ignores the opportunity plaintiffs had to sell their property at a market rate. As described above, the preservation laws permitted owners to sell their properties to non-profit organizations at market rates. The opportunity to cash out of their investment at a market rate effectively eliminated all damages from the alleged taking. The fact that plaintiffs chose not to pursue the option to sell demonstrates that they perceived the other options – specifically Use Agreements – as even more valuable than a market rate sale of the property. Dr. Peiser's model makes no effort to value the alternatives available to the plaintiffs.

### 2. Plaintiffs' Model Ignores HAP Contracts That Overlapped With The Prepayment Dates

The Court should reject plaintiffs' damage model because it ignores the limitations in plaintiffs' HAP contracts. Prior to the enactment of Title II, three of the five plaintiffs voluntarily entered into five-year Section 8 subsidy contracts with HUD. These contracts conferred certain benefits on plaintiffs, but they also limited plaintiffs' ability to raise rents, even in the absence of other HUD restrictions. The Skyline View, Del Amo, and Blossom Hill plaintiffs' Section 8 contracts expired after Title II became law, but before the prepayment dates assumed by Dr. Peiser. Each of the three plaintiffs chose to renew its contract for a five-year period extending beyond the property's assumed prepayment date. Dr. Peiser ignores the limitations in these Section 8 contracts when computing plaintiffs' alleged damages, although these contracts clearly would have prevented plaintiffs from raising rents on their initial prepayment date as predicted in Dr. Peiser's model.

In the past, plaintiffs have argued that, in the absence of the HUD restrictions, they would not have entered into the Section 8 contracts. This argument is purely speculative. Moreover, it ignores the fact that, had plaintiffs chosen to forgo Section 8 contracts in the but-for world, plaintiffs would have lost significant rent and been at risk of foreclosure. Plaintiffs have also argued that, in the but-for world they would have obtained made-to-measure Section 8 contracts that would have ended on the prepayment date. There is no evidence the Government would have been willing to enter into such ad hoc contracts to ease plaintiffs' transition into prepayment.

3. **Plaintiffs' Model Overstates Rents Plaintiffs Would Have Received**

Plaintiffs' model overstates the rents plaintiffs would have received in the but-for world had they prepaid their mortgages and raised rents to market rate.

In his model, Dr. Peiser relies upon rents obtained from negotiations between HUD and plaintiffs in the preservation process. Mr. Hendricks has reviewed these valuations and determined that many overstate the actual rents that would have been available to plaintiffs had they switched to conventional properties on the initial prepayment dates. Because the inflated rents form the basis of Dr. Peiser's damage model, his model overstates any damages.

4. **Dr. Peiser Improperly Treats Catch-Up Distributions To The Owners In The HUD-Restricted Scenario**

Dr. Peiser's model improperly raises damages by ignoring payments that the properties made to the owners in the actual world.

It is undisputed that during Dr. Peiser's damage window, plaintiffs made cash distributions to their investors. Under the basic premise of Dr. Peiser's model those payments should have been used to lower damages. Dr. Peiser, however, has simply chosen to ignore the benefits from these distributions.

There is no rational basis for excluding the distributions in question, even if – as Dr. Peiser assumes – they represent catch-up distributions for years prior to the damages period. Within the context of Dr. Peiser's model, it makes no difference whether the distributions that were actually made to plaintiffs pertained to the current year or some past year. These distributions are cash flows that plaintiffs received in the actual world, and would not have received in the but-for world. As such, they satisfy the criterion that Dr. Peiser, himself,

establishes as the basis for calculating plaintiffs' losses. Accordingly, Dr. Peiser's estimate of damages should be reduced by the amount of these distributions.

### 5. <u>Dr. Peiser Makes No Allowance For Phasing-In Market Rents</u>

Dr. Peiser's lost-profits model incorrectly assumes that plaintiffs would have immediately raised rents to market rates in the but-for world on the initial prepayment date.

Plaintiffs' practices throughout their properties has been to phase in rent increases over 18 months or two years, to make the rents more agreeable to the tenants and to avoid the losses that would accompany widespread tenant evacuations. Dr. Peiser ignores this practice in his model, and in doing so, improperly increases damages.

