# EXHIBIT B

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **FIRST FEDERAL LINCOLN BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 95-518 C** |
| | ) | **(Senior Judge Margolis)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON LIABILITY

Pursuant to ¶ 14(b) of Appendix A of the Rules of the United States Court of Federal Claims and ¶ 3 of this Court's March 4, 2003 order, defendant, the United States, respectfully submits its memorandum of contentions of fact and law regarding the liability allegations of plaintiff First Federal Lincoln Bank ("Lincoln").

## INTRODUCTION

Lincoln's complaint arises out of its merger with three other Nebraska thrifts in 1982: Great Plains Federal Savings and Loan Association ("Great Plains"), Tri-Federal Savings and Loan Association ("Tri-Federal"), and Norfolk First Federal Savings and Loan Association ("Norfolk"). These mergers required regulatory approval by the Federal Home Loan Bank Board ("FHLBB"). On May 5, 1982, the FHLBB issued Resolution No. 82-322, which approved the merger of Great Plains and Lincoln. On June 24, 1982, pursuant to delegated authority, the Principal Supervisory Agent ("PSA") for the FHLBB's Tenth District approved the merger of Tri-Federal and Lincoln. On August 23, 1982, the PSA approved the merger of Norfolk and Lincoln.

Pursuant to the "purchase method" of accounting under Generally Accepted Accounting Principles ("GAAP"), the excess of the market value of liabilities over the market value of assets is recorded as "goodwill" on the books of the acquiring institution and amortized over a period of

time. At the time of the acquisitions at issue here, the FHLBB had expressly adopted GAAP to account for all thrift mergers. FHLBB Memorandum R-31b, Sept. 21, 1981. As a result of the 1982 mergers, which were accounted for using the purchase method, Lincoln recorded approximately $40 million in goodwill and began amortizing its goodwill over a period of 25 years for both GAAP and regulatory accounting purposes.

Both GAAP and regulatory accounting practices, in existence at the time of Lincoln's 1982 mergers, permitted the inclusion of goodwill as an asset on corporate balance sheets. Thus, goodwill was not excluded as an asset and comprised part of a thrift's regulatory capital. On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. §§ 1463-1464. Among other things, FIRREA provided that thrifts must phase out goodwill for purposes of determining regulatory capital compliance.

Nearly six years after FIRREA, Lincoln filed suit contending that it entered into "contracts" with the FHLBB in the course of completing each of its 1982 acquisitions, and that these "contracts" guaranteed the "right" to include goodwill as a capital asset and amortize it over a period of 25 years, irrespective of changes in the regulations or regulatory policy.

The Trial Court must examine the factual record surrounding each of the transactions at issue in order to determine whether plaintiff has established all of the elements of a contract. These elements include an unambiguous manifestation of mutual intent to contract, including an offer and acceptance, consideration, and a Government representative with actual authority to bind the Government. California Federal Bank v. United States, 245 F.3d 1342, 1346-47 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002). As the evidence at trial will demonstrate, the

Government's role in Lincoln's acquisition of Great Plains, Tri-Federal, and Norfolk constituted nothing more than the routine, and entirely non-contractual, exercise of the FHLBB's regulatory authority to approve thrift mergers. As we will demonstrate at trial, while there is evidence Lincoln undertook its 1982 acquisitions upon the assumption that the purchase method of accounting would be approved by the FHLBB, there is no evidence that Lincoln intended to seek or form "contracts" with the FHLBB, or that the FHLBB intended to seek or form "contracts" with Lincoln.

## THE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

The issues of fact and law regarding liability to be resolved by the Court are:

(1) whether there existed all of the elements of a contract, including mutuality of intent, such that the FHLBB promised that the goodwill arising from Lincoln's mergers with Great Plains, Tri-Federal, and Norfolk could be counted as regulatory capital over a 25-year period irrespective of changes in regulations; and

(2) whether the FHLBB, by implementing its statutory responsibilities to approve the voluntary mergers of regulated thrifts, entered into contracts with Lincoln concerning the treatment of goodwill.

