IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| HUNTLEIGH USA CORPORATION, | : | No. 03-2670C |
| Plaintiff, | : | (Judge Margolis) |
| - against - | : | ECF Case |
| THE UNITED STATES, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFF'S POST-TRIAL MEMORANDUM OF**
**<u>CONTENTIONS OF FACT AND LAW</u>**

Jonathan J. Lerner
Lauren E. Aguiar
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Plaintiff
Huntleigh USA Corporation

Of counsel:
William J. O'Brien
Sarah Heckman Yardeni
Elliot Friedman

December 20, 2006

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

CONTENTS OF FACT ........ 5

CONTENTIONS OF LAW ........ 40

I. THE EVIDENCE AT TRIAL ESTABLISHED THAT HUNTLEIGH SUFFERED A COMPENSABLE TAKING ........ 40

A. The Constitutional Framework ........ 40

B. Huntleigh Had a Protected Property Right In Its Business Assets, Including Its Screening Contracts, Going Concern Value and Goodwill ........ 40

C. The Evidence Demonstrates that the Act Constituted a Categorical Taking under *Lucas* ........ 42

(1) The Relevant Property For Purposes of the Takings Inquiry is Huntleigh's Screening Business ........ 43

(2) The Fair Market Value of Huntleigh's Screening Business ........ 45

D. The Evidence At Trial Also Established That the Act Constituted a Taking Under the Three-Part *Penn Central* Test ........ 54

(1) The Character of the Government Action Demonstrates That There Has Been a Taking Under *Penn Central* ........ 54

(2) The Evidence Demonstrated That the Government Interfered With Huntleigh's Reasonable Investment-Backed Expectations ........ 55

(3) The Evidence At Trial Established That the Economic Impact of the Act Was Serious and Severe ........ 57

II. THE EVIDENCE AT TRIAL ESTABLISHED THAT HUNTLEIGH IS ENTITLED TO COMPENSATION UNDER THE ACT ........ 59

# TABLE OF AUTHORITIES

## CASES

Air Pegasus v. United States, 424 F.3d 1206 (Fed. Cir. 2005) ..................................... 41

Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002)...........51, 52

Armstrong v. United States, 364 U.S. 40 (1960)......................................................... 40

Associated Imports, Inc. v. ASG Indus., Inc., No. 5952, 1984 WL 19833 (Del. Ch. 1984) ........................................................................................................................ 45

Bassett, N.M. LLC v. United States, 55 Fed. Cl. 63 (2002) .......................................... 45

Bauman v. Ross, 167 U.S. 548 (1897)........................................................................... 54

Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376 (2d Cir. 2006)......................45, 48, 50

Brace v. United States, 72 Fed. Cl. 337 (2006) .......................................................... 55

Cane Tenn., Inc. v. United States, 57 Fed. Cl. 115 (2003) ........................................... 44

Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602 (1993)........................................................................................... 43

Cienega Gardens v. United States, 67 Fed. Cl. 434 (2005)........................................... 44

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003).........................*passim*

Consolidated Rock Prods. Co. v. DuBois, 312 U.S. 510 (1941).................................... 47

Conti v. United States, 48 Fed. Cl. 532 (2001) ............................................................ 56

Deltona Corp. v. United States, 657 F.2d 1184 (Ct. Cl. 1981)..................................56, 57

Doe v. United States, 100 F.3d 1576 (Fed. Cir. 1996) .................................................... 5

In re Duplan Corp., 9 B.R. 921 (S.D.N.Y. 1980) ........................................................ 52

Eastern Enterprises v. Apfel, 524 U.S. 498 (1998)........................................................ 55

Estate of Jung v. Commissioner, 101 T.C. 412 (1993).................................................. 49

Georgia-Pacific Corp. v. United States, 640 F.2d 328 (Ct. Cl. 1980) ............................ 48

Good v. United States, 189 F.3d 1355 (Fed. Cir. 1999) ................................................ 56

Gross v. Commissioner, 272 F.3d 333 (6th Cir. 2001) ................................................ 48

Hendler v. United States, 175 F.3d 1374 (Fed. Cir. 1999)...................... 52, 53, 54, 55, 59

Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440 (2005) ................................5, 41, 55

Indep. Park Apartments v. United States, 61 Fed. Cl. 692 (2004) ................................. 45

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987) ....................... 43

Kimball Laundry Co. v. United States, 338 U.S. 1 (1949) .......................................41, 45

Kirby Forest Indus., Inc. v. United States, 467 U.S. 1 (1984)....................................... 45

Krapf v. United States, 977 F.2d 1454 (Fed. Cir. 1992)................................................ 48

Landmark Land Co. v. United States, No. 95-502C, 46 Fed. Cl. 261 (2000).................. 34

Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005) ..................................42, 43, 54, 55

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) ........................ 59

Loveladies Harbor Inc. v. United States, 28 F.3d 1171 (Fed. Cir. 1994) ..................44, 57

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992)....................2, 42, 43, 44

Maritrans, Inc. v. United States, 40 Fed. Cl. 790 (1998) ............................................... 56

In re Med Diversified, Inc., 346 B.R. 621 (Bankr. E.D.N.Y. 2006)..........................51, 52

MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344 (Fed. Cir. 2005) .........51, 52

Naegele Outdoor Adver., Inc. v. City of Durham, 803 F. Supp. 1068 (M.D.N.C. 1992)........................................................................................ 44

Norman v. United States, 63 Fed. Cl. 231 (2004) ........................................................ 45

Okerlund v. United States, 365 F.3d 1044 (Fed Cir. 2004) .......................................... 48

Olson v. United States, 292 U.S. 246 (1934) ................................................................ 45

Palm Beach Isles Assocs. v United States, 208 F.3d 1374 (Fed. Cir. 2000).................... 44

Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978)....................... 3, 54

Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001, 2004 WL 345551 (S.D.N.Y. 2004)............................................................................................. 51

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) .......... 3, 45, 46, 51

Robertson v. United States, No. Civ.A 03-CV-2113, 2006 WL 302302 (N.D. Tex. 2006) .......... 40

Rose Acre Farms, Inc. v. United States, 373 F.3d 1177 (Fed. Cir. 2004) .......... 43, 44

Sartori v. United States, 67 Fed. Cl. 263 (2005) .......... 43, 44

Schneider v. County of San Diego, 285 F.3d 784 (9th Cir. 2002) .......... 59

Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689 (1933) .......... 49

TV58 Ltd. P'ship v. Weigel Broad. Co., 1993 WL 285850 (Del. Ch. 1993) .......... 52

Union Bank of Switz. v. Deutsche Fin. Servs. Corp., No. 98 Civ. 3251, 2000 WL 178278 (S.D.N.Y. 2000) .......... 48

United States v. 0.88 Acres of Land, 670 F. Supp. 210 (W.D. Mich. 1987) .......... 41

United States v. Brooklyn Union Gas Co., 168 F.2d 391 (2d Cir. 1948) .......... 49

United States v. Cartwright, 411 U.S. 546 (1973) .......... 45

Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394 (1989) .......... *passim*

Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1991) .......... 46, 55, 59

## STATUTES

14 C.F.R. § 108 .......... 5, 6

28 U.S.C. § 1491(a)(1) .......... 5

The Aviation and Transportation Security Act, Pub. L. No. 107-71, 49 U.S.C. § 44901 et seq., 115 Stat. 597 (2001) .......... *passim*

U.S. Const. amend. V .......... 40

Pursuant to Appendix A ¶ 19 of the Rules of the United States Court of Federal Claims and the Court's December 5 and December 14, 2006 Orders, plaintiff Huntleigh USA Corporation ("Huntleigh") respectfully submits this Post-Trial Memorandum of Contentions of Fact and Law.

## INTRODUCTION

The Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001) (the "Act" or "ATSA") nationalized the screening industry at airports throughout the United States and barred Huntleigh from performing under its long-standing contracts with the airlines to provide pre-board passenger and baggage screening services. As mandated by the Act, the business of screening passengers and baggage was converted into a government monopoly. Huntleigh's long-standing contracts with the airlines, which formed the basis of its business and were routinely renewed for years, were abrogated and Huntleigh was legally prohibited from competing with the government. In short, the record evidence proves that Huntleigh's business assets were confiscated by the United States, epitomizing precisely the kind of "taking" for which the Fifth Amendment to the United States Constitution mandates that "just compensation" be paid.

The undisputed record evidence demonstrated that the Act deprived Huntleigh of all economically beneficial use of its screening business -- a business that had flourished due to firmly-established relationships and the excellent reputation Huntleigh developed with the airlines. The undisputed evidence also showed that prior to September 11, 2001 ("9/11"), Huntleigh focused its business on its screening operations, that screening was a growing and increasingly profitable business, and that Huntleigh was one of only a few major players in the consolidating and burgeoning security screening industry. Even before 9/11, legislative initiatives, industry trends and the views of industry participants all indicated that the amount and type of pre-board screening that would be required from private screening companies was expanding at a great pace. A profitable future awaited Huntleigh.

The events of 9/11 caused a sea change in pre-board passenger and baggage screening. They urgently accelerated the implementation of initiatives that already were on the drawing board or in the

process of being put in place. Huntleigh successfully responded to the new, post-9/11 world and the enhanced regulations and increased customer demand, resulting in a corresponding immediate surge in its revenue and gross profit. Indeed, the evidence demonstrated that this significant upward trend in Huntleigh's revenue and profit was obvious before November 19, 2001, the selected "takings" date, and it continued as Huntleigh provided enhanced screening services on behalf of its existing airline customers until Huntleigh began providing these same screening services on behalf of the Government for an interim period. In short, the unequivocal and undisputed evidence proved that Huntleigh already had achieved major growth in its profits and was poised for even further growth just as the Government confiscated its property. Not only was Huntleigh's business snatched away from it, but it was taken at the height of its value.

The overwhelming evidence also proved that neither Huntleigh (nor anyone else in the airline industry or even at the Federal Aviation Administration ("FAA")) had any reason to believe that pre-board screening would be nationalized prior to 9/11. Given Huntleigh's history and reputation in the industry, as well as the clear regulatory trend toward enhanced airport security by private companies that would be certified by the FAA, the Company had every reasonable expectation that it would continue to grow and prosper. As a result, Huntleigh made substantial investments in its business with the reasonable expectation that the Government would not impose an industry-wide monopoly for itself. The Act effected a taking of Huntleigh's entire screening business -- lock, stock and barrel -- voiding Huntleigh's private contracts and destroying the goodwill and going concern value Huntleigh had worked so hard to create, which constituted a categorical taking pursuant to the Supreme Court's decision in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992).

To be sure, Huntleigh also furnished certain auxiliary non-screening services, but the evidence demonstrated that these were functionally and qualitatively different from Huntleigh's profitable and growing security screening operation. Accordingly, the happenstance that Huntleigh also supplied these different services does not diminish the "categorical" nature of the taking. In any event, even if

these business lines were considered, it would not change the conclusion, because the evidence showed that without the screening operations -- the core of Huntleigh's profitable business -- these remaining services were a money-losing drain on the Company that had de minimis, if any, value. The proof of the pudding is in the eating, and the confiscation of its screening business caused Huntleigh to suffer a total loss of the value of its property. Even if the Court were to find that the Act did not effect a "categorical" taking, the record evidence firmly established that the Government's actions in this case constituted a taking under the three-part test in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978). It is conceded that the Government failed to pay "just compensation," which violates the Takings Clause of the Fifth Amendment to the Constitution.

Given the surge in value attributable to the increased demand for Huntleigh's screening services after 9/11, Huntleigh's damages expert, Christian Tregillis, conservatively placed the value of Huntleigh's screening business (which consisted of its screening contracts (Tr. 578:14-22)) between $151 and $201 million as of the takings date. The Government, on the other hand, presented no reliable evidence of the economic impact Huntleigh has suffered as a result of the Act. In its zeal to deny that any damage occurred, the Government offered a witness retained to provide "litigation support," not bona fide, unbiased expert damages testimony. The Government's witness presented an analysis so skewed and biased that it is rarely encountered and, Huntleigh respectfully submits, ought not be countenanced. Even though this so-called "expert" acknowledged the importance of analyzing the impact of 9/11, and the documentary evidence proved he was well aware of the significant surge in Huntleigh's post-9/11 revenues and profits, he assiduously avoided addressing this critical change in Huntleigh's value, and used historical, pre-9/11 information instead. He effectively assumed away the impact of 9/11 and valued Huntleigh as if 9/11 had never happened and the world had not changed. The Government's attempt to avoid the impact of 9/11 on the value of Huntleigh's screening business -- based on alleged "uncertainties" at the time -- is contrary to controlling authority from the United States Supreme Court. In Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 452-53 (1968), the Supreme Court held in language equally applicable here, "[i]f it is shown that the record of past earnings is not a reliable criterion of future performance, the court must form an estimate of future performance by inquiring into all foreseeable factors which may affect future prospects."

The record evidence also proved that the Government violated the Act, which provides that the Government "may assume the rights and responsibilities of [a] . . . contract for provision of passenger screening services . . . , subject to payment of adequate compensation." § 101(g)(2), 49 U.S.C. § 44901. The undisputed evidence -- including the legislative history of the Act, contemporaneous internal TSA memoranda, the TSA's repeated testimony before Congress, and the admissions of the Government's representative Anthony Washington -- established that the "rights and responsibilities" of Huntleigh's contracts were effectively assumed by the Government when screening responsibility was placed solely in the hands of the TSA. The fact that the assumption of the "rights and responsibilities" of Huntleigh's contracts was accomplished through the "mechanism" of new, short term contracts, rather than through the direct assumption of existing contracts, was not considered by the TSA as a sufficiently important distinction to advise the Congress -- and it cannot now be a basis to avoid compensating Huntleigh. It merely is a transparent, disingenuous and post hoc rationale for the Government's stubborn refusal to compensate Huntleigh, and it should be rejected. Therefore, the Government is required by the Act to pay Huntleigh "adequate compensation" for assuming the "rights and responsibilities" of its private contracts.

# CONTENTIONS OF FACT

## Parties

1. Plaintiff Huntleigh is a corporation organized under the laws of the State of Missouri, and is located in St. Louis, Missouri. (DX 8, p. 3.)[1] Huntleigh was a provider of passenger and baggage screening in the United States. (Id., p. 6; PX 112-007.)

2. Defendant is the United States of America acting through, among other bodies, the TSA, which is now part of the Department of Homeland Security. (Answer ¶12.)

## Jurisdiction

3. Huntleigh's claims against the United States are founded upon the Takings Clause of the Fifth Amendment to the United States Constitution and Section 101(g) of the Act. As such, this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491(a)(1). See Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 451 (2005) ("Huntleigh I"); see also Doe v. United States, 100 F.3d 1576, 1580-84 (Fed. Cir. 1996).

## Huntleigh's History and Contractual Relationships

4. Since the early 1970s, private screening companies had provided pre-board passenger and baggage screening services on behalf of air carriers pursuant to applicable FAA regulations. (Tr. 58:1-12 (Tuero); 426:2-6 (Soliday).) These regulations required each air carrier to establish a specific air transportation security program with certain minimum security requirements and provided for the screening of all passengers and property to be carried aboard an aircraft. 14 C.F.R. §§ 108.1 to 108.33 (2001) (PX 2). Air carriers contracted with private companies, like Huntleigh, to provide pre-board screening services pursuant to the airlines' approved security program. (Tr. 58:1-12 (Tuero); 426:7-427:21, 428:8-20 (Soliday).)

---

[1] "Tr." refers to citations to the trial transcript. "PX" refers to Plaintiff's Trial Exhibit and "DX" refers to Defendant's Trial Exhibit. Deposition testimony refers to excerpts from stipulated deposition designations.

