# In the United States Court of Federal Claims

| | | |
|---|---|---|
| HUNTLEIGH USA CORPORATION, Plaintiff, | * | No. 03-2670C |
| v. | * | (Filed: March 15, 2007) |
| THE UNITED STATES, Defendant. | * | Takings; airline passenger and baggage screening contracts; goodwill and going-concern value; Aviation and Transportation Security Act. |

*Jonathan J. Lerner*, with whom was *Lauren E. Aguiar*, Skadden, Arps, Slate, Meagher & Flom, LLP, for plaintiff. *William J. O'Brien*, *Sarah Heckman Yardeni*, and *Elliot Friedman*, of counsel.

*Kyle Chadwick*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Peter D. Keisler*, Assistant Attorney General, and *David M. Cohen*, Director, for defendant. *Amy Allen Ruggeri*, Assistant Chief Counsel for Litigation, and *Janessa L. Grady*, Senior Counsel, Office of the Chief Counsel, Transportation Security Administration, of counsel.

## OPINION

MARGOLIS, *Senior Judge*.

This case is before the Court following a four-day trial in November 2006. After post-trial briefing, the Court heard closing arguments on February 27, 2007. Plaintiff Huntleigh USA Corporation ("Huntleigh") performed passenger and baggage screening at airports across the country before those functions were federalized in 2002 pursuant to the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001), ("ATSA" or "the Act"). Huntleigh filed suit against the defendant, the United States, on two claims. Count I alleges that when the Transportation Security Administration ("TSA") federalized airport screening, the government violated the Fifth Amendment's Takings Clause by taking Huntleigh's screening contracts, as well as the goodwill and going-concern value of its security screening business,

without just compensation.[1] Complaint at ¶ 44. Count II alleges that defendant violated ATSA § 101(g) by failing to pay "adequate compensation" for Huntleigh's security screening contracts. Complaint at ¶ 46. Huntleigh claims damages totaling between $151,117,026 and $201,252,328. The facts are discussed in detail in the Court's previous decisions in this case, Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440 (2005) ("Huntleigh I") and 65 Fed. Cl. 178 (2005) ("Huntleigh II"), and they are summarized below.

In Huntleigh I and Huntleigh II, the Court made preliminary determinations as to both fact and law. Takings cases, however, are highly fact-intensive, and the Court stated that it was necessary to develop a full factual record before making an ultimate decision. With the benefit of a complete record and a review of the applicable law, the Court has reached some different conclusions than in the previous opinions. After careful consideration of the evidence presented at trial, as well as the post-trial briefs and oral arguments, the Court finds for the defendant on both counts.

## FACTS

The U.S. Congress passed the Aviation and Transportation Security Act in response to the terrorist attacks of September 11, 2001, and the President signed the Act into law on November 19, 2001. It created the new Transportation Security Administration to oversee civil aviation security. The Act required virtually all passenger and baggage screening to be conducted by federal employees within one year. In the interim, ATSA required the new Under Secretary of Transportation for Security (and head of TSA) to take over responsibility for security screening within three months. The Act listed two approaches for transitioning from private to federal screeners: (1) on or after three months from the date of enactment, the Under Secretary could assume the rights and responsibilities of airline contracts for passenger and baggage screening; and (2) not more than 90 days after enactment, an airline could, at the Under Secretary's request, transfer screening contracts to the Under Secretary. Instead of these methods, the TSA negotiated new contracts directly with the screening companies to cover the interim period from February 19, 2002, until federalization was complete on November 19, 2002.

Since 1973, the airlines had been responsible for passenger and baggage screening, pursuant to regulations and guidelines established by the Federal Aviation Administration. Tr. 426. Most airlines met their security responsibilities by contracting with private companies to conduct screening. Tr. 427. Huntleigh had been providing passenger screening services since at least 1989 and checked baggage screening since 1999. Tr. 30-31, 34. By November 2001, Huntleigh had screening contracts with approximately 75 airlines in about 35 cities. Tr. 85. As a

[1] Although Huntleigh at times made reference to tangible, personal property (such as office furniture and uniforms) that also might have been taken, these items were not mentioned in Huntleigh's post-trial brief, Huntleigh offered no evidence at trial as to their value, and they are the subject of a separate, administrative action between Huntleigh and the defendant. Trial Transcript ("Tr.") 192. As such, the Court will not consider such property in the instant litigation.

