# *United States Court of Appeals for the Federal Circuit*

FILED
JUL 7 2008
U.S. COURT OF FEDERAL CLAIMS

2007-5118

HUNTLEIGH USA CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

# *Judgment*

*ON APPEAL from the* UNITED STATES COURT OF FEDERAL CLAIMS

*in CASE NO(S).* 03-CV-2670

*This CAUSE having been heard and considered, it is*

*ORDERED and ADJUDGED:* **AFFIRMED**

*ENTERED BY ORDER OF THE COURT*

*DATED* MAY 1 5 2008

*Jan Horbaly, Clerk*

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Date: 7/7/08

ISSUED AS A MANDATE: JUL 07 2008

# United States Court of Appeals for the Federal Circuit

2007-5118

HUNTLEIGH USA CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief was Lauren E. Aguiar.

Kyle E. Chadwick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was Jeanne E. Davidson, Director. Of counsel on the brief was Janessa Grady Fleming, Senior Counsel, Office of the Chief Counsel, Transportation Security Administration, of Arlington, Virginia.

Appealed from: United States Court of Federal Claims

Senior Judge Lawrence S. Margolis

# United States Court of Appeals for the Federal Circuit

2007-5118

HUNTLEIGH USA CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 03-CV-2670, Senior Judge Lawrence S. Margolis.

---

DECIDED: May 15, 2008

---

Before NEWMAN, MAYER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Huntleigh USA Corporation ("Huntleigh") is a corporation in the business of providing passenger and baggage screening services at airports throughout the United States. During the period between 1989 and early 2002, airlines contracted with Huntleigh in order to meet their responsibilities for passenger and baggage screening under the Air Transportation Security Act of 1974, Pub. L. No. 93-366, 88 Stat. 415 (1974) ("Air Transportation Security Act") (repealed 1994).

Following the terrorist attacks of September 11, 2001, Congress enacted, and the President signed into law, the Aviation and Transportation Security Act, Pub. L. No. 107-171, 115 Stat. 597 (2001) (codified in scattered sections of 5 U.S.C. and 49 U.S.C.) ("ATSA"). Two of ATSA's provisions are pertinent to this appeal. The first provision, section 101(g)(1), 49 U.S.C. § 44901 (note) (Supp. I 2001), provided that the Under Secretary of Transportation for Security was to assume all security and screening functions at United States airports. The second provision, section 101(g)(2), id., provided that the Under Secretary of Transportation could perform those functions by assuming the contracts of private companies that, at the time, provided security and screening functions at airports. If the government chose to accomplish its security and screening obligations via this route, the statute required that it pay adequate compensation to the private companies whose contracts were assumed. Id. ATSA's transfer of responsibility for passenger and baggage screening from airlines to the federal government had the effect of bringing to an end Huntleigh's security screening contracts with airlines.

In November of 2003, Huntleigh filed suit in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000). In its suit, Huntleigh alleged that ATSA's transfer of responsibility for passenger and baggage screening resulted in a taking of its property without just compensation, in violation of the Fifth Amendment to the Constitution. Huntleigh also alleged that it was entitled to compensation under section 101(g)(2) of ATSA. In November of 2006, the Court of Federal Claims conducted a four-day trial on Huntleigh's claims. Thereafter, on March 15, 2007, the court rendered a decision in which it rejected both of Huntleigh's claims

and ordered the dismissal of Huntleigh's complaint. Huntleigh USA Corp. v. United States, 75 Fed. Cl. 642 (2007). The court ruled that Huntleigh's takings claim failed because Huntleigh had failed to establish that its property had been taken by the government. Id. at 645–46. The court ruled against Huntleigh on its claim for compensation under section 101(g)(2) of ATSA on the ground that the government had not assumed any of Huntleigh's contracts. Id. at 649.

Huntleigh now appeals the decision of the Court of Federal Claims. Because we conclude that governmental action did not effect the taking of Huntleigh's property under the Fifth Amendment and that the government did not assume Huntleigh's security screening contracts so as to entitle Huntleigh to compensation under section 101(g)(2) of ATSA, we affirm the court's decision.