### 6. **Dr. Peiser Incorrectly Assumes That Each Plaintiff Could Have <u>Obtained Permanent Financing On The Assumed Prepayment Dates</u>**

Dr. Peiser overstates damages by assuming that each of plaintiffs would have obtained permanent financing at market rates on the assumed prepayment dates. There is no basis in fact for this assumption. Indeed, the most likely avenue available to plaintiffs – and the road actually pursued when Skyline View and Blossom Hill prepaid – involved a short term bridge loan for several years while the properties demonstrated their earning power to the lenders. Then, and only then, would plaintiffs have been able to obtain market rate loans. This method of financing would have included higher interest payments on the bridge loan, and more transaction costs in obtaining two loans rather than one. Dr. Peiser's model ignores those costs.

### 7. <u>Dr. Peiser Employs The Wrong Discount Rates</u>

Dr. Peiser's incorrect application of discount rates improperly increases plaintiffs' alleged damages.

It is undisputed that, when discounting cash flow streams, each stream must be discounted based upon the riskiness of the cash flows. Dr. Peiser's model, however, ignores this basic economic principle in discounting the cash flows from the "actual" world.

Cash flows from HUD-insured properties are less risky than cash flows from conventional properties. Investors in HUD-subsidized properties avoid numerous risks faced by those investing in conventional properties, such as low vacancy rates, and reduced credit risk. Generally, HUD properties maintain rents below market rates, which makes the apartments precious commodities. HUD property owners maintain waiting lists with the names of potential tenants. These lists reduce the likelihood that property owners will face an un-rented – and thus unprofitable – apartment. Plaintiffs do not have such waiting lists for their conventional properties. HUD, moreover, allowed an owner to bill for a unit even when that unit was vacant, which resulted in reduced vacancy risks. Similarly, apartments with assistance contracts faced a reduced risk that tenants would fail to pay the rent, known as credit risk. Under the HAP contracts, the Government provided plaintiffs lump-sum rental payments at the beginning of each month.

Because of the lower risk on the cash flows from HUD-insured properties, Dr. Peiser should have discounted those cash flows at lower discount rates. Dr. Peiser, however, discounts cash flows from properties with HUD-insured mortgages at the same rate he applies to those properties if they had received market rate rents. By using a single discount rate to apply to all of the cash flows in his model, Dr. Peiser's model illogically concludes that the risks associated with the cash flows from HUD-subsidized operations is equal to the risks associated with cash flows from the conventional market. Moreover, Dr. Peiser's model illogically assigns the same degree

of risk to the payment of a judgment by the United States Treasury as to cash flows from tenants paying rent in the conventional market. This error improperly inflates plaintiffs' alleged damages.

### F. Plaintiffs Lost-Profit Model Improperly Extends Damages Beyond The Takings Periods

The Court should conclude that Dr. Peiser's model incorrectly describes the just compensation due to plaintiffs because the model improperly continues to accrue damages long beyond the alleged takings periods.

#### 1. Plaintiffs Use Agreements Terminated Any Taking

The Court should conclude that Del Amo Garden, Las Lomas, and Cienega Garden settled their continuing taking claims when they signed Use Agreements with the Government.

##### a. Plaintiffs Were Made Whole When They Signed The Use Agreements

As we describe above, each Use Agreement should be viewed as an accord and satisfaction of the signatory's claims. Should the Court conclude that the plaintiffs did not waive their claims by signing the Use Agreements, the Court should still conclude that the Use Agreements terminated the alleged takings.

Plaintiffs Del Amo Garden, Las Lomas, and Cienega Garden contend that their right to prepay was taken in 1992. In 1994, plaintiffs filed this action alleging the taking of their property. In 1995, while this suit was pending, plaintiffs voluntarily signed Use Agreements in which they accepted a package of financial benefits from the Government in exchange for relinquishing any future opportunity to prepay their mortgage and leave the HUD program. The Court should conclude that plaintiffs contracted away their opportunity to prepay in 1995, and thus voluntarily terminated the taking period.

Plaintiffs contend that they signed the Use Agreements before HOPE was enacted, and, thus they did not know if they would ever be permitted to prepay. Plaintiffs, however, were aware when they signed the Use Agreements that legislation was pending that could restore their opportunity to prepay. Nevertheless, plaintiffs sought and signed Use Agreements surrendering the opportunity to prepay. More importantly, plaintiffs knew that they had filed a complaint in which they alleged that the Government had taken the right to prepay. They knew that by signing away their opportunity to convert in exchange for financial benefits, they were resolving at least part of the taking claim raised in their complaint. Over the past nine years, Del Amo, Las Lomas, and Cienega Gardens have enjoyed the benefits from the Use Agreements, including higher rents and the opportunity to make withdrawals from the residual receipt accounts. The Court should not permit the plaintiffs to avoid their responsibilities pursuant to those Use Agreements.