## I. STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL

### A. LINCOLN'S STRATEGY TO SURVIVE

1. In the early 1980s, high interest rates created problems within the thrift industry. Because of a rise in interest rates, thrift assets (which, because they were primarily long-term, fixed rate mortgages, could not reap the benefit of an increase in interest rates) became worth substantially less than their original value, while the costs of liabilities (primarily short-term deposit liabilities) skyrocketed. This interest rate mismatch subjected many thrifts to losses.

2. Lincoln was not immune to these thrift industry problems. Beginning in 1980, Lincoln began to suffer losses and a deterioration in its net worth due to the high cost of its deposit liabilities. These losses continued and increased in magnitude through 1981 and 1982. By early 1982, Lincoln was on a list of insolvent institutions maintained by the FHLBB, with a projected insolvency date of March 1984.

3. Whether Lincoln could survive as a viable institution became an issue for its management. Lincoln believed its choices were to "either grow or die" and it chose to pursue mergers "state-wide" as a means of combating its deteriorating net worth. Pursuant to this strategy, Lincoln sought to acquire Great Plains, Tri-Federal, and Norfolk, which offered Lincoln an ability to branch into new market areas and to acquire significant operational and economic benefits that would help Lincoln through the interest rate crisis.

## B. THE FHLBB'S REGULATORY OVERSIGHT OF THRIFT MERGERS

4. To enable the FHLBB to assess and limit the risk posed by institutions to the industry-financed insurance fund administered by the Federal Savings and Loan Insurance Corporation ("FSLIC"), and to protect the stability of the thrift industry, the FHLBB established an elaborate system of regulations governing the financial standards and activities of thrift institutions. Among other things, the FHLBB promulgated net worth regulations that required thrifts to maintain specified levels of net worth, usually expressed as a ratio of capital against liabilities. For purposes of determining compliance with net worth requirements and other financial regulations, the FHLBB generally required thrifts to adhere to GAAP, unless otherwise specified. See 12 C.F.R. § 563.23-3(c) (1982).

5. By statute, no insured thrift institution could acquire or merge with another insured institution without the approval of the FHLBB. 12 U.S.C. § 1730(q) (1982). In addition, no insured institution could increase its insurable accounts as part of any merger or consolidation without the FHLBB's approval. E.g., 12 C.F.R. § 563.22(a) (1982). At all relevant times, the FHLBB required submission of an application for approval of a merger, acquisition, conversion, or change in control. 12 C.F.R. §§ 543.2, 546.2, 563.22 (1982).

6. The FHLBB's regulations required an applicant to describe the accounting method it intended to use to record a merger, and required that the computation and amortization of goodwill be in accordance with the FHLBB's policies. See, e.g., 12 C.F.R. § 571.5(e) (1982); 47 Fed. Reg. 17801, 17803 (1982); FHLBB Memorandum SP-24, Dec. 29, 1981. Intangible assets, including goodwill, were scrutinized by the FHLBB. 12 C.F.R. § 571.5(c)(2) (1982).

7. At the time of Lincoln's acquisitions in this case, the FHLBB's policies expressly adopted GAAP to account for all thrift mergers. FHLBB Memorandum R-31b; FHLBB Memorandum SP-24. GAAP permitted two methods of accounting for mergers and acquisitions – the "pooling" method and the "purchase" method.[1] Under the purchase method, excess liabilities were treated as an intangible asset (goodwill) for accounting purposes. The FHLBB required that merger applicants furnish the FHLBB with specific numerical data concerning goodwill, accompanied by an opinion of the applicant's independent accountant that GAAP had been adhered to, after the effective date of the merger. FHLBB Memorandum SP-24 at 6.

[1]In the "pooling" method, the assets and liabilities of the two entities are simply combined at their historic or "book" values. When the conditions for use of the pooling method of accounting are not present, the combination must be accounted for as a "purchase." In the purchase method, the assets and liabilities of the acquired entity are revalued from their original "book" values to their market values at the time of the acquisition and recorded upon the books of the acquiring association at those market values.

## C. LINCOLN'S 1982 MERGER TRANSACTIONS

### 1. The Great Plains Transaction

8. Like Lincoln, Great Plains was suffering losses as a result of the high cost of deposit liabilities in the early 1980s. Though the thrift's management was attempting to control losses, it remained solvent. Great Plains' board of directors nonetheless independently determined that merger was the institution's only feasible alternative.