5. The FAA regulations also required, in some circumstances, that checked baggage be screened by explosive detection systems equipment prior to being loaded onto the aircraft. 14 C.F.R. §§ 108.13, 108.20 (2001) (PX 2-005, 008). Accordingly, private screeners, including Huntleigh, also performed this function. (Tr. 34:5-12 (Tuero); 458:17-24 (Soliday); 711:9-12.)

6. Huntleigh had been performing passenger and baggage screening services since at least 1989. (Tr. 30:20-31:3 (Tuero).) By November 2001, Huntleigh had secured screening contracts with approximately seventy-five airlines, both domestic and international, at some thirty-five airports across the United States. (85:7-87:19 (Tuero); PX 600 (detailed log of Huntleigh screening contracts).)

7. As explained by Joseph Tuero, Huntleigh's former President and Chief Executive Officer (Tr. 28:13-17), Huntleigh entered into various kinds of agreements with the airlines that outlined the services that Huntleigh would provide and included other terms of the relationship. (Tr. 38:17-39:7; 47:13-17; 50:25-51:12; see PX 13-59; PX 601.) Certain contractual relationships with the airlines were governed by "core" agreements (Tr. 38:23-39:25, 40:10-13 (Tuero); see PX 13-19) that were supplemented by separately negotiated "location exhibits" prescribing the rates and services for each individual airport location (Tr. 40:14-25 (Tuero); 431:1-12 (Soliday); PX 55-002-3; see PX 20-59.) In some instances, no core agreement existed and the contractual relationship was on a location-by-location basis pursuant to individual agreements. (Tr. 41:11-42:5 (Tuero); PX 53-002-19; see also PX 20-59.) In other locations, Huntleigh's airline relationship was governed simply by letter agreements or through invoices sent by Huntleigh pursuant to which the airline paid for Huntleigh's services. (Tr. 42:16-47:17 (Tuero); PX 151.) In all events, Huntleigh's relationships with its customers were negotiated, awarded and terminated on a specific location basis independent of Huntleigh's relationship with the carrier at other locations. (Tr. 57:1-15 (Tuero); see PX 343-007-8.)

8. Some of Huntleigh's screening contracts were for a specific number of years (e.g., 2 to 5 years), while many others continued indefinitely unless terminated. (Tr. 51:23-53:24 (Tuero); 431:13-18 (Soliday); see, e.g., PX 32-002-8; 26-002.) Airlines customarily renewed their screening contracts

with set durations and continued those that were of an indefinite term. (Tr. 52:25-55:2 (Tuero); 227:20-229:6 (Sporn); 431:19-432:5 (Soliday); PX 343-008.) By 2001, Huntleigh had continuously provided airport screening services for more than a decade for various airlines, including American, Continental and United. (Tr. 30:24-31:15 (Tuero); see PX 601-017-030.) Since 1991, no major airline had terminated a Huntleigh core agreement. (Tr. 57:16-18 (Tuero).) As Huntleigh's industry expert, Captain Edmond Soliday (Tr. 423:21-25), testified, long-term relationships between air carriers and screening companies like Huntleigh were the norm. (Tr. 432:6-9.) Mr. Tuero and Richard Sporn, Huntleigh's current President and Chief Executive Officer (Tr. 222:5-8), confirmed that "it was extremely rare that we lost contracts." (Tr. 228:20-24; 216:20-24.)

9. The evidence at trial was undisputed that Huntleigh operated throughout its history on the basis of continuously renewed contracts (Tr. 52:25-55:2, 216:20-24 (Tuero); 227:20-229:6 (Sporn)), and that Huntleigh had achieved an excellent reputation and strong relationships with its airline customers (Tr. 32:13-34:4, 37:19-38:6 (Tuero); 225:6-227:6 (Sporn); PX 343-009-10). Based on this history, absent the Act, Huntleigh would have retained its existing contracts and those contracts would have been renewed in the future. (See 54:3-55:5 (Tuero); 227:20-228:10 (Sporn); see PX 343-008-9.)

**Huntleigh's Focus and Growth Before 9/11**

10. In 1998, Huntleigh's previous owner agreed to sell the business to ICTS International N.V. ("ICTS"), a Netherlands corporation, specializing in aviation security throughout Europe. (Tr. 398:20-23, 408:23-409:1 (Zicher); PX 112-007.) According to the testimony of Doron Zicher, a former ICTS executive and currently General Manager of an ICTS subsidiary providing aviation security services (Tr. 401:16-23; 403:11-18; 404:15-405:2), the United States aviation security market was going through a "revolution," and Huntleigh and ICTS saw opportunities for expansion in response to expected growth in this market. (Tr. 409:7-410:22.)

11. In 1998, Huntleigh, which was already established in the screening industry, shifted its business away from the less profitable ancillary non-screening services the Company had traditionally

provided (Tr. 32:2-7, 34:2-4, 98:5-22, 118:23-119:8 (Tuero)) and focused its business primarily on the lucrative and expanding screening industry. (Tr. 223:25-225:5 (Sporn); see 37:1-6, 118:23-119:8 (Tuero); 433:17-434:1 (Soliday).) As a "pure play" devoted almost exclusively to security screening, Huntleigh was able to concentrate its efforts on developing its screening operations. (Tr. 61:22-62:6 (Tuero).) Huntleigh successfully expanded these operations based on, among other things, its reputation and consistent ability to perform. (Tr. 32:24-33:24, 38:9-16, 53:25-55:2 (Tuero); see 432:6-23 (Soliday); PX 600.) By 2001, passenger and baggage screening had become the core of Huntleigh's business, comprising the majority of its revenue and profitability. (Tr. 37:1-6, 118:23-119:8 (Tuero); 433:17-434:1 (Soliday); PX 112-008.)

12. The documentary evidence established that from 1997 to 2001, as its business mix shifted toward screening, Huntleigh's financial performance was on an upward trajectory, showing consistent, year-over-year revenue and profit growth. (Tr. 34:25-37:6; PX 107; PX 109; PX 110; PX 112.) This trend is reflected on the chart below:

| Year | Revenue | Gross Profit |
|---|---|---|
| 1997 | $38.4 million | $2.6 million |
| 1998 | $44.3 million | $3.2 million |
| 1999 | $57.9 million | $3.6 million |
| 2000 | $66.6 million | $5.3 million |
| 2001 | $96.6 million | $9.1 million |

(PX 107, 109, 110, 112.)

13. By 2001, the screening industry was consolidating and becoming dominated by four to five larger companies, including Huntleigh, which controlled an ever-growing market. (Tr. 60:24-61:8 (Tuero); 320:1-11 (Washington); 433:17-434:9 (Soliday); PX 290-001; PX 343-009.) Huntleigh stood to benefit from this consolidating market and from the trend toward increased screening services and responsibility. (Tr. 207:1-25 (Tuero); 233:18-234:8 (Sporn); 410:4-22 (Zicher); PX 343-009.)

14. The Government adduced no evidence to suggest that the upward trend of Huntleigh's financial performance would not have continued into the future, even absent the events of 9/11.

**Prior to 9/11, Legislative Trends Indicated Increased Screening, Including More Screening of Checked Baggage**

15. Prior to 9/11, potential enhancements to aviation security in general, and passenger and baggage screening in particular, were discussed in the political arena and among airport security industry leaders. (Tr. 407:13-22 (Zicher); PX 343-010-12.) In 1996 and 1997, the FAA was explicitly directed by federal legislation and the White House Commission on Aviation Security (the "Gore Commission"), to strengthen screening operations, including increased performance standards and training, to provide for additional screening of checked baggage, and to strengthen the direct relationship between the FAA and screening companies through a screener certification program. (See, e.g., Tr. 436:6-440:1 (Soliday); PX 3; PX 4; PX 5; PX 343-010-12.)

16. The strengthening of aviation screening included an FAA goal of "100% checked baggage screening by [explosive detection systems]" prior to boarding, and the FAA had issued a Notice of Proposed Rule Making to this effect. (DX 12, p. 24; see Tr. 59:6-20, 203:9-204:6 (Tuero); 452:12-457:9, 501:11-16 (Soliday); 712:20-713:1 (Burke); PX 7; PX 4.)

17. Increasing checked baggage screening would necessarily entail a "significant increase" in the number of screeners. (Tr. 459:11-460:3, 510:11-17 (Soliday); 705:15-24 (Burke); PX 343-011.) Accordingly, as Captain Soliday explained, "[s]creening, with today's technology and what's probably going to be available in the next 20 years, is manpower-intensive," this increase in screeners was a foregone result regardless of how that baggage was screened -- by explosive detection systems where available or by some other method until those systems could be installed. (Tr. 510:11-21.)

18. As Huntleigh already performed baggage screening for its airline customers (Tr. 34:5-12 (Tuero); 457:10-23 (Soliday); 300:10-20 (Sporn); 458:17-24 (Soliday)), increased baggage

screening would have resulted in an expansion of its operations and workforce in the future. (Tr. 300:10-302:11 (Sporn); PX 343-011.)

**Prior to 9/11, the FAA Rejected Federalization in**
**<u>Favor of Certification of Private Screening Companies</u>**

19. The Federal Reauthorization Act of 1996 directed the FAA to certify private screening companies and study the allocation of civil aviation security responsibilities. (Tr. 439:15-441:6 (Soliday); PX 3-038 ("Reauthorization Act").) In 1998 the FAA issued a report entitled "Study and Report to Congress on Civil Aviation Security Responsibilities and Funding," analyzing, among other things, whether civil aviation security responsibilities should remain a partnership between the government, the airlines and screening companies with enhanced guidelines and increased responsibility for screening companies, and whether the responsibilities should be transferred entirely to the government. (PX 359-002.) Options for changing the system were all soundly rejected in the 1998 Report, which concluded that "a consensus exists to retain the current system of shared responsibilities. <u>The [R]eport does not recommend</u> a transfer of air carrier responsibilities to either airport operators or the Federal Government." (PX 359-006 (emphasis added).) It further concluded that, "[t]here is little support for the Federal Government's assuming all air carrier responsibilities." (PX 359-053; <u>see</u> Tr. 442:8-446:10.) In April 2000, the Associate Administrator for Civil Aviation Security of the FAA reiterated this sentiment in testimony before Congress. (DX 12, p. 23; <u>see</u> Tr. 448:21-450:8.)

20. In January 2000, pursuant to the Reauthorization Act, the FAA issued a Notice of Proposed Rule Making that contemplated an even greater role in airport security for private screening companies by being directly certified by the FAA (rather than the certification being held by the airline). (PX 3-038; PX 11; Tr. 446:16-448:3.) This FAA Rule, which was scheduled to become effective as of September 2001 (Tr. 447:23-448:15 (Soliday); 706:25-707:3 (Burke); PX 350-004), envisioned that screening companies would maintain contractual relationships with the airlines, but

that the FAA would award certificates to qualified screening companies that met certain standards and regulate those companies directly. (Tr. 206:8-211:17 (Tuero); 440:2-442:7, 450:9-452:11 (Soliday); PX 11-012-15.)

21. Huntleigh was aware of this contemplated change, and positioned itself to benefit from the increased role in aviation security that would have resulted from certification. (Tr. 60:17-23, 207:4-19 (Tuero); 231:19-234:2-18 (Sporn); see 452:3-11 (Soliday).) Certification would have eliminated smaller companies unable to withstand the certification process and opened up the market even more for larger companies like Huntleigh. (Tr. 234:2-18 (Sporn); 452:3-11 (Soliday).) It also indisputably meant that screening would remain in the hands of private screening companies who were awarded a certificate because "[i]t would be somewhat ridiculous to certify a Government agency to itself." (Tr. 441:7-20, 450:17-22 (Soliday).) Mr. Sporn and Captain Soliday confirmed that, as one of the major providers of screening services, Huntleigh had the resources and commitment to successfully complete the certification process. (Tr. 233:18-234:1 (Sporn); 451:3-452:2 (Soliday).)

22. In May 2000, Huntleigh wrote to the FAA commending the FAA's efforts and "strongly advocat[ing] joint industry government partnerships to further our mutual goal of providing a safe and secure environment for the traveling public." (PX 273-001.) The screener certification program was likewise supported by airline representatives (Tr. 450:23-451:2), and FAA employees such as Chuck Burke, who testified that screener certification was a "great" idea. (Tr. 717:24-718:10; see also Burke Dep. (2) 40:21-41:3.)

23. The Government did not adduce a scintilla of evidence that federalization was considered a realistic option prior to 9/11. On the contrary, every witness who testified on this subject at trial -- including both Huntleigh's and the Government's witnesses -- testified that they were not aware that federalization was an option that was being realistically considered (aside from the FAA's rejection of it in 1998). (Tr. 62:7-25 (Tuero); 234:19-235:13 (Sporn); 364:25-366:19 (Washington); 412:4-21 (Zicher); 429:1-16 (Soliday); 716:21-717:16 (Burke).)

24. In keeping with the understanding that screening would remain the responsibility of private screening companies who would be certified by the FAA, Huntleigh reasonably expected that it would continue to provide screening services to its airline customers under enhanced regulatory standards and overview. (Tr. 208:1-211:17 (Tuero); see 441:7-20, 450:17-22 (Soliday).)

25. Indeed, evolving legislative initiatives that were being enacted and implemented by the FAA, such as increased baggage screening and certification of private screening companies, had always led to, and would have continued to lead to, an increased amount of screening and responsibility for private companies like Huntleigh. (Tr. 61:9-13, 206:19-207:25 (Tuero); 411:16-412:3, 415: 22-25 (Zicher).)

**The Heightened Threat Environment After**
**9/11 and the Urgent Increase in Screening**

26. Plainly, the events of 9/11 significantly heightened the threat environment. They instantly created an urgent need to accelerate implementation of enhanced security measures at all airports, especially pre-board screening standards. (Tr. 64:24-65:2 (Tuero); 458:25-459:10, 509:20-510:10 (Soliday); 713:2-18, 721:11-722:11 (Burke); PX 343-012; see also Hayes Dep. 25:17-21; Moran Dep. 17:24-18:14; Kolmstetter Dep. 59:21-24.) As Captain Soliday testified,

> If one looks at the history of security screening in America, it is event driven. Because of economics, Congress will act when there is an event. [T]here's no question after 9/11 things would have accelerated, and one can justify that from an historical perspective, one can justify that from just what was going on. Congress had not acted and already the FAA was ramping up security at a very steep level.

(Tr. 510:3-10; see also Tr. 415:2-4 (Mr. Zicher testified that ". . . these tragic events for companies, such as the company we have, always bring more work.").)

27. Though many screening initiatives previously had been under consideration, or were working their way through the federal approval process, the events of 9/11 precipitated an immediate expansion of pre-board screening (Tr. 460:18-461:25 (Soliday); PX 343-012), especially for checked baggage screening, which had been progressing at a steady rate prior to 9/11 but was immediately

expedited after 9/11. (Tr. 300:10-302:11 (Sporn); 368:19-369:6 (Washington); 458:25-461:9, 499:20-501:16 (Soliday); 713:10-18 (Burke); see also Hayes Dep. 26:20-27:4 (noting immediate focus on checked baggage screening).) Anthony Washington acknowledged that deploying explosive detection systems became urgent after 9/11. (Tr. 368:19-369:22.) Indeed, Chuck Burke admitted that 9/11 had a "huge impact" on baggage screening and 100% of checked baggage was going to happen no matter what shape the ultimate legislation took. (Tr. 713:2-18; 714:5-8; see Burke Dep. (2) 79:8-80:6.)

28. Regardless of whether screening was federalized, 100% screening of checked baggage was a foregone conclusion. (Tr. 714:5-8 (Burke).) On October 17, 2001, before any decision, much less a final one, had been made to federalize screening, the FAA Administrator unequivocally vowed to achieve "100 per cent screening of every checked bag": "Before September 11, Congress gave us the initial resources to put in explosives detection technology at the largest commercial service airports. But, in today's world, we must accelerate the program. The goal for all of us must be the 100 percent screening of every checked bag. The great challenge is how rapidly can the screening equipment be produced. I can tell you that every machine that is produced will be deployed immediately." (PX 701-003 (emphasis added); see Tr. 370:5-372:25.)