result of ATSA, the airlines terminated their screening contracts with Huntleigh on or about February 17, 2002, and Huntleigh signed interim letter contracts with the TSA to continue providing passenger and baggage screening at locations where Huntleigh already operated until federal employees took over the function. Tr. 84-85, 380, 382-83. Huntleigh earned $235,112,000 from screening revenues in 2002, a significant increase from its $68,983,000 in screening revenues in 2001. Plaintiff's Exhibit Admitted at Trial ("PX") 113-010.

## DISCUSSION

I. Takings Claim

The Takings Clause of the Fifth Amendment states, "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. The Supreme Court has expanded on these 12 words to declare that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," Armstrong v. United States, 364 U.S. 40, 49 (1960). Beyond this simple principle, however, there is no formula for determining when a taking has occurred, only "ad hoc, factual inquiries" for each case. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). With regard to regulatory takings, the framework for these inquiries has been defined by the analysis in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), and Penn Central. Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-39 (2005). Before a court can reach any of these analyses as to whether a compensable taking of private property occurred, however, it must first address the threshold issue of whether the claimant possessed a legally protected property interest at the time of the alleged taking. Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005). Although Huntleigh may have been injured, it has not alleged a taking of private property under the Fifth Amendment.

In Huntleigh I, this Court held that "mere engagement in a particular business activity is not property protected by the Fifth Amendment," and Huntleigh cannot recover for damage to "its *right to engage in the business of passenger and baggage screening*." 63 Fed. Cl. at 444 (emphasis in original). Huntleigh argues that it is not claiming a taking of its right to operate its screening business. Instead, it alternatively describes the relevant property as its "business assets, including its regularly renewed screening contracts, goodwill and going concern value" and its "entire screening business." E.g., Pl. Brief at ¶ 104, 109. Regardless of the label, the property Huntleigh described in its evidence at trial is not subject to compensation under the Fifth Amendment.

Huntleigh's claim is similar to that in NL Industries, Inc. v. United States. In that case, the plaintiff did not have a compensable property interest in the physical plant and systems it had developed for transporting spent nuclear fuel, which were rendered valueless when a change in U.S. policy resulted in a moratorium on the license application of the reprocessing plant with which the plaintiff had contracted. 12 Ct. Cl. 391, 398 (1987), aff'd 839 F.2d 1578 (Fed. Cir. 1988), cert. denied 488 U.S. 820 (1988). The Court found in NL Industries that the regulatory scheme that allowed the agency to deny the license to the reprocessing plant was in place before

the plaintiff entered the market. Id. Whether the plaintiff could have or should have anticipated the particular regulatory decisions at issue was irrelevant. Id. Likewise, when Huntleigh entered the security screening business, it contracted with the airlines pursuant to security regulations issued by the government. Plaintiff's own aviation security expert admitted at trial that the federal government retained the right to change those regulations. Tr. 492. Before the Fall of 2001, both the Congress and executive branch entities had publicly discussed the possibility of changing the aviation screening paradigm, to include federalizing the screening functions and workforce. See generally, PX 359 (discussing the history of federal aviation security studies). It is immaterial that Huntleigh did not anticipate the specific policy shifts that occurred after the terrorist attacks of September 11, 2001, or deem federalization likely, because the regulatory scheme allowing those changes was already in place.

In another license case, the Federal Circuit's recent decision in Colvin Cattle Co. v. United States also is instructive. The court declined to find a constitutionally-protected property interest when the only beneficial use of the property was destroyed by the government's refusal to grant cattle grazing rights to a ranch owner. 468 F.3d 803, 808 (2006). Because the ranch never possessed grazing rights as a stick in the bundle of property rights it had, the fact that the denial of grazing rights rendered its water rights worthless and diminished the value of its ranch, did not support a takings claim. Id. Similarly, Huntleigh is attempting to claim a taking of its contracts and screening business based on the government's interference with its right to engage in the screening business– –a right that Huntleigh never possessed because its contracts with the airlines were always subject to the security regulations the government imposed on the airlines. See Tr. 130-31, 151-52. Huntleigh's value may have been diminished after ATSA was enacted, but as these cases demonstrate, not every loss of value triggers constitutionally-mandated compensation.