## BACKGROUND

### I.

The facts pertinent to this case are not in dispute. With the enactment of the Air Transportation Security Act in 1974, Congress directed the Federal Aviation Administration to require airlines to implement security programs to screen all passengers and luggage traveling in commercial aviation. Air Transportation Security Act, Pub. L. No. 93-366, §315(a), 88 Stat. 415, 415 (1974) ("The Administrator shall prescribe . . . reasonable regulations requiring that all passengers and all property intended to be carried in the aircraft cabin in air transportation . . . be screened by weapon-detecting procedures or facilities employed or operated by employees or agents of the air carrier . . . ."). In order to meet their obligations under the statute, most

airlines hired private security contractors to perform the required passenger and baggage screening.

Huntleigh began offering passenger screening services in 1989, and it assumed baggage screening functions in 1999. As of November 19, 2001, when ATSA became law, Huntleigh had in place contracts with approximately 75 airlines. The contracts covered passenger and baggage screening at some 35 airports across the United States.

The provisions of Huntleigh's contracts varied. Some contracts contained set periods of performance, whereas others simply continued indefinitely. All contracts, however, were terminable upon one party's providing a certain number of days notice to the other party. Huntleigh contends, and the government does not dispute, that, as of 2001, Huntleigh had acquired an excellent reputation in the industry and that no major airline had terminated a contract with Huntleigh since 1991.

II.

In the wake of the terrorist attacks of September 11th, Congress reassessed the effectiveness of the screening regime created by the Air Transportation Security Act, wherein airlines were responsible for screening functions and generally met that responsibility by hiring private contractors such as Huntleigh. Specifically, Congress determined that the federal government, through a new federal agency, the Transportation Security Administration ("TSA"), could more effectively provide screening services at airports than could private contractors. See H.R. Rep. No. 107-296, at 53–54 (2001) ("The conferees . . . note the terrorist hijacking and crashes of passenger aircraft on September 11, 2001 . . . required a fundamental change in the way [the

conferees] approach[] the task of ensuring the safety and security of the civil air transportation system. The Conferees expect that security functions at United States airports should become a Federal government responsibility . . . ."). Consequently, Congress enacted ATSA, thereby assigning all airport screening responsibilities to the TSA, rather than commercial airlines.

ATSA imposed screening responsibilities upon the federal government and set forth a way in which the government could meet those responsibilities. Thus, section 101(a) of ATSA amended 49 U.S.C. § 114(d) to provide that the Under Secretary of Transportation "shall be responsible for security in all modes of transportation," and ATSA section 101(g)(1) stated that, not later than three months after the enactment of ATSA, the Under Secretary of Transportation "shall assume civil aviation security functions and responsibilities." ATSA section 101(g)(2), in turn, provided that, in order to meet the government's responsibilities, the Under Secretary of Transportation "may assume the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports in the United States." If the Under Secretary of Transportation chose to meet the government's obligations under ATSA by assuming a contract that existed between an airline and a private screening contractor, section 101(g)(2) required the "payment of adequate compensation to parties to the contract."

Though ATSA nowhere expressly forbade Huntleigh or other private contractors from continuing to provide airport screening functions, it effectively eliminated the market for such services, given that it concentrated all screening functions in the federal government. Thus, although no airline other than American Airlines specifically sent a

termination notice to Huntleigh, Huntleigh and the other airlines with which it had contracts treated their contracts as terminated upon the government's full assumption of screening functions at airports, resulting in a considerable loss of business to Huntleigh.

III.

As noted above, Huntleigh filed suit in the Court of Federal Claims under the Tucker Act, alleging that ATSA's transfer of responsibility for security screening from airlines to the federal government resulted in a taking of its property without just compensation in violation of the Fifth Amendment. Huntleigh also alleged that it was entitled to compensation under section 101(g)(2) of ATSA. Following a trial, the Court of Federal Claims rendered a decision rejecting both of Huntleigh's claims and ordering the dismissal of Huntleigh's complaint. See generally Huntleigh.