Plaintiffs' argument that they now seek damages based upon the fact that they are not receiving market rents from the Use Agreements is both factually and legally unsupportable. Plaintiffs have failed to identify any language in the Use Agreements that provide for such rents. Moreover, if plaintiffs seek damages from the Government's breach of the Use Agreement, they must pursue those damages in a separate suit. Plaintiffs' current complaint makes no such allegation, nor has any court found such a breach. To the extent plaintiffs argue that deficiencies in their payments under the Use Agreements arise from the takings, these damages must be seen as several steps removed from the just compensation requirement of providing rents on the value of the property for the period of the taking. As noted above, such consequential damages are not available for a taking case. <u>See</u> <u>Yuba</u>, 904 F.2d at 1581.

b. **Plaintiffs' Mitigation Analysis Is Not Relevant**

The Court should reject plaintiffs' argument that they signed the Use Agreements to mitigate damages as contrary to fact and law.

Plaintiffs knew when that they signed the Use Agreements, they were not reserving their rights to sue the Government for the claimed taking. Thus, plaintiffs knew that they were not merely mitigating damages but, rather, resolving their takings claims. Plaintiffs offer no case law to support their argument that signing a settlement agreement can be considered a form of mitigation. Indeed, such a conclusion would make it impossible for parties to resolve taking claims without a judge ordered remedy. As we noted above, the Constitution does not prevent the Government from taking a citizen's property but merely requires that the owner be adequately compensated. The Use Agreements were intended to do precisely that.

2. **Damages Allegedly Caused By The One Year Notice Period Are Unfounded**

The Court should reject plaintiffs' claim that Blossom Hill and Skyline View are entitled to damages that accrued after the passage of the HOPE Act because they were required to give one year's notice before exiting their existing Section 8 contracts. Plaintiffs' decision not to give notice under this long-standing requirement was completely within their control. Plaintiffs could have chosen to provide such notice on a protective basis once they became aware that they could be permitted to prepay. Plaintiffs' decision not to pursue this notice cannot give rise to damages on behalf of the Government. Such damages, moreover, are not related to the taking in any way and, thus, do not serve as a proper basis for just compensation.

## V. Plaintiffs Are Only Entitled To Simple Interest At The Government's Rate Of Borrowing

The Court should not award interest on the plaintiffs' lost-profits theory. If the Court concludes that interest is warranted on any award, the interest should not be compounded.

### A. No Interest Is Available On The Lost-Profits Theory

Because of the unusual nature of the requested lost-profits award, interest on such an award would not be necessary to make the plaintiffs whole.

When a taking is found, an owner is entitled to interest sufficient to place it in the same financial position it would have occupied if the payment had coincided with the appropriation. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984). In Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411 (1994), the Court explained the basis for the interest award that typically accompanies a takings award:

> Where the government has taken plaintiff's property and returns a payment worth an identical amount at a subsequent date, the plaintiff still suffers an economic loss. Such a conclusion follows from the fact that when the government merely returns an identical sum as compensation, the plaintiff loses the opportunity to earn interest on its principal.

Id. at 413.

This rationale has no basis here, where the plaintiffs' model does not seek to value the opportunity taken, nor to value the rents from that opportunity, but instead provides the assumed profits the plaintiffs would have made had they pursued the opportunity. Interest is not generally available for lost-profits claims. See, e.g., Wells Fargo Bank v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996). Had the plaintiffs received the lost-profits award under the breach of contract theory, which was the original predicate for the award, the plaintiffs admittedly would not have been able to seek interest. 28 U.S.C. § 2516(a) (1994). If this lost-profits award would

have made the plaintiffs whole under a contract theory, there is no reason why it does not suffice to make them whole (at the very least) under a takings theory.

### B. Plaintiffs Are Entitled Only To Simple Interest

Should the Court award interest to the plaintiffs, the award should be based upon a calculation of simple interest.

Traditionally, this Court permitted only simple interest for just compensation claims. Calhoun v. United States, 453 F.2d 1385, 1396 (Ct. Cl. 1972) ("simple interest (as part of just compensation) is to accrue"); see also Paul v. United States, 21 Cl. Ct. 415, 428 (1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991); Yaist v. United States, 17 Cl. Ct. 246, 262 (1989); Cloverport Sand & Gravel Co. v. United States, 6 Cl. Ct. 178, 203-204 (1984). In 1995, the Federal Circuit provided the trial courts some discretion on whether to award simple or compound interest. Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1555 (Fed. Cir. 1995) (en banc).