9. Great Plains and Lincoln initiated formal merger negotiations no later than mid-October 1981. No contemporaneous evidence exists that regulators directed or pressured Great Plains or Lincoln to approach or negotiate with the other concerning a possible merger.

10. Lincoln and Great Plains reached an agreement in principle on December 8, 1981. On December 16, 1981, the thrifts reached a definitive merger agreement whereby Great Plains would be merged into Lincoln. As required by regulation, this merger agreement was conditioned upon FHLBB approval. 12 C.F.R. § 546.2(b) (1982). However, the FHLBB was not involved in the negotiations of these private agreements nor was it a party to them. The agreement to merge was negotiated by Great Plains and Lincoln on a voluntary basis without any Government involvement.

11. Lincoln submitted an application for merger with Great Plains to the FHLBB on December 31, 1981. As required by regulation, the application included a copy of the merger agreement between Great Plains and Lincoln, and a description of the purchase method of accounting, including a discussion of goodwill.

12. The multi-part application was accompanied by a letter from Lincoln's President requesting that the FHLBB consider the acquisition of Great Plains a "supervisory merger." The

FHLBB declined to do so. Great Plains was never placed under the control of the FHLBB or the FSLIC, was never the subject of any legal or administrative action by the FHLBB or FSLIC as a result of a failure to meet minimum capital requirements, and was under no regulatory restrictions prior to its subsequent merger with Lincoln. The FHLBB processed the merger request as an ordinary non-supervisory merger, and regulations concerning non-supervisory mergers were followed by both Lincoln, in pursuing its application, and by the FHLBB, in processing Lincoln's application to merge with Great Plains.

13. The FHLBB's review of Lincoln's application to merge with Great Plains was consistent with existing regulatory requirements. Although Lincoln believed that amortization of goodwill over 30 years was appropriate, the FHLBB determined that it was not. The FHLBB analyzed Lincoln's request for the use of purchase accounting and found that a 30-year amortization period was unreasonable under GAAP and existing regulatory guidelines. Instead, it determined that a 25-year period of amortization was appropriate. As noted by Lincoln's independent accountants, this treatment was required for FHLBB approval of all mergers in a uniform manner and was consistent with the application of purchase accounting under GAAP.

14. On May 5, 1982, the FHLBB adopted resolution No. 82-322, approving the application for the merger of Great Plains into Lincoln. The resolution did not address the accounting of goodwill other than to require that Lincoln provide an opinion from its independent accountant describing the intangible assets, including goodwill, that resulted from the merger and opining as to the reasonableness of the amounts attributed to intangible assets and their method of amortization. Such conditions were required by existing regulations.

15. The FHLBB further authorized the issuance of two requested forbearances. However, these forbearances did not concern the accounting treatment of goodwill.

16. On June 11, 1982, Lincoln responded to the conditions set forth in the FHLBB's resolution, and on June 23, 1982, Lincoln was informed that the materials submitted fulfilled the conditions placed upon the merger by the FHLBB's resolution.

**2. The Tri-Federal Transaction**

17. In the early 1980s, Tri-Federal was also suffering losses as a result of the high cost of funds. Despite these losses, Tri-Federal remained solvent. Thus, although the FHLBB was concerned with Tri-Federal's financial condition, the FHLBB left the solution of Tri-Federal's financial difficulties to Tri-Federal's management and board of directors. No contemporaneous evidence exists that regulators ever directed or pressured Tri-Federal and Lincoln to approach or negotiate with the other concerning a possible merger. Tri-Federal's management and board of directors remained in control of the thrift, and independently made all decisions for the thrift, until its subsequent merger with Lincoln.

18. Lincoln and Tri-Federal reached an agreement to merge in principle on March 23, 1982. On April 15, 1982, the thrifts reached a definitive merger agreement whereby Tri-Federal would be merged into Lincoln. As required by regulation, the merger agreement was conditioned upon FHLBB approval. The merger agreement was also conditioned upon satisfactory utilization of the purchase method of accounting to account for the merger for regulatory purposes. These agreements to merge with Tri-Federal were negotiated by the parties on a voluntary basis without any Government involvement.

19. Lincoln submitted an application for merger with Tri-Federal to the FHLBB on April 30, 1982. The application included a copy of the merger agreement between Tri-Federal and Lincoln, and a description of the purchase method of accounting, including a discussion of goodwill.