**Huntleigh's Response to the Increased**
**Threat Environment and New Regulations**

29. Immediately after 9/11, the FAA issued new regulations requiring intensified passenger and baggage screening at checkpoints, continuous use of explosives detection systems to screen passengers' checked baggage, additional screeners per lane, more and different prohibited items to identify, random checks of passengers and their carry on baggage, and gate screening. (Tr. 64:24-68:2 (Tuero); 245:1-11, 248:5-16, 251:4-252:12 (Sporn); 458:25-459:10, 461:10-23 (Soliday); PX 85-002; PX 350-002.) These regulations required Huntleigh to increase the level of security it provided, and Huntleigh recruited, hired and trained thousands of additional employees to meet the added

requirements for security services.[2] (Tr. 71:18-72:3 (Tuero); 248:5-16 (Sporn); PX 112-008; see Tr. 462:1-20 (Soliday).) As Mr. Sporn testified, Huntleigh's job was to provide "safety to the flying public. . . . Without screening, the passengers cannot get to the aircraft. So from our point of view, we had to step up to the plate. Everybody after September 11 had to shoulder the burden of doing something. This was our little part, to do the best we can in those very, very difficult times for everybody in the aviation industry." (Tr. 248:5-249:5.)

30. Mr. Tuero testified that Huntleigh took its business "very serious[ly]," and quite simply, post-9/11, "[it] was no longer business as usual." (Tr. 71:11-16.) Huntleigh made the determination that, to improve turnover rates and attract employees with the necessary skill level, its employees should be paid an increased wage commensurate with the responsibility of the position, and instituted corresponding rate increases for all its screening services. (Tr. 68:19-72:18, 157:14-158:11, 211:18-213:7 (Tuero); 245:12-246:9, 251:4-252:12 (Sporn); PX 178; see also Moran Dep. 18:15-24 (agreeing that after 9/11, it was necessary for screeners to be "better paid, better trained, more educated, more sophisticated in general . . . [with the use of] more sophisticated equipment at their disposal."); Hayes Dep. 27:8-21, 28:22-29:3 (agreeing that screeners should be "better paid").) This determination is fully supported by FAA official rule-making and policy which acknowledged that: "Experience in other countries seems to indicate that higher compensation, more training, and frequent testing of their screeners may result in lower turnover rates and more effective screeners performance." (PX 11-010; Tr. 212:13-25) The Associate Administrator for Civil Aviation Security of the FAA echoed this sentiment in remarks before Congress in which he stated that the Government could influence higher pay for screeners, and thus enhance performance, "through . . . standards, that require more training and more investment in individuals who do [screening] well." (DX 12, p. 23.)

---

[2] Huntleigh personnel and Captain Soliday testified that the additional regulations necessitated more screeners, regardless of the fact that only ticketed passengers were being allowed beyond the checkpoints. (Tr. 251:4-252:12; 461:10-462:13.)

31. Huntleigh's higher rates, which were a direct result of paying screeners a competitive wage, applied across-the-board to all Huntleigh screening customers at each of its locations. (Tr. 69:2-70:2, 72:9-18 (Tuero); 249:6-250:23 (Sporn); PX 597.) Because the percentage markup received by Huntleigh, which remained constant, applied to a higher amount paid to screeners, the increase in wages, personnel, and hours billed correspondingly led to a significant increase in Huntleigh's revenues and profits. (Id; Tr. 255:1-256:7 (Sporn); PX 158.)

32. Despite some financial difficulties experienced by the airlines immediately after 9/11, the airlines continued to pay Huntleigh, as had been the case in prior years. (See Tr. 412:22-413:7 (Zicher); 429:17-430:4 (Soliday).) The airlines agreed to, and did, pay the higher rates in response to the increased demands of the new security environment and in order to comply with their statutory obligations. (Tr. 71:5-9 (Tuero); 462:21-23 (Soliday); see Tr. 413:8-414:16 (Zicher); see, e.g., PX 55-044; PX 343-012.) Indeed, there is no doubt that the airlines would have continued to pay higher rates into the future if they had remained statutorily responsible for screening, because, as Mr. Zicher testified, "In the list of services airlines require, I think [security is] No. 2, after fuel. You can't fly without it." (Tr. 413:2-5 (Zicher); see also Tr. 248:23-25, 253:9-17 (Sporn); 462:21-464:4, 428:21-25 (Soliday); PX 343-017.)

33. The Government introduced no evidence to suggest that if airlines had remained responsible for screening, they would have been unable to pay, or would not have paid, for this essential service. As Captain Soliday testified, "to argue that [the airlines] wouldn't be able to comply with [federal screening regulations] would be like to argue they wouldn't be able to do maintenance on the aircraft or they wouldn't be able to train pilots . . . I would have to back into the room at the FAA to offer [such an argument]." (Tr. 463:19-464:4.) In fact, to this day, U.S. air carriers continue to pay private screening companies to perform passenger and baggage screening at many non-U.S. airports. (Tr. 414:2-16 (Zicher).) Moreover, the airlines also currently pay the Government a mandatory fee to defray the cost of the screening services the TSA provides. 49 U.S.C. § 44940.

34. Immediately after 9/11, Huntleigh successfully responded to the increased regulations and demands. (Tr. 82:3-13 (Tuero); 254:4-255:12 (Sporn).) If screening had not been federalized, Huntleigh would have continued providing passenger and baggage screening services at these increased levels, and was poised to maintain its increased workforce and rate, and to expand its operations. (Tr. 119:4-120:11 (Tuero); see 470:19-471:19 (Soliday); 713:19-22, 714:5-715:9 (Burke); PX 343-016-17; Kolmstetter Dep. 61:9-24, 64:3-15 (a private workforce could have provided screening post 9/11 in ways that are commensurate to services provided by federal employees); Moran Dep. 70:24-72:8 (if screener standards had been increased, but federalization had not been mandated, the training to meet those standards would have been exactly the same); Hayes Dep. 46:4-8; 76:9-15 (the requisite numbers of screeners performing pre-board screening and the through-put numbers post 9/11 would be the same, whether private sector employees or federal employees were performing the screening).)

35. The Government failed to present any evidence that this heightened level of screening would not have been sustained had private companies continued to provide screening services. In fact, the Government's own expert acknowledged that following the events of 9/11, screening standards would not have returned to pre-9/11 levels (Tr. 782:2-11), a sentiment confirmed by Mr. Burke when he testified that "aviation security w[ould] never be the same as it was prior to this incident." (Tr. 721:15-19.)

**Huntleigh's 2002 Budget Presentation**

36. In November 2001, Huntleigh management created a presentation for the purposes of meeting with ICTS, its corporate parent, to review preliminary views on Huntleigh's budget for the following year. (PX 121.) The presentation was largely prepared prior to the passage of ATSA, and was based on the information available at the time. (Tr. 74:13-76:24, 77:3-81:25 (Tuero); PX 167.) At that time, Huntleigh knew that the demand for its screening services had already increased and that rate increases already had occurred. (Tr. 81:5-12, 214:8-15 (Tuero); 246:21-247:1 (Sporn).) Accordingly, the increased income in the budget attributable to screening took into account only the new contracts already received in 2001 and the increased rates charged to existing customers immediately after 9/11. (Tr. 81:5-25 (Tuero).) Huntleigh's management did not attempt to project or quantify the full potential magnitude of future increases that would result from 9/11. (Tr. 214:20-23 (Tuero); 247:2-23 (Sporn).)

37. If Huntleigh had been attempting to value itself for sale, it would have retained investment bankers to value the company and analyze and maximize that value. (Tr. 626:19-628:4 (Tregillis).) As several witnesses testified, including Messrs. Sporn and Zicher, considering the relevant facts that impacted Huntleigh's revenues and profits -- such as a vastly expanded workforce to accommodate checked baggage screening, an increase in the amount of hours worked by all screeners, higher wages, and screener certification -- Huntleigh could have expected earnings to double or triple from the projection made in the November 2001 budget. (Tr. 120:12-121:4 (Tuero); 261:22-268:4 (Sporn); see Tr. 414:17-416:12 (Zicher).) To be sure, these components could not be known with precise certainty, but they were anticipated at the time, particularly given that "the future in our business cycle is very short. We can see what is coming to us . . . ," and the future for screening companies was "a growing future in terms of revenues and activities." (Tr. 416:2-3; 10-12 (Zicher); see 262:4-268:4 (Sporn).) Even the modest, tentative budget projections for 2002 lead to a much higher value for Huntleigh than the Government acknowledges. Considering that Huntleigh expected earnings to double or triple from the budget projection (Tr. 261:22-268:4 (Sporn)), and applying the

Government's multiple of 6.8 to the projected, annualized screening EBIT (Earnings Before Interest and Taxes) (DX 18, p. 6) in the budget, reveals a value in the range of at least $138.45 million to $207.67 million. (PX 121-015.) This is consistent with Huntleigh's expert's opinion of the company's fair market value at the time of the taking. (PX 342-061.)

**<u>Huntleigh's Results After 9/11: Enormous Growth</u>**

38. Huntleigh's post 9/11 results demonstrate an immediate and profound increase in screening revenues and gross profits. For the entire <u>nine month</u> period ending September 30, 2001, Huntleigh earned screening revenues of $33.6 million and gross profits from screening of $3.3 million, or an average of **$3.7** million per month in screening revenues and **$345,555** per month in gross profits from screening. (PX 129; Tr. 546:3-547:16 (Tregillis).) In <u>October 2001 alone</u> -- the first full month following 9/11 -- Huntleigh earned screening revenues of **$10.9** million and gross profits of **$1.1** million -- approximately tripling the pre-9/11 monthly averages. (PX 129; Tr. 546:3-547:21 (Tregillis).) The enhanced numbers for revenue and gross profit witnessed during this pre-taking period continued along the same exponential path until federalization was made official in late February 2002:

| Month | Screening Revenue | Gross Profit from |
|---|---|---|
| October 2001 | $10.9 million | $1.1 million |
| November 2001 | $10 million | $1.1 million |
| December 2001 | $12 million | $1.6 million |
| January 2002 | $13 million | $2.2 million |
| February 2002 | $17 million | $5 million |

(PX 126, 129; Tr. 256:1-261:21 (Sporn); 548:25-550:15 (Tregillis).)

39. Based on the annualization of Huntleigh's October 2001 screening revenue and gross profit -- which by no means reflected the full impact of all expected changes in screening following 9/11 -- Huntleigh could reasonably have expected to earn at least $129 million in screening revenues

in 2002 (compared to $69 million in 2001) and $13.2 million in screening gross profits in 2002 (compared to $7 million in 2001). (PX 112, 129; Tr. 547:25-548:7 (Tregillis).)

40. The stellar performance of Huntleigh's screening business after 9/11 is demonstrated by the screening revenues in the fourth quarter of 2001 alone -- $35.3 million – which exceed screening revenues from the entire first three quarters of 2001 combined -- $33.6 million. (PX 112, 121-015.) Annualizing Huntleigh's fourth quarter screening revenues projects screening revenues of $140 million (compared to screening revenues of $69 million in 2001). (PX 121-015.)

**Huntleigh's Reasonable Investment Backed Expectations**

41. Prior to enactment of ATSA -- and certainly before 9/11 -- Huntleigh had every reasonable expectation that it would continue to perform screening services pursuant to its contractual relationships, and that these relationships would continue into the future, given the custom and industry practice, the legislative trends, and its own track record. (See, e.g., ¶¶ 1-35, supra; Tr. 38:3-5, 54:9-55:2, 62:7-63:20 (Tuero); 224:24-226:6; 227:20-229:6 (Sporn); see 408:23-412:21 (Zicher); 431:19-432:5 (Soliday).) Huntleigh also reasonably expected to provide expanded and enhanced services in line with existing aviation security industry trends. (See ¶¶ 15-25, supra; see also Tr. 32:25-34:7, 119:12-120:11 (Tuero); 266:7-268:4 (Sporn); 408:23-412:21 (Zicher).)

42. The prevailing view on airline security, both before and after 9/11, was that it would continue to be operated through a joint partnership between government and private screeners, as it had been for approximately 30 years prior. (See Tr. 464:5-467:2 (Soliday); PX 343-012-14.) As late as October 25, 2001, while Congress was in the midst of determining how to address the events of 9/11, the President issued an official letter approving the "public/private partnership," and expressing his opposition to federalization. (PX 625; see Tr. 467:3-21.) As late as October 2001, Huntleigh still "felt confident that federalization would not happen," even if the Government elected to modify the statutory scheme in some way. (PX 83-001; Tr. 82:20-83:18 (Tuero).) On November 1, the House of

Representatives voted down a proposal that included federalization of screening responsibilities. 147 Cong. Rec. H7781-02.

43. As Mr. Tuero testified, Huntleigh was "a company that was constantly looking to improve ourselves" (Tr. 63:24-25), and in reliance on the reasonable expectation that it would continue to improve and expand its business, Huntleigh invested capital and devoted substantial resources to enhance its infrastructure, to improve its training programs, and to expand its business in line with industry trends and increased regulation. (Tr. 63:21-64:19 (Tuero); 225:14-226:6 (Sporn), PX 122.)

**The Act Required Federalization of the**
**Private Passenger and Baggage Screening Industry**

44. Despite these expectations, on November 19, 2001 -- at the height of Huntleigh's value and to the surprise of many in the aviation industry -- the President signed the Act into law, which, among other things, created the TSA, and gave it a monopoly on pre-board passenger and baggage screening. See 49 U.S.C. § 114; 115 Stat. 597. Indeed, the Act squarely prohibits Huntleigh and any other private screening company from performing pre-board screening services pursuant to private screening contracts. See § 110(b)(2), 115 Stat. at 614. The decision to federalize civil aviation security represented a major departure from the direction in which both the industry and the Government had been moving prior to 9/11. (See ¶¶ 19-25, supra.)

45. The parties agree that November 19, 2001 is the "takings date" for purposes of this case. (PX 342-009; DX 18, p. 1.)

46. Section 110(a) of the Act required that all checked baggage be screened by explosive detection systems equipment by December 31, 2002. See 49 U.S.C. § 44901(d). Section 111 of the Act required certain enhanced criteria for screener hiring and performance standards. See 49 U.S.C. § 44935(e)-(f).

47. Section 118 of the Act provides for fees to be paid by passengers and airlines to help defray the Government's cost of providing civil aviation security services. See 49 U.S.C. § 44940.

These fees have two components, one that is charged to passengers at $2.50 per enplanement and one that is charged to the airlines, Huntleigh's former customers, in a sum not to exceed the total the airlines spent on providing security in the year 2000. Id. (See Tr. 470:6-14 (Soliday); Fiertz Dep. 16:25-20:1.) Both fees are imposed and collected by the Government. (Id.)

48. Although Section 108 of the Act anticipates the establishment of a limited number of "pilot program" airports in which private screening companies are permitted to provide screening services, and that ultimately airports may be able to "opt-out" of federalized screening, it excludes Huntleigh from participation. This section explicitly requires that for a screening company to participate, it must, among other things, be owned by a United States citizen. See 49 U.S.C. §§ 44919(g), 44920(d). Because Huntleigh is ultimately owned by ICTS, a company incorporated in the Netherlands (DX 8, p. 9), Huntleigh is not eligible to participate in any program permitting the return of screening to the private sector. (DX 8, p. 4.)