With regard to Huntleigh's screening contracts, the government's actions amount, at most, to frustration of purpose rather than a taking. Lawful government action that renders a contract impossible to perform does not amount to a taking of the contract. Omnia Commercial Co. v. United States, 261 U.S. 502, 511 (1923) (government requisition of steel, preventing the steel producer from honoring its contract, frustrated customer's contract with the steel producer, but was not a taking).

Huntleigh's former and current presidents and Chief Executive Officers testified at trial that all of Huntleigh's screening contracts with the airlines contained a clause that gave either party the right to terminate the contract in compliance with its specified notice provisions. Tr. 54, 199-200, 228. They testified that the notice requirements were usually 30, 60, or 90 days, Tr. 196, 228, with the vast majority requiring 30 days notice. PX 13-59. The airlines terminated these contracts with Huntleigh as a result of ATSA, Tr. 84, but Huntleigh did not consider the terminations to be a breach and did not sue any of the air carriers for breach of contract. Tr. 186-87. The airlines were within their rights to terminate the screening contracts at any time, for any reason or no reason. Tr. 199-200. The government did not interfere with these contracts.

The airlines terminated the contracts because they no longer needed Huntleigh's services when the federal government took over the screening functions covered by the contracts. Huntleigh no longer had a customer for its services. Relying on Omnia, the Federal Circuit has

declared that "frustration of a business by loss of a customer was not a taking" of private contracts. NL Industries, Inc. v. United States, 839 F.2d 1578, 1579 (Fed. Cir. 1988). Like the airlines in Huntleigh, a contracting party in NL Industries was unable to fulfill its contract obligations because of a government policy decision. Id.

The Federal Circuit also found frustration of purpose rather than a taking when aviation restrictions in response to the terrorist attacks of September 11, 2001, interfered with the operation of a business. Specifically, a heliport operator in Washington, D.C., was forced to close the only business permitted under its lease when the Federal Aviation Administration banned commercial aircraft from the area that included the heliport. Air Pegasus, 424 F.3d at 1209-10. The regulations merely frustrated the plaintiff's business because they did not apply to the heliport itself, but to the third parties who sought to fly in and out of the facility. Id. at 1216. Likewise, ATSA did not address Huntleigh or the other screening companies; it merely moved the responsibility for aviation security from the airlines to the newly-created TSA. Huntleigh relies heavily on Cienega Gardens v. United States to rebut the government's argument on frustration of purpose. However, ATSA was "legislation targeted at some public benefit, which incidentally affect[ed] contract rights, not, as in [Cienega Gardens], legislation aimed at the contract rights themselves in order to nullify them." See 331 F.3d 1319, 1335 (Fed. Cir. 2003) (legislation preventing property owners from pre-paying mortgages in accordance with their contract terms to keep the property within federal, low-cost housing programs resulted in a taking because it kept the contracts alive for the government's benefit).

Finally, Huntleigh seeks compensation under Kimball Laundry Co. v. United States for damage to its goodwill and going-concern value. In that case, the Supreme Court held that the property owners could recover going-concern value as an element of the just compensation awarded for the government's temporary takeover of their business during World War II. 338 U.S. 1, 8, 16 (1949). There was never a question of whether a taking had occurred, but only the amount and method for determining just compensation. Id. at 3, 8. In contrast, the government in the instant case has not taken Huntleigh's underlying property, the screening contracts, so there is no basis for awarding damages for the associated goodwill or going-concern value.

In summary, Huntleigh did not possess a compensable property interest under the Fifth Amendment, and the Court's analysis ends there. Without a property interest, there can be no taking, and the Court need not address the Lucas or Penn Central requirements.