The Court of Federal Claims began by addressing Huntleigh's takings claim. Huntleigh alleged the taking of several property interests. Huntleigh contended first that the government had appropriated its contracts with the airlines. Though Huntleigh conceded that the government had not actually substituted itself as a party to any of its contracts, it argued that the government had effectively appropriated the contracts insofar as it had taken upon itself the responsibility of performing precisely the functions formerly performed by Huntleigh. Id. at 645. Huntleigh relied upon Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), to establish entitlement to compensation for the taking of its contractual rights. Huntleigh, 75 Fed. Cl. at 646. Second, Huntleigh argued that the government had effected a taking by destroying the going concern value and goodwill associated with its security screening business. Id. In advancing this argument, Huntleigh relied upon Kimball Laundry Co. v. United States, 338 U.S. 1, 69

S. Ct. 1434 (1949), to establish the compensability of going concern value and goodwill,[1] see id. at 10–11. Huntleigh, 75 Fed. Cl. at 646.

Turning first to the alleged taking of Huntleigh's security screening contracts, the Court of Federal Claims determined that the contracts were not taken by the government. Id. at 645–46. The court noted that all the contracts between Huntleigh and the airlines contained termination clauses, generally requiring from 30–90 days advance notice, thus permitting either party to terminate a contract. Id. at 646. The court further noted that, except for American Airlines, none of the airlines with which Huntleigh had contracts had terminated their contracts. Id. Rather, following the enactment of ATSA, they had allowed the contracts to expire pursuant to their terms. Id. Under these circumstances, the court reasoned, Huntleigh could not properly contend that its contracts were taken by the government. Id. The court further reasoned that, despite the fact that ATSA was the reason for the expiration of Huntleigh's contracts, the government could not be deemed to have committed a taking of Huntleigh's property because ATSA did not regulate Huntleigh. Id. Rather, by eliminating any screening obligations the airlines formerly possessed and transferring those obligations to the federal government, the statute embodied regulatory action with respect to the airlines. Id. Citing Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S. Ct. 437 (1923), and Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005) ("Air Pegasus II"), the court determined that governmental action

---

[1] Kimball Laundry describes "going-concern value" as the inertia associated with the clientele of any established business, as a result of which at least a certain percentage of the customers of a business can likely be expected to continue to patronize the business so long as it remains solvent. 338 U.S. at 10–11. "Goodwill" consists of "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business." Black's Law Dictionary 715 (8th ed. 2004).

directed at third parties had frustrated Huntleigh's expectations under its contracts, but that this circumstance did not provide the basis for a cognizable takings claim. Huntleigh, 75 Fed. Cl. at 646.

The Court of Federal Claims also rejected Huntleigh's claim for compensation based upon the alleged taking of going concern value and goodwill. The court reasoned that going concern value and goodwill could not be deemed to have been taken when, as in the case before it, there had not been a taking of the underlying business with which the going concern value and goodwill were associated. Id. Since the government did not appropriate Huntleigh's business, but rather simply assumed many of the same functions Huntleigh had formerly performed, Huntleigh was unable to allege that the government actually took its business and therefore could not allege a taking of going concern value and goodwill. Id.

Having disposed of Huntleigh's takings claim, the Court of Federal Claims turned to Huntleigh's second claim: that it was entitled to compensation under section 101(g)(2) of ATSA. In advancing this claim, Huntleigh acknowledged that the government had not actually stepped into its shoes under the various security screening contracts with the airlines, so as to be deemed to have assumed "the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports," as contemplated by section 101(g)(2). Id. at 648. Rather, Huntleigh argued that the statute did not require a literal assumption of the contracts. Id. According to Huntleigh, the statute mandated compensation if, as in Huntleigh's case, the government assumed the responsibilities formerly borne by a private contractor. Id.

The Court of Federal Claims rejected Huntleigh's argument, concluding that section 101(g)(2) of ATSA did not provide authority for awarding Huntleigh compensation for its lost business. Id. at 648–49. In reaching that conclusion, the court relied primarily upon a textual comparison between sections 101(g)(1) and 101(g)(2) of the statute. As seen, section 101(g)(1) provided that the government "shall" assume all screening functions at national airports. Id. at 647 (emphasis added). By contrast, section 101(g)(2) provided that the government "may" effect this obligation by substituting itself as a party into contracts that formerly existed between the airlines and private screening contractors. Id. (emphasis added). Were Huntleigh's view of ATSA correct, the Court of Federal Claims reasoned, the statute, in section 101(g)(1), would have required the government to assume screening functions and then, in section 102(g)(2), would have provided that compensation be paid to former private screeners upon the assumption of such functions. The statute's use of the permissive word "may" in section 101(g)(2), however, conveyed to the court that Congress did not intend for section 101(g)(2) to set forth the sole means by which the government could assume screening responsibilities under ATSA. Id. at 648. Thus, the court determined that the requirements of section 101(g)(2) only applied when the government actually assumed a contract between private parties, rather than when the government undertook to perform functions formerly performed by one of the parties. Id. at 648–49. Since Huntleigh conceded that the government had not actually assumed any of its security screening contracts, the court determined that section 101(g)(2) did not require compensation. Id. at 649. Based upon its rulings, the Court of Federal Claims entered

judgment in favor of the United States and dismissed Huntleigh's complaint. Id. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