In exercising this discretion, the courts have considered the nature of the property taken as well as the manner in which the taking affected plaintiffs' investment opportunities. See Rose Acre, 55 Fed. Cl. 643, 665 (2003), vacated on other grounds 373 F.3d 1177 (2004) (citing Whitney, 30 Fed. Cl. at 415-16); see also Heydt v. United States, 38 Fed. Cl. 286, 314 (1997) (plaintiff entitled to simple interest on temporary taking).

If the Court awards interest on the plaintiffs' lost-profits model, the interest should be simple, as the model itself already more than captures the full investment opportunity contained within the taken property. For all the reasons discussed in the previous section as to why the plaintiffs' lost-profits model should not be the basis of an award of interest, those same factors weigh against the plaintiffs receiving compound interest.

Even if the Court adopts the Government's damage model, however, the Court should reject the plaintiffs' request for compound interest because the plaintiffs cannot prove that the plaintiffs' partners would have reinvested the profits from converting to market properties.

### C. Plaintiffs Are Entitled To Only A Risk-Free Interest Rate

The Court should base any interest awarded to the plaintiffs on the risk-free rate at which the Government borrows.

#### 1. Interest Should Be Awarded At The Statutory Rate

The courts have repeatedly recognized a "'strong judicial policy in just compensation cases which favors uniform interest rates in order to avoid discrimination among litigants.'" Tulare Lake Basin Water Storage Dist. v. United States, 59 Fed. Cl. 246, 266 (2003) (quoting Pettro v. United States, 47 Fed. Cl. 136, 154 (2000)); Miller v. United States, 620 F.2d 812, 838 (Ct. Cl. 1980).

In response to this interest, the courts have repeatedly applied the interest rate set forth by Congress in 40 U.S.C. § 258e-1 to inverse condemnation cases, even where that rate is not legally controlling. Under the formula set forth in 40 U.S.C. § 258e-1, the calculation of interest includes the average of the 52-week Treasury bill rate for the period prior to December 21, 2000, and the weekly average 1-year constant maturity Treasury yield for the period after that date. Tulare Lake, 59 Fed. Cl. at 266-67.

Courts have routinely provided plaintiffs with interest calculated at the Government's rate of borrowing. Rose Acre, 55 Fed. Cl. at 665; NRG Co. v. United States, 31 Fed. Cl. 659, 670 (1994); Pettro, 47 Fed. Cl. at 136 ( 1-year Treasury bill). A lower rate is particularly relevant in takings cases because the obligation to pay the deficiency is an obligation of the United States, a

creditor whose obligation embodies no risk of default. See King v. United States, 504 F.2d 1138, 1143 (Ct. Cl. 1974) (holding that government bonds is an appropriate measure for interest); Gargoyles, Inc. v. United States, 37 Fed. Cl. 95, 109 (1997) (concluding that the 52-week Treasury bills was an appropriate basis for interest).

Alternatively, if the Court chooses to award compound interest, it should do so at the 10-year Treasury strip rate.

## CONCLUSION

The evidence and testimony presented at trial will demonstrate that the plaintiffs' claims should be dismissed because: (1) they are not ripe; (2) their claims were settled pursuant to the accord and satisfaction memorialized by the Use Agreements; or (3) because the limited partners assigned their claims against the Government in violation of the ACA. In the alternative, the Government will establish at trial that no taking occurred. Finally, should the Court conclude the preservation statutes effected a taking, the evidence and testimony will establish that the plaintiffs are entitled to only nominal damages, or, in the alternative, damages based upon a rental value analysis.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

David M. Cohen /by HD [signature]
DAVID M. COHEN
Director

[signature]
KENNETH M. DINTZER
Senior Trial Counsel
KENNETH D. WOODROW
DAVID A. HARRINGTON
TIMOTHY P. McILMAIL
SEAN DUNN
CRISTINA C. ASHWORTH
MICHAEL AUSTIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

October 26, 2004

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 26th day of October 2004, I caused to be delivered" DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON LIABILITY FOR CIENEGA GARDENS PLAINTIFFS," in the following manner:

BY EMAIL AND REGULAR MAIL:

EVERETT C. JOHNSON, JR.
Latham & Watkins
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
Tele: (202) 637-2200

BY EMAIL AND REGULAR MAIL:

JEFF HOWARD ECKLAND
Eckland & Blando
700 Lumber Exchange
10 South Fifth Street
Minneapolis, MN 55402
Tele: (612) 305-4400

Leslie Anderson