20. Lincoln did not request that the Tri-Federal transaction be treated as a supervisory merger and it was not treated as such by either the FHLBB or Lincoln. Tri-Federal was never placed under the control of the FHLBB or the FSLIC, was never the subject of any legal or administrative action by the FHLBB or FSLIC as a result of a failure to meet minimum capital requirements, and was under no regulatory restrictions prior to its merger with Lincoln.

21. The Tri-Federal merger was conditionally approved by the PSA on June 24, 1982, pursuant to delegated authority. The PSA approval letter did not mention goodwill, but required a statement of financial condition for the merged thrifts, including footnotes on purchase accounting, as of the merger's effective date, and an opinion from Lincoln's independent accountant certifying the use of purchase accounting in accordance with GAAP. This condition was a standard regulatory requirement. Ultimately, Lincoln complied with the conditions set forth in the PSA approval letter.

### 3. <u>The Norfolk Transaction</u>

22. Norfolk also experienced financial difficulties in the early 1980s as a result of the high cost of savings. Although the FHLBB was concerned with Norfolk's financial condition given this high cost of funds, the FHLBB left the solution of Norfolk's financial difficulties to Norfolk's management. No contemporaneous evidence exists that regulators ever directed or pressured Norfolk and Lincoln to become merger partners. Norfolk's management and board of directors remained in control of the thrift, and independently made all decisions for the thrift, until its subsequent merger with Lincoln.

23. Lincoln pursued a merger with Norfolk beginning in the mid-1970s, and thereafter approached Norfolk on a regular basis about a possible merger of the two thrifts. For example, in

early 1981, Lincoln again approached Norfolk about a possible merger. In early November 1981, Norfolk was ready to listen to Lincoln's merger proposal and Lincoln's management made a presentation to Norfolk's board of directors later that month.

24. Lincoln and Norfolk reached an agreement in principle to merge on May 7, 1982. On May 18, 1982, the thrifts reached a definitive merger agreement whereby Norfolk would be merged into Lincoln. Lincoln conditioned the Norfolk merger agreement on the FHLBB's regulatory approval of the merger, which was a regulatory requirement, and the utilization of the purchase method of accounting to account for the merger for regulatory purposes.

25. Lincoln submitted an application for merger with Norfolk to the FHLBB on June 21, 1982. Consistent with the regulations, the application included a copy of the merger agreement between Norfolk and Lincoln, and a description of the purchase method of accounting, including a discussion of goodwill.

26. Lincoln did not request that the Norfolk transaction be treated as a supervisory merger, and it was not treated as such by either the FHLBB or Lincoln. Norfolk was never placed under the control of the FHLBB or the FSLIC, was never the subject of any legal or administrative action by the FHLBB or FSLIC as a result of a failure to meet minimum capital requirements, and was under no regulatory restrictions prior to its merger with Lincoln.

27. The Norfolk merger was approved by the PSA on August 23, 1982, pursuant to delegated authority. Like the letter approving the Tri-Federal merger, the PSA approval letter did not mention goodwill, but required a statement of financial condition for the merged thrifts, including footnotes on purchase accounting, as of the merger's effective date, and an opinion from Lincoln's independent accountant certifying the use of purchase accounting in accordance

with GAAP. Ultimately, Lincoln complied with the conditions set forth in the PSA approval letter, conditions which were standard regulatory requirements.

## D. LINCOLN WAS NOT "INDUCED" BY PROMISES OF A CONTRACT

28. Lincoln contends that the Government "facilitated" or "induced" "supervisory mergers" with Great Plains, Tri-Federal, and Norfolk and thereby "relieved the government of the burden of resolving these 'problem cases.'" There is no evidence that Lincoln was "induced" by any contractual promises or guarantees. Far from being "induced," Lincoln's pursuit of the transactions was driven by the operational and economic benefits it recognized would result.

29. Lincoln understood that, to survive, it would need to undertake actions to reduce operating expenses, attract lower cost deposits, and increase income through additional fees generated by credit and debit cards, and other services that would generate income regardless of interest rate conditions.