**The Government Implemented a Federal Monopoly Over Passenger and Baggage Screening, Eliminating Huntleigh's Business**

49. Because of the Government's impending take-over of security functions, all of Huntleigh's airline screening contracts were cancelled. (Tr. 83:19-85:3, 216:1-24 (Tuero); 347:2-13 (Washington); see, e.g., PX 61.) Indeed, the Government's planned assumption of screening responsibility contemplated that the airlines would cancel their existing screening contracts. (Tr. 347:2-13 (Washington), PX 292-003.)

50. As a first step towards implementing the Act, the Government entered into a letter contract with Huntleigh, pursuant to which Huntleigh temporarily provided, in return for payment, screening services on behalf of the Government at certain locations, including Huntleigh's existing checkpoints. (PX 362; Tr. 343:25-344:17 (Washington).) Huntleigh was later awarded several locations formerly staffed by Argenbright (Tr. 267:6-23 (Sporn); PX 362-039), another private screening company that was prevented from providing screening services based on, among other things,

certain well-publicized charges brought against it prior to 9/11 for hiring felons and various security lapses. (Tr. 719:12-721:6, 724:7-12 (Burke); 634:17-20 (Tregillis).)

51. While the newly-formed TSA hired and trained its workforce -- many of whom previously had been employed by Huntleigh and other private screening companies -- Huntleigh temporarily provided screening for the Government. (Tr. 91:13-93:23 (Tuero); see PX 616.) During the summer and fall of 2002, the Government, with little or no advance warning, federalized Huntleigh's airport locations one by one, removed its screeners from the checkpoints, and prevented Huntleigh from performing under its private screening contracts. (Tr. 88:25-97:12 (Tuero); PX 138; PX 367.)

52. By November 2002, the Government had fully implemented its nation-wide screening monopoly and every checkpoint for which Huntleigh had a contract to provide screening services became staffed by employees working on behalf of the TSA. (Tr. 97:3-12 (Tuero).) As a direct and intended result of the Act, Huntleigh has been legislatively precluded from providing the checkpoint passenger and baggage screening services that were the core of its business and receives no revenues from the provision of these services. (Tr. 97:16-98:4, 103:9-20, 118:23-119:11 (Tuero); 268:11-25 (Sporn).)[3]

**Huntleigh's Non-Screening Services**

53. Historically, Huntleigh also offered certain non-screening services, such as skycap services, in order to provide ancillary airport support needs to its airline customers. (Tr. 30:20-23 (Tuero); 229:7-10 (Sporn); see, e.g., PX 110-008, PX 112-007.)

54. Huntleigh's non-screening services were fundamentally different in a number of important respects from its screening business. (Tr. 229:7-231:18, 269:4-19 (Sporn).) Screening was a

---

3 Although Huntleigh continues to provide a few services labeled as "screening," these services are not similar in scope or substance to Huntleigh's pre-board passenger and baggage screening operations prior to federalization. (Tr. 103:21-104:25 (Tuero); 272:9-274:3 (Sporn).)

distinct security function that involved, among other things, protecting planes and passengers by screening travelers and their carry-on baggage for weapons and other prohibited items and detecting explosive devices in checked baggage. (PX 343-005-6.) The screening employees were required to meet strict regulatory requirements, including hiring criteria, experience, background checks and training and those employees were continuously monitored for compliance with the regulatory scheme. (Tr. 229:11-230:9 (Sporn); PX 2.) Huntleigh trained and employed a separate workforce to handle these sensitive, security-related tasks and accordingly paid workers a higher wage. (Tr. 230:10-231:2 (Sporn).)

55. By contrast, lower level non-security functions (e.g., skycaps or wheelchair operators) were performed by different employees who were not subject to the regulations in 14 C.F.R. part 108 and who received less training. (Tr. 229:11-22 (Sporn).) As Mr. Sporn testified, Huntleigh was a "security company. . . . So we tried very hard to get the screening business. Nonscreening, if it was there, we picked it up as part of the package, so to speak…." (Tr. 231:8-15.)

56. Huntleigh's screening and non-screening businesses also were different from a financial and strategic perspective. (Tr. 231:3-18 (Sporn).) Huntleigh maintained separate statements of earnings for these two businesses, given the unique earning implications for each. (See, e.g., PX 128-023-795.) The non-screening services were unprofitable, low margin services that were bundled together with Huntleigh's profitable screening operations in order to make the Company's overall bid packages more attractive. (Tr. 269:23-271:14 (Sporn).) The low margins made non-screening an untenable business on its own. (Tr. 32:2-7, 98:1-22, 32:24-34:4, 98: 23-100:2 (Tuero); 231:3-18 (Sporn).) Huntleigh's internal accounting allocated the majority of fixed costs to Huntleigh's vastly more successful screening operations. (Tr. 269:23-271:14 (Sporn).)

57. Removing the screening business from Huntleigh reveals the unprofitable nature of providing non-screening alone. (Tr. 270:20-271:11 (Sporn).) Huntleigh has operated at an ever-increasing financial loss since its screening operations were taken in 2002. (Tr. 97:16-98:4 (Tuero).)

In 2003, excluding a one-time non-operational credit stemming from the reversal of a reserve taken the previous year, Huntleigh operated with extensive losses. (Tr. 105:1-23, 106:14-108:2 (Tuero); PX 116.) For the years 2004 and 2005, Huntleigh suffered pretax losses of $1,381,000 and $1,792,394.56, respectively. (PX 116-004; PX 117-003-4.) Even after adjusting for certain tax credits, the losses for 2004 ($1,125,000) and 2005 ($1,152,189.62) were significant. (PX 116-004; PX 117-004; Tr. 108:3-109:15 (Tuero); 275:8-17 (Sporn).) In the first five months of 2006, Huntleigh sustained pre-tax losses of $648,152.58 and a net loss of $478,350.76, and it will record a loss at year end. (Tr. 276:6-14 (Sporn); PX 119-003.) When the unavoidable fixed costs for the remaining non-screening business in 2003 and 2004, respectively, are applied to the 2001 screening revenue, it demonstrates that non-screening alone simply was not viable. (Tr. 519:1-520:15; 590:17-594:15 (Tregillis).)

58. At the time it was acquired by ICTS, Huntleigh had, for accounting purposes, attributed a certain percentage of its goodwill balance to screening. (PX 110-005; 112-09.) By the end of 2002, when Huntleigh had been precluded from performing any screening, Huntleigh acknowledged that "[t]he goodwill balance of the Company is considered to be <u>entirely related to the Company's screening operations</u>." (PX 113-010 (emphasis added).) As a result, the carrying value of the goodwill was reduced to zero, "essentially due to the fact that all locations were transitioned to the U.S. Federal government as of November 19, 2002, and the Company's previously existing airport security screening services have ceased." (<u>Id.</u>)

59. In an attempt to salvage what little remained of the Company, beginning in 2002, Huntleigh implemented a comprehensive and "aggressive" plan to lower operational expenses, with little impact on Huntleigh which "still . . . continued to lose money." (Tr. 271:16-272:8 (Sporn); <u>see</u> 100:3-9 (Tuero).) Following the termination of its screening operations, Huntleigh attempted to diversify and offer new services, including entering cruise line security. (Tr. 100:10-101:11 (Tuero).) However, efforts at diversification met with no success. (<u>Id.</u>; Tr. 102:6-11 (Tuero).)

60. Understanding it had no future as a standalone airport services company, beginning in 2002, Huntleigh tried on numerous occasions to attract potential purchasers -- participating in many meetings and negotiations with potential buyers -- with no success. (Tr. 109:21-114:1 (Tuero).)

61. In 2005, Huntleigh's failed efforts at a sale culminated in an offer by Mr. Tuero, who had since left Huntleigh. (Tr. 114:2-25.) Mr. Tuero offered to acquire the Company for nothing other than the outstanding accounts receivable Huntleigh was able to collect and remit to its ultimate parent company, ICTS because, as Mr. Tuero explained, "there was not a value to the company at the time." (Tr. 116:1-117:2.) Huntleigh has been unable to market and sell itself to a willing buyer at any price. (Tr. 277:19-22 (Sporn).) The Government offered no contrary evidence.

**The TSA Assumed the Responsibilities of Huntleigh's Screening Contracts as Contemplated By the Act**

62. Because screening services previously had been provided by private companies pursuant to private contracts, the Act expressly recognizes that federalization of screening could require the Government to displace screening companies by assuming the "rights and responsibilities" of those screening contracts, and provides that if the Government did so, it would be required to pay "adequate compensation" to the parties. See § 101(g)(2), 115 Stat. at 603-04. The legislative history of the Act explained the Act's mandate: "The Conference Report requires the DOT to assume existing screening company contracts as soon as possible." (PX 700-013; Tr. 359:12-362:10.)

63. Immediately following the passage of the Act, the predecessor to the TSA created "Go-Teams" dedicated to effectuating the terms of the Act. (Tr. 318:10-17 (Washington).) An internal Go-Team memorandum reveals the TSA's contemporaneous understanding of the Act: "Charge: the Act requires the TSA to assume air carriers' screening company contracts early in 2002." (PX 292-001; see Tr. 333:9-15.) Since the agency understood that the Act essentially required the assumption of the rights and responsibilities of the screening companies' contracts, the only question for the TSA was how to effectuate that mandate. (Tr. 327:8-328:6, 331:18-332:10 (Washington); PX 291-001; PX 292.)

The TSA chose to assume the rights and responsibilities of the screening contracts through a legal "mechanism" -- terminating those contracts and replacing them with temporary interim contracts in February 2002, as an intermediate step to physically taking control at the airports as required by the Act and completing its charge of assuming the rights and responsibility of the screening contracts. (Tr. 335:18-25, 340:7-342:22, 343:25-344:17 (Washington); PX 291-001; PX 292-002.)

64. Any doubt that the TSA did not view the "mechanism" of the interim contracts as different from the "assumption" under the Act -- which mandated compensation -- is dispelled by its own statements to the Congress which made no such distinction. In January 2002, John Magaw, then Under Secretary of Transportation for Security at the TSA, testified to Congress that: "On February 17 less than a month from today the TSA will take over the aviation screening responsibility that has been the airlines' up until now by assuming the airline screening contracts and equipment that provide passenger screening at the Nation's airports." (PX 297-003 (emphasis added); see Tr. 351:17-352:5 (Washington).) Before making these statements to Congress, the accuracy of the testimony would have been ensured. (Tr. 351:2-10 (Washington).)

65. Subsequent reports by the TSA to Congress confirm the TSA's assumption of screening contracts. On March 31, 2003, the TSA again acknowledged that private screening contracts were assumed, pursuant to the Act, as an essential part of the process of federalizing airport security functions nationwide:

> As required by [the Act], on February 17, 2002, TSA took over the responsibility for civil aviation security functions from [the] FAA and approximately 1400 FAA aviation security personnel became the core workforce of the TSA. That same day TSA assumed the airlines' passenger screening company contracts and all equipment used to perform passenger screening at the Nation's airports. This was the first step toward the required hiring, training and positioning of Federal security screeners at all U.S. airport screening checkpoints, achieved on November 18, 2002, as required by law.

(PX 298-010 (emphasis added).)

66. This report to Congress was thoroughly vetted within the agency, underwent "extensive revisions," and was circulated to "TSA Executives" and within the "Department." (PX 391; see Tr.

352:23-353:9 (Washington).) The Report was presented to Congress in final form on March 31, and the exact language quoted above was specifically focused on and viewed as important enough to be moved from page 31 of the draft up to page 10 of the final presentation. (Id.; Tr. 356:13-19 (Washington).)

67. Mr. Washington, a former FAA lawyer who was recruited to work for the newly-formed TSA and was involved in determining how the Government was going to take over airport screening (Tr. 313:14-315:3), and who served as the Government's representative at trial, agreed that the TSA assumed the passenger and baggage screening responsibilities of the screening contracts. (Tr. 334:15-335:2; 340:7-342:22; see Washington Dep. 85:9-17.) Indeed, in February 2003, Mr. Washington echoed the conclusions stated in the legislative history of the Act, the subsequent Go Team meetings (of which he was a member (Tr. 318:15-17)), Mr. Magaw's statement to Congress, and the later statements made by the TSA to Congress, when he wrote to Mr. Tuero at Huntleigh and stated the "TSA assumed responsibility of the screening contracts . . . ." (PX 289.)

68. At the time the TSA implemented ATSA, and in the years afterwards, it made no distinction between assuming the rights and responsibilities of the screening contracts through the direct assumption of existing contracts, or through the "mechanism" of entering into new, short term contracts. (Tr. 359:12-18 (Washington).) It should not be allowed to create an artificial and legally unsupportable distinction now in a transparent effort to avoid compensating Huntleigh.

**Huntleigh's Value Was At Least Between $151 and $201 Million**

69. According to the expert report of Christian D. Tregillis, Huntleigh's damages expert, and Mr. Tregillis's trial testimony, the value of Huntleigh's screening business that was taken -- i.e., the value of its contracts -- as of November 19, 2001 was between $151 and $201 million. (PX 342-060; Tr. 517:1-14; 578:14-22.) The fair market value of Huntleigh's screening business immediately after the taking was effectuated was zero. (PX 342-009; Tr. 517:24-519:11.)

*Huntleigh's Expert Properly Considered The*
*Impact of Major Industry Changes on Huntleigh's Value*

70. Because Huntleigh operated in an industry that was experiencing monumental change, Mr. Tregillis considered Huntleigh's value in light of the changes to the screening industry and Huntleigh's financial results brought about by 9/11. (Tr. 342-007; Tr. 536:12-14; 537:6-24.) In valuing Huntleigh's screening business, Mr. Tregillis valued Huntleigh's ongoing screening contracts. (Tr. 578:14-22.) In so doing, Mr. Tregillis took into account all factors that might have been afforded substantial weight by a buyer and seller, including: interviews with Huntleigh's officers; Huntleigh's history of growth in its screening contracts, rates and financial performance; the expanding nature of the pre-board passenger and baggage screening industry in the U.S.; Huntleigh's pre-taking plans to enhance significantly the services it provided; the trend towards industry consolidation; Huntleigh's customer base; Huntleigh's ability to finance its expanding operations; and various risks, including general industry risks and certain risks specific to Huntleigh. (See PX 342, PX 343, PX 600; Tr. 534:24-536:17; 567:6-569:9; 646:23-647:11; 654:8-655:4 see also ¶¶ 1-43, supra.)

71. In reaching his valuation conclusions, Mr. Tregillis also took into account the sea change in the screening industry precipitated by 9/11, the resulting increase in demand for Huntleigh's services, and how the screening industry would continue to evolve in the future. (Tr. 539:15-540:24.) The passenger and baggage screening industry is largely event-driven, and the aviation security industry in the U.S. had never witnessed an event of such historical significance. (See ¶¶ 26-28, supra; Tr. 532:17-533:3 (Tregillis).) Immediately following the 9/11 attacks, the FAA introduced a number of directives that significantly enhanced security screening requirements, and which required a much larger workforce to carry out. (See ¶¶ 29-31, supra; PX 342-006.) Mr. Tregillis observed that the events of 9/11 accelerated the implementation of other, already-contemplated security measures, such as the screening of 100% checked baggage. (See ¶¶ 26-28, supra; Tr. 539:15-540:24; 653:4-15.)

72. Mr. Tregillis also observed that the events of 9/11 directly impacted Huntleigh's workforce and resulted in an increase in personnel, wages, and rates which led to a corresponding increase in revenues and profits for Huntleigh. (Tr. 539:15-543:19; PX 342-006-7.) He studied these actual results and concluded they demonstrated significant growth before the takings date, a trend which continued while Huntleigh was still providing its services to its airline customers until February 2002. (See ¶¶ 38-40, supra; Tr. 539:15-540:24; 555:16-556:9; PX 342-007.) Huntleigh's growth trends -- both before and especially after 9/11 -- inform and underlie Mr. Tregillis's analysis and his valuation approaches. (See Tr. 599:1-600:6.)