## II. Statutory Claim

Huntleigh also asserts that, aside from its takings claim, it is entitled to "adequate compensation" under the Aviation and Transportation Security Act. It argues that "adequate compensation" in the Act can be interchangeable with "just compensation" in the Fifth Amendment context, and Congress therefore intended the phrase "adequate compensation" to create a statutory right to takings compensation without the traditional, common law takings

requirements. Pl. Brief at ¶ 147. The Court turns to traditional rules of statutory interpretation to determine if Huntleigh is entitled to compensation under § 101(g) of ATSA.[2]

Section 101(g)(1), "SCHEDULE FOR ASSUMPTION OF CIVIL AVIATION SECURITY FUNCTIONS," states that the new Under Secretary for Transportation Security "shall assume civil aviation security functions and responsibilities" within three months of the Act's November 19, 2001, enactment date. § 101(g)(1), 115 Stat. 603 (emphasis added). The next section, "ASSUMPTION OF CONTRACTS," declares that "the Under Secretary may assume the rights and responsibilities of an

---

[2] (g) TRANSITION PROVISIONS.--
(1) SCHEDULE FOR ASSUMPTION OF CIVIL AVIATION SECURITY FUNCTIONS.--Not later than 3 months after the date of enactment of this Act, the Under Secretary of Transportation for Security shall assume civil aviation security functions and responsibilities under chapter 449 of title 49, United States Code, as amended by this Act, in accordance with a schedule to be developed by the Secretary of Transportation, in consultation with air carriers, foreign air carriers, and the Administrator of the Federal Aviation Administration. The Under Secretary shall publish an appropriate notice of the transfer of such security functions and responsibilities before assuming the functions and responsibilities.
(2) ASSUMPTION OF CONTRACTS.--As of the date specified in paragraph (1), the Under Secretary may assume the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports in the United States described in section 44903©, subject to payment of adequate compensation to parties to the contract, if any.
(3) ASSIGNMENT OF CONTRACTS.--
(A) IN GENERAL.--Upon request of the Under Secretary, an air carrier or foreign air carrier carrying out a screening or security function under chapter 449 of title 49, United States Code, may enter into an agreement with the Under Secretary to transfer any contract the carrier has entered into with respect to carrying out the function, before the Under Secretary assumes responsibility for the function.
(B) SCHEDULE.--The Under Secretary may enter into an agreement under subparagraph (A) as soon as possible, but not later than 90 days after the date of enactment of this Act. The Under Secretary may enter into such an agreement for one 180-day period and may extend such agreement for one 90-day period if the Under Secretary determines it necessary.
(4) TRANSFER OF OWNERSHIP.--In recognition of the assumption of the financial costs of security screening of passengers and property at airports, and as soon as practical after the date of enactment of this Act, air carriers may enter into agreements with the Under Secretary to transfer the ownership, at no cost to the United States Government, of any personal property, equipment, supplies, or other material associated with such screening, regardless of the source of funds used to acquire the property, that the Secretary determines to be useful for the performance of security screening of passengers and property at airports.
(5) PERFORMANCE OF UNDER SECRETARY'S FUNCTIONS DURING INTERIM PERIOD.--Until the Under Secretary takes office, the functions of the Under Secretary that relate to aviation security may be carried out by the Secretary or the Secretary's designee.

air carrier or foreign air carrier contract for provision of passenger screening services at airports." Id. at § 101(g)(2) (emphasis added). This assumption could occur "as of" the date in § 101(g)(1), meaning at or on February 19, 2002. See 115 Stat. 603; Webster's Third New International Dictionary (Unabridged) 129 (2002). Finally, "not later than 90 days" after the November 19, 2001, enactment date, § 101(g)(3), "ASSIGNMENT OF CONTRACTS," states that an air carrier may, at the request of the Under Secretary, make an agreement to transfer to the Under Secretary any contract for passenger and baggage screening. See 115 Stat. 604.

By using both "shall" and "may," the clear implication of these provisions is that the Under Secretary was required to take over responsibility for passenger and baggage screening within three months, but the assumption or assignment of contracts was discretionary– –i.e., it was a possible means for accomplishing the mandate of the Act. See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992). Plaintiff cites the legislative history to argue that the Under Secretary was required to assume Huntleigh's screening contracts. Pl. Brief at ¶ 62. Yet, on this particular point, the Act's language is clear and unambiguous. As such, examination of legislative history is unnecessary and inappropriate, and the Court will not stray from the plain language of the statute. Messick ex rel. Estate of Kangas v. United States, 70 Fed. Cl. 319, 324 (2006); Fluor Enters., Inc. v. United States, 64 Fed. Cl. 461, 479 (2005) (citing Bob Jones Univ. v. United States, 461 U.S. 574, 586 (1983)).