On appeal, Huntleigh argues that the Court of Federal Claims erred in holding that the enactment of ATSA did not result in the taking of its security screening contracts, going concern value, and goodwill. Huntleigh also argues that the court erred in holding that it was not entitled to compensation under section 101(g)(2) of ATSA on account of what it alleges was the government's de facto assumption of its security screening contracts. We address these contentions in turn.

I.

The issue of whether a taking has occurred is a question of law based on factual underpinnings. Stearns Co. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005); Maritrans, Inc. v. United States, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003); Washoe County v. United States, 319 F.3d 1320, 1325 (Fed. Cir. 2003). As noted above, in this case, the pertinent facts are not in dispute. Consequently, our consideration of Huntleigh's takings claim reduces to a question of law. We review de novo a ruling by the Court of Federal Claims on a question of law. Columbia Gas Sys., Inc. v. United States, 70 F.3d 1244, 1246 (Fed. Cir. 1995).

The Takings Clause of the Fifth Amendment of the United States Constitution states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The purpose of the Takings Clause is to prevent "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Penn Cent. Transp.

Co. v. City of N.Y., 438 U.S. 104, 123, 98 S. Ct. 2646, 2659 (1978). We have developed a two-part test for determining whether "fairness and justice" require compensation for burdens imposed by a particular governmental action.

First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004); see also Maritrans, 342 F.3d at 1351. That is because "only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001). The protections of the Takings Clause apply to real property, see Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 2895 (1992), personal property, see Andrus v. Allard, 444 U.S. 51, 65, 100 S. Ct. 318, 327 (1979), and intangible property, see Ruckelhaus v. Monsanto Co., 467 U.S. 986, 1003–04, 104 S. Ct. 2862, 2873 (1984). In this case, it is undisputed that the property interests Huntleigh alleges were taken are, for purposes of the Fifth Amendment, cognizable property interests.

Second, "after having identified a valid property interest, the court must determine whether the government action at issue amounted to a compensable taking of that property interest." Am. Pelagic, 379 F.3d at 1372; see also Maritrans, 342 F.3d at 1351. A compensable taking can occur not only through the government's physical invasion or appropriation of private property, see Lucas, 505 U.S. at 1014–15; Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427, 102 S. Ct. 3164, 3171 (1982),

but also by government regulations that unduly burden private property interests, see Pa. Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922).[2]

II.

A.

Huntleigh argues that the Court of Federal Claims erred in holding that ATSA did not effect a taking of its security screening contracts and the going concern value and goodwill associated with its security screening business. Huntleigh contends that its business relationships were not merely "frustrated." It argues that ATSA, by establishing the federal government as the only party allowed to perform security screening at national airports, specifically illegalized the subject matter of its contracts with the airlines. Huntleigh distinguishes both Omnia and Air Pegasus II on the ground that the statute at issue in this case was far more direct in terms of its impact on Huntleigh than the governmental actions in Omnia and Air Pegasus II were on the plaintiffs in those cases. Omnia and Air Pegasus II, Huntleigh argues, involved governmental regulation applicable to one party that resulted in a loss to a third party.

---

[2] Regulatory takings are further subdivided into categorical and non-categorical takings. A categorical taking occurs when "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition." Rith Energy, Inc. v. United States, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (citation omitted); see also Am. Pelagic, 379 F.3d at 1372. Conversely, a non-categorical taking is a taking "that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use." Rith Energy, 247 F.3d at 1362 (citation omitted). Determining whether a non-categorical taking occurred involves the fact-based inquiry stated in Penn Central, under which a court considers (1) the character of the governmental action, (2) the economic impact of the action on the claimant, and (3) the effects of the governmental action on the reasonable investment-backed expectations of the claimant. Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538–39, 125 S. Ct. 2074, 2081–82 (2005); Am. Pelagic, 379 F.3d at 1372; Maritrans, 342 F.3d at 1351; Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002); Rith Energy, 247 F.3d at 1362.