30. Lincoln thus sought to acquire Great Plains, Tri-Federal, and Norfolk pursuant to a strategy of improving its state-wide branch structure and expand it customer base. Growth through mergers offered Lincoln a number of significant benefits that would help stem the tide of Lincoln's losses and deteriorating net worth. These included: 1) economies of scale, which would help reduce operating expenses; 2) an ability to sell services and products that the acquired thrifts did not offer to their customers, such as insurance, debit cards and credit cards, which would increase non-interest income; and, 3) a capacity of the acquired savings and loan accounts to generate future income and new business.

31. There is no contemporaneous evidence demonstrating that Lincoln's desire to use the purchase method of accounting was to include goodwill in regulatory capital; rather, it was to

obtain significant accounting income in the years immediately after the acquisitions, while Lincoln was attempting to survive the effects of high interest rates. By using purchase accounting, Lincoln could obtain millions of dollars in net income during the first few years after the acquisitions.

32. Indeed, far from being an inducement, the use of purchase accounting to account for the Great Plains, Tri-Federal, and Norfolk acquisitions was driven by GAAP and Lincoln's business expectations after the mergers. Lincoln intended to dispose of a significant portion of the assets it planned to acquire. Thus, the accounting pronouncements of the time required accounting under the "purchase" method. That is, given Lincoln's business expectations, GAAP dictated the use of purchase accounting to account for the mergers. Lincoln necessarily recognized that in acquiring these thrifts, the goodwill represented the intangible "going concern" value that made up the difference between the acquired thrifts' marked-to-market assets and liabilities. There is no evidence to suggest that regulators were asked, or offered, to allow any accounting treatment concerning goodwill not ordinarily available under GAAP and existing regulatory policy.

33. The "realities of the transactions" indicate that Lincoln was in no sense "induced" by the Government to acquire Great Plains, Tri-Federal, and Norfolk. There exists no contemporaneous evidence that Lincoln contemplated a risk of regulatory change. The facts indicate the transactions were voluntarily negotiated between Lincoln and the acquired thrifts, and there was never any indication that, in order to make the acquisitions attractive, Lincoln and the FHLBB had to enter into a "contract" relating to the amortization of goodwill or the right to count goodwill as regulatory capital.

34. Lincoln desired to enter new markets, and the acquired thrifts presented a cost-effective way to do so irrespective of any "contract" with the FHLBB. There is no evidence Lincoln ever informed the FHLBB that it could not and would not proceed with the acquisition without a contract. Lincoln knew forbearances were available but it never sought or received any forbearance relating to goodwill. Had there been a contract with the FHLBB, the documents would have made reference to the contract and discussed the risk of breach. No such discussion is reflected in any of the contemporaneous documents in this case. In short, there is no evidence of a "contract" concerning goodwill and ample evidence that there was no contract. Lincoln was struggling and its future was uncertain. In these circumstances, the potential benefit that Lincoln sought to achieve by entering into these transactions -- i.e., "growing its way out" of its problems -- was amply sufficient to justify the assumption of risk that the applicable definition of regulatory capital might change at some indefinite point in the future.

## II. DEFENDANT'S CONTENTIONS OF LAW

### A. FHLBB MERGER APPROVALS DID NOT CREATE CONTRACTS

1. To prove a contract in a Winstar-related case, it is not enough that a plaintiff be able to demonstrate that it acquired a "failing" thrift in the context of a "supervisory merger" that was approved by the FHLBB. As this Court has observed:

> To do so would be tantamount to deciding that a contract must be implied as a matter of law in all of these cases once the minimum documentation required for regulatory approval is present, and would contravene the intent, clearly expressed by the Supreme Court in Winstar as well as by the Federal Circuit in Cal.Fed.II, that these cases be adjudicated based on their individual facts and according to accepted principles of contract law.

Standard Federal Bank v. United States, No. 95-478, 2002 WL 31947572 at *3 (Fed. Cl. 2002)

(citing Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1059 (Fed.Cir. 2001), and Heyer Prods., Co. v. United States, 177 F.Supp. 252 (Ct. Cl. 1959)).