73. In performing his analysis, Mr. Tregillis also considered post-taking information to corroborate the reasonableness of expectations as of the takings date. (Tr. 555:4-556:9, 587:6-10).[4]

74. Consistent with the need to compensate Huntleigh for the fair market value of its property assuming no federalization, Mr. Tregillis held the risk of federalization constant. As he explained at trial, factoring in an ever-increasing risk of federalization post 9/11 and pre-ATSA would defeat the very purpose of a takings claim by allowing Huntleigh's value to be "taken" indirectly -- it would penalize Huntleigh progressively in the weeks leading up to the final enactment of the Act, effectively resulting in a death by a thousand cuts. (Tr. 619:7-25; 615:10-616:4.)

75. In reaching his conclusions about the value of Huntleigh's screening business that was taken, Mr. Tregillis applied two commonly accepted valuation techniques -- the income approach and the market approach. (PX 342-011-023.) Both approaches are based on, and reflect, all relevant information available to a hypothetical buyer as of the takings date. (Tr. 534:22-536:14 (Tregillis).)

---

4 Mr. Tregillis noted that performing a valuation in the context of a litigation differs from valuations outside the litigation context in one basic respect. (Tr. 678:3-21.) When valuing a company for the purposes of litigation -- which, unlike a valuation prepared in a real-time business context, is a post hoc exercise -- the expert has actual data points available to confirm his valuation.

*Application of the Income Approach*
*To Determine Huntleigh's Fair Market Value*

76. The income approach projects the future income of the company and discounts that future income stream to present value using an appropriate discount rate. (Tr. 522:8-524:21 (Tregillis).) The income approach is based upon the economic principle of anticipation: the earnings that are anticipated or expected to be generated by the business. (Id.; see also Tr. 527:5-11 (Tregillis).) In this case, Mr. Tregillis used standard methods to project Huntleigh's screening income into the future and then discount those future cash flows back to their present value as of the takings date. (Tr. 565:20-567:5.)

77. Mr. Tregillis started with Huntleigh's basic business model for screening services. Huntleigh billed its airline customers at an agreed upon hourly rate, multiplied by the actual number of hours worked by screening personnel. (Tr. 541:5-23; 555:2-15; PX 342-005.) Profit was arrived at by subtracting from income the wages paid to screeners (variable costs) and Huntleigh's infrastructure costs (fixed costs). (Id.)

78. In performing his analysis, Mr. Tregillis understood that a willing buyer would have considered and estimated the number of hours that Huntleigh screeners could be expected to work in the future. (PX 342-017.) Mr. Tregillis observed that after 9/11, Huntleigh already had hired thousands of new employees who were providing enhanced services, and that this necessarily increased the number of hours Huntleigh billed. (See ¶¶ 29-30, supra; Tr. 541:24-543:19; PX 342-007.) He also observed the surge in post-9/11 income and profits caused by these events. (See ¶¶ 38-40, supra; Tr. 539:15-543:19; PX 342-006.) Recognizing that this trend would continue, Mr. Tregillis derived the first component (the amount of expected hours Huntleigh's screeners would work) from the actual hours worked by the TSA. (Tr. 555:12-15.) These hours corresponded to the growth in demand for Huntleigh's screening services post-9/11, which a hypothetical willing buyer could reasonably have expected at the takings date.

79. In determining Huntleigh's wage costs, Mr. Tregillis applied the wage rate paid by Huntleigh to its screening employees in 2002, a time when Huntleigh continued to perform the same screening functions at the same locations it had in November 2001. (Tr. 555:16-556:9.) He applied a growth rate to the wage figure of 5% per year, based on reasonable expectations of future wage increases. (Id.)

80. To determine the markup on costs (Huntleigh's profit margin), Mr. Tregillis considered the possibility that Huntleigh might continue to provide services to airlines or might provide screening services to the Government. (Tr. 557:24-558:22.) Mr. Tregillis reviewed the FAA's pricing handbook, which emphasizes that a negotiated profit margin should be "fair and reasonable" to both parties; a 12% profit margin was given as an example of such a negotiated margin. (Tr. 559:1-561:4; 561:20-562:13; PX 570-002, 028.) Mr. Tregillis then applied three different profit margins of 9%, 10% and 12% to Huntleigh's wage costs. (PX 342-016.)

81. To ensure that his results were reasonable, he then compared these markups to the actual costs incurred by the TSA in providing screening, as well as to the rates charged by private screening companies participating in the pilot screening programs. (Tr. 562:22-565:19; PX 342-051.) Mr. Tregillis found that under each of his three profit margin scenarios, the total expected cost charged by Huntleigh was lower than the cost incurred by the TSA or the cost charged by the companies participating in the pilot program. (Id.) This was explained by the fact that Huntleigh operated more efficiently than the TSA and the other private screening companies. (Tr. 564:14-565:19; 575:23-576:11 (Tregillis).)

82. After determining Huntleigh's screening revenues, Mr. Tregillis then assumed that Huntleigh would have incurred greater fixed costs than it had incurred pre-9/11. Accordingly, he considered the fixed costs incurred by the TSA. (Tr. 556:10-557:17; PX 342-052.) Finally, he applied a discount rate of 26% to convert the future stream into a value as of November 19, 2001. (Tr. 566:2-

569:9.) In Mr. Tregillis's opinion, this discount rate was very high (i.e. conservative), which lowered the present value of Huntleigh's future income stream substantially. (Tr. 567:6-568:1.)

*Application of the Market Approach*
*To Determine Huntleigh's Fair Market Value*

83. Mr. Tregillis also assessed Huntleigh's fair market value at the time of the taking using the market approach. (PX 342-002-22.) Pursuant to the market approach, a company's value is assessed by considering transactions involving similar businesses operating in the same market environment, and deriving a "multiple" based on the relationship between the revenue or profits of that company and its sale price. (Tr. 525:7-526:23, 569:10-573:6.) This multiple is then applied to the revenue or profits of the relevant company to determine its fair market value. (Id.)

84. Mr. Tregillis derived his multiple from five different transactions involving companies that provided aviation security services. (PX 342-020-022.) While those transactions showed EBITDA multiples of 8.02, 10.53 and 11.90 and revenue multiples of 0.17, 1.23 and 1.24, Mr. Tregillis selected EBITDA multiples of 5 and 7 and revenue multiples of 0.5 and 0.8 -- all of which are below the average multiples suggested by the comparable transactions. (PX 342-058; Tr. 663:13-664:18.) He then applied these multiples to Huntleigh's projected EBITDA and revenues, and averaged the results (in order to control for potentially inaccurate numbers) to determine a value of Huntleigh's screening business as of the takings date. (PX 342-058; Tr. 571:21-573:6.)

85. The market approach is constrained by the need to find comparable transactions occurring in similar market conditions. See Pratt, Valuing a Business (PX 572-114). Given the absence of similar transactions involving airline security companies immediately after 9/11, the available multiples do not reflect the drastically changed market caused by 9/11. (Tr. 532:17-533:17.) Mr. Tregillis accounted for the market effects of 9/11 by applying the available multiples to Huntleigh's projected revenues as determined by him under the income approach. (Tr. 526:9-23, 664:3-667:20.) This is an accepted approach where an appropriate multiple -- one that reflects a

significant change in an industry -- cannot be derived with sufficient accuracy. See Pratt, Valuing a Business, (PX 572-145); Id. ("Since merger and acquisition transaction dates almost always differ from the subject company effective valuation date, adjustments often are needed to reflect differences in economic and industry conditions between the dates.") (PX 572-162).

*Mr. Tregillis's Conclusions*
*As To Huntleigh's Damages*

86. Under the income approach, Mr. Tregillis concluded that the fair market value of Huntleigh's screening business was in the range of $97.5 million to $129.8 million as of the takings date. (PX 342-060.) Applying the market approach, Mr. Tregillis arrived at a fair market value of Huntleigh's screening business in the range of $204.7 million to $272.7 million. (Id.) He then averaged the two approaches and concluded that Huntleigh's fair market value at the takings date was between $151 million and $201 million. (Id.) Applying a pre-judgment interest rate of 2.31% to these figures (or an interest factor of 1.12), Mr. Tregillis concluded that Huntleigh's total damages are between $169,206,809 and $225,343,663. (PX 342-061.) If Mr. Tregillis had relied only on the market approach, the value of Huntleigh's screening business would have been substantially greater. (Tr. 521:14-522:4; 576:12-21.)

87. Mr. Tregillis testified that the higher end of his damages range was "extremely supportable" due to his conservative approach to Huntleigh's valuation. (Tr. 586:5-587:13.) Mr. Tregillis applied a very high discount rate (26%) to Huntleigh's future revenue stream under the income approach; he used multiples that were significantly lower than those derived from comparable transactions in applying the market approach; and, apart from the addition of the Argenbright locations,

Mr. Tregillis did not factor in sustained growth, despite Huntleigh's demonstrated ability to acquire new contracts and increase market share.[5] (Tr. 584:24-587:13.)

**The Government's Assessment of Damages**

88. At the summary judgment hearing, shortly before trial, the Government acknowledged that it was having second thoughts about calling a damages expert. (S.J. Tr. 27:20-23.)

89. The testimony of Peter Phalon explains the Government's reluctance to call him. In reality, Mr. Phalon was forced to admit he was providing "litigation support" in the guise of an expert opinion -- a wolf in sheep's clothing. (Tr. 774:19-775:3 (Phalon).) In keeping with his role, his flawed report and skewed testimony abound with hallmarks of impartiality and unsound reasoning -- all for the purpose of conforming to the Government's litigation objective to lower Huntleigh's value.

*Mr. Phalon Failed to Follow His Own Recommended Practice*

90. Mr. Phalon applied only one valuation approach: the market approach. (Tr. 839:24-840:11.) He is well aware, however, that the use of multiple valuation approaches is the correct and accepted way to value a business. In testimony under oath in another case in this Court, Mr. Phalon criticized another expert for relying on only one valuation method, as the use of only one method could "bias the results":

> [T]he fact that it completely ignored the market approach results in an implication on the value and could bias the results. . . . My partner likes to say I'd rather be riding a bicycle rather than a unicycle, and tricycle rather than a unicycle, because each approach provides stability to the value conclusion that is being reached.

(See testimony provided by Mr. Phalon in Landmark Land Co. v. United States, No. 95-502C, Fed Cl., on behalf of the Government (PX 288A-024-25); Tr. 838:18-840:11 (Phalon).) Despite his professed practice of riding a tricycle, Mr. Phalon chose a unicycle in this case. After observing that "Huntleigh's revenue nearly doubled between the third and fourth quarter of 2001," (PX 243-006), Mr.

---

[5] The addition of the Argenbright locations increased Huntleigh's revenues by approximately 12%. (Tr. 655:14-19 (Tregillis).)

Phalon was aware that using an income approach would have undermined the Government's attempt to avoid damages, so he compliantly skewed his report and testimony to help the Government contend that Huntleigh was not damaged by the confiscation of its profitable screening business at the height of its value.

*Mr. Phalon Violated Ethical Standards,*
*Which He Misrepresented in His Report*

91. Tellingly, Mr. Phalon did not even attempt to reconcile his results with an income (or discounted cash flow) approach, nor did he attempt to provide the ethically obligatory explanation of why a second or third approach was not employed. (Tr. 809:20-810:2; 811:15-21.) This failure represents a clear violation of the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. (See DX 18, p. 12.) Standards Rule 10-2(a)(ix) states that "The content of an Appraisal Report must be consistent with the intended use of the appraisal and, at a minimum . . . summarize the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the market approach, asset-based (cost) approach, or income approach must be explained." (PX 704-001-2 (emphasis added).) Nonetheless, Mr. Phalon offered no explanation for why he only used the market approach to the exclusion of the income approach (which would have led to a much higher valuation of Huntleigh). (Tr. 843:5-844:18.) In his report, Mr. Phalon attempted to obfuscate this ethical breach by falsely certifying that that he had complied with these industry standards. (See ¶¶ 10-14, supra; Tr. 842:21-844:15.)

92. The single valuation method Mr. Phalon employed -- the market approach -- relied upon only one multiple, derived from one transaction: the purchase of Huntleigh by ICTS that was negotiated in 1998. (Tr. 739:1-740:8 (Phalon); DX 18, p. 2.) Mr. Phalon attempted to justify this multiple on the grounds that Huntleigh's business as of November 2001 "was pretty close to the same" as it was in 1998 and that "the business operations were reasonably consistent" with historical operations. (Tr. 742:14-23.) In truth, as Mr. Phalon conceded (Tr. 847:4-13), and as the evidence at

trial unequivocally established, between 1998 and 2001, Huntleigh's business mix shifted heavily toward the more profitable screening business, and its revenues and gross profits grew substantially. (PX 252; 275.)

*Mr. Phalon's Conclusions Are Fatally Flawed*
*Due to His Reliance on Historical Earnings*

93. Given the undisputed and overwhelming evidence of the enormous impact of 9/11 on the screening industry, the one thing that is absolutely clear is that Huntleigh's historical earnings before 9/11 do not reflect its post-9/11 earnings or the company's value. Nevertheless, Mr. Phalon applied this outdated multiple to an annualized EBIT figure of $2,326,745 based solely on Huntleigh's historical financial performance for the ten months ending October 31, 2001. (Tr. 733:12-24; 808:14-810:2; PX 572-033; DX 18, p. 7.) Given that this ten-month figure only included one-and-a-half-months of post-9/11 data, Mr. Phalon's backward-looking analysis suggests that Huntleigh's future, post-9/11 performance would be consistent with its pre-9/11 record. (Tr. 782:2-6.) This model completely fails to provide a fair market value of Huntleigh's screening business as of November 19, 2001.

94. Mr. Phalon acknowledged that the concept of value is inherently forward-looking, and that projections of future earnings must be made when valuing a company. (See Tr. 807:5-8 ("I believe that historical earnings are not what a buyer is buying. Historical earnings are relevant in thinking about what they might expect the future earnings to be."); 807:11-16 ("I believe that historical earnings are relevant information but that the future earnings are what's being purchased."); 807:21-24 ("Q. The next sentence says, 'Value, under any plausible theory of capitalized earning power, is necessarily forward-looking.' Is that also right? A. Correct.").) He also admitted that when applying a purely historical approach, as he did, the historical data must be adjusted to reflect future expectations. (Tr. 808:14-18.) Mr. Phalon, however, made no projections about Huntleigh's future earnings, nor did he adjust his historical model to take into account future expectations of any kind.

(Tr. 808:14-810:2; PX 572-033.) Mr. Phalon's market approach began and ended at Huntleigh's financial results from January 2001 to October 31, 2001, with no adjustment to reflect Huntleigh's true future value in the new post 9/11 world.

95. Mr. Phalon knew full well that any basic value of Huntleigh had to analyze the impact of 9/11 on its business. Even before Mr. Phalon was retained by the Government to "support" its litigation objective, he knew the importance of assessing the impact of 9/11 on Huntleigh's value and promised that his analysis of damages "will include evaluating the impact of the September 11, 2001 terrorist attacks on the economy and the airline industry" and will "analyze industry information to determine how changes in the industry were impacting Huntleigh regardless of the passage of the Act." (PX 335-002) (emphasis added). Not only is Mr. Phalon's expert report bereft of any of the promised analysis, the impact of 9/11 -- an admittedly critical aspect of Huntleigh's value -- is not even referenced in the report at all. (Tr. 793:20-794:4 ("I did not present in the report discussion of the specific events of 9/11 or discussion specifically as to how that would change particular characteristics.").)