In Huntleigh I, this Court assumed as true for the purposes of determining jurisdiction, plaintiff's allegations that the contracts had been assumed, thereby triggering the Act's "adequate compensation" requirement. See 63 Fed. Cl. at 450-51; Huntleigh II, 65 Fed. Cl. at 180. In contrast, the current analysis centers on whether the government actually assumed the contracts as a matter of law, as allowed under the statute. The issue fundamentally turns on the meaning of "assume" in the Act. Black's Law Dictionary defines "assumption" as "[t]he act of taking (esp. someone else's debt or other obligation) for or on oneself; the agreement to so take." Black's Law Dictionary (8th ed. 2004). The TSA did not assume Huntleigh's contracts by taking on the airlines' obligations because, among other reasons, the contracts differed greatly and contained provisions that were inappropriate for federal government contracts. PX 292; Tr. 345-47. Instead, the airlines terminated their contracts with Huntleigh and the other screening companies on or about February 17, 2002, and the TSA entered into new contracts with the screening companies for the interim period before complete federalization occurred. Id.

When making its legal conclusions, the Court will not be swayed by agency statements, however official they might be. The TSA's March 2003 report to the Congress on compliance with ATSA stated that it had "assumed the airlines' passenger screening company contracts." PX 298-010. The Under Secretary of Transportation for Security had made a similar statement in January 2002, when informing the Congress about the TSA's plans for following the Act. PX 297-003. Huntleigh relies on these official pronouncements, as well internal TSA memoranda from late 2001 and early 2002, to argue that the TSA assumed the contracts. Pl. Brief at ¶ 63-66. Whether the TSA assumed the contracts is a matter of law for the Court to decide, however, and a statement, even by a party, that something "is so" does not make it legally true.

Huntleigh argues that the TSA's eventual takeover of Huntleigh's screening responsibilities amounts to an assumption of its contracts under the Act, even though the government did not assume Huntleigh's contracts with the airlines in the strict, legal sense. The language of the Act undermines this assertion. Section 101(g)(1) requires the assumption of "civil aviation security functions and responsibilities." 115 Stat. at 603 (emphasis added). In contrast, § 101(g)(2), "ASSUMPTION OF CONTRACTS," allows the Under Secretary to "assume the rights and responsibilities of an air carrier . . . contract for provision of passenger screening services . . . subject to payment of adequate compensation to parties to the contract, if any." Id. at 603-04 (emphasis added).

In interpreting a statute, a court must attempt to give effect to every word and clause. Mudge v. United States, 308 F.3d 1220, 1228 (Fed. Cir. 2002); Perez v. Merit Sys. Prot. Bd., 85 F.3d 591, 594 (Fed. Cir. 1996). The court also must avoid interpretations that make a word or clause "inconsistent, meaningless, or superfluous." Messick, 70 Fed. Cl. at 324; TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001). Following these tenets, this Court must give significance to the Congress' use of the word "contract" in § 101(g)(2), and the absence of that word in § 101(g)(1). In the first section, the Act requires assumption of "functions and responsibilities," but not necessarily contracts. In the second, it specifically permits assumption of contracts for adequate compensation of the contract parties. To adopt Huntleigh's interpretation would ignore the Congress' deliberate insertion of "contract" in § 101(g)(2) and render the word superfluous. As a result, this Court must conclude that the Congress intended § 101(g)(2) to apply only if the government chose to assume screening company contracts as defined by Black's Law Dictionary––taking the airlines' contract obligations onto itself. That did not happen, and Huntleigh has not asserted that it did. Plaintiff's counsel even admitted at the post-trial hearing that the government "did not directly assume those contracts." Tr. Feb. 27, 2007 at 25. The language of § 101(g)(3) also does not apply because the airlines never entered into any agreements to transfer contracts to the government. The government did not assume Huntleigh's contracts under the Act, and Huntleigh therefore is not entitled to compensation.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED that the Clerk of the Court shall dismiss the complaint and enter judgment in favor of the defendant. Each side to pay its own costs.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

March 15, 2007