Huntleigh asserts that ATSA, by contrast, applied directly to the contracts between the airlines and Huntleigh, by illegalizing their subject matter. Huntleigh urges that Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S. Ct. 622 (1903), NL Industries, Inc. v. United States, 839 F.2d 1578 (Fed. Cir. 1998), and Cienega Gardens, compel the conclusion that ATSA did effect a taking of its property. Finally, Huntleigh claims that the Court of Federal Claims erred in its application of Kimball Laundry to the alleged taking of the going concern value and goodwill associated with its security screening business.

The government responds by asserting that Omnia and Air Pegasus II control the outcome of this case. The government notes that Congress created the airlines' obligation to screen passengers and baggage with the enactment of the Air Transportation Security Act and then eliminated that obligation with the enactment of ATSA, mandating that the government assume the screening obligations formerly borne by the airlines. Thus, the government posits, the statutory mandate focused upon airlines, not upon private contractors, such as Huntleigh. The government states that, although ATSA undoubtedly diminished the demand for Huntleigh's services and negatively impacted its business, such effects were indirect consequences of ATSA's regulating the airlines and thereby comprised mere "frustration" of Huntleigh's business interests.

B.

The Court of Federal Claims did not err in holding that Huntleigh had failed to establish a Fifth Amendment taking of its property. Huntleigh has conceded that the government did not actually assume its contracts. Instead, the government engaged in

the functions formerly performed by Huntleigh under the contracts. Thus, any takings claim cannot be predicated upon a taking of the contracts. Rather, the argument must be that ATSA rendered the contracts and the going concern value and goodwill associated with Huntleigh's security screening business worthless. Such a claim cannot stand, however, in the face of Omnia and Air Pegasus II.

In Omnia, the plaintiff Omnia Commercial Co. ("Omnia") owned a contract entitling it to purchase a large quantity of steel plate from the Allegheny Steel Company ("Allegheny") for an amount below the current market price. 261 U.S. at 507. Before any deliveries were made under the contract, however, the government, pursuant to statute and in order to meet needs caused by World War I, requisitioned Allegheny's entire production of steel plate for 1918 and directed it not to comply with its contract with Omnia. Id. In due course, Omnia filed suit in the Court of Claims, alleging that the government's actions with respect to Allegheny and Allegheny's contract with Omnia had effected a taking of Omnia's right to priority to the steel plate Allegheny expected to produce. Omnia alleged that the government had therefore appropriated "for public use [Omnia's] property in the contract," causing Omnia to suffer a large monetary loss as a consequence of its losing a lucrative contract. Id. at 507–08. After the Court of Claims dismissed Omnia's complaint, Omnia appealed to the Supreme Court. The Supreme Court affirmed the decision of the Court of Claims. Id. at 514. The Court started from the premise that Omnia's contract with Allegheny was "property within the meaning of the Fifth Amendment" and that if the contract was "taken for public use the government would be liable." Id. at 508. The Court held, however, that Omnia's contract with Allegheny had not been taken:

> In exercising the power to requisition, the government dealt only with the steel company, which company thereupon became liable to deliver its product to the government, by virtue of the statute and in response to the [requisition] order. As a result of this lawful governmental action the performance of the contract was rendered impossible. It was not appropriated, but ended.

Id. at 511.

In Air Pegasus II, the plaintiff, Air Pegasus of D.C., Inc. ("Air Pegasus") operated a heliport at property it leased in Washington, D.C. 424 F.3d at 1209. Following the terrorist attacks of September 11th, the Federal Aviation Administration ("FAA") banned all commercial air travel within twenty-five nautical miles of Washington, D.C., except at a few select locations, such as Ronald Reagan Washington National Airport. Id. As a consequence, Air Pegasus was effectively unable to continue the operation of its business. It thus abandoned its lease and ceased operations at the heliport. Id. at 1210. Subsequently, Air Pegasus brought suit in the Court of Federal claims alleging that the FAA's flight ban had resulted in the regulatory taking of its heliport business. Id. Eventually, the court granted summary judgment in favor of the government and dismissed Air Pegasus's complaint. Air Pegasus of D.C., Inc. v. United States, 60 Fed. Cl. 448, 459 (2004). The court did so after concluding that "although the FAA's regulatory activity may have had an adverse impact on [Air Pegasus's] heliport business," there was not a taking of any cognizable property interest of Air Pegasus. Id.