2. The fact that this is a Winstar-related case does not obviate Lincoln's burden to prove the elements of every express or implied in fact contract, namely lack of ambiguity in offer and acceptance, mutuality of intent to contract, consideration, and actual authority on the part of the Government representative to bind the Government in contract.[2] United States v. Winstar, 518 U.S. 839, 871 (1996) (in Winstar context "ordinary principles of contract construction and breach" apply); California Federal Bank v. United States, 245 F.3d at 1346-47 ("any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government").

3. At trial we will present evidence that the actions undertaken by Lincoln and the FHLBB with respect to the mergers at issue were required by, and consistent with, the existing regulations governing mergers of savings and loan institutions. It is well settled that an agency's mere performance of its regulatory or sovereign functions does not create contractual obligations. New Era Constr. v. United States, 890 F.2d 1152, 1155 (Fed. Cir. 1989); Aetna Cas. & Sur. Co. v. United States, 655 F.2d 1047, 1053-54 (Cl. Ct. 1981); Anchor Savings Bank v. United States, 52 Fed. Cl. 406, 420-21 (2002); Advance Bank v. United States, 52 Fed. Cl. 286, 288 (2002).

---

[2] This Court, prior to reassignment, decided that the Principal Supervisory Agent, which approved the Tri-Federal and Norfolk transactions in this case, possessed implied authority to bind the FHLBB "to promises regarding amortization and use of goodwill towards regulatory capital." First Federal Lincoln Bank v. United States, 54 Fed. Cl. 446, 452-53 (2002) (Judge Wilson). We respectfully disagree with the Court's decision, and reserve all rights to appeal, if necessary, concerning the issue of FHLBB and PSA authority to contract. See Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002) (general "housekeeping" statute, like 12 U.S.C. § 1725(c), did not authorize military recruiters to enter into contracts), pet. for cert. docketed, No. 02-1226 (Jan. 24, 2003).

The Supreme Court has explained that existing laws

> may open a chance for benefits to those who comply with its conditions, but it does not address them, and therefor, it makes no promise to them. It simply indicates a course of conduct to be pursued until circumstances or its views of policy change. It would be quite intolerable if parties not expressly addressed were to be allowed to set up a contract on the strength of their interest in, and action on the faith of, a statute, merely because their interest was obvious and their action likely, on the face of the law.

Wisconsin & Mich. Ry. v. Powers, 191 U.S. 379, 387 (1903).

4. The FHLBB's consideration and ultimate approval of Lincoln's applications to merge with Great Plains, Tri-Federal, and Norfolk did not provide protection against the risk of subsequent regulatory change. Indeed, the presumption is just the opposite. In an industry as heavily regulated as the banking industry, an institution seeks and obtains regulatory approval of a proposed transaction with knowledge that the law applicable to the transaction may change. See, e.g., Winstar, 518 U.S. at 844 (quoting Fahey v. Mallonee, 332 U.S. 245, 250 (1947); Carteret Sav. Bank v. OTS, 963 F.2d 567, 581 (3d Cir. 1992)).

5. "In deciding if there was a contract, this [C]ourt is guided by CalFed, which requires that the [C]ourt determine whether there was a bargained for exchange between the acquirers and the regulators in connection with goodwill." Southtrust of Georgia, Inc. v. United States, 54 Fed. Cl. 741, 746 (2002) (citation omitted). At a minimum, a "special or negotiated" treatment of goodwill that the parties understood would be protected from any regulatory change is required. Id.

6. Lincoln is simply unable to direct this Court to any evidence of a bargained for exchange concerning the "special or negotiated" treatment of goodwill, and its claims of liability must be repelled. See, e.g., Southtrust, 54 Fed. Cl. 746-747 (finding there was "no evidence of

any actual arms-length negotiations between the plaintiffs and the government regarding the use of goodwill"). All of the documents upon which Lincoln has relied in an attempt to cobble together a contract - privately negotiated merger agreements, applications for mergers, accountant's letters, FHLBB conditional approval documents, and responses to conditional approval letters - are entirely consistent with what was required by regulation and regulatory policy and are insufficient to establish mutuality of intent to contract. See, e.g., Commercial Federal Corp. v. United States, No. 94-599, 2003 WL 1698218 at *34 (Fed. Cl. 2003) ("On balance, in this case the documents do not reflect a 'bargained for' exchange.").