96. Indeed, Mr. Phalon's refusal to take 9/11 into account certainly was not because Mr. Phalon was oblivious to the positive impact 9/11 had on Huntleigh's earnings and value. The documentary evidence -- unexplained by the Government -- proved beyond doubt that Mr. Phalon was acutely aware that Huntleigh's income surged as a direct result of 9/11. (See PX 243-006.) The evidence shows that when Mr. Phalon saw the surge in revenues and profits and Huntleigh's significantly enhanced value following 9/11, instead of assessing its impact on Huntleigh's value he sought out the Government's litigation counsel to explain to him why Huntleigh's revenues and profits had grown so considerably during this time. In an e-mail dated December 8, 2005 to Mr. Chadwick, Mr. Phalon inquired:

> My real question is that if nothing changed immediately following 9/11, why did Huntleigh's revenue nearly double between the third and fourth quarter of 2001. They

> must have been asked to do something differently. Who asked them – the airlines or TSA? What were they asked to do different[] or why were they paid more?

(PX 243-006.) The obvious and realistic answer to Mr. Phalon's "real question" -- that the doubling of Huntleigh's revenue in the fourth quarter of 2001 was caused by the heightened threat environment after 9/11 -- was studiously omitted by Mr. Phalon from his report to avoid the dramatic increase it would have on Huntleigh's fair market value.

97. At trial, Mr. Phalon acknowledged that 9/11 caused a significant change in the market for screening services which was evident even before, and immediately after, the takings date. (Tr. 780:14-15; 820:7-17.) He recognized that:

- Soon after 9/11, Huntleigh instituted a "significant" rate increase. (Tr. 785:21-786:1.)
- 9/11 generated a higher demand for passenger and baggage screening services, such as the screening of checked baggage. (See Tr. 758:21-22 ("I certainly agree that the demand for passenger screening would have increased after 9/11."; 801:18-802:5.)
- Huntleigh's revenues and profit margins increased substantially in October and November 2001. (Tr. 781:23-782:1; 785:22-24; 815:3-6.)
- The trend of increased revenues and increased profits that began in October and November 2001 continued for the following months during which Huntleigh continued to provide screening to its existing airline customers. (Tr. 784:10-14, 816:4-8.)

Nevertheless, Mr. Phalon took none of these factors into account in assessing Huntleigh's fair market value; he assumed away the impact of 9/11 and valued Huntleigh as if 9/11 had never happened.

98. In trying to rationalize his refusal to account for 9/11, Mr. Phalon was forced to advance the outlandish position that he, a business valuation expert, a senior member of the American Society of Appraisers and a chartered financial analyst, was unable to assess the impact of 9/11 on Huntleigh's future prospects. (See Tr. 780:14-19 ("I knew that there was significant change going on in the screening industry. I do not know and am not able to project what would have happened in the screening industry but for the passage of the Act. . . . I wasn't able to do it."); 804:3-6 ("I believe the uncertainties that existed at the time make projecting the financial results of Huntleigh after 2002 and beyond it just a guess, and therefore I would rather not do the valuation based on that guess."), 836:1-3

("To make a projection of what Huntleigh's profitability would be post-Act, I determined that I couldn't do with any reliability.").)[6]

99. In truth, Mr. Phalon was not unable to assess the impact of 9/11 on Huntleigh's prospects, he was unwilling. Any doubt is dispelled by his failure to use Huntleigh's pre-taking Huntleigh budget for 2002 on which the Government placed great reliance in its Motion for Summary Judgment, claiming it provided "a uniquely valuable snapshot of Huntleigh's financial expectations after September 11, 2001." (Gov't S.J. Br. at 23.) To be sure, the budget was by no means a complete and accurate projection of Huntleigh's expected revenues in the post-9/11 environment (see ¶¶ 36-37, supra) but could have served as a floor for Mr. Phalon's future income analysis -- and would have led to a far greater value of Huntleigh than that reached by Mr. Phalon (a value of approximately $69 million, a figure substantially higher than his value of $15.8 million). (PX 121-015, 17.)

100. At trial, when confronted with the blatant flaws in his methodology and report, Mr. Phalon abandoned his methodology and sought to replace it with a valuation approach newly-minted on the witness stand -- claiming that the "best evidence" of Huntleigh's value at the takings date "was the stock-market value of ICTS." (Tr. 821:25-825:2.) Not surprisingly, this "best evidence" failed to find its way into Mr. Phalon's expert report. (Id.) In all events, this newly contrived approach quickly proved untenable because, as Mr. Phalon conceded, it ignores the fact that the ownership structure of ICTS in 2001 was such that it was effectively controlled by a single individual, leading to deep discounts for lack of marketability of the stock and the inability of investors to gain control. (Tr. 824:13-24 (Phalon); see also 616:5-15 (Tregillis).)

---

[6] Mr. Phalon did not even attempt to assess the indisputable impact of 9/11. Indeed, the list of "primary reliance documents" in his report contains only one document identified by Mr. Phalon as relating to 9/11 and informing his view as to the effects of 9/11 on Huntleigh and the airline industry -- a news article posted on the website www.union-network.org. (Tr. 796:8-800:9.) Moreover, apart from consultations with Mr. Chadwick and Mr. Washington, a TSA lawyer, Mr. Phalon did not consult, or even contact, anyone in the airline industry or anyone involved in airline security. (Tr. 794:5-795:16.)

101. In short, Mr. Phalon made the subjective determination to ignore all empirical evidence available as of the takings date regarding the impact of 9/11 on the screening industry, and instead applied a purely historical approach -- which he knew was wrong. Mr. Phalon has been criticized for replacing empirical data with subjective analysis before. See Robertson v. United States, No. Civ.A 03-CV-2113, 2006 WL 302302, at *6 (N.D. Tex. Jan. 13, 2006) ("By contrast, Mr. Phalon used subjective factors, not supported by any empirical data, in reaching his conclusion. . . . When questioned by the Court, Mr. Phalon failed to adequately explain how he arrived at that percentage and admitted it was subject to some upward or downward adjustment. The Court therefore credits the testimony of Burns over Mr. Phalon.") (PX 709-007.)

## CONTENTIONS OF LAW

## I. THE EVIDENCE AT TRIAL ESTABLISHED THAT HUNTLEIGH SUFFERED A COMPENSABLE TAKING

### A. The Constitutional Framework

102. The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This guarantee fits this case perfectly because, as explained by the Supreme Court, it "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

103. In enacting a federal monopoly over the pre-board passenger and baggage screening industry, and confiscating Huntleigh's screening business without compensation, the Government has violated this fundamental principle, forcing Huntleigh to bear a burden that should properly be borne by the public as a whole.

### B. Huntleigh Had a Protected Property Right In Its Business Assets, Including Its Screening Contracts, Going Concern Value and Goodwill

104. As the evidence at trial established, Huntleigh is seeking compensation for its substantial, identifiable business assets, including its regularly renewed screening contracts, goodwill

and going concern value. As a matter of law, each of these business assets is a compensable property interest as a component of Huntleigh's fair market value.[7] See Kimball Laundry Co. v. United States, 338 U.S. 1, 9-13 (1949) (recognizing intangible property rights, including going concern value, as compensable property); Cienega Gardens v. United States, 331 F.3d 1319, 1329-30 (Fed. Cir. 2003) (recognizing contracts as compensable property); United States v. 0.88 Acres of Land, 670 F. Supp. 210 (W.D. Mich. 1987) (recognizing goodwill and going concern value as compensable property); see also Huntleigh I, 63 Fed. Cl. at 445-46 (2005). Contrary to the assertions of the Government in its prior briefs (see, e.g., Gov't Pretrial Br. at 4), Huntleigh is not seeking compensation for its right to engage in the screening business, but for the value of its taken business assets (tangible and intangible).[8]

105. The regulated nature of the industry in which Huntleigh's business operated does not preclude it from establishing a viable takings claim. See Cienega Gardens, 331 F.3d at 1330-31; Huntleigh I, 63 Fed. Cl. at 447. This is especially true where, as here, a business does not depend on the exercise of the Government's regulatory power, but simply is subject to certain regulations. Id.

106. In prior briefs, the Government also has contended that ATSA did nothing more than frustrate Huntleigh's performance under its screening contracts, citing Air Pegasus v. United States, 424 F.3d 1206 (Fed. Cir. 2005), in support of this contention. (Gov't Pretrial Br. at 6-7.) Air Pegasus turns to bite the Government. In Air Pegasus, plaintiff, a heliport operator, alleged that the Government took its property when the Government restricted aircraft operators' rights to use the

---

[7] Huntleigh is seeking compensation for the fair market value of its business assets, which includes provision for the "'transferable intangible values of [its] former business.'" United States v. 0.88 Acres of Land, 670 F. Supp 210, 213 (W.D. Mich. 1987) (citation omitted). The suggestion that such intangible value is only compensable in the context of a temporary taking (see Gov't Pretrial Br. at 5), is unsupported by common sense or any case law. See, e.g., id. (compensating business owner for loss of goodwill and going concern in the case of a permanent business taking).

[8] Because ATSA mandates that air carriers pay fees for the provision of aviation security, the airlines are still paying for screening services -- only now they compensate the Government rather than private screening companies to defray the costs associated with providing that service. 49 U.S.C. § 44940.

airspace above the heliport. Id. at 1209-10. In assessing whether Air Pegasus suffered a taking, the Federal Circuit made clear that "a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that its property interest was actually taken by the government action." Id. at 1215. There, the court found Air Pegasus's only property interest was in a leasehold, and the Government had taken no action to regulate this interest, much less "take" it; instead, the Government's actions affected "other people's property." Id. at 1215-16. As such, the challenged regulation -- directed only at third parties -- did nothing more than frustrate Air Pegasus's business expectations. Id. at 1216. Significantly, in reaching its conclusion, the Court also found that plaintiff had no property interest in the navigable airspace above its heliport. Id. at 1217-18.

107. In sharp contrast to Air Pegasus, here the Act federalized all passenger and baggage screening directly and legally precluded Huntleigh from performing under its existing contracts with air carriers by making performance of those contracts illegal. The Act then converted the entire screening business into a Government monopoly that arrogated Huntleigh's business for itself and permanently excluded Huntleigh. Accordingly, Huntleigh's injury flows directly from the Government's appropriation of Huntleigh's contracts, not a limitation imposed on a third party's property.

### C. The Evidence Demonstrates that the Act Constituted a Categorical Taking under *Lucas*

108. Under Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), a categorical taking occurs if the Government eliminates "all economically beneficial use" of the property at issue. In such circumstances, the "economic impact" of the Government's action becomes the sole and determinative issue. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538-40 (2005). The evidence established that the Government effected a categorical taking of Huntleigh's passenger and baggage

screening business under Lucas for which compensation must be paid.[9] The amount of just compensation owed to Huntleigh, or Huntleigh's damages, is equivalent to the fair market value of Huntleigh's screening business on the takings date, plus interest from the date of the taking. Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394, 416 (1989) (citations omitted).

**(1) The Relevant Property For Purposes of the Takings Inquiry is Huntleigh's Screening Business**

109. The relevant property for purposes of determining the economic impact imposed on Huntleigh as a result of the Act is Huntleigh's heavily regulated passenger and baggage screening business. It is undisputed that Huntleigh's entire screening business, not simply a fungible portion of it, was confiscated. This is not a case where the Act merely took part of Huntleigh's screening business by federalizing screening only at certain airports (such as higher-risk, urban airports) and allowed Huntleigh to continue to perform under its contracts at other locations. Here, the Government confiscated an entire business from Huntleigh. See Sartori v. United States, 67 Fed. Cl. 263, 274 (2005); cf. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987). Accordingly, Huntleigh is not attempting artificially to divide fungible units of its business by focusing solely on what was taken. Cf. Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 644 (1993); Keystone Bituminous Coal Ass'n, 480 U.S. at 497 (rejecting claimant's attempt to define parcel as the coal regulated by the Government, while ignoring coal left unaffected by the regulation).

---

[9] Any argument that Lucas applies only to takings of real property and is, therefore, inapplicable to this case, is foreclosed by controlling legal authority to the contrary -- including a unanimous decision of the United States Supreme Court. See Lingle, 544 U.S. at 548 (noting, in a regulatory business taking, that "a plaintiff seeking to challenge a government regulation as an uncompensated taking of private property may proceed . . . by alleging . . . a Lucas-type 'total regulatory taking,' [or] a Penn Central taking"); see also Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004) ("The trial court correctly rejected the government's contention that a 'per se' takings analysis is never applicable when personal property is at issue."), cert. denied, 545 U.S 1104 (2005).

110. Even where only a portion of a claimant's property interests is regulated, in defining the relevant property, courts consider whether a "'unique attribute inherent in the restricted portion [of the property] provides a basis for distinguishing it from the unrestricted portion.'" Sartori, 67 Fed. Cl. at 274 (quoting Rose Acre Farms, 373 F.3d at 1190). Huntleigh's passenger and baggage screening business was fundamentally distinct from its non-screening services, and, therefore, should not be included in the denominator for Lucas analysis. (See ¶¶ 53-62, supra.) These businesses were different from a regulatory, personnel, strategic and financial perspective. (Id.)

111. Even if the Court were to include in the relevant property Huntleigh's non-screening services, it still would be a categorical taking. The evidence establishes that after its screening business was taken, Huntleigh's remaining non-screening operations were, at best, of de minimis value. (See ¶¶ 139-143 infra (noting that Huntleigh's fair market value after the taking was $649,040 -- less than 1% of Huntleigh's pre-taking value).) The fact that Huntleigh's post-taking operations have de minimis value does not preclude the application of the Lucas test. See, e.g., Loveladies Harbor Inc. v. United States, 28 F.3d 1171, 1181-82 (Fed. Cir. 1994) (categorical taking found when remaining value -- 1% of total value -- was found to be de minimis); Palm Beach Isles Assocs. v. United States, 208 F.3d 1374, 1381 (Fed. Cir. 2000) (categorical taking where the remaining property had "no or minimal value") (emphasis added). Therefore, irrespective of how the relevant parcel is defined, Huntleigh satisfies the Lucas test.[10]

---

[10] As a matter of law, the relevant property cannot include Huntleigh's foreign-incorporated parent, ICTS International N.V. ("ICTS"). First, as a nonparty, ICTS's interests cannot be factored into this Court's assessment of the relevant parcel and corresponding economic impact. See Cienega Gardens v. United States, 67 Fed. Cl. 434, 474-79 (2005). Second, as a separate corporate entity with distinct legal rights, Huntleigh is entitled to have its corporate form respected for purposes of the takings analysis. See Cane Tenn., Inc. v. United States, 57 Fed. Cl. 115, 118, 122-31 (2003). Finally, ICTS was operated separately and independently from Huntleigh's operations, making it inappropriate to combine the two for takings purposes. See, e.g., Naegele Outdoor Adver., Inc. v. City of Durham, 803 F. Supp. 1068, 1074 & n.4 (M.D.N.C. 1992), aff'd mem., 19 F.3d 11 (4th Cir. 1994); see also Lucas, 505 U.S. at 1016 n.7. In any event, the Government presented no evidence at trial as to (i) why the relevant property should include ICTS or (ii) the value of ICTS.

**(2) The Fair Market Value of Huntleigh's Screening Business**

112. "Fair market value" is defined as "what a hypothetical buyer in a hypothetical free market for the property that was taken would have paid for the property." Independence Park Apartments v. United States, 61 Fed. Cl. 692, 707 (2004) (citing Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984)). Stated differently, it is "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.'" Norman v. United States, 63 Fed. Cl. 231, 270 (2004) (citing United States v. Cartwright, 411 U.S. 546, 551 (1973)). (See also Tr. 533:22-534:17 (Tregillis).)

113. In determining the fair market value of Huntleigh's screening business, "all considerations that fairly might be brought forward and reasonably be given substantial weight in . . . bargaining" between a buyer and seller must be taken into account. Olson v. United States, 292 U.S. 246, 257 (1934); see also Bassett, N.M. LLC v. United States, 55 Fed. Cl. 63, 69 (2002). (See Tr. 534:8-536:14 (Tregillis).)