On appeal, we affirmed the decision of the Court of Federal Claims. Air Pegasus II, 424 F.3d at 1219. Noting that Air Pegasus did not own or operate any helicopters itself, we pointed out that Air Pegasus's economic injury was "not the result of the government taking Air Pegasus's property, but . . . the more attenuated result of the government's purported taking of other people's property. This circumstance does not

form the basis for a viable takings claim." Id. at 1215. After comparing Air Pegasus's takings claim to that of the plaintiff in Omnia, we stated:

> Air Pegasus, which did not itself own or operate any helicopters, does not allege that the FAA's restrictions regulated its operations under the lease. Instead, Air Pegasus basically alleges that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations at the South Capitol Street heliport. Therefore, like the appellant in Omnia, Air Pegasus, while no doubt injured by reason of the government's actions, has not alleged a taking of private property under the Fifth Amendment.

Id. at 1216 (emphasis in original).

As did the plaintiffs in Omnia and Air Pegasus II, Huntleigh alleges that it suffered a loss of business as a result of the government's regulation of a third party. The federal government imposed screening obligations upon commercial airlines in 1974. With the enactment of ATSA in 2001, however, Congress drastically reduced the demand for Huntleigh's services. ATSA did not, however, regulate Huntleigh directly. Rather, it modified governmental regulation of the airlines, which resulted in adverse economic consequences for Huntleigh. Thus, any losses that Huntleigh suffered were indirect, arising only as a consequence of ATSA's elimination of the airlines' security screening obligations. In other words, ATSA had the effect of "frustrating" Huntleigh's business expectations, which does not form the basis of a cognizable takings claim. See id.; Omnia, 261 U.S. at 510.

As noted, Huntleigh argues that Omnia is distinguishable because, in that case, the government's action was directed at a third party, Allegheny, resulting in only an indirect impact on Omnia. However, urges Huntleigh, in this case ATSA was directed squarely at providers of airport security screening functions, such as Huntleigh, by nationalizing their operations. Similarly, Huntleigh maintains that Air Pegasus II is

distinguishable because any effect that the FAA's flight ban had on Air Pegasus, which owned neither the heliport nor the helicopters, was indirect, as it arose from governmental regulation of third parties. We are not persuaded by Huntleigh's efforts to distinguish Omnia and Air Pegasus II. As far as Omnia is concerned, the facts of that case were more favorable to the plaintiff, Omnia, than the facts of this case are to Huntleigh. As seen, in Omnia, the government's actions were directed squarely at the contractual relationship that existed between Allegheny and Omnia. The government requisitioned the steel plate that was meant for Omnia and directed Allegheny not to comply with its contract with Omnia. Omnia, 261 U.S. at 507. Yet, the Court held, there was no taking because, "[a]s a result of this lawful governmental action the performance of the contract was rendered impossible. It was not appropriated, but ended." Id. at 511. In this case, the purpose of ATSA was not to take action with respect to any security screening contract to which Huntleigh was a party. Rather, its purpose was to transfer security screening responsibilities from the airlines to the federal government. This action, directed at the airlines, frustrated Huntleigh's business interests. Air Pegasus II, which cited Omnia, is indistinguishable from this case because in both Air Pegasus II and this case the party alleging a taking, rather than having its own property taken, saw its business interests frustrated by governmental regulation of third parties (the FAA's flight ban in Air Pegasus II, and ATSA's transfer of screening responsibility here).

Finally, Huntleigh's reliance upon Monongahela, Cienega Gardens, and NL Industries is misplaced. None of these cases speaks to the situation presented here.