7. Simply because the transaction at issue in this case occurred prior to FIRREA, and plaintiff was permitted, under existing regulations, to use goodwill for regulatory capital purposes, does not mean that the Government entered into a contract. Id.; see also D & N Bank v. United States, No. 95-539 (Fed Cl. May 20, 2002), Order Recorded In Transcript at p. 355 ("merely responding positively to such a required request for approval [of a merger transaction] did not create a contract or evince a mutual intent to contract"), appeals argued, Nos. 02-5130, -5144 (Fed. Cir. Apr. 9, 2003).

## B. CONTRACTS MAY NOT BE INFERRED AS A MATTER OF LAW

8. Unable to direct this Court to evidence of a mutually binding promise concerning the treatment of goodwill, plaintiff will most likely contend that a contract must nonetheless be inferred due to the regulatory "context" or "realities of the transaction" within which each of its 1982 mergers occurred. In this respect, plaintiff has in the past referred to each of the mergers as "supervisory" mergers, which furthered a Government "scheme" or "policy" to avoid having to liquidate ailing thrifts and, thus, protect the thrift insurance fund. Plaintiff has further argued that

it would have been out of capital compliance absent the inclusion of goodwill in its regulatory capital base as of the effective date of the merger, and, thus, mutuality of intent must be inferred, because to proceed without a contractual promise would have been "madness." The Court must reject these pleas. Such claims are based upon "duties that are deemed to arise by operation of law," City of Cincinnati v. United States , 153 F.3d 1375, 1377 (Fed. Cir. 1998), or that are based upon a perception that a party "ought to be bound" rather than from a conclusion that a party "has agreed to be bound." Aetna, 655 F.2d at 1059-60. Such implied-in-law contracts are "outside the jurisdiction of the Court of Federal Claims." Id. at 1377.

### 1. "Supervisory" Mergers Did Not Take Place, And The Term Is Otherwise Irrelevant

9. There exists no evidence that any one of the three 1982 mergers that Lincoln undertook was a "supervisory" merger. Indeed, the evidence is quite the contrary. In each case, both Lincoln and the FHLBB treated the merger applications as an application for non-supervisory merger. Furthermore, even if Lincoln's merger with any one of the acquired thrifts were deemed to be "supervisory," this would have no bearing upon the issue of whether Lincoln sought or received from the Government an extra-regulatory promise regarding its accounting for goodwill. See First Commerce Corp. v. United States, 53 Fed. Cl. 38, 40 (2002), appeal docketed, No. 02-5183 (Fed. Cir. Sept. 30, 2002); Anchor Savings Bank F.S.B. v. United States, 52 Fed. Cl. 406, 418 (2002).

10. A "supervisory" merger does not result in a contract. As part of its regulatory responsibilities, the FHLBB generally required thrifts to report their financial condition to the FHLBB and FSLIC in accordance with GAAP. As described in Winstar, the purchase method of accounting under GAAP possessed a number of advantages. For example, in some

circumstances, it resulted in the creation of an intangible asset, known as "goodwill," which amortized over a period of up to 40 years. Winstar, 518 U.S. at 851-53. The use of the purchase method enabled the acquirer to record fictitious income during the years immediately following the merger because the accretion to income of the acquired loans exceeded the amortization to expense of the goodwill. See id.

11. The FHLBB's adherence to GAAP, which in this case required the use of the purchase method, id. at 849, occurred at a time when no statute or regulation excluded goodwill as an asset in calculating a thrift's regulatory capital, even though, given the state of the economy, the amount of goodwill could be quite substantial and even though goodwill was an intangible asset. The FHLBB's policy not to exclude goodwill created by the purchase method from the calculation of regulatory capital, see 12 C.F.R. § 571.5(e), permitted a thrift to acquire another thrift that was insolvent on a marked-to-market basis without an immediate reduction in the acquiring thrift's regulatory capital.