(a) Huntleigh's Likely Future Revenues Are a Critical Component of Determining Fair Market Value as of the Takings Date

114. Potential future revenues are critical to determining the value a buyer would pay for a business. See Whitney Benefits, 18 Cl. Ct. at 409 (compensation for real property taken included a valuation of the coal reserves on that property, "which can be measured only by their ability to produce income," and are not consequential damages); Kimball Laundry, 338 U.S. at 9 (determination of just compensation for real property taken included value of lost trade routes, as these were "the reasonably probable earnings of [the] business"); Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 452-53 (1968); Associated Imports, Inc. v. ASG Indus., Inc., No. 5953, 1984 WL 19833 (Del. Ch. June 20, 1984), aff'd sub nom., Hubbard v. Associated Imports, Inc., 497 A.2d 787 (Del. 1985); see also Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 386 (2d Cir.

2006) (in valuing stock options immediately before an IPO, evidence tending to show economic conditions and performance that would aid a "knowledgeable investor in anticipating the future conditions of the Company," should be considered); Pratt, Valuing a Business ("In the simplest sense, the theory surrounding the value of an interest in a business depends on the future benefits that will accrue to the owner of it.") (PX 572-020).

115. The considerations that must be taken into account necessarily also include projections that a willing buyer would make about Huntleigh's likely future revenues. See Yancey v. United States, 915 F.2d 1534, 1542 (Fed. Cir. 1991) ("[T]he fair market value of property . . . can include an assessment of the property's capacity to produce future income if a reasonable buyer would consider that capacity in negotiating a fair price for the property."); see also Whitney Benefits, 18 Cl. Ct. at 410 (finding it permissible to consider a claimant's prospects to determine fair market value despite the uncertain or speculative nature of those prospects). (See Tr. 526:24-533:3 (Tregillis).)

(b) Under Controlling Legal Authority, Where a Major Change Occurs, its Impact on Huntleigh's Value Must be Considered

116. Where, as here, the events of 9/11 caused a sea change in the value of Huntleigh's screening business, as a matter of controlling law, its impact on Huntleigh's future revenues must be considered. In Protective Comm. for Indep. Stockholders, the United States Supreme Court squarely held that in valuing a business "operat[ing] in a market undergoing substantial change . . . an adequate notion of going-concern value . . . [can] be obtained only by looking to the future as well as the past." 390 U.S. at 446-47 (emphasis added). There, the Supreme Court considered the propriety of a court's determination that a freight transportation company operating between the U.S. and Puerto Rico was insolvent when this determination failed to consider the company's future prospects. See id. at 419, 423. In addition to having increased its share of a highly competitive market despite numerous obstacles, the company confronted a future marked by significant change: trade between the U.S. and Puerto Rico, and the rates applicable thereto, were in flux, and the company faced the task of re-

equipping and modernizing its fleet to keep pace with developments in the industry. See id. at 445-46. Given this evidence of impending change, the Supreme Court emphasized the importance of accounting for the company's future prospects when determining its value, including:

> 'all circumstances which indicate whether or not (the past earnings record) is a reliable criterion of future performance.' If it is shown that the record of past earnings is not a reliable criterion of future performance, the court must form an estimate of future performance by inquiring into all foreseeable factors which may affect future prospects. In forming this estimate, 'mathematical certitude' is neither expected nor required.

Id. at 452-53 (emphasis added) (quoting Consolidated Rock Prods. Co. v. DuBois, 312 U.S. 510, 526 (1941)).[11]

(c) The Post-9/11 Upward Trend: Huntleigh's Financial Results During the Pre-Taking and Pre-Interim Contract Periods Confirm Its Future Growth

117. Unlike the Government, Mr. Tregillis properly took into account the sea change in the screening industry caused by 9/11 and the resulting increase in demand for Huntleigh's services. As discussed above, Huntleigh experienced an immediate and major increase in screening revenues and gross profits after 9/11. In October alone, Huntleigh earned screening revenues of $10.9 million and gross profits of $1.1 million -- approximately tripling its pre-9/11 averages for the prior nine months. (See ¶¶ 38-39, supra.)

(d) Use of Post-Taking Data to Confirm the Reasonableness of the Valuation Is Valid

118. In performing his analysis, Mr. Tregillis considered post-taking information to corroborate the reasonableness of expectations as of the takings date and to subject his conclusions to a "sanity check." (Tr. 555:2-556:9, 587:6-10.) As he explained at trial, the alternative to using actual

---

11 Huntleigh witnesses, including Messrs Sporn, Zicher and Tregillis, all testified that such a valuation would have been possible had it been required at the time. (Tr. 262:4-268:4 (Sporn); Tr. 414:23-416:12 (Zicher); 528:15-529:25, 625:8-628:4 (Tregillis).) Even Mr. Tuero, who is by no means a financial expert (Tr. 34:20-22), testified that even though uncertainties existed in the aviation security industry immediately after 9/11 (Tr. 219:20-220:18), and that, due to the extreme time pressure the Company was under, he did not undertake to value Huntleigh as a going concern (Tr. 214:7-23), given the time and resources, such a valuation would have "definitely" been possible. (Tr. 214:20-215:20.) In any event, the assertion that the existence of uncertainty as to future performance prevents a valuation expert, such as Mr. Phalon, from valuing Huntleigh's future income stream is disingenuous and fails as a matter of law.

data points as corroboration would be to base projections solely on the October and November 2001 information -- which showed a huge rise in revenues, profits and demand for Huntleigh's services, and which, if used as the sole basis for projection, would suggest a far higher value for Huntleigh. (Tr. 552:6-555:1; 562:22-565:19; 623:23-625:4; 649:3-651:17.)

119. Mr. Tregillis's methodology for assessing Huntleigh's fair market value under the income approach is entirely consistent with the case law. See, e.g., Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394, 412 (1989) (considering coal transaction that took place subsequent to the taking for purposes of valuing claimant's coal at the time of the taking); Georgia-Pacific Corp. v. United States, 640 F.2d 328, 337 n.5 (Ct. Cl. 1980) (allowing expert use of post-taking data regarding logging practices "for purposes of corroborating the reasonableness of the views of a [date-of-taking] prospective purchaser and seller as to their anticipations relative to future logging efforts" and noting that "in circumstances where the prediction of damages rests on uncertain future events, which is the case here, reasonable use of hindsight would not, in any event, be fatal as plaintiff so strenuously maintains"); see also Boyce, 464 F.3d at 389 (vacating district court's decision which drew a "bright-line" rule excluding all evidence of post-breach value without weighing "other factors of the case and determining their aggregate significance," because the fact finder "should be able to make its valuation determination on all relevant elements of the case," whether dated before or after the valuation date); Krapf v. United States, 977 F.2d 1454, 1459-60 (Fed. Cir. 1992) (holding that the admission of post-valuation data is governed by the ordinary rule of relevancy); Okerlund v United States, 365 F.3d 1044, 1053 (Fed Cir. 2004) (reaffirming Krapf and noting that "the critical question [in determining the admissibility of evidence of post-valuation data] is relevance.").

120. The appropriateness of Mr. Tregillis's methodology is bolstered by the fact that it uses post-taking data to confirm Huntleigh's fair market value as of the takings date, not as evidence that directly affects (or increases) fair market value. See, e.g., Gross v. Commissioner, 272 F.3d 333, 355 (6th Cir. 2001) (holding that a court "is not prohibited from considering post-valuation data if relevant

to shed light on facts existing on the date of the valuation"); Union Bank of Switz. v. Deutsche Financial Services Corp., No. 98 Civ. 3251, 2000 WL 178278, at *10 (S.D.N.Y. Feb. 16, 2000) ("[T]o assure that a valuation is 'based in reality', the court may consider information 'originating subsequent to the [valuation] date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date.'") (quoting Coated Sales, Inc. v. First Eastern Bank, N.A., 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992)).

121. As the Second Circuit Court of Appeals held in United States v. Brooklyn Union Gas Co., 168 F.2d 391, 397 (2d Cir. 1948):

> [D]eductions or conclusions as to future productivity not only must be made, but are an important element in a case of this kind. The question then becomes one whether deductions as to the future may be checked up by the actualities as they have happened. It would seem an eerie conclusion that a court must resort to guess, closing its eyes to reality, when its decisions must actually be formulated after the true facts become available. We think the evidence admissible not as a standard of value in itself, but for its bearing upon the prospective values at the time of taking.

122. In Estate of Jung v. Commissioner, 101 T.C. 412, 431-32 (1993), the United States Tax Court emphasized the importance of this distinction:

> A distinction may usefully be drawn between later-occurring events which *affect* fair market value as of the valuation date, and later-occurring events which may be taken into account as *evidence* of fair market value as of the valuation date. . . .
>
> When viewed in this light -- as evidence of value rather than as something that affects value -- later occurring events are no more to be ignored than earlier-occurring events.

Id. Further, the Supreme Court approved the propriety of courts' consideration of post-valuation data. Sinclair Refining Co. v. Jenkins Petroleum Process Co. 289 U.S. 689, 698 (1933).

123. Because Huntleigh's fair market value as of the takings date was so drastically impacted by the events of 9/11, Mr. Tregillis appropriately considered post-taking data to corroborate his analysis of the obvious growth trend that Huntleigh had already experienced, and anyone looking to buy Huntleigh would have expected to continue into the future. (Tr. 532:17-533:3.) This is not a "hindsight" value placed on Huntleigh (see Gov't Pretrial Br. at 15), but the most appropriate way to

confirm Huntleigh's value given the unprecedented change in its business that occurred after 9/11.[12] See, e.g, Boyce, 464 F.3d at 389 ("Our precedent supports the conclusion that consideration of evidence dated post-[valuation] can properly be considered by the fact finder in making this [valuation] determination without violating the rule against considering evidence in hindsight.").

(e) The Court Should Not Credit the Expert Report or Trial Testimony of Peter Phalon, the "Litigation Support" Witness Proffered as the Government's "Damages Expert"

124. Mr. Phalon's expert testimony is infected by the fact that he signed on not just to provide "independent" expert testimony, but to supply "litigation support" to assist the Government in achieving its litigation objective. (Tr. 774:19-775:3 (Phalon).) Indeed, Mr. Phalon admitted that he did not "make a significant distinction between" his "litigation support" role and his expert role -- even when testifying. (Id.)

125. Given (i) Mr. Phalon's avowed role in providing "litigation support" to the Government; (ii) Mr. Phalon's violation of industry ethical rules; and (iii) the previous criticism of Mr. Phalon by Judge Kaplan for giving "subjective" testimony unsupported by empirical data (Tr. 776:23-779:10) -- it comes as no surprise that Mr. Phalon presented skewed testimony and analysis. He entirely ignored the impact of 9/11 on Huntleigh's screening business despite undertaking in his retainer letter to do so, disregarded relevant post-9/11 data in favor of exclusive use of outdated historical data that obviously did not reflect Huntleigh's future value, jettisoned his own sworn practice of using multiple valuation methods, ignored his own observations of Huntleigh's increased earnings and profits after 9/11, and sought answers from the Government's litigation counsel when faced with incontrovertible evidence

---

[12] The fact that the TSA "did not exist on the valuation date" (Gov't Pretrial Br. at 15) is of no consequence. The Government adduced no evidence at trial that the functions performed by the TSA are in any way different from the job that private screeners would have performed if screening had not been federalized. To the contrary, Huntleigh provided screening services in 2002 pursuant to the standards required by the Act and the evidence overwhelmingly demonstrated that, absent federalization, private screeners could have, and would have, performed screening in ways that are commensurate with the TSA's provision of this service. Indeed many of the TSA's screeners are former Huntleigh employees. (Tr. 91:13-93:23 (Tuero).)

that his conclusions were erroneous and radically understated Huntleigh's value. Given the patent bias and obvious flaws in Mr. Phalon's report and trial testimony, his testimony should be rejected by this Court. See, e.g., MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1353-55 (Fed. Cir. 2005) (upholding a district court's decision to exclude expert's reports because the expert ignored several factors relevant to the damages analysis, thus employing "a flawed methodology" that rendered the reports unreliable); Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 268-69 (2d Cir. 2002) (upholding district court's exclusion of expert testimony because, although the expert "identified the factors that affected" his assessment, he "did not include any of these variables in his calculation"); In re Med Diversified, Inc., 346 B.R. 621, 626 (Bankr. E.D.N Y. 2006) (excluding an expert's testimony and report on account of the "manifest, pervasive, and systemic bias" the expert demonstrated when he "deliberately drove his adjustments of the discount rate and other variables toward the lowest order of value in order to accomplish his client's implicit bidding"); Point Productions A.G. v. Sony Music Entertainment, Inc., No. 93 Civ. 4001, 2004 WL 345551, at *6-7 (S.D.N.Y. Feb. 23, 2004) (excluding expert's testimony as "irretrievably unreliable and indefensible" given the expert's "gaping omissions of real world events that were highly material to [the analysis]").

126. In stark contrast to Mr. Tregillis's reliance on the results of both the income and the market approaches -- even though the income approach reduced Huntleigh's damages significantly – and his consideration of multiple scenarios within each method, Mr. Phalon used only one valuation technique: the market approach. (Tr. 839:24-840:11 (Phalon).)

127. Furthermore, Mr. Phalon himself acknowledged that events which have a material impact on the revenues and cash flows of a business ought to be considered in valuing a company, even where the ultimate effects of those events are uncertain. (Tr. 828:22-829:1.) The principle that uncertainties do not prevent valuation analysis is well-established in relevant case law. See Protective Comm. for Indep. Stockholders, 390 U.S. at 452-53; Whitney Benefits, 18 Cl. Ct. at 410 (finding it permissible to look to a claimant's prospects to determine fair market value despite the uncertain or

speculative nature of those prospects); TV58 Ltd. P'ship v. Weigel Broad. Co., 1993 WL 285850, at *4 (Del. Ch. July 22, 1993) ("Because [plaintiff corporation] did not have an earnings history, a discounted cash flow analysis must be based purely on speculation as to the company's future performance. This fact, however, does not undermine the method's validity or appropriateness."); In re Duplan Corp., 9 B.R. 921, 928 (S.D.N.Y. 1980) ("Forecasts are a necessary part of the valuation process. Disagreement is therefore inevitable. Although mathematical certainty is not required in order for a valuation to be fair, an informed judgment is."). Indeed, Mr. Phalon acknowledged that a company facing significant uncertainty -- such as a pharmaceutical company whose only drug is the subject of a patent infringement suit -- could be valued, and that the historical revenues of such a company were not indicative of future value. (Tr. 831:13-20.)

128. Given the weaknesses and flaws in Mr. Phalon's report and trial testimony, it is hardly surprising that the Government was hesitant to call him as a witness. (See Summ. J. Tr. at 27:20-23.) His methodology and conclusions should be rejected by this Court. See, e.g., MicroStrategy Inc., 429 F.3d at 1353-55; Amorgianos, 303 F.3d at 268-69; In re Med Diversified, Inc., 346 B.R. at 626.

(f) There is No Merit to the Government's "Special Benefits" Theory

129. The Government has argued that the just compensation to which Huntleigh is entitled should be reduced to the extent that Huntleigh received "special benefits" or earned additional profits as a result of the Act, by providing interim screening services to the Government. (See, e.g., Gov't Pretrial Br. at 20.) This is plainly wrong. Huntleigh received no "benefits" from the Act -- special or otherwise -- nor did it earn any "additional" profits. To establish "special benefits," the Government would have been required to prove that the "benefits" flowed from the taking. Cf. Hendler v. United States, 175 F.3d 1374, 1382-83 (Fed. Cr. 1999) (the benefit must "happen as a result" of the taking). In other words, the Government would have had to establish that Huntleigh received some additional

income that it would not have obtained "absent any government action." Id. at 1382. The Government failed to offer any credible evidence at trial on this point, let alone meet its heavy burden.