In Monongahela, a private company spent considerable sums of money on the improvement of the Monongahela River by means of locks and dams. 148 U.S. at 324. The United States government later condemned and appropriated the locks and dams. Id. In the condemnation proceeding, the government conceded liability for the reasonable value of the appropriated property but disputed the amount of compensation due. Id. at 314. After reaffirming that takings law clearly established that the United States was liable for the appropriation of the property, id. at 324, the Court devoted the bulk of its opinion to determining the proper measure of damages, id. at 324–45. The facts of Monongahela clearly differ from the facts of the present case in that the government has not appropriated for its own use any property owned by Huntleigh. Rather, the government has merely relieved commercial airlines of a duty they formerly possessed, which action indirectly resulted in the elimination of the market for Huntleigh's business.

In Cienega Gardens, various property owners entered into regulatory agreements with the Department of Housing and Urban Development ("HUD"). 331 F.3d at 1325. The agreements provided that the property owners could prepay their forty-year mortgages after twenty years. Id. As the twenty year prepayment eligibility date approached, however, Congress determined that permitting prepayment would undermine efforts to provide low-cost housing. As a result, Congress temporarily suspended, and then later eliminated, the prepayment provisions through the enactment of statutes that required HUD approval for prepayment. Id. at 1326. We determined that Congress's enactment of such statutes effected a taking that entitled certain of the property owners to just compensation. Id. at 1353. The facts of Cienega Gardens,

however, differ significantly from those of this case. Here, Huntleigh was not a party to any agreement or contract with the federal government that was later unilaterally altered by statute. Rather, Huntleigh's contracts with various commercial airlines were frustrated by a shift in the government's regulation of the airlines. Cienega Gardens therefore does not support Huntleigh's takings claim.

Neither does NL Industries support Huntleigh. In that case, NL Industries ("NL") invested considerable resources in developing a fleet of vehicles to transport spent nuclear fuel rods for reprocessing. NL Indus., 839 F.2d at 1579. NL's investment became valueless, however, when the President determined not to allow the plant that was to provide the spent fuel rods to operate. Id. Holding that NL had failed to establish a compensable taking, we stated: "The trial court, . . . rightly, we think, thought that Omnia . . . was, by itself, authority enough to support its holding that frustration of a business by loss of a customer was not a taking." Id. We believe that the facts of NL Industries are materially indistinguishable from the facts of the present case: a governmental action (ATSA) directed at a third party (airlines) resulting in the loss of business to a claimant (Huntleigh) who alleges a compensable taking. We concluded in NL Industries that Omnia foreclosed the existence of a compensable taking, and we conclude the same with respect to Huntleigh's claim.[3]

---

[3] Our reasoning applies to all property interests possessed by Huntleigh, including its contracts and any going concern value or goodwill associated with its security screening business. Thus, the authority of Kimball Laundry does not alter our holding. Though going concern value and goodwill are indeed compensable property interests, Kimball Laundry, 338 U.S. at 11, those property interests, like Huntleigh's contracts, were merely "frustrated" by the government's enactment of ATSA. They were not taken. Moreover, going concern value is a property interest that has been held to be compensable in the context of a temporary, but not a permanent, taking. See id. at

III.

A.

We turn next to Huntleigh's claim under section 101(g)(2) of ATSA. As already seen, section 101(g)(2) provided that, if the Under Secretary of Transportation for Security chose to meet the government's obligations under ATSA by assuming a contract to provide security screening services, the government was required to pay adequate compensation to parties to the contract.

In alleging entitlement to compensation under section 101(g)(2), Huntleigh, as it did in the Court of Federal Claims, argues first that the clause "assume the rights and responsibilities of an air carrier . . . contract," describing the conditions under which compensation is required, suggests that Congress intended that compensation be provided even when, as in this case, contracts were not actually assumed. According to Huntleigh, had Congress intended that compensation be provided only when contracts were actually assumed, it would have used the word "contracts" rather than the phrase "rights and responsibilities of . . . contract[s]." Noting the canon of statutory interpretation that the words of a statute are not to be rendered superfluous if such a construction can be avoided, Walther v. Sec'y of Health & Human Servs., 485 F.3d 1146, 1150 (Fed. Cir. 2007) ("'[A] statute should be interpreted so as not to render one part inoperative.'" (quoting Colautti v. Franklin, 439 U.S. 379, 392, 99 S. Ct. 675, 684 (1979))), Huntleigh urges that section 101(g)(2) should be read to require compensation any time the government assumed the functions formerly performed by private parties under security screening contracts. Second, Huntleigh argues that, in any event, the

---

15; Cooper v. United States, 827 F.2d 762, 763 (Fed. Cir. 1987); Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 903 (Fed. Cir. 1986).

government, for all intents and purposes, did effectively assume Huntleigh's contracts even if it did not literally insert itself as a party into any existing contract. In support of this argument, Huntleigh cites various statements by government officials speaking of "assuming" air carrier contracts.