12. The fact that the FHLBB's adherence to GAAP may have made acquisitions attractive does not support the conclusion that Lincoln and the FHLBB entered into a contract shifting the risk of regulatory change to the Government. Given the conditions at the time, the FHLBB's adherence to GAAP represented an effort by the agency to fulfill its regulatory responsibilities. See, e.g., 12 C.F.R. § 571.5(e). An agency's efforts to fulfill its regulatory responsibilities does not demonstrate an intention to enter into a contract. Aetna, 655 F.2d at 1052; see Greenbrier v. United States, 40 Fed. Cl. 689, 693, 699 (1998), aff'd, 193 F.3d 1348 (Fed. Cir. 1999) (finding that Congress aimed to increase low income housing "by providing incentives to private industry" but "HUD's role in encouraging the transactions" at issue "could

not gloss over the fact that HUD was not a party on the . . . contract"); Fifth Third Bank of Western Ohio v. United States, 52 Fed. Cl. 264, 277 (2002) ("fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate dispute as to whether it actually made such a promise").

13. The suggestion that the industry-financed insurance fund might have benefitted indirectly from Lincoln's acquisitions does not create an express or implied-in-fact contract concerning the regulatory treatment of goodwill. City of Cincinnati, 153 F.3d at 1378 ("[w]hile the United States may be said to be the beneficiary of . . . services provided by the city, it was not offered the opportunity to accept those benefits, and it cannot be said to have taken any action . . . to indicate its willingness to pay the charges"); Trauma Serv. Group v. United States, 104 F.3d 1321, 1327 (Fed. Cir. 1997) ("mere receipt of such services, even to the benefit of the Government, would not create an implied-in-fact contract to pay for them"). As the Court of Federal Claims has astutely observed, "for the same reasons that FHLBB preferred to encourage such acquisitions without FSLIC contributions, FHLBB certainly would have accepted such transactions without committing itself to a contract ." Fifth Third, 52 Fed. Cl. at 277.

### 2. A Contract May Not Be Inferred From The "Realities Of The Transaction"

14. Lincoln will also assert that this Court should infer contractual intent merely from the "context" or economic "realities of the transaction." Contrary to Lincoln's contentions, no court has held that, where manifestations of contractual intent are not evidenced as a matter of fact, they may simply be inferred from the "realities of the transaction" as a matter of law. In fact, as this Court has cautioned, "[t]he alluring umbrella of 'totality of the circumstances' and an

implied in fact contract when the law does not permit it is not a satisfactory alternative to a legal right." City of El Centro v. United States, 922 F.2d 816, 823-24 (Fed. Cir. 1990).

15. At the time of the acquisition, FHLBB regulation did not exclude goodwill created as a result of the use of purchase accounting from the calculation of regulatory capital. See 12 C.F.R. § 571.5(e). Lincoln contends that it would have fallen out of capital compliance immediately after its acquisition of each of the merged thrifts if goodwill had been excluded from the calculation of regulatory capital. Lincoln further contends that, notwithstanding the lack of evidence, there must have been a contract shifting to the FHLBB the risk of a regulatory change that required the exclusion of goodwill from the calculation of regulatory capital. This argument depends upon misconstructions of decisions of this Court, the Federal Circuit, and the Supreme Court. No court has made the possibility of non-compliance with thrift capital requirements absent the ability to include goodwill as a capital asset a litmus test for contractual intent, where, as here, there otherwise exists no evident manifestations of a bargained-for exchange. See e.g., Winstar, 518 U.S. at 863, 910; Winstar Corp. v. United States, 64 F.3d 1531, 1542 (Fed. Cir. 1995), aff'd 518 U.S. 839 (1996); California Federal Bank v. United States, 39 Fed. Cl. 753, 767-68 (1997), aff'd, 245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 122 S. Ct. 920 (2002) ("madness" is not a litmus test for when a contract exists); Home Savings of America v. United States, 50 Fed. Cl. 427, 435 (2001) (plurality decision in Winstar did not find that "irrationality" or "madness" alone could create a promise); Commercial Fed. Corp., 2003 WL 1698218 at *44.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

OF COUNSEL:
COLLEEN HANRAHAN
JEFFERY T. INFELISE
WILLIAM G. KANELLIS
Trial Attorneys

GARY J. DERNELLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
Washington, D.C. 20530

Tel. (202) 353-0509
Fax (202) 353-7988

Attorneys for Defendant

April 16, 2003

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 16th day of April, 2003, I caused to be served by U.S. Mail (first class, postage prepaid) the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON LIABILITY" addressed as follows:

Edward L. Lublin
BLANK ROME LLP
Watergate, Eleventh Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037

Monica Atkins
_______________________________