130. It is undisputed that heightened passenger and baggage screening would have continued to be required absent the Act. (See Tr. 713:19-22, 714:9-14 (Burke).) The Government offered no evidence that Huntleigh would have been unable to perform under its contracts to provide these enhanced, and more profitable, screening services in the future. Further, if the Act had not been passed and if the Government had not taken Huntleigh's business, there is no evidence to suggest that the strong trend of enhanced revenues and profits experienced by Huntleigh between October 2001 and February 2002 would not have continued throughout 2002 and beyond. Indeed, the record evidence suggests the exact opposite. (Tr. 256:1-261:21 (Sporn); 536:18-538:16, 544:4-550:15 (Tregillis).)

131. Mr. Phalon's attempted explanation -- that the enhanced revenues Huntleigh earned had to be "special benefits" because they were "disproportionate with historical information" -- is not supported by a scintilla of evidence and is not based on any study or analysis of the potential profits that Huntleigh could have earned in 2002. (Tr. 848:12-849:3; 755:25-756:3.) Instead, it is based solely on the projected income figures from Huntleigh's 2002 budget presentation -- the same budget presentation that was ignored by Mr. Phalon in assessing Huntleigh's likely future performance. (Tr. 754:9-757:1 (Phalon); DX 18.) Mr. Phalon was comfortable relying on this document to reduce Huntleigh's damages under the Government's "special benefits" theory, but unwilling to rely on the document when it would lead to a greater fair market value of Huntleigh. Mr. Phalon's preposterous insinuation that the financial information in the budget somehow reflected the results Huntleigh expected to achieve as a consequence of "federalization" is contradicted by the record evidence. (See Tr. 80:13-18, 213:15-214:1 (Tuero); 336:13-338:10 (Washington).) Indeed, the budget was prepared before the TSA had any idea what form the "federalization" would ultimately take, so Huntleigh could not possibly have been so omniscient as to have adjusted its budget for the completely unknown "federalization." (See Id.)

132. Any additional profits earned by Huntleigh in 2002 were due to the demand for more screening as a result of the heightened threat environment following 9/11; they were not the result of "government action," and were not caused by the Act. Cf. Bauman v. Ross, 167 U.S. 548 (1897); Hendler, 175 F.3d at 1382-83.

### D. The Evidence At Trial Also Established That the Act Constituted a Taking Under the Three-Part *Penn Central* Test

133. Even if this Court were to conclude that the Act did not effect a "categorical" taking under the Lucas test, then the Act constituted a compensable regulatory taking under the three-factor analysis in Penn Central. See Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). The three factors identified by the Supreme Court are: (1) the character of the governmental action; (2) the extent to which the regulation had interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. Id.

#### (1) The Character of the Government Action Demonstrates That There Has Been a Taking Under *Penn Central*

134. The Government's takeover of Huntleigh's passenger and baggage screening business caused substantial harm to Huntleigh by destroying the value of its business assets. As such, the Government improperly shifted a "disproportionate" share of the regulation's burden onto a "small class of private parties," which included Huntleigh. Cienega Gardens v. United States, 331 F.3d 1319, 1328, 1340 (Fed. Cir. 2003).

135. Throughout this case, the Government has emphatically suggested that the Act does not possess the "character of a taking" because, for example, it was enacted for a public purpose or to "protect health and safety," and thus the Government is immune from the obligation to pay just compensation under the Takings Clause. (See Gov't Pretrial Br. at 18.) As a matter of law, whether the Act was enacted for a legitimate public purpose or whether it was intended to protect the public has no bearing on the Government's entitlement to take Huntleigh's property without compensation. See Lingle, 544 U.S. at 543 ("[T]he Takings Clause presupposes that the government has acted in pursuit

of a valid public purpose.") (emphasis added); Cienega Gardens, 331 F.3d at 1340 ("Congress' purpose in enacting the statutes may have been entirely legitimate but the government has not shown that the actions Congress took . . . were within its powers to exercise without also granting compensation."); Yancey v. United States, 915 F.2d 1534, 1542 (Fed. Cir. 1990) (finding that a statute that was meant to protect the public safety by preventing the spread of a highly contagious viral disease was a taking, and noting that "even when pursuing a public good . . . the Government does not operate in a vacuum"); see also Huntleigh I, 63 Fed. Cl. at 449.[13]

136. Likewise, whether a law is effective in substantially advancing a public purpose "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." Lingle, 544 U.S. at 542. The purported success (or failure) of legislation has no relevance, one way or another, as to whether a taking has occurred because it "reveals nothing about the magnitude or character of the burden a particular regulation imposes upon private property rights," and provides no "information about how any regulatory burden is distributed among property owners." Id. Huntleigh is not arguing -- and has never argued -- that its takings claim turns on whether the Act was successful or unsuccessful.

**(2) The Evidence Demonstrated That the Government Interfered With Huntleigh's Reasonable Investment-Backed Expectations**

137. The evidence adduced at trial, including the history of the airport security industry, the evolving federal regulatory landscape, and Huntleigh's near 15-year tenure in the industry, demonstrated that Huntleigh had a reasonable expectation that the Government would not impose an

---

[13] The Government has asserted that Brace v. United States recently "suggested" that in analyzing the character element, the retroactivity of the action or whether it targets particular individuals may be relevant. 72 Fed. Cl. 337, 355-56 (2006) (citing Eastern Enters. v. Apfel, 524 U.S. 498 (1998)). (Gov't Pretrial Br. at 18.) However, those factors were limited to the "unusual" and "specific circumstances" of Eastern Enters., in which the burden imposed by the legislative action was entirely retroactive in nature and directed to a limited class of individuals. 524 U.S. at 536-37. In any event, in this case, the impact of federalization of screening was targeted at a small class of private parties, as only Huntleigh and a limited number of private screening companies had their screening business legislated out of existence.

industry-wide monopoly and expropriate its business. Indeed, the evidence categorically showed that prior to the passage of the Act, the Government intended to introduce requirements for the certification of screening companies, a prospect that by its terms meant screening would stay in private hands, and that federalization was not a viable option being considered. On the basis of these reasonable expectations, Huntleigh invested significant resources, both before and after 9/11, to meet its contractual obligations.[14]

138. Courts have repeatedly and unequivocally rejected the argument that a plaintiff's investment-backed expectations are not reasonable because a plaintiff, like Huntleigh, operated in a highly regulated industry. See Cienega Gardens, 331 F.3d at 1350 ("A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. But that does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever."); Maritrans, Inc. v. United States, 40 Fed. Cl. 790, 797 (1998); cf. Conti v. United States, 48 Fed. Cl. 532, 537 (2001), aff'd, 291 F.3d 1334 (Fed. Cir. 2002).[15]

---

[14] In prior briefing to this Court, the Government asserted that "further investment by Huntleigh in the screening business after the events of September 11, 2001 was not based upon reasonable expectations." (Gov't Pretrial Br. at 17.) This argument is frivolous. Huntleigh invested in its business after 9/11 because the demand for its services increased immediately and substantially, as did the regulatory requirements governing the provision of those services. Federalization was far from certain at this time; the only certainty was that Huntleigh was performing the heightened security services demanded by the flying public and the FAA.

[15] Ignoring this clear authority, the Government has attempted to argue the exact opposite position in prior briefing to this Court. (See, e.g., Gov't Pretrial Br. at 16-17.) It relies most recently on two decisions, Good v. United States, 189 F.3d 1355 (Fed. Cir. 1999) and Deltona Corp. v. United States, 657 F.2d 1184 (Ct. Cl. 1981) -- both cases in which the plaintiff claimed a taking based on the denial of a permit by the Government. In Good, the court found that the plaintiff's investment-backed expectations -- that a dredging and filling permit would be granted -- were unreasonable because the plaintiff was on actual and constructive notice at the time the investment was made that the regulatory regime in place made the grant doubtful, and plaintiff even acknowledged this fact in its contract of investment. 189 F.3d at 1361-63. Clearly, the situation in Good, where the plaintiff's ability to exploit its investment depended entirely on the grant of permission by the Government, and where this grant was always doubtful, is vastly different from the situation here, where Huntleigh's business did not depend on the grant of future permission by the Government, let alone permission that was uncertain from the outset. In Deltona, contrary to the impression

*(cont'd)*

**(3) The Evidence At Trial Established That the Economic Impact of the Act Was Serious and Severe**

139. The Act resulted in the elimination of Huntleigh's passenger and baggage screening contracts, its going concern value and its goodwill. Even if the "relevant property" for takings purposes is considered to be both Huntleigh's screening and non-screening operations, the evidence established at trial demonstrates that Huntleigh as a going concern was rendered effectively valueless by the Act. As such, Huntleigh has suffered "serious financial loss" for which compensation must be paid. Cienega Gardens, 331 F.3d at 1340 (citing Loveladies Harbor, Inc. v. United States., 28 F.3d 1171, 1177 (Fed. Cir. 1994).

140. According to Mr. Tregillis's expert report, the fair market value of Huntleigh's screening business -- consisting almost entirely of Huntleigh's contracts with airlines -- as of the takings date was between $151 and $201 million. (PX 342-061.) The value of Huntleigh's remaining business -- its non-screening services -- immediately after the takings date was $649,040. (PX 342-064.) Therefore, even assuming the lowest pre-taking valuation of $151 million, the diminution in value caused by the Act was still 99.57% ([$151,117,026 - $649,040] / $151,117,026 = 99.57%). Notably, the Government did not offer any evidence as to the fair market value of Huntleigh's non-screening business after the taking.

141. This analysis is reflected in the income approach detailed by Mr. Tregillis, who concluded, based on Huntleigh's continual losses in 2003, 2004 and 2005, that the fair market value of Huntleigh's remaining operations after the taking was negative $4.56 million. (PX 342-062.) Mr. Tregillis also valued Huntleigh's remaining operations pursuant to the market approach. (PX 342-063.) Because Huntleigh was still generating revenue -- albeit resulting in continual net losses -- the market

*(cont'd from previous page)*

conveyed in the Government's papers, the court held explicitly that plaintiff's investment-backed expectations were reasonable: "As a result of an unforeseen change in the law, Deltona is no longer able to capitalize upon a reasonable investment-backed expectation which it had every justification to rely upon until the law began to change." 657 F.2d at 1191. "Until the law began to change," federalization was a completely "unforeseen" development. Id.

approach yielded a residual value of $5.858 million. (Id.) Consistent with his valuation of Huntleigh's screening operations, Mr. Tregillis then averaged the results of the income and market approaches and concluded that Huntleigh's post-taking value was $649,040. (PX 342-064; Tr. 589:4-9.) Mr. Tregillis's conclusion is confirmed by the fact that Huntleigh's audited financial statements for the year ended December 31, 2002 reduce Huntleigh's goodwill to zero, as the goodwill balance was "considered to be entirely related to the Company's screening operations." (PX 113-010; Tr. 584:7-23.)

142. Although Huntleigh's screening operations represented approximately 71% of Huntleigh's total revenues in 2001, this percentage does not reflect the relative value of the screening and non-screening operations. (PX 112-008.) Due to Huntleigh's fixed costs -- such as its audit services, computer and telephone systems and rent expense -- the elimination of screening did not reduce Huntleigh's expenses by a proportionate share. (Tr. 270:3-272:8 (Sporn); 519:21-520:15 (Tregillis).) Accordingly, Huntleigh's non-screening services, when operating without the screening services, had to bear the burden of all remaining, unavoidable fixed costs. While Huntleigh made aggressive attempts to reduced its fixed costs, the impact of these measures was minimal -- stripped of its "crown jewel" screening business, Huntleigh's remaining non-screening operations simply did not generate enough revenue to cover the fixed costs that remained. (Tr. 519:1-20, 590:15-594:15 (Tregillis).)

143. Mr. Tregillis explained the reasons why Huntleigh's non-screening operations were not viable as a standalone business. If Huntleigh's January through October 2001 gross profit from non-screening services is annualized, it amounts to $2.728 million. (Tr. 591:10-23.) Mr. Tregillis assumed that a willing buyer immediately after the takings date would have predicted that upon eliminating Huntleigh's screening services, Huntleigh's SG&A (selling, general and administrative expenses) would have been reduced by half and the interest expense would have remained unchanged. (Tr. 592:1-593:8.) According to these estimations, if Huntleigh provided only non-screening services it would have operated at a loss of $109,917 in 2001. Mr. Tregillis then applied a "sanity check": he

looked at the actual fixed costs incurred by Huntleigh in 2003 and 2004, when Huntleigh was performing non-screening operations only. He found that, in fact, the actual SG&A expense was even higher than estimated, and that Huntleigh would have therefore incurred even greater losses than predicted. (Tr. 593:9-594:15.)

144. The evidence at trial demonstrated that the diminution in value of Huntleigh's property was serious and severe. This devastating economic impact supports the finding of a taking under Penn Central. See, e.g., Yancey, 915 F.2d at 1541.

## II. THE EVIDENCE AT TRIAL ESTABLISHED THAT HUNTLEIGH IS ENTITLED TO COMPENSATION UNDER THE ACT

145. The Act provides that the TSA "may assume the rights and responsibilities of [a] . . . contract for provision of passenger screening services . . . subject to payment of adequate compensation to parties to the contract, if any." § 101(g)(2), 49 U.S.C. § 44901 (emphasis added). On its face, the Act does not require that the actual contracts be assumed to trigger the payment of "adequate compensation," but instead mandates payment if the rights and responsibilities underlying those contracts are assumed. As set forth above, the evidence at trial unequivocally demonstrated that the TSA "assumed" screening responsibilities from the private companies. (See ¶¶ 63-68, supra.)

146. The compensation due to Huntleigh must be "adequate," and must account for the reasonably expected future revenue stream from its existing screening contracts. See Yancey, 915 F.2d at 1542; Whitney Benefits, 18 Cl. Ct. at 409. This entitlement cannot be reduced by any "benefits" received by Huntleigh from the Government in 2002, as such "benefits" did not flow from the Act and constituted a quid pro quo for interim screening services rendered. Cf. Hendler, 175 F.3d at 1381-83.

147. The term "adequate compensation" is frequently used interchangeably with "just compensation" in government confiscation cases. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 425 (1982); Schneider v. County of San Diego, 285 F.3d 784, 794 (9th Cir. 2002).

Therefore, the Court should conclude from Congress' use of the phrase "adequate compensation" that it intended to create a statutory right to Fifth Amendment compensation for the taking of private screening contracts under the Act, without requiring plaintiffs to surmount the requirements of a traditional common law takings analysis. Simply because the damages resulting from an interpretation of "adequate" and "just" compensation may be the same, and the Government may be liable under both theories, does not lead to the conclusion that the Act is "redundant," as the Government has suggested, to the Fifth Amendment of the Constitution. To the contrary, the statutory framework creates an automatic right to compensation where the Government "assume[s] the rights and responsibilities" of the screening contracts, while the Fifth Amendment requires a more thorough analysis of entitlement to compensation under applicable takings jurisprudence.

148. According to the assessment of Huntleigh's damages expert, the fair market value of the screening contracts assumed by the Government was between $151,117,026 and $201,252,328. (PX 342-060; 578:14-22.) As noted above, given the conservative approach adopted by Mr. Tregillis, an award of damages at the higher end of that value range is supportable. Huntleigh seeks no interest on its statutory claim.

## CONCLUSION

149. At trial, Huntleigh met its burden of proof on Counts I and II in its Complaint and demonstrated its entitlement to compensation.

Dated: December 20, 2006
New York, New York

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ Jonathan J. Lerner
Jonathan J. Lerner (attorney of record)
Lauren E. Aguiar
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Plaintiff Huntleigh USA