The government responds to Huntleigh's arguments by reiterating the Court of Federal Claims' distinction between sections 101(g)(1) and 101(g)(2) of ATSA. The government argues that, in contrast to section 101(g)(1), section 101(g)(2), upon which Huntleigh relies, imparted discretion to the Under Secretary of Transportation and created no enforceable rights. The government notes that section 101(g)(2) provided that, "[a]s of the date specified in paragraph (1)," i.e., February 19, 2002, "the Under Secretary may assume the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports in the United States described in [49 U.S.C. §] 44903(c), subject to payment of adequate compensation to the parties to the contract, if any" (emphases added). The government takes the position that the purpose of section 101(g)(2) was to authorize, but not require, TSA to assume existing screening contracts, in order to meet the three-month deadline established by section 101(g)(1). In the event that TSA did assume an existing contract, the obligation to pay compensation arose. The government argues that Huntleigh's reading of the statute creates an illogical result. According to the government, that is because if, under the statute, the government was required to compensate Huntleigh even when it did not actually assume a contract—which is what Huntleigh urges—it would mean that section 101(g)(2) was essentially superfluous. The reason is that section 101(g)(1) specifically mandated that the government assume all

screening functions at national airports. Section 101(g)(2) then provided that one way the government could perform that obligation was to assume the "rights and responsibilities" of contracts between airlines and screening service providers. If assuming "rights and responsibilities" is read to mean solely that the government would provide screening services at national airports, as Huntleigh argues, then section 101(g)(2) served merely to reemphasize the obligation that section 101(g)(1) had already created. Under these circumstances, the provision would be redundant, which would be an illogical result. Accordingly, like the Court of Federal Claims, the government concludes that the only reading of the statute that preserves the distinction in language between the two sub-sections is that in which the government was required to pay compensation only when it actually assumed the contracts of private contractors. The government emphasizes that Huntleigh concedes that there was no such assumption of any of Huntleigh's security screening contracts.

B.

The Court of Federal Claims did not err in holding that Huntleigh was not entitled to compensation under ATSA section 101(g)(2). The language of section 101(g)(2) is clear. The obligation to pay compensation only arose if TSA "assume[d] the rights and responsibilities of an air carrier or foreign air carrier contract." The way one assumes the "rights and responsibilities" of a contract is to step into the shoes of the parties to the contract. In other words, section 101(g)(2) required compensation only when TSA actually stepped into the shoes of a party providing security screening services to an airline under a contract. Huntleigh concedes that TSA never did that in the case of any of its contracts. In addition, we agree with the government that Huntleigh's reading of

the statute—under which compensation was due when TSA took over security at airports but did not step into Huntleigh's shoes under any of its contracts—renders section 101(g)(2) redundant. The reading of a statute that produces such a result is disfavored. See Clark v. United States, 322 F.3d 1358, 1365 (Fed. Cir. 2003); see also United States v. Alaska, 521 U.S. 1, 59, 117 S. Ct. 1888, 1918 (1997). In sum, section 101(g)(2) did not require that the government compensate Huntleigh for its assumption of screening functions at national airports.

We also are not persuaded by Huntleigh's alternative argument that the government effectively assumed Huntleigh's contracts. Huntleigh notes that internal TSA memoranda speak of "assuming" screening contracts and that the Under Secretary of Transportation himself referred to "assuming" contracts in testimony before Congress. However, such isolated instances, wherein agency representatives may have inadvertently used the term "assume" without contemplating its legal significance, do not give us a reason to adopt a reading of ATSA that is inconsistent with its proper construction.

## CONCLUSION

Because ATSA did not effect the taking of Huntleigh's property, but merely frustrated its business interests, and because Huntleigh is not entitled to compensation under section 101(g)(2) of ATSA, we affirm the decision of the Court of Federal Claims.

AFFIRMED

COSTS

Each party shall bear its own costs.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

By: [signature] Date: 7/7/08